# Exhibit A

First Amended Complaint with redlines

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RICHARD SCHAFER, ~~JAMES BRIETFELLER,~~ and WILLIAM UNDERWOOD, on behalf of themselves and all others similarly situated, | |
| | Case No. 6:19-cv-6907 (FPG) |
| Plaintiffs, | |
| v. | CLASS ACTION ~~COMPLAINT~~ |
| DIRECT ENERGY SERVICES, LLC, a Delaware Limited Liability Company, | JURY TRIAL DEMANDED |
| Defendant. | |

**FIRST AMENDED CLASS ACTION COMPLAINT**

Pursuant to Federal Rule of Civil Procedure 15(a)(1)(A), Plaintiffs Richard Schafer and William Underwood, ~~Richard Schafer, and James Brietfeller~~ hereby file their First Amended Complaint as a matter of course. Plaintiffs bring this class action in their individual capacities, and on behalf of classes of persons defined below, against Direct Energy Services, LLC[1] ("Defendant" or "DES"), and ~~hereby~~ allege the following with knowledge as to their own acts, and upon information and belief as to all other acts:

**INTRODUCTION**

1.      For decades, the prices paid by consumers for their electricity and natural gas were strictly regulated. However, in 1996, the New York legislature opened New York's energy market to "competition," whereby consumers could choose from a variety of companies selling residential energy in addition to traditional utilities like Consolidated Edison. Taking advantage of the deregulation in New York and other states, companies like Defendant (called energy

---

[1] As alleged herein, DES includes the brand names "Direct Energy," "Energetix," and "NYSEG Solutions" that were purchased and incorporated into DES during times relevant to this Complaint.

1

services companies, or "ESCOs") jumped into the market and began to grow rapidly.

2.      Defendant has fueled its rapid expansion not by providing a good service for a fair price, but rather by developing and using deceptive and unlawful marketing and sales practices that often result in its energy customers paying far more than they would have paid had they stayed with their traditional energy suppliers. And regardless of any savings, or lack thereof, DES fails to conspicuously disclose its variable rate pricing structure, in violation of New York law. DES advertises low, temporary fixed rates, and then buries the long-term variable rate pricing structure in the fine print of a dense contract without any highlighting or call to attention.

3.      These unscrupulous practices violate New York's Energy Services Consumers Bill of Rights, N.Y. Gen. Bus. Law § 349-d (the "ESCO Bill of Rights" or "Section 349-d"), which mandates that all ESCO contracts and all ESCO marketing materials clearly and conspicuously identify all variable charges included as part of an energy plan.

4.      In addition, and in the alternative, DES unjustly retained payments obtained from customers pursuant to purported contracts that were void as against public policy pursuant to Section 349-d.

5.      A class action is the only way Defendant's customers can remedy DES's ongoing wrongdoing. The loss suffered by each DES customer is small compared to the cost of trying to challenge DES's unlawful practices. It is thus untenable for each individual consumer to bring his or her own lawsuit. In addition, many customers may not even realize they are victims of DES's deceptive conduct.

6.      Plaintiffs bring this action on behalf of themselves and Classes of DES customers similarly harmed and described below. Plaintiffs seek, *inter alia*, actual damages, statutory damages, treble damages up to ten thousand dollars for each class member, declaratory and injunctive relief, restitution, disgorgement, and attorneys' fees and costs.

2

7.      With this class action, Plaintiffs and the Classes seek to ensure that DES engages in forthright and non-deceptive business practices. Plaintiffs therefore seek equitable relief in addition to monetary damages. Plaintiffs ask that the Court declare Defendant's business practices impermissible, and enjoin Defendant from continuing its dishonest practices.

**PARTIES**

8.      **Plaintiff Richard Schafer** is a citizen of New York residing in Rochester, New York.

9.      ~~**Plaintiff James Breitfeller** is a citizen of New York residing in Rochester, New York.~~

~~10.~~9.   **Plaintiff William Underwood** is a citizen of New York residing in Endicott, New York.

~~11.~~10.   **Defendant Direct Energy Services, LLC** is a Delaware limited liability company with its principal place of business at 12 Greenway Plaza Suite 250, Houston, Texas.

~~12.~~11.   DES was founded in Toronto, Ontario in 1986 and has become one of the largest ESCOs in the United States, now serving nearly 5 million electric and natural gas customers across its North American operations. DES sells electricity or natural gas in New York, eighteen other states, and the District of Columbia.

~~13.~~12.   DES is a wholly-owned subsidiary of Centrica plc, a British multinational utility company headquartered in Windsor, Berkshire, United Kingdom.

~~14.~~13.   On information and belief, at all times relevant to this Complaint, the DES brands "Direct Energy," "Energetix," and "NYSEG Solutions" were not separate or distinct entities, but rather mere brand names of DES.

~~15.~~14.   DES acquired Energetix and NYSEG Solutions from a company called Iberdrola

in 2012.[2] According to the New York Secretary of State, by the end of 2013, both Energetix and NYSEG Solutions were "merged out" and "inactive," meaning they both ceased to be their own entities and were mere alter egos of DES.

16.15.  Even if Energetix or NYSEG Solutions were separate companies for some portion of the Class Periods, both Energetix and NYSEG Solutions would have been wholly owned subsidiaries of DES. As of today, indisputably, Energetix and NYSEG Solutions both cease to exist as companies or brand names, and DES is responsible for all liabilities of Energetix and NYSEG Solutions.

## JURISDICTION AND VENUE

### A.    Subject Matter Jurisdiction

17.16.  This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332 (the "Class Action Fairness Act").

18.17.  This action meets the prerequisites of the Class Action Fairness Act, because the claims of the Classes defined below exceed the sum or value of $5,000,000, the Classes have more than 100 members, and diversity of citizenship exists between at least one member of the Classes and Defendant.

### B.    Personal Jurisdiction

19.18.  This Court has specific personal jurisdiction over Defendant DES because it maintains sufficient minimum contacts in this jurisdiction through the advertising, marketing, and sale of electricity and natural gas to New York consumers.

---

[2]      https://www.prnewswire.com/news-releases/direct-energy-to-acquire-energetix-and-nyseg-solutions-for-1102-million-162172025.html.

### C.      Venue

~~20.~~19.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2). Substantial

acts in furtherance of the alleged improper conduct occurred within this District and Plaintiff~~s~~

Schafer ~~and Breitfeller~~ reside~~s~~ within this District.

~~21.~~20.   Venue is also proper in this District pursuant to 28 U.S.C. § 1391(d) because

Defendant's contacts within this District would be sufficient to subject it to personal jurisdiction

if this District were a separate state: DES maintains sufficient minimum contacts in this District

through the advertising, marketing, and sale of electricity and natural gas to consumers that

reside in this District.

### FACTUAL ALLEGATIONS

### A.      New York's Energy Markets

~~22.~~21.   In 1996, New York deregulated the sale of retail gas and electricity, allowing

New York consumers to purchase natural gas and electricity through third-party suppliers while

continuing to receive delivery of the energy from their existing utilities. More than a million

New York consumers have switched to an ESCO since New York opened its retail gas and

electric markets to competition.

~~23.~~22.   ESCOs are subject to minimal regulation by New York's utility regulator, the

New York State Public Service Commission ("NYPSC"). ESCOs like DES do not have to file

their rates with NYPSC, or the method by which their rates are set.

~~24.~~23.   Unfortunately for New York consumers, the introduction of ESCOs to New York

energy markets has likely cost consumers billions of dollars, according to the NYPSC.[3] For just

the 30-month period of January 2014 to June 2016, New York consumers paid $820 million

---

[3]      https://www.pressconnects.com/story/news/2018/02/09/risk-ny-groundbreaking-program-allowing-customers-select-electric-gas-suppliers/302146002/

more for gas and electricity service than they would have to the regulated utilities.[4]

~~25.~~24.   For example, in Rochester (zip code 14618), the average Direct Energy variable rate monthly bill for natural gas supply was roughly three times the monthly bill for customers of the regulated utility serving Rochester, Rochester Gas & Electric ("RGE") from 2017 to 2019:



Actual Weighted Average Historic Price for Gas Supply* as Reported by the Supplier in 14618 (RGE)



~~26.~~25.   It's not just ESCOs' unprecedented overcharging that causes problems. From 2014 through 2016, the NYPSC and the New York Attorney General's office fielded 14,000 complaints about ESCO marketing practices.[5] ESCOs are an incredible drag on both the pocketbooks of New York residents and the resources of New York's government agencies— pilfering billions of dollars in the process.

~~27.~~26.   Most of this is largely invisible to consumers, though, because consumers rarely interact with an ESCO other than to sign up. ESCO customers, like Plaintiffs, never get bills

---

[4] *Id.*

[5] *Id.*

from Direct Energy or any ESCO.

28.27.  If a customer switches to an ESCO, the customer will have his or her energy "supplied" by the ESCO, but still "delivered" by their existing utility (in the Syracuse area, typically National Grid). The customer's existing utility continues to bill the customer for both the energy supply and delivery costs. The only difference to the customer is which company sets the price for the customer's energy supply.

29.28.  Ultimately, to the customer, everything is handled by the regulated utility, just as before switching to an ESCO. If service is needed, that is handled by the regulated utility. If customers have billing questions, they must call the regulated utility. The result is that many consumers eventually forget the ESCO even exists, which is exactly what the ESCOs want. The ESCOs get to keep overcharging while the regulated utilities and New York government deal with the complaints.

30.29.  After a customer switches to an ESCO, the customer's energy supply charge—based either on a customer's kilowatt-hour ("kWh") (for electricity) or therm[6] (for gas) usage—is calculated using the supply rate charged by the ESCO and not the regulated rate charged by customer's former utility. The supply rate is itemized on the customer's bill as the number of kWh or therms multiplied by the rate. For example, if a customer uses 300 100 therms kWh at a rate of 1140.0¢ per kWhtherm, the customer will be billed $3340.00 (300 100 x $.1140) for his or her energy supply.

31.30.  Beginning in 2009, the New York Legislature passed crucial safeguards to protect New York's residential energy consumers from deceptive and predatory practices by ESCOs: the ESCO Bill of Rights. Among the consumer protections in the ESCO Bill of Rights, Section 349-

---

[6] Natural gas is also sometimes measured in hundred-cubic-feet ("Ccf") or thousand-cubic-feet ("Mcf"). A Ccf is approximately 1.036 therms, and a Mcf is approximately 10.36 therms.

d(7) requires that "[i]n every contract for energy services and in all marketing materials provided to prospective purchasers of such contracts, all variable charges shall be *clearly and conspicuously* identified" (emphasis added). Section 349-d(8) further provides that "any contract for energy services which does not comply with the applicable provisions of this section shall be void and unenforceable as contrary to public policy."

32.31.  The ESCO Bill of Rights went into effect on January 11, 2011.

**B.    DES's Misleading Conduct**

33.32.  DES purportedly offers its customers fixed rate ~~electricity and~~ gas supply plans, but it fails to adequately inform consumers who switch that once their low "teaser" or "fixed" rate expires their gas supply ~~energy~~ rates will rise—oftentimes doubling or even tripling the original teaser rate.

34.33.  Once the initial low, fixed rates for ~~electricity or~~ natural gas expire, DES customers' plans automatically switch to a month-to-month variable rate plan. These variable ~~energy~~ rates can rise at the whims of DES and have no upper limit.

35.34.  DES misleadingly fails to clearly and conspicuously disclose that every single one of its supposedly fixed rate ~~electricity and~~ gas plans convert to variable rate plans—by default unless a customer takes action—after the~~ir~~ initial term concludes.

36.35.  Once a customer is on a month-to-month variable rate plan, DES can simply raise the customer's rate every month, and is under no further obligation to inform the customer of this fact. Nor is DES required to provide its customers with notice of their ability to (1) switch back to a fixed-rate plan by signing a new agreement, or (2) switch back to their regulated utility.

37.36.  On information and belief, DES frequently applies the "frog in boiling water" treatment to its ~~energy~~ customers on variable rate plans: it raises prices slowly enough that the customers do not realize that they are paying much more than they previously had under their

fixed rate plans—to say nothing of what they would have paid if they had simply remained with their regulated utility.

38.37.  The terms of a consumer's relationship with DES are memorialized in the New York Residential & Small Commercial Terms and Conditions (the "Terms").[7]

39.    The electricity Terms utterly fail to meet the requirement of Section 349-d(7) that variable energy rates be clearly and conspicuously disclosed in a contract for energy services. The electricity Terms provide the following disclosure regarding DES's variable rates:

After the Initial Term and during the Renewal Period, Direct Energy will charge you at a variable price per kWh based upon generally prevailing market prices for electricity in the LDU load zone for the applicable period, plus an adder, determined solely by Direct Energy in its discretion. Your variable price will include ancillary charges, cost of capacity, generation, line losses, New York City Utility Tax (when applicable), and other miscellaneous charges.

The reference to variable charges is buried without highlighting or other emphasis amid the electricity Terms' sea of confusing fine print (highlighting added):

---

[7] A t̶T̶rue cop̶y̶ies of the electricity and natural gas Terms and Conditions visible to consumers during DES's online sign-up process as of November 2019 are is attached hereto as Exhibit A.



Direct Energy Services, LLC • Toll-Free Phone: 1-866-348-4194
www.directenergy.com • csdirectenergy@directenergy.com

**NEW YORK RESIDENTIAL & SMALL COMMERCIAL TERMS AND CONDITIONS**
Electricity Supply Service
Direct Energy Services, LLC

**1. Terms of Service.** These Terms and Conditions together with the Customer Disclosure Statement (defined below), which is incorporated herein by reference, constitute the agreement ("Agreement") between you and Direct Energy Services, LLC ("Direct Energy"). "Customer Disclosure Statement" means, as applicable, either the section of the enrollment consent form/letter of authorization entitled 'Customer Disclosure Statement' or the Schedule A accompanying these Terms and Conditions entitled 'Customer Disclosure Statement – Schedule A to Terms and Conditions'.
**2. Agreement to Purchase Energy.** We will supply your retail electricity, as delivered to you by your Local Distribution Utility ("LDU"), subject to the terms and conditions of this Agreement.
**3. Agency.** You appoint us as your agent to provide retail electric service, including the electric transportation, transmission and related services appropriate to provide that service to you.
**4. Eligibility.** For electric service, you must (a) be eligible to receive service from your LDU and stay eligible for such service during the Term of this Agreement and (b) meet all eligibility requirements to enable Direct Energy to provide electric service. We can terminate this Agreement by giving you notice if you are not eligible.
**5. Term of Agreement.** The "Initial Term" of your service can be found on the Customer Disclosure Statement. The Initial Term will continue for the number of monthly billing cycles as indicated on the Customer Disclosure Statement. Thereafter, you will be notified in advance that this Agreement will automatically renew on a month-to-month basis at the same terms, unless Direct Energy sends you written notice of proposed changes to such terms in advance of the renewal date (each such renewal are collectively referred to as the "Renewal Term"). Any such written notice will be sent at least thirty (30) days and no more than sixty (60) days prior to the renewal date, apprising you of any proposed changes in the terms and conditions of this Agreement and of your right to renew, terminate or renegotiate this Agreement. If you wish to reject the renewal of this Agreement without incurring an early cancellation fee, if any, you will have

three (3) business days from the day you receive the first billing statement of your Renewal Term to cancel by calling us as detailed in Section 24. When receiving service on a month-to-month basis, you may provide written notice of termination or call us as detailed in Section 24 or call LDU to terminate the agreement. We may terminate this Agreement by providing thirty (30) days' written notice to you.
**6. Price: the Rate and Daily Fee.** During the Initial Term, your rate per kWh will be as set forth on the Customer Disclosure Statement. For a fixed or variable rate, your rate per kWh will be for electric generation service and New York City Utility tax (when applicable), and excludes other taxes and regulated charges from the utility, including but not limited to, delivery and distribution charges. You may also be charged a flat daily fee, which you will find in the Customer Disclosure Statement. Upon completion of the Initial Term, this Agreement will automatically renew on a month-to-month basis (the "Renewal Period") with no cancellation fee unless Direct Energy sends you advance written notice of a change. After the Initial Term and during the Renewal Period, Direct Energy will charge you at a variable price per kWh based upon generally prevailing market prices for electricity in the LDU load zone for the applicable period, plus an adder, determined solely by Direct Energy in its discretion. Your variable price will include ancillary charges, cost of capacity, generation, line losses, New York City Utility Tax (when applicable), and other miscellaneous charges. If you are a tax-exempt customer, you must provide us with an appropriate exemption certificate before we will waive any assessment and collection of taxes. The amount you pay may change for reason for allowed by law, including, without limitation: (a) a change in charges, or new charges imposed by your LDU, NYPSC or other government agency; or (b) determine that the service plan originally designated is incorrect.
**7. Renewable Energy Plan.** If you are purchasing our Renewable Energy Plan pursuant to this Agreement, you are agreeing to purchase from Direct Energy a product that is supported 100% by renewable energy credits ("RECs"), in an amount sufficient to match your annual consumption from your EDC. RECs are a tradeable, non-tangible energy commodity in the United States that represents proof that 1 megawatt-hour (MWh) of electricity was generated from an eligible renewable energy resource like biomass, hydro, solar or wind. Direct Energy will purchase and

NYTCRSCE - 082919

40.38.  The natural gas Terms utterly fail ~~similarly fail~~ to meet the requirement of Section 349-d(7) that variable energy rates be clearly and conspicuously identified in a contract for energy services. The natural gas Terms provide the following disclosure regarding DES's variable rates:

> After the Initial Term and during the Renewal Term, your rate per ccf/mcf/therm, as well as the daily customer charge, will both be variable, and will not change more than once each monthly billing cycle, unless we send advance written notice indicating otherwise. Each will change as we solely determine based on business & market conditions. Your rate per ccf/mcf/therm excludes: (a) fees, charges and other assessments imposed by your LDU, the New York Public Service Commission (including the New York Department of Public Service, the "NYPSC") or other governmental agency; and (b) federal, state and local taxes. These items are in addition to your per ccf/mcf/therm rate.

The reference to variable charges is buried without highlighting or other emphasis amid the

natural gas Terms' sea of confusing fine print (highlighting added):



41.39.  Even for those customers who read and understand the provisions of the Terms,

the Terms are still entirely unclear as to how a customer would determine what he or she would

pay under a variable plan: while the Terms mention "generally prevailing market prices for

electricity" or "market conditions" for natural gas, it offers no suggestion of where a consumer

might be able to see those prices before being billed. More important, DES can change the

variable rate based on an "adder, determined solely by Direct Energy in its discretion," or

"business  . . . conditions" "solely determine[d]" by DES. Therefore, a consumer truly has no

way to determine what his or her variable rate would be; DES states that it can charge whatever it wants. This is hardly the clear and conspicuous disclosure of variable charges mandated by the ESCO Consumers Bill of Rights.

42.40.  Through its conduct, DES has violated both the spirit and letter of Section 349-d, the law that is explicitly designed to protect energy consumers and allow them to make informed choices when deciding whether to switch to an ESCO.

43.41.  Defendant's conduct is ongoing. DES still offers fixed rate plans that revert automatically to variable rate plans after certain periods of time. As shown above in paragraphs 39 and 3840, DES's current Terms (as of November 21, 2019) still contain the unclear, inconspicuous variable rate language.

44.42.  On information and belief, at all times after the ESCO Bill of Rights went into effect in January of 2011, DES has consistently provided its customers with Terms that fail to comply with Section 349-d(7).

**C.      Plaintiff Schafer's Experience**

45.43.  Plaintiff Schafer began receiving gas service through the Energetix brand of DES in or about 2013.

46.44.  On information and belief, DES purportedly sent to Plaintiff Schafer enrollment notices, renewal notices, and Terms and Conditions for his DES natural gas supply service.

47.45.  On information and belief, the enrollment notices, renewal notices, and Terms and Conditions that DES sent to Schafer for his natural gas supply service did not clearly and conspicuously disclose that he would be charged a variable rate per term for his gas supply service.

48.46.  On information and belief, none of the materials DES provided to Plaintiff Schafer clearly or conspicuously identified all variable charges in accordance with § 349-d(7).

12

49.47.  As a result of DES's conduct, Plaintiff Schafer was injured because he paid more for DES's variable rate electricity and natural gas supply than he would have from an alternative energy supplier (in an amount to be proven at trial).

**D.      Plaintiff Breitfeller's Experience**

50.      Plaintiff Breitfeller started as a DES customer on a fixed rate in July 2014 and continuing through November 2015 (18 billing cycles). Breitfeller remained on a variable rate plan from December 2015 until March 2019.

51.      The following is a chart showing Plaintiff Breitfeller's electricity cost in cents/kWh for each month as billed to him by DES. On information and belief, the increase in electricity supply cost beginning in December 2015 does not correspond to the prevailing market rates for electricity but rather reflect DES's blatant and arbitrary overcharging for electricity during this time period.



52.      As the chart above shows, DES gave Plaintiff Breitfeller the "frog in boiling

water" treatment—i.e., upon switching Breitfeller to a variable rate plan in December 2015, DES slowly ramped up the rates to more than double what he had been paying on a fixed rate. By early 2019, Plaintiff Breitfeller was "boiling" in high electricity rates, so to speak.

53.     Plaintiff Breitfeller complained to DES about the overcharging and asked for compensation, but was refused.

54.     Plaintiff Breitfeller complained to the PSC about his experience with DES, but received no compensation or resolution.

55.     Plaintiff Breitfeller discussed the matter with his regulated utility and electricity delivery provider, RG&E. The RG&E representative with whom he spoke told him, "you're getting raped" by DES.

56.     Breitfeller did not receive any renewal notice or Terms and Conditions of any kind prior to DES switching him to a variable rate. As a result, DES completely failed to comply with § 349-d(7).

57.     Alternatively, the renewal notice and Terms and Conditions DES sent to Breitfeller failed to clearly and conspicuously disclose that Brietfeller would be charged a variable rate per kWh for his electricity service.

58.     Either because DES completely failed to communicate any variable rate information to Breitfeller or because DES failed to clearly and conspicuously disclose that Brietfeller would be charged a variable rate per kWh for his electricity service, DES failed to comply with § 349-d(7) as it relates to Plaintiff Breitfeller.

59.     As such, any contract that purportedly existed between DES and Underwood was "void and unenforceable as contrary to public policy." N.Y. Gen. Bus. Law § 349-d(8).

60.     Despite the lack of any valid contract between DES and Mr. Breitfeller, DES

14

nevertheless charged Mr. Breitfeller more for electricity supply service than his regulated utility would have charged him.

61.    On information and belief, over the course of his time as a DES customer, Mr. Breitfeller paid thousands of dollars more to DES for electricity and gas service than he would have paid to his regulated utility.

**E.D.    Plaintiff Underwood's Experience**

62.48.  Plaintiff Underwood began service with the DES brand NYSEG Solutions in or before April 2013.

63.49.  Plaintiff Underwood was a NYSEG Solutions customer for both electricity and gas supply until DES eliminated the NYSEG Solutions brand in 2016.

64.50.  Mr. Underwood remained a variable rate electricity and gas supply customer of DES through spring 2019.

65.    On information and belief, DES never provided Plaintiff Underwood with a contract for his electricity service that clearly and conspicuously disclosed that he would be charged a variable rate per kWh.

66.51.  On information and belief, DES also never provided Plaintiff Underwood with a contract for his gas service that clearly and conspicuously disclosed that he would be charged a variable rate per therm.

67.52.  Thus, any contract between DES and Underwood failed to comply with Section 349-d(7)'s requirement that "all variable charges shall be clearly and conspicuously identified."

68.53.  As such, any contract that purportedly existed between DES and Underwood was "void and unenforceable as contrary to public policy." N.Y. Gen. Bus. Law § 349-d(8).

69.54.  Despite the lack of any valid contract between DES and Mr. Underwood, DES

nevertheless charged Mr. Underwood more for ~~electricity and~~ gas service than his regulated utility would have charged him.

~~70.~~55.  On information and belief, over the course of his time as a DES customer, Mr. Underwood paid thousands of dollars more to DES for ~~electricity and~~ gas service than he would have paid to his regulated utility.

## CLASS ACTION ALLEGATIONS

~~71.~~56.  Plaintiffs sue on their own behalf and on behalf of two Classes of similarly-situated individuals for damages, disgorgement, restitution, and declaratory and injunctive relief under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure.

~~72.~~57.  The Disgorgement Class is preliminar~~ily~~ defined as follows:

> All DES ~~energy~~ gas customers in New York, including customers of the Direct Energy, NYSEG Solutions, and Energetix brands, who paid DES for ~~electricity or~~ gas supply from January 11, 2011 to the date of Class Certification of this action (the "Disgorgement Class Period").

~~73.~~58.  The ~~Gas~~ Damages Class is preliminar~~ily~~ defined as follows:

> All DES gas customers in New York, including customers of the Direct Energy, NYSEG Solutions, and Energetix brands, who paid a variable rate for gas supply from the date three years prior to the date of the filing of this action to the date of Class Certification of this action (the "~~Gas~~ Damages Class Period").

~~74.~~59.  Excluded from the Classes are the officers and directors of Defendant, members of the immediate families of the officers and directors of Defendant, and its legal representatives, heirs, successors or assigns and any entity in which Defendant has or has had a controlling interest. Also excluded are all federal, state and local government entities; and any judge, justice or judicial officer presiding over this action and the members of their immediate families and judicial staff.

~~75.~~60.  Plaintiffs estimate the size of each Class to number in the thousands. Accordingly,

the members of the Classes are so numerous that the joinder of all such persons is impracticable.

76.61.  Plaintiffs are adequate class representatives. Their claims are typical of the claims of the Classes and do not conflict with the interests of any other members of the Classes. Plaintiffs and members of the Classes were subject to the same or similar conduct by Defendant. Further, Plaintiffs and the Classes sustained substantially the same injuries and damages arising out of Defendant's conduct.

77.62.  Plaintiffs will fairly and adequately protect the interests of all Class members. Plaintiffs have retained competent attorneys experienced in the prosecution of class actions to represent his interests and those of the Classes.

78.63.  The questions of law and fact common to the Classes predominate over any questions affecting only individual Class members, and a class action will generate common answers which are apt to drive the resolution of this action. These common questions of law and fact include, without limitation:

      a.      Whether Defendant's variable charges are clearly and conspicuously identified in all contracts for energy services;

      b.      Whether all of Defendant's Terms are void and unenforceable as against public policy;

      c.      Whether Defendant was unjustly enriched by profiting as a result of contracts that were void and unenforceable when they were purportedly formed;

      d.      Whether members of the Classes have been injured by Defendant's conduct;

      e.      Whether, and to what extent, Defendant should be enjoined to prevent it from continuing its unlawful practices;

      f.      The extent of class-wide injury and the measure of damages for those

injuries; and

g.      The measure of unjustly obtained profits that Defendant should be made to disgorge.

79.64.  A class action is superior to other methods for resolving this controversy because:

a.      the prosecution of separate actions by Class members creates a risk of adjudications with respect to individual Class members that would be dispositive of the interests of other Class members not parties to that action, or substantially impair or impede their ability to protect their interests;

b.      the prosecution of separate actions by Class members creates a risk of inconsistent or varying adjudications, which would establish inconsistent standards for Defendant's conduct;

c.      Defendant's wrongful conduct is generally applicable to all Class members; and

d.      there will be no difficulty in managing this action as a class action.

80.65.  Accordingly, this action satisfies the requirements set forth under Federal Rules of Civil Procedure 23(a) and 23(b).

**COUNT I**
**UNJUST ENRICHMENT**
**(ON BEHALF OF EACH PLAINTIFF INDIVIDUALLY**
**AND THE DISGORGEMENT CLASS)**

81.66.  Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

82.67.  Common law prohibits one party's possession of money that belongs to another and that, in the absence of an agreement, and in equity and good conscience, the party possessing such money ought not retain.

83.68.  Because Defendant's Terms fail to "comply with the applicable provisions" of Section 349-d, the Terms are "void and unenforceable as contrary to public policy." N.Y. Gen. Bus. Law § 349-d(8). Any purported waiver by Plaintiff of the rights afforded by Section 349-d is similarly void and unenforceable by DES. *Id.*

84.69.  Defendant has been unjustly enriched by collecting money from its customers in the absence of valid contracts. On information and belief, the majority of DES customers paid substantially more to DES than they would have paid to their regulated utility, while DES provided them with nothing of value in return for their higher payments.

85.70.  Defendant's enrichment has been at the expense of Plaintiffs and the Disgorgement Class because Plaintiffs and the Disgorgement Class paid money to Defendant in the absence of a valid contract. Defendant has retained these benefits that rightfully belong to Plaintiffs and the Disgorgement Class.

86.71.  Defendant's retention of those benefits constitutes its unjust enrichment at the expense of Plaintiffs and the Disgorgement Class.

87.72.  Defendant appreciates and has knowledge of such benefits.

88.73.  Under principles of equity and good conscience, Defendant should not be permitted to retain the revenue that it acquired by virtue of its unjust conduct. All funds, revenue, profits, and benefits received by Defendant as a result of its actions rightfully belong to Plaintiffs and the Disgorgement Class.

89.74.  Plaintiffs and the Disgorgement Class have no adequate remedy at law.

90.   As a result of Defendant's wrongful retention of monies to which Plaintiffs and the Disgorgement Class are entitled, Plaintiffs and the Disgorgement Class are entitled to recover benefits wrongfully retained by Defendant and such other relief as this Court deems just and proper.

19

75.

**COUNT II**
**VIOLATION OF NEW YORK GENERAL BUSINESS LAW SECTION 349-d(7)**
**(ON BEHALF OF PLAINTIFF SCHAFER INDIVIDUALLY**
**AND THE ~~GAS~~ DAMAGES CLASS)**

~~91.~~76.  Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

~~92.~~77.  Plaintiff Schafer brings this claim under Section 349-d(7) on his own behalf and on behalf of the members of the ~~Gas~~ Damages Class.

~~93.~~78.  Section 349-d(7) provides that "[i]n every contract for energy services and in all marketing materials provided to prospective purchasers of such contracts, all variable charges shall be clearly and conspicuously identified."

~~94.~~79.  The Terms Defendant provides to its customers fail to clearly and conspicuously inform consumers about DES's variable gas rates or the factors affecting DES's variable rates.

~~95.~~80.  Through its conduct described above, Defendant has violated Section 349-d(7) and caused financial injury to Plaintiffs and DES's other variable rate customers by causing Plaintiffs and Class members to pay more for gas than they would have had they stayed with their previous ~~energy~~ gas supplier or chosen a different ~~gas~~ energy supplier.

~~96.~~81.  Section 349-d(10) also provides that

any person who has been injured by reason of any violation of this section may bring an action in his or her own name to enjoin such unlawful act or practice, an action to recover his or her actual damages or five hundred dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to ten thousand dollars, if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

~~97.~~82.  As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class

20

suffered injury and were damaged in an amount to be determined at trial, but in any case not less

than $500 for each violation.

98.83.  As shown above, Defendant willfully or knowingly violated Section 349-d.

99.84.   Because Defendant's violations of Section 349-d have damaged Plaintiffs and the

Class, and Defendant's continued violations threaten additional injury for which Plaintiffs and

the Class have no adequate remedy at law, Plaintiffs seek an order pursuant to Section 349-d

enjoining Defendants from such future conduct.

100.85.Pursuant to Section 349-d, Plaintiffs seek actual, statutory, and treble damages,

costs and expenses, pre and post-judgment interest, and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

a.      Enter an order certifying the Classes defined above, appointing the

Plaintiffs as Class representatives, and designating the undersigned firms as Class

Counsel;

b.      Enter an order granting monetary relief pursuant to Section 349-d on

behalf of the Class;

c.      Declare that Defendant has committed the violations of law alleged herein;

d.      Declare that the Terms issued by Defendant are void as against public

policy pursuant to Section 349-d;

e.      Determine that Defendant has been unjustly enriched as a result of its

wrongful conduct, and enter an appropriate order awarding restitution to the Class and

requiring disgorgement from Defendant;

f.      Render an award of compensatory damages of at least $5,000,000, the

precise amount of which is to be determined at trial;

21

g.     Issue an injunction or other appropriate equitable relief preventing

Defendant from engaging in the deceptive practices alleged herein;

h.     Render an award of treble damages;

i.     Enter judgment including interest, costs, reasonable attorneys' fees, costs,

and expenses; and

j.     Grant all such other relief as the Court deems appropriate.

**JURY TRIAL DEMAND**

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: January 3, 2020~~January 2, 2020~~          Respectfully submitted,


~~The Sweet Law Firm, P.C.~~**KamberLaw, LLC**

By:
     s/ ~~s/ Benjamin J. Sweet~~ Adam C. York

One of the attorneys for Plaintiffs, individually and
on behalf of a class of similarly situated individuals

Adam C. York
**KamberLaw, LLC**
220 N Green Street
Chicago, IL 60607
Telephone: (212) 920-3072
ayork@kamberlaw.com

Scott A. Kamber
(Application for Admission forthcoming)
Michael Aschenbrener
(Application for Admission forthcoming)
**KamberLaw, LLC**
201 Milwaukee Street, Suite 200
Denver, CO 80246
Telephone: (303) 222-0281
masch@kamberlaw.com

Benjamin J. Sweet
**The Sweet Law Firm, P.C.**

22

1145 Bower Hill Road, Suite 104
Pittsburgh, PA 15243
Telephone: (412) 857-5350
ben@sweetlawpc.com

~~Scott A. Kamber~~
~~(Application for Admission forthcoming)~~
~~Michael Aschenbrener~~
~~(Application for Admission forthcoming)~~
~~**KamberLaw, LLC**~~
~~201 Milwaukee Street, Suite 200~~
~~Denver, CO 80246~~
~~Telephone: (303) 222-0281~~
~~masch@kamberlaw.com~~

~~Adam C. York~~
~~(Application for Admission forthcoming)~~
~~**KamberLaw, LLC**~~
~~220 N Green Street~~
~~Chicago, IL 60607~~
~~Telephone: (212) 920-3072~~
~~ayork@kamberlaw.com~~

[*Signatures continued below.*]
David L. Steelman
(Application for Admission forthcoming)
**Steelman & Gaunt**
901 Pine Street, Ste. 110
P.O. Box 1257
Rolla, Missouri 65402
Telephone: (573) 341-8336
dsteelman@steelmangaunt.com

*Attorneys for Plaintiffs, individually and on behalf
of a class of similarly situated individuals*