UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

RICHARD SCHAFER, et al.,

Plaintiffs,

v.

DIRECT ENERGY SERVICES, LLC,

Defendants.

Case # 19-CV-6907-FPG

DECISION AND ORDER

## INTRODUCTION

Plaintiffs Richard Schafer and William Underwood bring this putative class action against Defendant Direct Energy Services, LLC ("Direct Energy"). ECF Nos. 1, 4. They allege claims of unjust enrichment and violation of New York law arising out of Direct Energy's allegedly unscrupulous business and marketing practices. On April 14, 2020, Direct Energy filed a motion to dismiss for improper venue and for failure to state a claim. ECF No. 14. Plaintiffs oppose the motion. For the reasons that follow, Direct Energy's motion is GRANTED.

## BACKGROUND

The following facts are from the complaint, unless otherwise noted. New York deregulated its natural-gas and electricity markets in 1996. This move allowed consumers to choose "from a variety of companies selling residential energy," in addition to traditional utilities. ECF No. 4 at 1. These companies are known as "energy services companies." Direct Energy is one such company that began to offer residential energy after deregulation.

The gravamen of Plaintiffs' complaint is that Direct Energy misleadingly markets the price of its natural-gas plans. Direct Energy advertises its plans as "fixed rate gas supply plans" with

enticingly low "teaser" prices. *Id.* The fixed-rate plans run for set terms, however, and after the term ends, the plans "automatically switch to month-to-month variable rate plan[s]" that "can rise at the whims of [Direct Energy] and have no upper limit." *Id.* Plaintiffs claim that the variable rates are often two or three times as expensive as the teaser rates.

The problem, in Plaintiffs' view, is that Direct Energy does not "clearly and conspicuously disclose" to consumers that this switch from fixed- to variable-rate will occur at the end of the set term. Plaintiffs argue that Direct Energy's contracts do not highlight this point but instead bury that condition in a "sea of confusing fine print." *Id.* at 9. Moreover, after customers are switched to the variable-rate plan, Direct Energy only raises their rates slowly, so that customers do not initially "realize that they are paying much more than they previously had" under the fixed-rate plan. *Id.* at 8. Over time, consumers pay more for energy without any redounding benefit. Plaintiffs thus assert that Direct Energy makes its money by "developing and using deceptive" marketing and sales practices that "often result in its energy customers paying far more than they would have paid had they stayed with their traditional energy suppliers." *Id.* at 2.

Challenging this alleged bait-and-switch business strategy, Plaintiffs brought this putative class action. The named plaintiffs, Richard Schafer and William Underwood, are both former Direct Energy natural-gas customers. They raise claims of (1) a violation of New York General Business Law § 349-d(7) (on behalf of Plaintiff Schafer and a putative class of Direct Energy customers); and (2) unjust enrichment (on behalf of both plaintiffs and on behalf of a putative class). *See* ECF No. 4 at 14-17.

**DISCUSSION**

Direct Energy moves to dismiss the claims of both named plaintiffs on several grounds. The Court examines the motion with respect to each plaintiff separately.

## I. Richard Schafer

As to Schafer, the parties agree on many of the relevant facts. In November 2015, Schafer signed up for Direct Energy's natural-gas service. He chose a one-year fixed-rate plan, and received a number of documents explaining the plan. *See* ECF No. 14-13. Near the end of that year, Direct Energy sent Schafer another set of documents, in which it described the terms of service at the expiration of the fixed-rate plan. Among other things, Schafer's plan would switch from fixed- to variable-rate. The crux of Schafer's claims is that the documents he received did not "clearly and conspicuously disclose that he would be charged a variable rate" when his plan renewed. ECF No. 4 at 11.

In its motion to dismiss, Direct Energy argues that based on the language of the documents it sent, Schafer's allegations are insufficient to state a claim under § 349-d(7) or for unjust enrichment. The Court agrees.

### a. § 349-d(7)

N.Y. General Business Law § 349-d provides various protections to customers of energy services companies. Subsection (7) provides, "In every contract for energy services and in all marketing materials provided to prospective purchasers of such contracts, *all variable charges shall be clearly and conspicuously identified*." N.Y. Gen. Bus. Law § 349-d(7) (emphasis added). Plaintiffs argue that Direct Energy violated this section because its natural-gas contracts do not "clearly and conspicuously inform consumers about [its] variable gas rates or the factors affecting [its] variable rates." ECF No. 4 at 16. Direct Energy counters that its contracts do, in fact, satisfy this standard, and it therefore moves to dismiss this claim.

In order to determine whether a violation of § 349-d(7) is adequately alleged, there are two issues that the Court must address: (1) what information about "variable charges" must be

identified in an energy services contract; and (2) how must that information be identified in order to be "clear and conspicuous"? These present issues of statutory interpretation that the New York Court of Appeals has not addressed.

When interpreting a state statute, a federal court must "predict how the forum state's highest court would decide the issues" and, "to the extent there is any ambiguity in the state statute[] under consideration, to carefully predict how the highest court of the state would resolve the uncertainty or ambiguity." *N.Y.S. Prof'l Process Servers Ass'n, Inc. v. City of New York*, No. 14-CV-1266, 2014 WL 4160127, at *5 (S.D.N.Y. Aug. 18, 2014). The Court's "cardinal function in interpreting a New York statute is to ascertain and give effect to the intent of the legislature." *Id.* "As the clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof." *Id.* A statute is to be "construed as a whole," and "all parts of an act are to be read and construed together to determine the legislative intent." *Id.*

On the first issue, § 349-d(7) provides that "all variable charges" must be identified clearly. As to what exactly must be disclosed, there are arguably two possible interpretations. One interpretation is that the only thing that must be identified is the *fact* that a charge is variable. For example, if marketing materials boast that this month's rate is 30% below the utility's rate, it must also highlight that the rate is a variable one; similarly, if a contract indicates that the customer's rate will vary month-to-month, it must do so clearly. *See Mirkin v. Viridian Energy, Inc.*, No. 15-CV-1057, 2016 WL 3661106, at *5 (D. Conn. July 5, 2016) (concluding that subsection (7) "requires disclosure only of the existence of a variable rate"); *Stanley v. Direct Energy Servs., LLC*, No. 19-CV-3759, 2020 WL 3127894, at *13 (S.D.N.Y. June 12, 2020) (under subsection (7),

an energy services company need only identify "the plain fact that [the charges] are variable" (quoting another source)).

An alternative interpretation is that the provision requires more specific disclosures *about* the variable rate. Under this interpretation, a contract might not only need to highlight the fact that the rate varies, but must also highlight information about, for example, the methodology by which the variable rate is calculated. *See Stanley*, 2020 WL 3127894, at *14 (discussing interpretation). In *Forte v. Direct Energy Services, LLC*, No. 17-CV-264, 2017 WL 3495861 (N.D.N.Y. Aug. 14, 2017), a court in the Northern District of New York concluded that an energy services company must identify the fact that a rate is variable *and* that it is charged "per KwH." *Forte*, 2017 WL 3495861, at *6.

The Court finds the former interpretation more consistent with the statutory language and the purpose of the provision. The language itself is narrow: all "variable charges" must be clearly and conspicuously identified. It speaks nothing of more detailed disclosures of specific information, whether that be the methodology of the variable-rate structure or the unit by which natural gas would be measured and charged. Had the legislature intended to require more detailed disclosures, it could have done so explicitly, as it did elsewhere in § 349-d: subsection (2) requires a door-to-door salesperson to "explain the purpose of the solicitation"; subsection (5) requires, in certain circumstances, an energy services company to provide an "estimate of the average monthly bill that customer would be charged for energy services and the [termination] fee that would be charged based on such estimate"; and subsection (6) requires an energy services company to "clearly inform[] the customer in writing . . . of the renewal terms and of his or her option not to accept the renewal offer." N.Y. Gen. Bus. Law § 349-d(2), (5), (6). All that subsection (7) requires is that variable charges be *identified*. *Accord Stanley*, 2020 WL 3127894, at *13 (noting that "[t]he

statute requires that variable charges be 'identified,' not that they be 'explained,' or that their 'basis' be identified" (quoting another source)).

The legislative history also supports a narrower interpretation. One of the particular evils the legislature identified was companies' "bait-and-switch" tactic of promising low fixed rates but then convincing consumers into contracts with variable rates. The sponsor of the bill noted the case of a small business owner who was "convinced to sign an energy services contract by a sales agent's assurances that the price would be fixed and he could save at least $200 a month. After a few months, his monthly bill had doubled, and he learned that the contract had a variable charge that fluctuated wildly." ECF No. 16-2 at 3. The sponsor lamented the "onerous contracts with unfathomable fine print" and "short-term 'teaser' rates followed by skyrocketing variable prices." *Id.* That bait and switch could be avoided if, as the sponsor elsewhere stated, all variable charges were "clearly and conspicuously identified *as such*." *Mirkin*, 2016 WL 3661106, at *4 (quoting legislative history). Subsection (7) serves that purpose by requiring clear and conspicuous disclosure of the fact that the charges being marketed or contracted-for are variable. To go beyond that, and interpret the provision to demand additional disclosures, does not accord with the particular evil the provision was intended to ameliorate.[1]

Accordingly, the Court concludes that § 349-d(7) only requires energy services companies to "clearly and conspicuously" disclose that the charges in question are variable. No further information about the charges is required.

[1] The *Forte* court goes an extra step and reads § 349-d(7) to require energy services companies to disclose that the variable rate (for electrical service) would be "per KWH." *Forte*, 2017 WL 3495861, at *6. Even if the language of subsection (7) could be construed to justify that requirement, the legislative history gives no indication that the legislature was concerned that consumers were being deceived by the lack of disclosure about the unit by which natural gas or electricity would be charged.

The next question is what a "clear and conspicuous" disclosure entails. This phrase is not unique to § 349-d(7) but is widely used in state and federal consumer protection laws. *See, e.g.*, 15 U.S.C. § 1637(c)(1)(B) (requiring that certain fees related to open end consumer credit plans be "clearly and conspicuously" disclosed in direct-mail solicitations); N.Y. Racing, Pari-Mutuel Wagering & Breeding Law § 1363(3) (requiring every gambling-related advertisement to "clearly and conspicuously" disclose a "problem gambling hotline number"); N.Y. Gen. Bus. Law § 335-a(1-a) (stating that a magazine publisher must print a customer service telephone number on each billing statement "in a clear and conspicuous form"). Consistent with its plain language, courts interpreting this phrase focus on two considerations: whether the disclosure is unambiguous and understandable to a layperson (*i.e.*, clear), and whether the disclosure is prominently displayed (*i.e.*, conspicuous). *See, e.g.*, *Barrer v. Chase Bank USA, N.A.*, 566 F.3d 883, 892 (9th Cir. 2009) ("Clear and conspicuous disclosures . . . are disclosures that a reasonable cardholder would notice and understand."); *Corcia v. Asset Acceptance, LLC*, No. 13-CV-6404, 2014 WL 3656-49, at *7 (E.D.N.Y. July 22, 2014) (in determining whether disclosure was clear and conspicuous, examining: "(1) the location of the notice within the document; (2) the type size used within the notice as well as the type size in comparison to the rest of the document; and (3) whether the notice is set off in any other way-spacing, font style, all capitals, etc."); *LeFoll v. Key Hyundai of Manchester LLC*, 829 F. Supp. 2d 44, 45, 47 (D. Conn. 2011) (payment due dates not clear where they were printed over other text and were therefore "indistinct to indiscernible"); *Direct Capital Corp. v. New ABI Inc.*, 822 N.Y.S.2d 684, 693-94 (N.Y. Sup. Ct. 2006) (warranty disclaimer not conspicuous where it was "obscured in the single-spaced, fine print, multiple provisions of boilerplate of the agreement").

In *Mirkin v. Viridian Energy, Inc.*, the District of Connecticut applied a multi-factor test developed by the Federal Trade Commission to determine whether a disclosure under § 349-d(7) was "clear and conspicuous." *Mirkin*, 2016 WL 3661106, at *5. The FTC's standard is used in the context of unfair and deceptive advertising: an advertisement that may otherwise be deceptive is not if there are clear and conspicuous disclosures of the material information about the transaction:

> The FTC takes several factors into account in assessing whether a given disclosure meets the standard, namely the placement of the disclosure in an advertisement and its proximity to the claim it is qualifying; the prominence of the disclosures; whether items in other parts of the advertisement distract attention from the disclosure, whether the advertisement is so lengthy that the disclosure needs to be repeated; [] and whether the language of the disclosure is understandable to the intended audience.

*Id.* (internal ellipsis omitted).

With this case law in mind, the Court concludes that, as a matter of law, Direct Energy's disclosures pass muster under § 349-d(7). Schafer received two sets of contract materials during his relationship with Direct Energy.[2] *See* ECF Nos. 14-13, 14-14. The first set was sent when he initially switched to Direct Energy's fixed-rate plan and includes (1) a welcome letter, (2) the terms and conditions, and (3) a customer disclosure statement. *See* ECF No. 14-13. The welcome letter does not indicate that Schafer will be switched to a variable-rate plan once his fixed-rate plan

[2] Direct Energy submitted these materials with its motion to dismiss. The Court may consider them because they are "integral to the complaint." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (internal quotation marks omitted); *see also* ECF No. 16 at 8 n.2. The Court reviews each set as a unit, since the documents "were all designed to be (and were) sent in the same envelope." ECF No. 17 at 10; *see also* ECF No. 14-12 ¶ 12.

expires. The terms and conditions do disclose that fact, but not in a conspicuous manner, as can be seen below (see Paragraph 8):

Direct Energy.

Direct Energy Services, LLC ~ Toll-Free Phone: 1-866-348-4194
www.directenergy.com ~ csdirectenergy@directenergy.com

**NEW YORK RESIDENTIAL & SMALL COMMERCIAL TERMS AND CONDITIONS**
Natural Gas Supply Service
Direct Energy Services, LLC

**1. Terms of Service.** These Terms and Conditions together with the Customer Disclosure Statement (defined below), which is incorporated herein by reference, constitute the agreement ("Agreement") between you and Direct Energy Services, LLC ("Direct Energy"). "Customer Disclosure Statement" means, as applicable, either the section of the enrollment consent form/letter of authorization entitled *'Customer Disclosure Statement'* or the Schedule A accompanying these Terms and Conditions entitled *'Customer Disclosure Statement – Schedule A to Terms and Conditions'*.
**2. Agreement to Purchase Energy.** We will supply your retail natural gas, as delivered to you by your Local Distribution Utility ("LDU"), subject to the terms and conditions of this Agreement.
**3. Agency.** You appoint us as your agent to provide retail natural gas service, including the natural gas transportation, transmission and related services appropriate to provide that service to you.
**4. Eligibility.** For natural gas service, you must (a) be eligible to receive service from your LDU and stay eligible for such service during the Term of this Agreement. We can terminate this Agreement by giving you notice if you are not eligible. For the Comfort & Control Plan and the Back to Business Plan, you must meet the eligibility requirements set forth in Section 6 and 7, respectively.
**5. Term of Agreement.** The "Initial Term" of your service will begin on the date the notification regarding the change of your energy provider is deemed effective by your LDU. The Initial Term is set forth in the Customer Disclosure Statement. After the Initial Term, you will be notified in advance that this Agreement will automatically renew on a month-to-month basis at the same terms, unless Direct Energy sends you written notice of proposed changes to such terms in advance of the renewal date (each such renewal are collectively referred to as the "Renewal Term"). Any such written notice will be sent at least 30 days and no more than 60 days prior to the renewal date, apprising you of any proposed changes in the terms and conditions of this Agreement and of the your right to renew, terminate or renegotiate this Agreement. If you wish to reject the renewal of this Agreement without incurring an early cancellation fee, if any, you will have three (3) business days from the day you receive the first billing statement of your Renewal Term to cancel by calling us as detailed in Section 24. When receiving service on a month-to-month basis, you may provide written notice of termination or call us as detailed in Section 24 or call the delivery company to terminate the agreement. We may terminate this Agreement by providing 30 days' written notice to you.
**6. Comfort & Control Plan.** If you are purchasing our Comfort & Control Plan pursuant to this Agreement, you are agreeing to purchase from Direct Energy a product that includes natural gas service and at least one (1) but no more than (3) NEST Learning Thermostats. You may request up to three (3) NEST Learning Thermostats; however, Direct Energy may limit the number of NEST Learning Thermostats provided to you in its sole discretion. To be eligible to enroll in the Comfort & Control Plan you must (i) reside in a single family home and (ii) have high speed, wireless internet service (dial up and mobile internet access is not compatible). The NEST Learning Thermostat works with a significant majority (but not all) of the heating and cooling systems in the market. You may check the compatibility of the NEST Learning Thermostat with your heating and/or cooling system at the following website http://support.nest.com/. If you cancel this Agreement after the Rescission Period (as defined in Section 10) but within the Initial Term, then you will be required to pay us a device cost recovery fee per NEST Learning Thermostat in the amount set forth in the Rate Plan Summary. You cannot return the NEST Learning Thermostat(s) to avoid the device cost recovery fee.
**7. Back to Business Plan.** If you are purchasing our Back to Business Plan pursuant to this Agreement, you are agreeing to purchase from Direct Energy a product that includes natural gas service and at least one (1) but no more than (3) NEST Learning Thermostats. You may request up to three (3) NEST Learning Thermostats; however, Direct Energy may limit the number of NEST Learning Thermostats provided to you in its sole discretion. To be eligible to enroll in the Back to Business Plan, you must have high speed, wireless internet service (Dial up and mobile internet access is not compatible). The NEST Learning Thermostat works with a significant majority (but not all) of the heating and cooling systems in the market. You may check the compatibility of the NEST Learning Thermostat with your heating and/or cooling system at the following website http://support.nest.com/. If you cancel this Agreement after the Rescission Period (as defined in Section 10) but within the Initial Term, then you will be required to pay us a device cost recovery fee per NEST Learning Thermostat in the amount set forth in the Rate Plan Summary. You cannot return the NEST Learning Thermostat(s) to avoid the device cost recovery fee.
**8. Price: the Rate and Daily Fee.** During the Initial Term, your rate per ccf/mcf/therm is set forth in the Customer Disclosure Statement.. You may also be charged a flat daily customer charge, which you will find in the Customer Disclosure Statement. After the Initial Term and during the Renewal Term, your rate per ccf/mcf/therm, as well as the daily customer charge, will both be variable, and will not change more than once each monthly billing cycle, unless we send advance written notice indicating otherwise. Each will change as we solely determine based on business and market conditions, and will not increase more than 40% over the rate for the previous monthly billing cycle. Your rate per ccf/mcf/therm excludes: (a) fees, charges and other assessments imposed by your LDU, the New York Public Service Commission (including the New York Department of Public Service, the "NYPSC") or other governmental agency; and (b) federal, state and local taxes. These items are in addition to your per ccf/mcf/therm rate. If you are a tax-exempt customer, you must provide us with an appropriate exemption certificate before we will waive any assessment and collection of taxes. The amount you pay may change for reasons allowed by law, including, without limitation (a) a change in charges, or new charges, imposed by your LDU, NYPSC or other government agency; or (b) we determine that the service plan originally designated is incorrect.
**9. Billing.** Our natural gas service, daily customer charge, and other charges will appear in your service bill from your LDU. Your LDU calculates and determines your usage and charges. Your LDU bills will specify where payments are due, and you agree to pay your bill as required by your LDU. Your payments may be pro-rated in accordance with procedures adopted by the NYPSC. Additionally, if your LDU is Central Hudson, you may be offered a billing cycle ending either monthly or every other month. If you receive residential service, your LDU may offer budget, levelized, or other payment plans, as provided in New York's Home Energy Fair Practices Act ("HEFPA"). The LDU's measurement of natural gas will be definitive for the purpose of calculating your charges under this Agreement. This determination may include any combination of actual meter reading usage, usage estimations or pro-rated usage.
**10. Your Right of Rescission and Termination by You.** Residential and small commercial customers may rescind this Agreement without an early cancellation fee or device cost recovery fee within three (3) business days after you receive a copy of it ("Rescission Period"). Thereafter, residential and small commercial customers can terminate service under this Agreement at any time during the Initial Term, subject to the early termination fee and/or device cost recovery fee in the amounts set forth in the Customer Disclosure Statement, if any. The early termination fee will not to exceed (a) one hundred dollars for any contract with a remaining term of less than twelve months; (b) two hundred dollars for any contract with a remaining term of twelve months or more. You agree to pay the early termination fee and device cost recovery fee immediately, but no later than ten (10) days after the date

NYTCRSCG - 022715

ECF No. 14-13 at 4. In the terms and conditions, the language concerning the variable rate has all the marks of an inconspicuous disclosure: it is buried among other boilerplate terms, is not set out or highlighted, and is the same font as the surrounding material.

By contrast, the Customer Disclosure Statement is adequate. This chart, which appears on the eighth and final page of the first set of documents, includes a simple, easy-to-read chart:

Direct Energy

Direct Energy Services, LLC ~ Toll-Free Phone: 1-866-348-4194 ~ PO Box 180, Tulsa, OK 74101-0180 ~ www.directenergy.com csdirectenergy@directenergy.com

DIRECT ENERGY CUSTOMER DISCLOSURE STATEMENT FOR ELECTRICITY OR NATURAL GAS
Schedule A to Terms and Conditions

| | |
|---|---|
| PRICE [1] | $0.41900/THERM |
| FIXED OR VARIABLE | Fixed rate. |
| RATE PLAN TYPE | If this box ☐ is checked, you chose the Comfort & Control Plan! |
| LENGTH OF THE AGREEMENT | 12 monthly billing cycles. |
| PROCESS FOR THE RESCISSION OF THE AGREEMENT WITHOUT PENALTY | Customer may contact us at 1-866-348-4194 to rescind within 3 business days. |
| EARLY TERMINATION FEE | $99.00 |
| AMOUNT OF LATE PAYMENT FEE AND METHOD OF CALCULATION | Past due charges may incur a late fee of 1.5% per month or the interest rate posted in your local utility's tariff. |
| PROVISIONS FOR RENEWAL OF THE AGREEMENT | We will send you a renewal notice between 30 and 60 days prior to the end of your Initial Term. This Agreement shall automatically renew for successive month-to-month periods at our standard variable rate plan as per the price applicable to the Terms and Conditions. |
| CONDITIONS UNDER WHICH SAVINGS ARE GUARANTEED | None. |

1. Your Utility will remain responsible for the delivery of power and/or natural gas to your home and will continue to respond to any service calls and emergencies. Switching to Direct Energy will not impact the reliability of your electric and/or natural gas service. Your Utility will continue to bill you on their regular billing cycles, and their bill will include the charges under your Agreement with Direct Energy. Your payments will be due as set out in those bills.

Simple. Friendly. Direct v.081314

ECF No. 14-13 at 8. As is relevant here, it states that Direct Energy will send Schafer "a renewal notice between 30 and 60 days prior to the end of your Initial Term. This Agreement shall automatically renew for successive month-to-month periods at our standard variable rate plan as per the price applicable to the Terms and Conditions." *Id.* The statement that Schafer's plan would switch to a variable rate plan at the expiration of the 12-month agreement is laid out in plain language, is set apart from the other information in the chart, and is neither lengthy nor buried in

other terms. Thus, in light of the customer disclosure statement, the first set of contract materials provided adequate disclosure of the variable rate for purposes of § 349-d(7). *Accord Mirkin*, 2016 WL 3661106, at *5 (disclosure of variable rate adequate where it was announced "in a highlighted box" that "does not include an overwhelming amount of information" and "uses clear and simple language").

The second set of materials discloses the variable rate even more prominently. Before Schafer's fixed-rate plan was set to expire, Direct Energy sent him a residential renewal notice and new terms and conditions. While the new terms and conditions suffer from the same defect as the earlier one, the renewal notice—which is the first page in this set of documents—clearly and conspicuously discloses the existence of a variable rate:

P.O. Box 180
Tulsa, OK 74101-0180

Richard K Schafer
684 Eastbrooke Ln
Rochester, NY 14618

October 17, 2016

**RESIDENTIAL RENEWAL NOTICE**

Dear Customer,

This letter is to inform you that your natural gas agreement(s) with Direct Energy will expire on November 27, 2016. We hope you will continue to choose Direct Energy for your natural gas supply needs. Listed below is a summary of your renewal agreement.

| | |
|---|---|
| Account Number: | R02000051829711 |
| Account Name: | Richard K Schafer |
| Service Address: | 684 Eastbrooke Ln, Rochester NY |
| Local Utility Company: | Rochester Gas |
| Type of Service: | Natural gas |
| Product Type: | Variable. Rate changes month-to-month based on business and market conditions. |
| Agreement Term: | Month to Month |
| Renewal Price: | Varies Month to Month |
| Early Termination Fee: | None |
| Term Start/End Date: | Start 11/28/2016 and continues month to month |

Attached, you will find a copy of the new agreement's Terms and Conditions. Please review the terms and conditions to assure your renewal agreement best suits your current needs.

To compare historic and current prices offered by all ESCOs for standard service without energy-related value-added attributes, please visit the Department of Public Service's Power to Choose website at: http://www.newyorkpowertochoose.com.

If you are interested in hearing about other supply plans that we offer, please contact us at 1-800-805-8586. If you choose not to continue your service with us, you may switch to another supplier or return to your local utility company, without an early termination fee, at the expiration of your current agreement by contacting us or your local utility company by November 12, 2016.

We are dedicated to exceeding your expectations. Thanks for the opportunity to serve you with competitive energy products and home services. If you have any questions, we're here to help you with your energy needs! Call us toll-free at 1-866-348-4194, Monday - Friday, 8 a.m. - 8 p.m., EST, and Saturday 8 a.m. - 5 p.m., EST. You can also visit us online at directenergy.com/NY for energy- saving tips and information to better manage your energy costs.

Thank you for allowing us to serve you.

Direct Energy

© 2015 Direct Energy, LLC. Direct Energy® and the Lightning Bolt Design are trademarks for Direct Energy Marketing Limited.

ECF No. 14-14 at 2.  There is a separate chart, set off from the surrounding text, which summarizes the basics of the renewal agreement.  It states in plain language that Schafer will receive a "variable" rate that "changes month-to-month based on business and market conditions." *Id.*  It also indicates that the renewal price "Varies Month to Month." *Id.*  A reasonable customer could not but notice and understand that, under the renewal agreement, service would be provided at a variable rate.  *See Barrer*, 566 F.3d at 892.

Furthermore, the Court is not convinced by Plaintiffs' argument that the information in the disclosure statement and renewal notice is inadequate simply because it is not *more* conspicuous than the surrounding text.  *See* ECF No. 16 at 17.  § 349-d(7) does not require the variable-rate disclosure to be the *most* conspicuous item in a contract, only that it be conspicuous.  *Cf. Harper v. Lindsay Chevrolet Oldsmobile, LLC*, 212 F. Supp. 2d 582, 589 n.19 (E.D. Va. 2002) ("That defendants could have done more to make the [] [d]isclosure conspicuous by adding stars, or bold type, or some other device does not mean that the existing disclosure . . . is insufficiently conspicuous.").

Here, the variable-rate disclosures are highlighted in charts that are formatted simply and contain a few, discrete pieces of information.  They are not buried in fine print or hidden by font or sizing tricks.  A reasonable consumer reviewing either chart would quickly and readily discern the variable-rate language.  Finally, each set of documents consists of less than ten pages, so there is no concern that the disclosure pages are themselves "buried" amongst other documents.  *Cf. Barrer*, 566 F.3d at 892 (no clear and conspicuous disclosure where disclosure appeared on pages 10 and 11 of multipage agreement and five "dense" pages after other relevant information).  In short, neither set of documents runs afoul of § 349-d(7)'s requirement that all variable charges be clearly and conspicuously identified.  This claim is dismissed.

**b. Unjust Enrichment**

Plaintiffs' theory for unjust enrichment is premised on their allegation that Direct Energy's natural-gas contracts did not clearly disclose the variable-rate change, in violation of § 349-d(7). Based on that violation, Plaintiffs claim that the contracts are void and unenforceable pursuant to § 349-d(8). *See id.* § 349-d(8) ("Any contract for energy services which does not comply with the applicable provisions of this section shall be void and unenforceable as contrary to public policy."). And consequently, Plaintiffs claim that Direct Energy has been "unjustly enriched by collecting money from its customers in the absence of valid contracts." ECF No. 4 at 15.

Given that the Court has rejected the premise of Plaintiffs' theory, the unjust enrichment claim must likewise fail, as Direct Energy's contracts do not violate § 349-d(7) and therefore are not void under § 349-d(8). Moreover, a claim for unjust enrichment cannot lie where, as here, the plaintiff has an adequate remedy at law via § 349-d. *See Forte*, 2017 WL 3495861, at *7; N.Y. Gen. Bus. Law § 349-d(10) (permitting private right of action for violation of subsection (7)). In other words, Schafer cannot recast his defective § 349-d(7) claim as one for unjust enrichment. *See Corsello v. Verizon New York, Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012) (noting that unjust enrichment is "not a catchall cause of action to be used when others fail" and that it is not available "where it simply duplicates, or replaces, a conventional contract or tort claim").

Therefore, both of Schafer's claims must be dismissed.

**II. Underwood**

Direct Energy argues, *inter alia*, that Underwood's claim should be dismissed due to improper venue.[3] "Federal Rule of Civil Procedure 12(b)(3) provides that a party may move to

---

[3] Direct Energy also argues that Underwood's claim should be dismissed on the merits. *See* ECF No. 17 at 12-13. Because Underwood's claim presents different facts from Schafer's, and given that venue is clearly improper, the Court declines to address the merits. *See Tucker v. TransCor America, LLC*, No. 07-CV-271, 2008 WL 4559832, at *2 (D. Vt. Oct. 8, 2008) (on motion to dismiss, declining to reach merits where venue was improper).

dismiss a complaint on the basis of improper venue." *Sepanski v. Janiking, Inc.*, 822 F. Supp. 2d 309, 312 (W.D.N.Y. 2011) (internal quotation marks omitted). Under 28 U.S.C. § 1391(b)(2), a civil action may be brought in a "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated."

Here, Direct Energy argues, and Plaintiffs do not dispute, that Underwood resides in Endicott, New York and received natural-gas services there. *See* ECF No. 14-1 at 16; ECF No. 16 at 27-28. Endicott is located in the Northern District. Plaintiffs do not appear to dispute that venue is inappropriate as to Underwood, but they argue the Court should defer its decision on venue until it is decided whether the class will be certified. *See* ECF No. 16 at 27-28.

However, because Schafer's claims will be dismissed—and therefore no class action may proceed thereon—there is no need to defer ruling on the matter. Plaintiffs articulate no connection between the Western District and Underwood's claim, and the Court therefore agrees that venue in this district is improper. *See Barr & Morgan v. Eljamal*, No. 19-CV-1455, 2020 WL 3630421, at *3 (D. Conn. July 2, 2020) (stating that in a contract dispute, venue may be proper "where the contract was negotiated or executed, where it was to be performed, and where the alleged breach occurred"). Under the circumstances, the Court also concludes that the proper course is to dismiss, rather than transfer, the case. *See* 28 U.S.C. § 1406(a). Plaintiffs do not contest that venue is clearly improper as to Underwood, and courts in this circuit have dismissed claims where a plaintiff fails "to state even a colorable basis for venue." *Wohlbach v. Ziady*, No. 17-CV-5790, 2018 WL 3611928, at *4 (S.D.N.Y. July 27, 2018) (collecting cases); *see also Spar, Inc. v. Info. Res., Inc.*, 956 F.2d 392, 394 (2d Cir. 1992) (declining to permit transfer of case where it would "reward plaintiffs for their lack of diligence in choosing a proper forum").

**CONCLUSION**

For the reasons discussed above, Direct Energy's motion to dismiss (ECF No. 14) is GRANTED. Plaintiff Richard Schafer's claims are DISMISSED WITH PREJUDICE, and Plaintiff William Underwood's claim is DISMISSED WITHOUT PREJUDICE. The Clerk of Court is directed to enter judgment and close the case.

IT IS SO ORDERED.

Dated: August 21, 2020
Rochester, New York

HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court