# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

RICHARD SCHAFER, on behalf of himself
and all others similarly situated,

        Plaintiff,

v.

DIRECT ENERGY SERVICES, LLC, a
Delaware Limited Liability Company,

        Defendant.

Case No. 6:19-cv-6907 (FPG)

CLASS ACTION

## PLAINTIFF RICHARD SCHAFER'S APPENDIX TO LOCAL RULE 56
## RESPONSE TO STATEMENT OF MATERIAL FACTS

| Item | Description |
|---|---|
| Asch. Decl. | Declaration of Michael Aschenbrener in Opposition to Defendant's Motion for Summary Judgment |
| Exhibit A | Data extracted from DE_SCHAFER_001 |
| Exhibit B | Email from Michael Aschenbrener to Matt Matthews, *Direct Energy: Schafer: tolling* (Dec. 10, 2019, 4:27 p.m.) |
| Exhibit C | Email from Matt Matthews to Michael Aschenbrener, *RE: Direct Energy: Schafer: tolling* (Dec. 11, 2019, 5:48 p.m.) |
| Exhibit D | Transcript of January 16, 2020 telephonic hearing before Magistrate Judge Andrew T. Baxter of the Northern District of New York in *Forte v. Direct Energy Services, LLC*, Case No. 6:17-cv-0264-FJS-ATB |
| Exhibit E | Deposition transcript of Richard Schafer in the *Forte* matter. |
| Exhibit F | New York Legislative Bill Jacket for Chapter 416 of the Laws of 2010 (New York General Business Law 349-d) |
| Exhibit G | DPS Staff Initial Brief filed in *In the Matter of Retail Access Business Rules*, No. 98-M-1343 (N.Y. Pub. Serv. Commn., filed Mar. 30, 2018) |
| Exhibit H | Order Adopting Changes to the Retail Access Energy Market and Establishing Further Process, *In the Matter of Retail Access Business Rules*, No. 98-M-1343 (N.Y. Pub. Serv. Commn. Dec. 12, 2019) |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

RICHARD SCHAFER, on behalf of himself
and all others similarly situated,

             Plaintiff,

v.

DIRECT ENERGY SERVICES, LLC, a
Delaware Limited Liability Company,

             Defendant.

Case No. 6:19-cv-6907 (FPG)

CLASS ACTION

**MICHAEL ASCHENBRENER'S DECLARATION IN OPPOSITION TO**
**DIRECT ENERGY'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to 28 U.S.C. § 1746, Michael Aschenbrener declares and states as follows:

1.      I am a member at KamberLaw, LLC, counsel for Plaintiff Richard Schafer in this matter. I am admitted to practice before the Western District of New York.

2.      I submit this declaration in support of Plaintiff's Response and Memorandum in Opposition to Direct Energy's Motion for Summary Judgment. This declaration is based on my personal knowledge, except where expressly stated otherwise. If called upon to testify as to the matters stated in this declaration, I could do so competently.

3.      Attached hereto as Exhibit A is a true and correct copy of data extracted from the spreadsheet produced as DE_SCHAFER_001 showing all charges, including variable charges, that Direct Energy billed to Plaintiff Schafer for his natural gas supply. This data was extracted, without modification, except to highlight two lines showing Direct Energy's first bill charges to Schafer under a variable rate, and Schafer's first payment of charges incurred under a variable rate contract.

4.      Based on the data in DE_SCHAFER_001, Plaintiff Schafer paid Direct Energy

$2,204.73 for natural gas supply on variable rate contracts.

5.      Based on the data in DE_SCHAFER_001, Plaintiff Schafer's first payment for natural gas supply on a variable rate contract occurred on December 22, 2016.

6.      I reached out to defense counsel via email on December 10, 2019 to seek a tolling agreement for Mr. Schafer's natural gas claims so that Mr. Schafer would not be forced to file a new case to protect his natural gas claims. *See* email from Michael Aschenbrener to Matt Matthews, *Direct Energy: Schafer: tolling* (Dec. 10, 2019, 4:27 p.m.), a true and correct copy of which is attached hereto as Exhibit B ("In order to avoid potentially unnecessary litigation, we propose the parties enter into a tolling agreement for Mr. Schafer, at least until the Court in *Forte* decides class certification.").

7.      DES declined to enter into a tolling agreement for Mr. Schafer's natural gas claims. Email from Matt Matthews to Michael Aschenbrener, *RE: Direct Energy: Schafer: tolling* (Dec. 11, 2019, 5:48 p.m.), a true and correct copy of which is attached hereto as Exhibit C.

8.      Attached hereto as Exhibit D is a true and correct copy of the transcript of the January 16, 2020 telephone conference before Magistrate Judge Andrew T. Baxter of the Northern District of New York in *Forte v. Direct Energy Services, LLC*, Case No. 6:17-cv-0264-FJS-ATB (N.D.N.Y. Filed March 6, 2017) (the "*Forte*" matter).

9.      Attached hereto as Exhibit E is a true and correct copy of the deposition transcript of Richard Schafer in the *Forte* matter.

10.     Attached hereto as Exhibit F is a true and correct copy of the New York Legislative Bill Jacket for Chapter 416 of the Laws of 2010 (New York General Business Law 349-d), downloaded from

2

http://digitalcollections.archives.nysed.gov/index.php/Detail/DownloadMedia/object_id/21790/d

ownload/1), and last accessed on June 20, 2022.

11.     Attached hereto as Exhibit G is a true and correct copy of the DPS Staff Initial

Brief filed in *In the Matter of Retail Access Business Rules*, No. 98-M-1343 (N.Y. Pub. Serv.

Commn., filed Mar. 30, 2018), downloaded from

http://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId=%7bFC19569E-3018-

48A4-82BC-946402689D21%7d), and last accessed on June 20, 2022.

12.     Attached hereto as Exhibit H is a true and correct copy of the Order Adopting

Changes to the Retail Access Energy Market and Establishing Further Process, *In the Matter of*

*Retail Access Business Rules*, No. 98-M-1343 (N.Y. Pub. Serv. Commn. Dec. 12, 2019),

downloaded from

http://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId={DB00A219-501C-

449B-A05F-A8BDB319A1D3}, and last accessed on June 20, 2022.

13.     I declare under penalty of perjury that the foregoing is true and correct.


Executed this 20th day of June, 2022            s/ Michael Aschenbrener                        
                                                Michael Aschenbrener

3

# EXHIBIT A
**Data extracted from DE_SCHAFER_001**

| Tran Date | Terr | Billed | Usage | Rate | Description | Net A/R Amt |
|---|---|---|---|---|---|---|
| 12/29/15 | RGG | LDC | 59.7 | 0.419 | 11/28/2015 · | 25.01 |
| 1/15/16 | RGG | LDC | | | Payment | -25.01 |
| 2/1/16 | RGG | LDC | 123.5 | 0.419 | 12/29/2015 · | 51.75 |
| 2/19/16 | RGG | LDC | | | Payment | -51.75 |
| 3/1/16 | RGG | LDC | 99.8 | 0.419 | 01/28/2016 · | 41.82 |
| 3/21/16 | RGG | LDC | | | Payment | -41.82 |
| 3/31/16 | RGG | LDC | 85.5 | 0.419 | 02/28/2016 · | 35.82 |
| 4/20/16 | RGG | LDC | | | Payment | -35.82 |
| 4/27/16 | RGG | LDC | 60.7 | 0.419 | 03/29/2016 · | 25.43 |
| 5/17/16 | RGG | LDC | | | Payment | -25.43 |
| 5/26/16 | RGG | LDC | 45.3 | 0.419 | 04/27/2016 · | 18.98 |
| 6/15/16 | RGG | LDC | | | Payment | -18.98 |
| 6/28/16 | RGG | LDC | 18.5 | 0.419 | 05/26/2016 · | 7.75 |
| 7/18/16 | RGG | LDC | | | Payment | -7.75 |
| 7/28/16 | RGG | LDC | 17.5 | 0.419 | 06/26/2016 · | 7.33 |
| 8/17/16 | RGG | LDC | | | Payment | -7.33 |
| 8/27/16 | RGG | LDC | 14.4 | 0.419 | 07/28/2016 · | 6.03 |
| 9/16/16 | RGG | LDC | | | Payment | -6.03 |
| 9/30/16 | RGG | LDC | 18.6 | 0.419 | 08/27/2016 · | 7.79 |
| 10/20/16 | RGG | LDC | | | Payment | -7.79 |
| 10/27/16 | RGG | LDC | 28.9 | 0.419 | 09/29/2016 · | 12.11 |
| 11/16/16 | RGG | LDC | | | Payment | -12.11 |
| 12/1/16 | RGG | LDC | 50.5 | 0.422818 | 10/27/2016 · | 21.35 |
| 12/22/16 | RGG | LDC | | | Payment | -21.35 |
| 12/30/16 | RGG | LDC | 126.7 | 0.571774 | 11/29/2016 · | 72.44 |
| 1/20/17 | RGG | LDC | | | Payment | -72.44 |
| 1/31/17 | RGG | LDC | 93.7 | 0.96 | 12/30/2016 · | 89.95 |
| 2/21/17 | RGG | LDC | | | Payment | -89.95 |
| 2/25/17 | RGG | LDC | 116.4 | 0.926069 | 01/27/2017 · | 107.79 |
| 3/20/17 | RGG | LDC | | | Payment | -107.79 |
| 3/30/17 | RGG | LDC | 97.9 | 0.919 | 02/25/2017 · | 89.97 |
| 4/20/17 | RGG | LDC | | | Payment | -89.97 |
| 4/28/17 | RGG | LDC | 76.2 | 0.983839 | 03/28/2017 · | 74.97 |
| 5/22/17 | RGG | LDC | | | Payment | -74.97 |
| 5/31/17 | RGG | LDC | 38.1 | 0.954357 | 04/28/2017 · | 36.36 |
| 6/21/17 | RGG | LDC | | | Payment | -36.36 |
| 6/28/17 | RGG | LDC | 19.6 | 0.949 | 05/26/2017 · | 18.6 |
| 7/19/17 | RGG | LDC | | | Payment | -18.6 |
| 8/1/17 | RGG | LDC | 15.5 | 1.0345 | 06/28/2017 · | 16.03 |
| 8/22/17 | RGG | LDC | | | Payment | -16.03 |
| 8/30/17 | RGG | LDC | 19.6 | 1.074625 | 07/28/2017 · | 21.06 |
| 9/20/17 | RGG | LDC | | | Payment | -21.06 |
| 9/30/17 | RGG | LDC | 20.6 | 1.079 | 08/29/2017 · | 22.23 |
| 10/23/17 | RGG | LDC | | | Payment | -22.23 |
| 10/27/17 | RGG | LDC | 18.6 | 1.079 | 09/28/2017 · | 20.07 |

| Date | | | | | | | |
|---|---|---|---|---|---|---|---|
| 11/17/17 | RGG | LDC | | | | Payment | -20.07 |
| 12/1/17 | RGG | LDC | 84.5 | 1.00603 | 10/27/2017 | | 85.01 |
| 12/22/17 | RGG | LDC | | | | Payment | -85.01 |
| 12/30/17 | RGG | LDC | 113.4 | 0.972419 | 11/29/2017 | | 110.27 |
| 1/22/18 | RGG | LDC | | | | Payment | -110.27 |
| 1/31/18 | RGG | LDC | 130.8 | 0.945929 | 12/30/2017 | | 123.73 |
| 2/21/18 | RGG | LDC | | | | Payment | -123.73 |
| 2/28/18 | RGG | LDC | 125.6 | 0.920375 | 01/27/2018 | | 115.6 |
| 3/21/18 | RGG | LDC | | | | Payment | -115.6 |
| 3/30/18 | RGG | LDC | 104 | 0.978004 | 02/28/2018 | | 101.71 |
| 4/23/18 | RGG | LDC | | | | Payment | -101.71 |
| 4/27/18 | RGG | LDC | 97.8 | 0.9803 | 03/28/2018 | | 95.87 |
| 5/18/18 | RGG | LDC | | | | Payment | -95.87 |
| 5/31/18 | RGG | LDC | 28.8 | 1.022283 | 04/27/2018 | | 29.44 |
| 6/22/18 | RGG | LDC | | | | Payment | -29.44 |
| 6/28/18 | RGG | LDC | 23.6 | 1.146818 | 05/26/2018 | | 27.06 |
| 7/20/18 | RGG | LDC | | | | Payment | -27.06 |
| 7/31/18 | RGG | LDC | 15.4 | 1.173 | 06/28/2018 | | 18.06 |
| 8/21/18 | RGG | LDC | | | | Payment | -18.06 |
| 8/30/18 | RGG | LDC | 15.4 | 1.173 | 07/27/2018 | | 18.06 |
| 9/20/18 | RGG | LDC | | | | Payment | -18.06 |
| 9/29/18 | RGG | LDC | 14.4 | 1.173 | 08/29/2018 | | 16.89 |
| 10/22/18 | RGG | LDC | | | | Payment | -16.89 |
| 10/27/18 | RGG | LDC | 38.1 | 1.173 | 09/27/2018 | | 44.69 |
| 11/19/18 | RGG | LDC | | | | Payment | -44.69 |
| 12/1/18 | RGG | LDC | 96 | 1.110212 | 10/27/2018 | | 106.58 |
| 12/24/18 | RGG | LDC | | | | Payment | -106.58 |
| 12/28/18 | RGG | LDC | 99 | 1.099 | 11/29/2018 | | 108.8 |
| 1/18/19 | RGG | LDC | | | | Payment | -108.8 |
| 1/31/19 | RGG | LDC | 143.1 | 1.124455 | 12/27/2018 | | 160.91 |
| 2/20/19 | RGG | LDC | | | | Payment | -160.91 |
| 3/1/19 | RGG | LDC | 159.6 | 1.138032 | 01/29/2019 | | 181.63 |
| 3/22/19 | RGG | LDC | | | | Payment | -181.63 |
| 3/30/19 | RGG | LDC | 107 | 1.139 | 03/01/2019 | | 121.87 |
| 4/22/19 | RGG | LDC | | | | Payment | -121.87 |
| 4/26/19 | RGG | LDC | 75.2 | 1.139 | 03/28/2019 | | 85.65 |
| 5/17/19 | RGG | LDC | | | | Payment | -85.65 |
| 5/31/19 | RGG | LDC | 54.5 | 1.139 | 04/26/2019 | | 62.08 |
| 6/21/19 | RGG | LDC | | | | Payment | -62.08 |

# EXHIBIT B

**Email from Michael Aschenbrener to Matt Matthews, *Direct Energy: Schafer: tolling* (Dec. 10, 2019, 4:27 p.m.)**

**Tuesday, April 14, 2020 at 9:05:56 AM Central Daylight Time**

**Subject:** Direct Energy: Schafer: tolling

**Date:** Tuesday, December 10, 2019 at 4:27:28 PM Central Standard Time

**From:** Michael Aschenbrener, Esq.

**To:** Matt Matthews, Diane Wizig

**CC:** Adam C. York, Esq., David Steelman

Matt-

In the wake of last week's hearing and in consultation with our client, Richard Schafer, we are obligated to preserve any potential natural gas claims that he may have. We have reason to believe that, absent further action, his gas claims may be at risk if no action is taken by this Friday, December 13, 2019. Please let me know if Direct Energy has a different understanding of the operative dates.

This will require us to file a new complaint or, preferably, to enter into a tolling agreement with Direct Energy on or before Friday. In order to avoid potentially unnecessary litigation, we propose the parties enter into a tolling agreement for Mr. Schafer, at least until the Court in *Forte* decides class certification. At that point, we will all know the scope of the certified class, if any. Alternatively, we are also open to entering into a shorter tolling agreement while we discuss any other suggestions that Direct Energy may have to avoid our filing of another complaint.

Because of the immediacy of the approaching deadline, I ask that you get back to us as soon as possible. I am happy to discuss by phone.

MJA

Michael Aschenbrener | KamberLaw LLC
1.303.222.0281 (direct)
masch@kamberlaw.com | www.kamberlaw.com

*CONFIDENTIALITY AND LIABILITY FOR MISUSE.*
The information contained in this communication is the property of KamberLaw, LLC. It is confidential, may be attorney work product, attorney-client privileged or otherwise exempt from disclosure under applicable law, and is intended only for the use of the addressee(s). Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited. If you have received this communication in error, please notify KamberLaw, LLC immediately by return e-mail and destroy this communication and all copies thereof, including all attachments. Pursuant to requirements related to practice before the U.S. Internal Revenue Service, any tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for purposes of (i) avoiding penalties imposed under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another person any tax-related matter.

# EXHIBIT C

**Email from Matt Matthews to Michael Aschenbrener, *RE: Direct Energy: Schafer: tolling* (Dec. 11, 2019, 5:48 p.m.)**

Monday, January 6, 2020 at 12:58:02 PM Central Standard Time

**Subject:** RE: Direct Energy: Schafer: tolling

**Date:** Wednesday, December 11, 2019 at 5:48:37 PM Central Standard Time

**From:** Matt Matthews

**To:** Michael Aschenbrener, Esq., Diane Wizig

**CC:** Adam C. York, Esq., David Steelman

Michael, Direct Energy will not enter into a tolling agreement.

Matt Matthews

MᴄDᴏᴡᴇʟʟ Hᴇᴛʜᴇʀɪɴɢᴛᴏɴ LLP

P: 713-337-8879   F: 713-337-8859

**CONFIDENTIALITY NOTICE**

The information in this e-mail may be confidential and/or privileged. This e-mail is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this e-mail and its attachments, if any, or the information contained herein is prohibited. If you have received this e-mail in error, please immediately notify the sender by return e-mail and delete this e-mail from your system.

**From:** Michael Aschenbrener, Esq. <masch@kamberlaw.com>
**Sent:** Tuesday, December 10, 2019 4:27 PM
**To:** Matt Matthews <matt.matthews@mhllp.com>; Diane Wizig <diane.wizig@mhllp.com>
**Cc:** Adam C. York, Esq. <Ayork@kamberlaw.com>; David Steelman <dsteelman@steelmanandgaunt.com>
**Subject:** Direct Energy: Schafer: tolling

Matt-

In the wake of last week's hearing and in consultation with our client, Richard Schafer, we are obligated to preserve any potential natural gas claims that he may have. We have reason to believe that, absent further action, his gas claims may be at risk if no action is taken by this Friday, December 13, 2019. Please let me know if Direct Energy has a different understanding of the operative dates.

This will require us to file a new complaint or, preferably, to enter into a tolling agreement with Direct Energy on or before Friday. In order to avoid potentially unnecessary litigation, we propose the parties enter into a tolling agreement for Mr. Schafer, at least until the Court in *Forte* decides class certification. At that point, we will all know the scope of the certified class, if any. Alternatively, we are also open to entering into a shorter tolling agreement while we discuss any other suggestions that Direct Energy may have to avoid our filing of another complaint.

Because of the immediacy of the approaching deadline, I ask that you get back to us as soon as possible. I am happy to discuss by phone.

MJA

Michael Aschenbrener | KamberLaw LLC
1.303.222.0281 (direct)
masch@kamberlaw.com | www.kamberlaw.com

*CONFIDENTIALITY AND LIABILITY FOR MISUSE.*

The information contained in this communication is the property of KamberLaw, LLC. It is confidential, may be attorney work product, attorney-client privileged or otherwise exempt from disclosure under applicable law, and is intended only for the use of the addressee(s). Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited.

If you have received this communication in error, please notify KamberLaw, LLC immediately by return e-mail and destroy this communication and all copies thereof, including all attachments.  Pursuant to requirements related to practice before the U.S. Internal Revenue Service, any tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for purposes of (i) avoiding penalties imposed under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another person any tax-related matter.

# EXHIBIT D

**Transcript of January 16, 2020 telephonic hearing before Magistrate Judge Andrew T. Baxter of the Northern District of New York in Forte v. Direct Energy Services, LLC, Case No. 6:17-cv-0264-FJS-ATB**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------x
MARTIN FORTE,

                Plaintiff,

    -and-

THOMAS AURELIA, JERRY BAGLIONE and
RICHARD SCHAFER,


                Intervenor-Plaintiffs,

vs.                          6:17-cv-264

DIRECT ENERGY SERVICES, LLC,
a Delaware Limited Liability Company,

                Defendant.
--------------------------------------------------x


*Telephone Conference* - January 16, 2020

James Hanley Federal Building, Syracuse, New York

HONORABLE ANDREW T. BAXTER

United States Magistrate Judge, Presiding


*Eileen McDonough, RPR, CRR*
*Official United States Court Reporter*
*P.O. Box 7367*
*Syracuse, New York 13261*
*(315)234-8546*

<u>APPEARANCES</u>  (by telephone)


For Plaintiffs:     KAMBERLAW, LLC
                    Attorneys at Law
                    220 Green Street
                    Chicago, IL 60607
                       BY:  MICHAEL J. ASCHENBRENER, ESQ.
                            ADAM C. YORK, ESQ.

                    STEELMAN & GAUNT
                    Attorneys at Law
                    901 Pine Street
                    Rolla, MO 65402
                       BY:  DAVID LLOYD STEELMAN, ESQ.


For Defendant:      MCDOWELL HETHERINGTON LLP
                    Attorneys at Law
                    1001 Fannin Street
                    Houston, TX 77002
                       BY:  DIANE S. WIZIG, ESQ.
                            MICHAEL D. MATTHEWS, JR., ESQ.


*Eileen McDonough, RPR, CRR*
*Official United States Court Reporter*
*P.O. Box 7367*
*Syracuse, New York 13261*
*(315)234-8546*

3

1          THE CLERK:  Good morning.  This is Forte versus

2     Direct Energy Services.  Who do we have on the line for the

3     plaintiff?

4          MR. ASCHENBRENER:  This is Michael Aschenbrener and

5     Adam York of KamberLaw.

6          MR. STEELMAN:  And David Steelman from Steelman &

7     Gaunt.

8          THE CLERK:  And for defendant?

9          MS. WIZIG:  This is Diane Wizig and Matt Matthews

10    from McDowell Hetherington.

11         THE COURT:  This is Forte versus Direct Energy

12    Services, LLC, 6:17-cv-264.  We have Messrs. York,

13    Aschenbrener and Steelman for the plaintiff, and Ms. Wizig

14    and Mr. Matthews for the defendant.

15         On December 4th, 2019 I granted in part the motion

16    of plaintiffs Aurelia, Baglione and Schafer to intervene as

17    named plaintiffs in this action with respect to their

18    electricity claims only.  That's reflected in docket number

19    101.

20         The defendant has moved for reconsideration of that

21    ruling based in significant part on plaintiff's subsequent

22    filing of an allegedly overlapping lawsuit on behalf of

23    plaintiffs Schafer, William Underwood and James Brietfeller

24    in the Western District of New York.  The defense motion is

25    docket number 105.

4

1          Plaintiff opposed the motion for reconsideration,

2  docket number 107, after amending the complaint in the

3  Western District of New York to allegedly narrow the claims

4  to include only natural gas claims, which purportedly reduce

5  or eliminate the overlap of the two cases.  Mr. Brietfeller

6  was dropped from the Western District of New York case as a

7  plaintiff in the amended complaint.

8          On Monday the defendant sought leave to file a

9  reply, docket number 109-1, which I allowed.

10          I'm going to take just a minute to summarize the

11  law applicable to a motion for reconsideration and I'll give

12  each side a brief chance to supplement their argument and

13  then proceed to make a decision.

14          Reconsideration is appropriate only if, and I'm

15  quoting, "There is an intervening change in the controlling

16  law; new evidence not previously available comes to light; or

17  it becomes necessary to remedy a clear error of law or to

18  prevent manifest injustice."  It's a quote from *United States*

19  *versus Jackson*, Northern District of New York case from 2014,

20  cited at 41 F.Supp. 3d 156 at 164, which in turn cites other

21  authority from the Northern District of New York.

22          A reconsideration motion, and I'm quoting now

23  again, "Is not to be used for re-litigating old issues,

24  presenting the case under new theories, securing a rehearing

25  on the merits, or otherwise taking a second bite at the

1    apple."  That's from *Murray versus Palmer*, Northern District

2    of New York case from April 27, 2007, reported at 2007 WL

3    1237679 at page 2.  I would also reference *In re Health*

4    *Management Systems, Inc. Securities Litigation*, a Southern

5    District of New York case from 2000, reported at 113

6    F.Supp.2d, 613 at 614, which held, and I'm quoting,

7    "Reconsideration of a previous order is an extraordinary

8    remedy to be employed sparingly in the interests of finality

9    and conservation of scarce judicial resources."

10           So since I let defense have the last word on paper,

11   I'll hear first from plaintiffs and then give the defendants

12   a brief opportunity.  And we have a court reporter, so please

13   identify whoever is speaking.

14           MR. ASCHENBRENER:  This is Michael Aschenbrener for

15   KamberLaw for plaintiffs.  I'll be brief, Your Honor.

16           I'd like to note up front here that our primary

17   goal as it relates to this case, the Forte matter, is to keep

18   it moving and to be able to get to the merits of the case and

19   ultimately trial, if necessary.  We have stuck to the 2019

20   February 25th scheduling order even while going through all

21   the motion practice we had this year even, timely moving for

22   class cert.

23           We also in order to keep this case moving forward,

24   as we pointed out in our opposition, we offered months ago to

25   hold the motion to intervene in abeyance, and the defendant

1   was not interested in that, which is defendant's right, but

2   it's notable nonetheless.  And more recently, as pointed out,

3   we offered to toll the Western District action so as to avoid

4   that case for the time being and potentially forever,

5   depending on how the Forte goes forward.  The defendant was

6   quite clearly not interested in that either.

7        So those points are made here to emphasize that

8   plaintiffs are doing everything they can to keep this case

9   moving forward while protecting the rights of the individuals

10  and the class reps.  I'll say moving forward here that I

11  don't see any clear error of law, no change in control of

12  law, there's no new evidence that has come to light, as we

13  documented fairly extensively in our opposition.  This

14  outcome was known by all parties, including the courts, and

15  discussed at some length and multiple occasions over some

16  period of time on the record, and I don't think there is any

17  injustice here, manifest injustice to prevent.  That was all

18  dealt with at the prior hearing on December 4th and we're not

19  here to re-litigate any of that.

20        I will point out as well that the standards were

21  permissive intervention and intervention as of right are

22  exceedingly similar, and different briefing I don't believe

23  would have resulted in any different outcome.

24        And then I will say briefly on the claims splitting

25  argument that defendant has made and keeps making even in its

1    reply brief, I don't think that holds here.  You know, the

2    defendant has argued for some time now successfully that the

3    gas claims are just too different, that would be a

4    substantive expansion of the case to allow the gas claims to

5    get included at this stage in the existing Forte matter.  And

6    now defendant seems to be arguing the exact opposite, that

7    gas claims are so similar they're actually part of the same

8    series of transactions or events so as to preclude or

9    prohibit the hearing of those issues in a different case.

10           And to me that looks a lot like judicial estoppel

11   would come into play here because those are not alternative

12   arguments, but they rather are in direct contradiction of

13   each other.  Either the claims, the gas claims are similar or

14   they are different, and defendant made both arguments here.

15           And I'll point out as a practical matter moving

16   forward that much of defendant's reply argument rests on the

17   hypothetical scenario that the Western District plaintiffs

18   reamend their case to re-add electricity claims.  And without

19   getting into the idea of whether that's claims splitting, I

20   would say as a practical matter that plaintiffs in that case

21   can no longer amend as of right, so this would get challenged

22   by the court anyway.

23           And then moving backward just for a moment, if the

24   Court did, in fact, decide that the gas claims are different,

25   so again we'd be relating something the Court already decided

1   here today.

2           Finally, Your Honor, I will say that as we pointed

3   out in a footnote in our opposition, we're fine to transfer

4   the Western District case to the Northern District.  We think

5   it would be appropriate for this court and Your Honor and

6   Judge Scullin to hear the gas case, the current Western

7   District case.  We filed it in the Western District only

8   because the defendant made a clear point on the record that

9   it would challenge venue if Mr. Schafer filed the case in the

10  Northern District, and we wish to avoid unnecessary motion

11  practice, so it was in our view the most conservative way to

12  do things would be to file that in the Western District.  But

13  we would be happy for that case to be moved to this Court, so

14  long as it doesn't slow down the existing Forte matter.  And

15  the exact procedural mechanisms for doing so were openminded,

16  but it may be a matter of transferring the related without

17  consolidating so that the cases proceed on different time

18  lines.  But like I say, we're openminded on that.  That's all

19  I have for now, Your Honor.

20          THE COURT:  My only other question for you,

21  Mr. Aschenbrener, is, you know, you talked about willingness

22  to hold off on the Western District of New York case but you

23  didn't get a tolling agreement.  Assuming they were amenable,

24  is staying that action pending further developments in this

25  case something the plaintiffs would consider?

9

1          MR. ASCHENBRENER:  Yes, I believe plaintiffs would
2     consider that.
3          THE COURT:  Okay.
4          MR. STEELMAN:  To add, Your Honor, yes, to that
5     question.
6          THE COURT:  Ms. Wizig or Mr. Matthews?
7          MS. WIZIG:  This is Ms. Wizig.  I will limit my
8     time to responding to the things that Mr. Aschenbrener just
9     raised, and as Your Honor pointed out we did get the last
10    word on reply.
11          I think that plaintiff's amendment of the Western
12    District action complaint shows that there was new evidence
13    that needed to be brought to the Court's attention and their
14    amendment to delete allegations about the electricity claims
15    shows that there are claims splitting issues.
16          As to Mr. Aschenbrener's points that Direct Energy
17    had somehow had inconsistent perspective on the issue of
18    whether natural gas and electricity are different claims,
19    absolutely not the case.  And Direct Energy has always
20    maintained that electricity and natural gas are different
21    claims and that Mr. Forte should not be able to represent
22    natural gas customers here because he was not one.  And the
23    only evidence that Mr. Forte presented in his motion for
24    class certification related to electricity.
25          Our point is that plaintiff and plaintiff's counsel

1   have always taken the position that that is not true.  And we

2   cited many statements on the record and footnote 8 of our

3   opening motion for reconsideration showing that that's

4   plaintiff's view.  Plaintiff's view all along has been that

5   they are the same, they're functionally identical, and there

6   is nothing different from a practical perspective from

7   deleting the electricity claims in the amended complaint in

8   the Western District.

9           So in our view there is no contradiction here.

10  We're going with what plaintiffs have always argued, and the

11  anticipation that plaintiffs are going to maintain a motion

12  for class certification here but decertification of both gas

13  and electricity and do the exact same thing in the Western

14  District action, and it is not inconsistent with Direct

15  Energy's position that it always wanted the distinct

16  alternative of adding claims here versus having a separate

17  lawsuit.

18          What plaintiffs have done is take one plaintiff,

19  Mr. Schafer, and split his claims into two different courts.

20  And that's not because Direct Energy has argued about the

21  venue, it's because Mr. Schafer's claims can only be brought

22  in the Western District of New York.  His claims are not

23  properly venued in this action and no transfer can occur on

24  any grounds because venue is not proper in this district for

25  Mr. Schafer's claims.

1          As far as delays, Mr. Aschenbrener argued that

2     they're trying to move the case forward and there won't be

3     any delay if the Court's December 4th ruling stands.  From

4     Direct Energy's view that's just not true, the delay will be

5     significant.  Rather than opposing class certification, like

6     we wanted to do back in October of 2019, at the earliest even

7     if the Court adopts plaintiff's position on schedule, that

8     won't happen for four months, and the summary judgment

9     briefing won't be complete for eight months.

10          If the Court's ruling on December 4th is

11     reconsidered and intervention is denied, all of that could

12     happen immediately because additional discovery won't need to

13     be taken, the new plaintiff won't need to be deposed, Direct

14     Energy's expert won't need to supplement our report, and the

15     briefing could commence almost immediately.

16          Finally, as to the suggestion that tolling would be

17     an appropriate resolution of the issue of two different

18     lawsuits, here not only is it contrary to Direct Energy's

19     stated preference for many years now to move forward with the

20     litigation and receive clarity and certainty on the merits,

21     but also a classic two bites of the same apple.  If we were

22     to win in front of Judge Scullin and have a complete victory

23     here in this Court, there is nothing to stop Mr. Schafer from

24     asserting the same claims in the Western District.

25          Just like the motion to intervene, we don't think

1    that plaintiff should get to sit around and wait and see

2    whether they like the outcome before proceeding with the

3    second chance to achieve the same result in another court.

4    So that is why Direct Energy declines the plaintiff's

5    suggestion that they toll the Western District action.

6            THE COURT:  Mr. Aschenbrener, any reply?

7            MR. ASCHENBRENER:  Very briefly, Your Honor.  I

8    haven't a reply in my head to every word that Ms. Wizig

9    uttered there, but I will leave it at this.  I think actions

10   speak louder than words, Your Honor.  And the plaintiffs have

11   actually tried to move the case forward and defendant has

12   barely talked about it.  But for the last year and a half the

13   defendant has done everything they can do through motion

14   practice to slow this case down.  And Ms. Wizig can say the

15   opposite here, but I'm inclined to follow her client's

16   actions, and those actions tell me that Direct Energy is

17   slowing this case down and does not want it to move forward.

18   Plaintiffs do and plaintiffs' actions support that.

19           THE COURT:  Okay.  Let me start by addressing the

20   new action in the Western District of New York and addressing

21   how, if at all, it is relevant on my ruling on the motion to

22   intervene.

23           As plaintiff's letter briefs document, our prior

24   conferences made clear that to the extent I denied

25   plaintiff's efforts to amend the complaint or the motion of

1   the other potential plaintiffs to intervene, plaintiff's

2   counsel might well initiate a separate action, to the extent

3   the applicable statute of limitations allowed to cover

4   putative or named plaintiffs for claims that were not allowed

5   in this action.

6          I also agree with plaintiff that defense counsel

7   was well aware that plaintiff might file a separate action to

8   the extent the defense resisted the efforts to bring in this

9   action all of the plaintiffs and all of the claims that

10   plaintiff's counsel wanted to include.  And defense counsel

11   vigorously resisted at every turn the efforts of plaintiff's

12   counsel to expand the scope of this action, knowing that this

13   increased the likelihood that counsel would initiate another

14   action.

15          In addressing the motions to amend and intervene, I

16   tried to balance the inefficiencies of multiple, overlapping

17   actions against the prejudice to the defendants from a

18   dramatic expansion of the scope of this action after several

19   years of litigation.  And neither side, frankly, has given me

20   much help in those efforts.

21          Plaintiff's counsel has tried to substantially

22   expand the scope of this action, rather than settling for

23   more modest changes that would address the issues relating to

24   plaintiff Forte's adequacy as a class representative.  And,

25   as noted, defense counsel has shown no flexibility in

14

1  compromising on more modest amendments to plaintiff's

2  complaint notwithstanding the risk that it would likely

3  trigger the filing of a separate action by other plaintiffs.

4       Eventually, I struck a balance between the

5  competing interests by allowing the three other plaintiffs to

6  intervene, but not allowing the complaint to be amended to

7  add natural gas claims or state claims relating to

8  subscribers who signed on originally with NYSEG Solutions or

9  Energetix.

10      While my ruling on the motion to amend and the

11 motion to intervene may appear to the defense to be

12 inconsistent, I tried to fairly apply the different legal

13 standards that apply to those two motions.  Not surprisingly,

14 plaintiffs were not satisfied with my compromise and filed a

15 new action led by Mr. Schafer, who as I understood it was the

16 only possible remaining plaintiff who could still assert

17 claims in a new action within the statute of limitations.

18      I take Mr. Aschenbrener at his word that they filed

19 in the Western District of New York because that is where

20 Mr. Schafer lives and because defense counsel has repeatedly

21 threatened venue motions to the extent all of the named

22 plaintiffs did not reside in the district where an action was

23 filed.

24      Plaintiff's counsel, in my view, initially

25 overreached by filing a complaint in the Western District of

1    New York that did arguably extensively overlap with the

2    action pending in this district.  However, in response to the

3    defense motion, it has narrowed the Western District of

4    New York claims to natural gas claims, which appears to

5    eliminate most of the overlap.  And as Mr. Aschenbrener

6    noted, they took their one chance to amend as of right, and

7    so if they tried to change the claims in the Western District

8    of New York, Direct Energy would have an opportunity to

9    oppose that.

10           While I have tried to avoid multiple actions, I

11   think that the plaintiffs acted reasonably in pursuing only

12   the natural gas claims that I did not permit in the Western

13   District of New York action given their ethical

14   responsibilities to protect the interests of the named

15   plaintiffs, or the plaintiffs that they have actually been

16   retained by and the putative plaintiffs on the various claims

17   that they are asserting.

18           In any event, to the extent the defendants believe

19   that the case filed in the Western District of New York

20   inappropriately overlaps or duplicates this action, seems to

21   me that the remedy is to file motions in the Western District

22   of New York seeking dismissal of some or all of the action as

23   duplicative or overlapping with the first-filed action in

24   this district.

25           You know, we're essentially looking at variations

1    of the first-filed rule, and I'm not in a position to dismiss

2    the Western District of New York action.  That would have to

3    be addressed in front of the judge in the Western District of

4    New York.

5            But particularly given the recent narrowing of the

6    Western District of New York case to natural gas claims, I do

7    not think it would be appropriate to change my prior ruling

8    allowing additional named plaintiffs to join this action, in

9    which the scope of the original electricity claim has not

10   been significantly changed.

11           While the defense reply stresses the inconsistent

12   positions that plaintiff's counsel has taken in the course of

13   trying to broaden the scope of this action, it really tries

14   to paper over similar inconsistencies in its position.

15           In opposing the motion to amend, the defense argued

16   vigorously that the plaintiff was vastly expanding the scope

17   of this action by adding the natural gas claims, causing

18   great prejudice to the defendant.  It argued that they would

19   assert a venue objection with respect to any named plaintiff

20   who did not reside in the Northern District of New York.

21           Now taking plaintiffs to task for filing an

22   overlapping action in the Western District of New York,

23   defense counsel argues that the Western District of New York

24   claims could have been brought here and that the plaintiffs

25   are improperly splitting similar claims.

17

1        Now I recognize that defendant Schafer is a

2   plaintiff in both actions.  And, you know, again, if to the

3   extent that overlap, notwithstanding the differences in the

4   claims, is a bone of contention with the defendants, they can

5   pursue that in the Western District of New York.  And

6   presumably if that becomes a significant issue, one of the

7   options that the plaintiffs can consider is dropping

8   Mr. Schafer from this action, which would still leave another

9   named plaintiff other than Mr. Forte.

10        Now it clearly would have been more efficient to

11   allow the plaintiff to broaden the scope of this action to

12   include both electricity and natural gas claims, but the

13   defendants were within their rights but vigorously resisted

14   that, and I agreed that defendants would be prejudiced by the

15   expansion of the action after several years of litigation.

16        The plaintiff's decision to pursue the natural gas

17   claim in a separate action was a predictable, if not

18   inevitable, result of the defense tactics, and I'm not going

19   to reconsider my ruling because the defendants may regret

20   that they got what they wished for.

21        The defense can seek relief in the Western District

22   of New York, but it would seem to me they're taking their

23   chances to do so.  The Western District might rule against

24   the defendants on the venue issue and order that the case be

25   transferred under 28 U.S.C. Section 1404(a) so that it can be

1   consolidated with this action.  See, for example,

2   *Wyler-Wittenberg versus MetLife Home Loans, Inc.*, Eastern

3   District of New York case from 2012, cited at 899 F.Supp.2d

4   at 235.  The other possibility is the Western District of

5   New York might stay that action pending further developments

6   in this case.

7          In any event, I think the defense motion does not

8   provide valid grounds for reconsideration of my ruling based

9   on the Western District of New York action, and nor do I

10   think there are other valid grounds for reconsideration.

11          I understand defense counsel's frustration about

12   the filing of a motion for permissive intervention after

13   plaintiff's counsel stated his intentions to file only for

14   intervention as of right, but that issue was raised and

15   addressed in connection with the motion to intervene and

16   defense counsel is just basically repeating the same

17   arguments again.

18          With respect to the defense argument that they did

19   not have an adequate opportunity to oppose the motion for

20   permissive intervention, defense counsel made a tactical

21   decision to briefly oppose that motion on procedural grounds

22   and to not explicitly address the merits.  So, letting

23   defense counsel have another bite at opposing the motion to

24   intervene is not consistent with the law relating to motions

25   for reconsideration.

1          As plaintiff's counsel argues, many of the same

2     factors are relevant to intervention as of right and

3     permissive intervention, although the Court clearly has

4     greater discretion with respect to the latter.

5          So, I think the defense counsel essentially

6     marshaled whatever persuasive arguments they had with respect

7     to both permissive intervention and intervention as of right.

8     And nor do I think that reconsideration is necessary to

9     correct any clear error or to prevent manifest injustice.

10    Given the broad discretion judges have with respect to

11    permissive intervention, I do not find that the defense

12    suggestion that my decision reflected clear error is

13    persuasive.

14         And I substantially limited the extent to which the

15    intervention of the three additional plaintiffs would alter

16    the substance of the claims in this case, so I also conclude

17    that my ruling did not cause manifest injustice.

18         So, in short, I am going to deny the motion for

19    reconsideration.

20         So the parties have submitted a joint status report

21    which proposes an adjustment of the schedule.  I guess the

22    uncertainty that I have at this point is whether I need to

23    wait 14 days to consider the proposed schedule to see if

24    there is an appeal of my denial of the motion to reconsider.

25    And I don't know whether you're prepared to tell me your

1  position on that at this time, Ms. Wizig, or not.

2          MS. WIZIG:  I think that we would maintain our

3  original position, but we of course need to consult with our

4  client.

5          THE COURT:  Okay.  So obviously if you decide to

6  appeal that decision, we're gonna be in limbo until that's

7  resolved by Judge Scullin.  And, you know, he is a senior

8  judge and does work in other districts and so that may take a

9  while.  But let me -- but the parties are in agreement on the

10 schedule once -- no, the parties are not in agreement on the

11 schedule.

12         MS. WIZIG:  Your Honor, we're in agreement on

13 limited written discovery to take place in the meantime.

14         THE COURT:  Okay.

15         MR. MATTHEWS:  I think the parties are in agreement

16 with respect to sort of the spacing of deadlines once they

17 begin.  The disagreement is when they should begin.  The

18 plaintiff's position would be they should commence

19 essentially now I think, whereas defendants would have them

20 begin once that objection has been ruled on.

21         THE COURT:  Okay.  Well, that sort of reinforces

22 the plaintiff's argument that they're the ones pushing to

23 move this action along as opposed to you.  So you're talking

24 about even the discovery with respect to the additional

25 intervenors?

1          MR. MATTHEWS:  What we have agreed on is that

2     Direct Energy will just go ahead and produce any documents

3     that are specific to the intervenors that have not already

4     been produced without the need for any written request and

5     that the written discovery with respect to those individuals

6     would commence now.

7          THE COURT:  But you would stop there and not

8     proceed with depositions, for example, and the other things

9     in the schedule until a ruling from Judge Scullin?

10         MR. MATTHEWS:  Yes, Your Honor.

11         THE COURT:  All right.  Anything on the plaintiff's

12    side on the schedule you want to say?

13         MR. ASCHENBRENER:  Very briefly.  Just that in

14    addition to what's been said thus far, I believe technically

15    the -- it's not clear to me if the stay that was put in place

16    this fall is lifted in this case or if it remains in place.

17         THE COURT:  We're still stayed, according to my

18    courtroom deputy.

19         MR. ASCHENBRENER:  So plaintiff's perspective is

20    that certain rights stay lifted so that we can move forward.

21    I understand that's indirectly what's being discussed here,

22    but I wanted to be direct about it.

23         THE COURT:  Okay.  And I take it, Mr. Matthews,

24    you're looking to stay the deadline to respond to the

25    intervenors' complaint as well?

1          MR. MATTHEWS:  Yes, Your Honor.

2          THE COURT:  Hang on just one second.  So I guess

3    what I'm gonna do, I'm going to certainly have the parties

4    move forward with the production of documents with respect to

5    the intervenors and the written discovery with respect to the

6    intervenors, which presumably is going to take at least

7    thirty days.  We will see whether or not an appeal is filed.

8    I will then consult with Judge Scullin's chambers and see if

9    I can get some input as to their view as to whether we should

10   move forward pending any appeal of the motion for

11   reconsideration or whether that should be stayed.  And

12   depending on the answer, we'll set the schedule.

13          But if I'm clear, Mr. Matthews, you're okay with

14   the sequence of the subsequent events, it's just a starting

15   date that you dispute?

16          MR. MATTHEWS:  Correct, Your Honor.  The parties

17   are in agreement about the sequence.

18          THE COURT:  Okay.  All right.  So we will stay for

19   now the deadline for the defendants to answer the intervenor

20   complaint, which I think the deadline may be tomorrow, and

21   otherwise continue the stay except to the extent the parties

22   have agreed to go forward with paper discovery with respect

23   to the intervenors.  And in the meantime I'll wait to see

24   what the final decision of Direct Energy is with respect to

25   appealing the motion to intervene and/or the motion for

23

1    reconsideration, and then depending on what input I can get

2    from Judge Scullin, we'll decide what to do about the

3    schedule.

4         I will also check with Judge Scullin as to whether

5    or not he might be prepared to address the disagreement

6    between the parties as to what should happen while he is

7    sitting on the motion to reconsider.  But as I say, I don't

8    have much control over his schedule but I will talk with him

9    at least and see if I can get some input on that.

10        All right.  Is there anything else we need to

11   discuss, any questions or need for clarification?

12        MR. ASCHENBRENER:  Not from plaintiff.

13        MR. MATTHEWS:  Not from the defendant either, Your

14   Honor.

15        THE COURT:  And I'm not weighing in on the Western

16   District of New York action obviously, but I would urge the

17   parties to talk further and see if there is something you can

18   work out that might eliminate some of the inefficiencies of

19   having the duplicate actions pending at the same time.  But

20   failing an agreement, I don't think there is much I can do

21   about it.  All right.  Thank you, Counsel.

22        MR. ASCHENBRENER:  Thank you, Your Honor.

23        MS. WIZIG:  Thank you.

24                    *          *          *

25

C E R T I F I C A T I O N

       I, EILEEN MCDONOUGH, RPR, CRR, Federal Official
Realtime Court Reporter, in and for the United States
District Court for the Northern District of New York,
do hereby certify that pursuant to Section 753, Title 28,
United States Code, that the foregoing is a true and correct
transcript of the stenographically reported proceedings held
in the above-entitled matter and that the transcript page
format is in conformance with the regulations of the
Judicial Conference of the United States.


_____
EILEEN MCDONOUGH, RPR, CRR
Federal Official Court Reporter

# EXHIBIT E

**Deposition transcript of Richard Schafer
in the *Forte* matter.**

```
 1                    RICHARD SCHAFER

 2

 3

 4       UNITED STATES DISTRICT COURT

         NORTHERN DISTRICT OF NEW YORK

 5

         -----------------------------------------

 6       MARTIN FORTE,

 7                             Plaintiff,

 8                    - and -    Civil Action No.

                                6:17-cv-0264(FJS/ATB)

 9

         THOMAS AURELIA, JERRY BAGLIONE,

10       and RICHARD SCHAFER,

11                             Intervenor/Plaintiffs,

12                    - vs -

13       DIRECT ENERGY SERVICES, LLC,

14                             Defendant.

         -----------------------------------------

15

16

17             Examination before trial of RICHARD

18       SCHAFER, Intervenor/Plaintiff, taken pursuant to

19       the Federal Rules of Civil Procedure, at REGUS

20       BUSINESS CENTERS, 510 Clinton Square, Rochester,

21       New York, on February 26, 2020, commencing at

22

23          a.m., before LORI K. BECK, CSR, CP, CM, Notary  9:38

24

25       Public.
```

                                                    Page 1

```
 1
 2   APPEARANCES:      KAMBERLAW, LLP,
                       By MICHAEL ASCHENBRENER, ESQ.,
 3                     220 N. Green Street,
                       Chicago, Illinois  60607,
 4                     (212) 920-3072,
                       masch@kamberlaw.com,
 5                         and
                       STEELMAN & GAUNT,
 6                     By DAVID L. STEELMAN, ESQ.,
                       901 N. Pine Street, Suite 110,
 7                     Rolla, Missouri  65401,
                       (573) 341-8336,
 8                     dsteelman@steelmanandgaunt.com,
                       Appearing for the Plaintiff,
 9                     individually and on behalf of
                       a class of similarly situated
10                     individuals.
11                     McDOWELL HETHERINGTON LLP,
                       By DIANE S. WIZIG, ESQ.,
12                     1001 Fannin Street, Suite 2700,
                       Houston, Texas  77002,
13                     (713) 333-5889,
                       diane.wizig@mhllp.com,
14                     Appearing for the Defendant.
15   PRESENT VIA       MICHAEL D. MATTHEWS, JR., ESQ.,
     TELEPHONE:        McDowell Hetherington LLP
16
                       CHRISTINA DILLARD, ESQ.,
17                     In-House Counsel,
                       Direct Energy Services, LLC
18
19
20
21
22
23
24
25
```

                                              Page  2

```
 1                      Richard Schafer
 2          THE VIDEOGRAPHER:  This will begin the video
 3     recorded testimony of Richard Schafer, taken for a
 4     case to be tried in the United States District
 5     Court, Northern District of New York, to be used in
 6     the matter of Martin Forte, et al. versus Direct
 7     Energy Services, LLC.
 8             This testimony is being taken in the office
 9     of the Regus Business Centers, 75 South Clinton
10     Avenue, Suite 510, Rochester, New York, on
11     February 26, 2020, and is commencing at the time of
12     9:38 as indicated on the video screen.
13             The court reporter and notary public, who is
14     from the firm of Veritext Reporting Services, is
15     Lori Beck.  My name is Tyler Rahner.  I am the
16     video technician, and I am from the same firm.
17             Counsel for the Plaintiff will now introduce
18     themselves, followed by counsel for the Defendant,
19     and the reporter will then swear in the witness.
20          MR. ASCHENBRENER:  Michael Aschenbrener of
21     KamberLaw for Plaintiffs in the putative class.
22          MR. STEELMAN:  David Steelman of Steelman &
23     Gaunt in Rolla, Missouri, for the named Plaintiffs
24     in the putative class.
25          MS. WIZIG:  Diane Wizig of McDowell
```

Veritext Legal Solutions
346-293-7000

```
 1                    Richard Schafer
 2   Hetherington for Defendant, Direct Energy, and on
 3   the phone is Matt Matthews, also of McDowell
 4   Hetherington for Direct Energy, and Christina
 5   Dillard, who is in-house at Direct Energy.
 6        MR. ASCHENBRENER:  We will hold on signature
 7   of the transcript so that we can review.
 8
 9   R I C H A R D   S C H A F E R, 684 Eastbrooke Lane,
10   Rochester, New York 14618, after being duly called
11   and sworn, testified as follows:
12
13        EXAMINATION BY MS. WIZIG:
14
15        Q.   Good morning, Mr. Schafer.
16        A.   Good morning.
17        Q.   We met just a few minutes ago.  My name
18   is Diane Wizig, and I represent Direct Energy in
19   this case.
20        Before today, we had never met; is that
21   right?
22        A.   Correct.
23        Q.   Okay.  Can you also state for the
24   record your date of birth, please?
25        A.   My birthday is September 12th, 1936.
```

Page 4

```
 1                    Richard Schafer
 2         Q.   Thank you.  Mr. Schafer, have you ever
 3    been deposed before?
 4         A.   No.
 5         Q.   Okay.  Have you ever seen a deposition?
 6         A.   No.
 7         Q.   Okay.  And you understand today that
 8    you're under oath just as you would be in a
 9    courtroom with a judge and jury, right?
10         A.   I do.
11         Q.   Okay.  And you've done a good job so
12    far of waiting until I'm done with my question and
13    then answering.  If we could just keep that going
14    so that the court reporter here doesn't get mad at
15    us and can -- and can take everything down, that
16    would be great.
17         A.   Okay.
18         Q.   Similarly, I can see your nods of the
19    head and so can the video, but the transcript
20    can't --
21         A.   Yes, ma'am.
22         Q.   -- so if you could verbalize all
23    answers --
24         A.   Right.
25         Q.   -- which you're doing already.
```

Page 5

```
1                    Richard Schafer
2         If you don't understand one of my
3   questions -- and I'm sure I will ask a bad question
4   today -- please just ask me for clarification.
5         A.   Okay.
6         Q.   And if you answer my question, I'll
7   assume you understood it; is that fair?
8         A.   Fair enough.
9         Q.   Okay.  This is not a sprint, so please
10  let me know if you want to take a break for the
11  bathroom, to get a drink, whatever it is.  We can
12  take a break --
13        A.   Sure.
14        Q.   -- unless I'm in the middle of a
15  question --
16        A.   Understood.
17        Q.   -- and then I'll ask you to finish.
18        Mr. Schafer, are you on any medications
19  today that would prevent you from answering
20  truthfully?
21        A.   No.
22        Q.   Did you do anything to prepare for your
23  deposition today?
24        A.   Nothing in particular in terms of the
25  deposition, no, except to get here.
```

Page 6

```
 1                    Richard Schafer
 2         Q.    Okay.
 3         A.    That's the preparation, yes.
 4         Q.    Yes, it is.  Did -- did you meet with
 5    your attorneys?  I don't want to know what you
 6    talked about, but did you meet with them?
 7         A.    Yes.
 8         Q.    Okay.  Did you review any documents
 9    with them?
10         A.    No.
11         Q.    Okay.  You didn't look at any documents
12    when you met with them?
13         A.    No.
14         Q.    Okay.  When did you meet with them?
15         A.    Last evening.
16         Q.    Okay.  For about how long did you meet?
17         A.    It was probably an hour and a half, two
18    hours.
19         Q.    Okay.  And was it just these two
20    gentlemen here, Mr. Aschenbrener and Mr. Steelman?
21         A.    That's correct.
22         Q.    Okay.  There was nobody on the phone?
23         A.    No.
24         Q.    Okay.  Mr. Schafer, you're -- you live
25    in New York, right, in Rochester --
```

Page 7

```
 1                    Richard Schafer
 2         A.    That's correct.
 3         Q.    -- on Eastbrooke Lane.
 4         A.    Right.
 5         Q.    How long have you been a New York
 6    resident?
 7         A.    I've been a resident of New York since
 8    1958, I would say.
 9         (Discussion off the record.)
10    BY MS. WIZIG:
11         Q.    So you -- you moved here in -- in 1958?
12         A.    1958.
13         Q.    And did you move to Rochester
14    specifically?
15         A.    Yes.
16         Q.    Okay.  And you've lived in Rochester
17    continuously since 1958?
18         A.    Yes.
19         Q.    Okay.  How long have you lived at 684
20    Eastbrooke Lane?
21         A.    Since about 1993, I'd say.  That could
22    be plus or minus a year.  I can't remember.
23         Q.    Okay.  And you own the home?
24         A.    Yes.
25         Q.    Does anyone else live there with you?
```

Page 8

```
 1                    Richard Schafer
 2          A.    No.
 3          Q.    Has anyone ever lived there with you?
 4          A.    My son lived there with me for a few
 5     years eight or nine years ago.
 6          Q.    Do you own any other properties besides
 7     the home on Eastbrooke Lane?
 8          A.    No.
 9          Q.    Okay.  Have you ever had electricity
10     service at any other home at the same time as your
11     home on Eastbrooke Lane?
12          Have you paid for your son's electricity at
13     an apartment of another home of his?
14          A.    No, I have not.
15          Q.    Okay.
16          A.    No.
17          Q.    So the only electricity payment you're
18     responsible for is your own at Eastbrooke Lane.
19          A.    That's correct.
20          Q.    Okay.  How old is your son?
21          A.    My son is roughly 39.
22          Q.    Okay.  And what's his name?
23          A.    Peter Schafer, same last name.
24          Q.    Okay.  Is he your only child?
25          A.    No, I have a daughter.
```

Page 9

```
1                    Richard Schafer
2           Q.    Okay.
3           A.    Well, I have a daughter from that
4    marriage, who's his sister, and she's roughly 39.
5           Q.    Okay.  I understand.  And what is her
6    name?
7           A.    Emily.
8           Q.    And has Emily ever lived with you --
9           A.    No.
10          Q.    -- at Eastbrooke Lane?  Okay.
11          Have you ever paid for Emily's electricity
12   or natural gas anywhere?
13          A.    Not for -- no.  No, I have not.
14          Q.    No?  Okay.  Mr. Schafer, what's the
15   highest level of education that you have?
16          A.    I have a couple years of graduate
17   school, but no graduate degree.
18          Q.    Okay.  So you obviously went to
19   undergraduate school.
20          A.    That's -- yes, that's the way it works.
21          Q.    Yes.  And where did you go for
22   undergraduate?
23          A.    University of Pennsylvania.
24          Q.    Okay.  And what was your degree in?
25          A.    Physics.
```

Page 10

```
1                    Richard Schafer
2          Q.   Okay.  And did you go directly into
3    graduate school after your undergraduate degree, or
4    did you work first?
5          A.   Yes, I went to -- I went directly into
6    graduate school.
7          Q.   Okay.  Was that also at UPenn?
8          A.   No, that was at the University of
9    Rochester.
10         Q.   Okay.
11         A.   That was after I was up here.  I'm
12   sorry, I should speak up.  Yes.
13         Q.   Okay.  So did you work in between the
14   undergraduate degree from UPenn and University of
15   Rochester?
16         A.   Not in between.  I'm trying to
17   remember.  I don't think I worked that summer, no.
18   I don't -- I don't believe I did.
19         Q.   Okay.
20         A.   It's possible I worked at a television
21   station, but --
22         Q.   Sure.
23         A.   -- that was more before that, I think.
24         Q.   You just took the summer off.
25         A.   As far as I can remember, yes.
```

Page 11

```
1                        Richard Schafer
2          Q.   Okay.  And then how many years were you
3    at the University of Rochester?
4          A.   Two.
5          Q.   And what degree were you pursuing?
6          A.   I was pursuing a masters in physics.
7          Q.   And why did you decide to not --
8          A.   I got pregnant.
9          Q.   -- finish?
10         A.   I'm sorry, my -- I'm -- I'm sorry, by
11   the way.
12         Q.   That's okay.
13         A.   I was married, and my wife was
14   pregnant --
15         Q.   Okay.
16         A.   -- and I needed a job.
17         Q.   I see.
18         A.   Sorry about that.
19         Q.   That's okay.  And what job did you get?
20         A.   I took a job with the Eastman Kodak
21   Company.
22         Q.   What was that?  I'm sorry.
23         A.   Eastman Kodak Company.  Excuse me.
24         Q.   And what kind of work was that?
25         A.   As an engineer or a scientist or -- you
```

Page 12

```
 1                    Richard Schafer
 2    know, I guess it would be an engineer.
 3         Q.   Okay.  And how long were you with
 4    Eastman Kodak?
 5         A.   I was there for 33 years.
 6         Q.   Wow.  Congratulations.
 7         And did your job change there over time?
 8         A.   Yes.
 9         Q.   Okay.  After you started as an
10    engineer, what was your next position within the
11    company?
12         A.   I was an engineer in the instrument
13    standardization group.  I can remember that.  Then
14    I was a product engineer.  Both these were at Kodak
15    Park, which was a manufacturing and research
16    facility.
17         So the next thing after that was as a
18    product engineer, and that followed into marketing
19    as a product specialist, marketing specialist, and
20    on and on to manager of motion picture film for the
21    company.
22         Q.   Okay.  And that was your last job when
23    you retired?
24         A.   Yes.
25         Q.   Okay.  And did you have any other jobs
```

Veritext Legal Solutions
346-293-7000

```
1                    Richard Schafer
2     after Kodak?
3          A.   No.  I did a little consulting with
4     Kodak after I left, but not much.
5          Q.   Okay.  And what year would that have
6     been when you left?
7          A.   No, I'm sorry, I'm trying to think, and
8     I -- I -- I think it was nine -- it was around
9     '90 -- what would it be, '93?  I have to do the
10    math.  If I started in '60, '70, '80, '93, yes.
11         Q.   '93.
12         A.   '93.  Sorry about that.  I'm not real
13    good at dates --
14         Q.   No, that's okay.
15         A.   -- and times.
16         Q.   And -- and since 1993, you haven't had
17    any other employment.
18         A.   No, other than that little bit of
19    consulting, no.
20         Q.   Okay.  And that's about the same time
21    you moved into the Eastbrooke Lane home?
22         A.   About the same time, yes.
23         Q.   Okay.  Mr. Schafer, will you please
24    tell the ladies and gentlemen of the jury what you
25    think this lawsuit is about?
```

Veritext Legal Solutions
346-293-7000

```
 1                    Richard Schafer
 2         A.    Well, I think it's about signing up
 3    with Direct Energy -- or really it was Energetix at
 4    the time -- for what I thought would be a fixed
 5    rate for electricity -- and gas, for that matter --
 6    and that -- that that was changed to a variable
 7    rate without my being aware of it.
 8         Q.    And what, if anything, do you think
 9    Direct Energy did that was wrong?
10         A.    I think what they did that was wrong
11    was to increase -- slowly increase, actually --
12    my -- my rate that I was paying for electricity
13    over time.
14         And I think it was -- what I think was wrong
15    was, notwithstanding what maybe they felt they did,
16    I was not made aware of it, and that was what was
17    wrong.
18         MR. ASCHENBRENER:  Objection as to the most
19    recent question.  Calls for a legal conclusion.
20         BY MS. WIZIG:
21         Q.    Okay.  And let me just kind of unpack
22    that a little bit.
23         A.    Okay.  Sure.
24         Q.    So if I understand you correctly, you
25    take issue with the rates that Direct Energy
```

Page 15

```
1                    Richard Schafer
2    charged you; is that right?
3         A.   Yes, with -- I take issue with the rate
4    and their information presentation to me, or lack
5    thereof, yes, so --
6         Q.   Okay.
7         A.    In other words, I was unaware of the
8    rate change.
9         Q.   Okay.  So you were unaware of the rate
10   increasing once you were on a variable rate.
11        A.    Correct.
12        Q.   Okay.
13        A.   Or excuse me, and -- and I didn't know
14   I was put on a variable rate.  I was not aware of
15   that.
16        Q.   Okay.  So you take issue with having
17   been put on a variable rate.
18        A.    As well as the rate increase, yes.
19        MR. ASCHENBRENER:  Objection, misstates
20   prior testimony.
21        BY MS. WIZIG:
22        Q.    Mr. Schafer, you had experience with
23   Direct Energy's variable rates before you renewed
24   on a fixed rate in 2015, right?
25             A.   I'm not clear --
```

Page 16

                          Richard Schafer

1

2            MR. ASCHENBRENER:  Objection, form.

3            THE WITNESS:  -- on the question.

4            BY MS. WIZIG:

5            Q.   Do you know how many times you were on

6      a fixed rate with Direct Energy?

7            A.   No.  No, I don't.  I assume it was once

8      when I signed up, and I signed up under the company

9      name Energetix.

10           Q.   Okay.  So your -- strike that.

11           How many times do you believe you signed up

12     with Direct Energy?

13           A.   Once.

14           MR. ASCHENBRENER:  Objection, form.

15           THE WITNESS:  I'm sorry.

16           BY MS. WIZIG:

17           Q.   So you don't remember being on a

18     variable rate before 2016.

19           A.   I don't remember that, no.

20           Q.   Okay.  Do you remember getting a letter

21     in the mail that explained that the rate would be a

22     month-to-month variable rate if -- after your fixed

23     term expired?

24           A.   I didn't -- don't recall that.

25           Q.   Do you recall getting a letter

                                             Page 17

```
1                    Richard Schafer
2    reminding you that the variable rate would start
3    before you went on a variable rate?
4         A.    No.
5         Q.    Do you deny getting those letters, or
6    you just don't remember them?
7         A.    I don't recall them, and I -- I -- it's
8    conceivable that letters went by me or that I
9    didn't pay attention or something.  I don't know,
10   but I do not recall that.
11        Q.    Okay.  Mr. Schafer, do you pay your own
12   energy bills?
13        A.    Yes.
14        Q.    How do you pay them?
15        A.    I pay them by check.
16        Q.    So do you get a paper bill in the mail?
17        A.    Yes.
18        Q.    Okay.  And you get that paper bill
19   every month?
20        A.    From the -- from this -- from RG&E.
21   From the Rochester Gas & Electric Company, I get a
22   bill every month in the mail.  Sorry.
23        Q.    Okay.  So every month you get a bill in
24   the mail, and you review it, right?
25        A.    Well, I pay it.  To say I review it,
```

Page 18

1                    Richard Schafer
2      there's an awful lot of information on the bill,
3      and I certainly don't look at every single -- other
4      than numbers, all the numbers that are on the bill.
5            Q.   Right, but you have to open the bill
6      and --
7            A.   I open the bill, I look at how much it
8      is, I look at when it's due, and I set up to pay it
9      before it's due.
10           Q.   Okay.  Do you handle all of your
11     household's finances?
12           A.   Yes.
13           Q.   Mr. Schafer, do you know who your
14     current supplier is for electricity?
15           A.   Yes, I do.
16           Q.   Okay.  And who is that?
17           A.   Rochester Gas & Electric.
18           Q.   How long has Rochester Gas &
19     Electricity been your supplier?
20           A.   Well, since Direct Energy, it would be
21     since earlier in 2019, and before that it was
22     Direct Energy, and then before that, it was
23     Rochester Gas & Electric.
24           Q.   Do you know your current rate with
25     Rochester Gas & Electric?

                                          Page 19

```
 1                    Richard Schafer
 2          A.   No, I don't know exactly what it is
 3    now, no.
 4          Q.   Do you have a general idea?
 5          A.   I have -- for electric, to tell you the
 6    truth, I -- I'm not sure I could state a general
 7    idea.
 8          Q.   Okay.  Fair enough.  You know that your
 9    electricity rate varies month to month with
10    Rochester Gas & Electric, right?
11          MR. ASCHENBRENER:  Objection, form.
12          THE WITNESS:  Should I still answer that?
13          The -- the answer is I know it can change up
14    and down a little bit.
15          BY MS. WIZIG:
16          Q.   Okay.  So the answer is yes.
17          A.   Yes, the answer is yes.
18          Q.   Okay.  Do you have your RG&E bills from
19    the time you were a Direct Energy customer?
20          A.   I don't have all of them, no.
21          Q.   Okay.  Do you have more than what
22    you've produced in this litigation?
23          A.   I -- I probably do.  I -- I have -- I
24    have some.  I had went through a point where I was
25    discarding a lot of materials, you know, older
```

Veritext Legal Solutions
346-293-7000

                              Richard Schafer
1
2    bills and stuff, and so I can't tell you exactly
3    what I have, but I have -- I know I presented, I
4    think, a few bills to the -- to these attorneys
5    here.
6              Q.   Okay.  But you may have more.
7              A.   I may have more, yes.
8              Q.   When those bills come in the mail, you
9    said you open them, you pay the bill by check.
10             What do you do with the bill after you're
11   done with it?
12             A.   I -- I put it in a folder for the month
13   of bills.  I have a setup where I have folders for
14   each month of the year, and I put anything I pay in
15   that, and then I kind of put it out, and when it's
16   a year old, it gets thrown out.
17             But I put it in a folder after I pay it, to
18   answer your question.
19             Q.   Are you familiar with the term ESCO,
20   energy --
21             A.   Yes.
22             Q.   Okay.  So you're -- you're familiar
23   that that's an independent company that supplies
24   energy, electricity, to customers as an alternative
25   to the utility, like Direct Energy.

                                              Page 21

```
 1                    Richard Schafer
 2          A.    Yes.
 3          Q.    Okay.  So if I use that term today,
 4    we'll be on the same page.
 5          A.    Yes.
 6          Q.    Okay.  Have you ever received
 7    electricity from an ESCO other than Direct Energy?
 8          A.    No.
 9          Q.    You testified earlier that you received
10    energy from Energetix, right?
11          A.    Yes.
12          Q.    So you've received energy from
13    Energetix and Direct Energy, right?
14          A.    Yes.
15          Q.    Okay.  Any others?
16          A.    No.  No, I'm sorry.  Did I receive --
17    ask me -- would you repeat the question you're
18    asking?
19          Q.    Absolutely.  You've testified that you
20    received electricity from Energetix.
21          A.    Yes.
22          Q.    And then Direct Energy.
23          A.    Yes.
24          Q.    Have there been any other ESCOs that
25    you've received --
```

```
 1                    Richard Schafer
 2          A.   No, ESCOs, no.
 3          Q.   Okay.  So you're -- you're probably
 4     thinking of Rochester Gas & Electric?
 5          A.   Right.
 6          Q.   So when you signed up for Energetix,
 7     that was the first time you signed up with an ESCO.
 8          A.   Yes.
 9          Q.   Okay.
10          MR. ASCHENBRENER:  Just remind to let her
11     finish her questions completely.
12          THE WITNESS:  I'm sorry, yes.  Thank you.
13          BY MS. WIZIG:
14          Q.   Do you remember, when you signed up
15     with Energetix, whether that was for a fixed or a
16     variable rate?
17          A.   It was -- my understanding was that it
18     was a fixed rate when I signed up with Energetix.
19          Q.   Okay.  Do you recall enrolling with
20     Energetix in 2002?
21          A.   I don't recall that exactly, but that's
22     conceivable that that's correct.
23          Q.   Okay.
24          A.   It would be early 2000s, I would think.
25          Q.   Okay.  Why did you choose to enroll
```

Veritext Legal Solutions
346-293-7000

```
 1                    Richard Schafer
 2  with Energetix in the early 2000s?
 3       A.   With the expectation that I would save
 4  money.
 5       Q.   Okay.  Did Energetix say anything to
 6  you to make you think you would save money?
 7       A.   I'm -- I'm sure they did.  I mean, I --
 8  I'm -- that's how I came to believe it.  I -- you
 9  know, they -- they must have sent me something,
10  told me something that made me believe that I --
11  anticipate that I would save money.
12       Q.   But you don't recall anything in
13  particular that they said to you.
14       A.   Well, no, not specifically, but my
15  reasoning is that I would not have signed up except
16  to save money.
17       Q.   Okay.  Were you considering any other
18  ESCOs at the time when you chose Direct -- or you
19  chose Energetix?
20       A.   No.
21       Q.   Do you remember any of your
22  communications with Energetix from that original
23  enrollment in 2002?
24       A.   From the original enrollment, I --
25  would you repeat the question now, because I've --
```

                                        Page 24

1                    Richard Schafer

2        Q.    Sure.  Do you remember any

3   communications with Energetix from that original

4   enrollment in 2002?

5        A.    I -- I think I probably received mail

6   when -- one thing I recall was an announcement that

7   it was changing to Direct Energy as -- I can't

8   recall specifically in between.  I may have gotten

9   something, but nothing that I can recall.

10       Q.    Okay.  So you don't remember reviewing

11  a contract before enrolling in 2002.

12       A.    Actually, I don't.

13       MR. ASCHENBRENER:  Objection, misstates

14  prior testimony.

15       BY MS. WIZIG:

16       Q.    Do you recall getting a contract in

17  2002?

18       A.    No.

19       Q.    So it's fair to say you don't have that

20  contract.

21       A.    Correct, if it exists.

22       MS. WIZIG:  I'm going to introduce what will

23  be Exhibit 1 to your deposition.

24  The following was marked for Identification:

25   SCHAFER EXH. 1     document entitled Notes, 16

                                          Page 25

```
 1                    Richard Schafer
 2                       pages
 3        BY MS. WIZIG:
 4        Q.   Mr. Schafer, have you ever seen this
 5   document before?
 6        A.   I'm sorry, the one that's just over
 7   here?
 8        Q.   Yes, Exhibit 1.
 9        A.   No.
10        Q.   Can you flip to the fifth page?  And it
11   looks like --
12        MR. ASCHENBRENER:  Sorry to interrupt.  The
13   pages are double-sided.  You mean the --
14        MS. WIZIG:  Yes, the page that looks like
15   this.
16        THE WITNESS:  That's the fifth page.
17        BY MS. WIZIG:
18        Q.   Yes.
19        A.   That's this page, yes.
20        Q.   And do you see at the top there, it
21   says Rate Plan, Blend 50/50 -- or sorry, Blend 50?
22   Do you see that?
23        A.   Well, I see something confidential,
24   electrical rates, and what am I looking for?
25        Q.   The first line in the table.
```

Page 26

1                    Richard Schafer

2          A.   Table, okay.  Rate Plan, yes, I see.

3          Q.   And it says Blend 50?

4          A.   Blend 50, yes.

5          Q.   And it say you started on April 23rd,

6     2002, right?

7          A.   That's what it says.  It says start at

8     4/12 -- 23, 2002.

9          Q.   Right.  And then that plan ended on

10    January 1st, 2012; is that right?

11         A.   That's what it says, end -- exactly as

12    you say.

13         Q.   And then below that, there are two more

14    rates called Blend 50, right?

15         A.   Yes.

16         Q.   So your rate plan history shows that

17    you agreed to a blended rate on three occasions.

18    Does that sound right?

19         MR. ASCHENBRENER:  Objection, form.

20         THE WITNESS:  Should I answer that?

21         MR. ASCHENBRENER:  Yes.

22         THE WITNESS:  All right.  The answer -- the

23    answer is I don't recall that -- recall agreeing to

24    it.

25         BY MS. WIZIG:

                                        Page 27

                          Richard Schafer

1

2          Q.   Okay.  Do you have any reason to
3   dispute Direct Energy's records of your enrollment
4   here?
5          A.   If they -- except for your use of the
6   word enrollment implies that I -- sounds to me like
7   I did something to agree to it, but I have no
8   reason to dispute the numbers here.
9          Q.   Okay.  So you have no reason to dispute
10  that you were on what's called a Blend 50 rate for
11  more than 11 years beginning in 2002.
12         A.   I have no reason to disagree with that.
13         Q.   Okay.  And then if you'll follow me
14  down there, in the fourth line, it says Fixed Rate
15  Contract.
16         A.   I see that.
17         Q.   Start date, January 1, 2013.
18         A.   I see that.
19         Q.   End date, July 1st, 2013.
20         A.   Yes.
21         Q.   And it also says six-month fixed
22  renewal, right?
23         A.   Yes.
24         Q.   Do you recall that enrollment?
25         A.   No.

                                            Page  28

```
1                    Richard Schafer
2          Q.   Do you have any reason to dispute that
3    you enrolled on a fixed rate on January 1st, 2013?
4          A.   No.
5          Q.   And then if you'll follow down with me
6    again, the next rate is a -- what's called DER
7    Variable.  Do you see that?
8          A.   Yes, DER Variable, right.
9          Q.   And that started on July 1st, 2013?
10         A.   Correct.
11         Q.   And it ended on November 25th, 2015.
12         A.   Yes.
13         Q.   Okay.
14         A.   Yes.
15         Q.   Do you recall that variable rate from
16   2013 to 2015?
17         A.   No, I don't.
18         Q.   Do you have any reason to dispute that
19   you were charged a variable rate during at that
20   time?
21         A.   No.
22         Q.   Okay.  Mr. Schafer, when was the first
23   time you heard about Direct Energy?
24         A.   First time I heard of Direct Energy?
25   The one piece of mail that I remember getting was
```

Veritext Legal Solutions
346-293-7000

```
 1                    Richard Schafer
 2  an announcement that the name was changing.  It
 3  wasn't clear to me whether the company was
 4  changing.  I don't think it was, but I'm not sure.
 5          But the name was changing to -- from
 6  Direct -- from Energetix to Direct Energy.  That's
 7  where I learned of Direct Energy.
 8          Q.   I'm going to hand you what will be
 9  Exhibit 2 to your deposition, and if the court
10  reporter can mark this one, and then that one can
11  go to your attorney.
12  The following was marked for Identification:
13   SCHAFER EXH. 2       letter to Schafer from Duda
14                        dated September 18, 2015,
15                        two pages
16          BY MS. WIZIG:
17          Q.   Have you seen this letter before?
18          A.   This, I believe, is the letter I
19  remember.
20          Q.   Okay.  So this is the letter you were
21  talking about --
22          A.   Yes.
23          Q.   -- being the first --
24          A.   Yes, and it's actually the headline on
25  it that I remember.
```

Veritext Legal Solutions
346-293-7000

1                      Richard Schafer

2          Q.   Okay.  What do you mean by headline?

3          A.   The -- the -- in red it says Energetix

4    Energy Service is now Direct Energy.

5          Q.   Okay.  Just a couple months after this,

6    in November 2015, you signed up for a new fixed

7    rate with Direct Energy, right?

8          A.   Not that I -- I don't recall signing

9    up, no.

10         Q.   Okay.  Let's look back at Exhibit 1 to

11   your deposition.

12         A.   Okay.  This one.  Oh, I'm sorry.  Thank

13   you.

14         Q.   So in the sixth line, it says Fixed

15   Rate Account Direct.

16         A.   Yes, I see it.

17         Q.   Start, November 25th, 2015?

18         A.   Right.

19         Q.   End, January 28th, 2017, right?

20         A.   Correct.

21         Q.   And it says you got 14 months at 6.29

22   cents per kilowatt hour, right?

23         A.   That's what it says, yes.

24         Q.   But you don't recall that at all.

25         A.   No.

                                        Page  31

```
 1                    Richard Schafer
 2          Q.   If you could look with me at the third
 3     page of that document.
 4          A.   Front -- counting the front and back?
 5          Q.   Yes.
 6          A.   Okay.  I think I'm on it.
 7          Q.   About halfway down there, you see it
 8     says Richard K. Schafer verified account?
 9          A.   I see that.  Richard K. Schafer
10     verified account.  Yes, I see that.
11          Q.   Because -- it looks like we have some
12     typos here, but because she wanted to go over the
13     current rates, right?
14          A.   Who's -- I'm sorry, who is she?
15          Q.   These are just the notes from Direct
16     Energy.
17          A.   I understand, but I --
18          Q.   I'm just reading it.
19          A.   But you're just reading it.  I can't --
20     I -- I assume that's typos or something.  There's
21     no she, but I see that it says that.
22          Q.   Okay.
23          A.   Which is --
24          Q.   We're on the same page.  It says right
25     here.  So we -- we agree that that's written here.
```

Page 32

```
 1                    Richard Schafer
 2         A.   Yes.
 3         Q.   Okay.  And then it says:  Offered the
 4  Live -- Live Brighter 12 months.
 5         A.    Offered the Live Brighter 12 months
 6  at --
 7         Q.   At -- I'm sorry, we should be in the
 8  ninth row.  At 6.29 cents per kilowatt hour.
 9         A.   Point to me here.  Oh, I'm sorry.
10  Okay, I see it.  Thank you.
11         Q.   And it says $99 cancellation fee cx.
12         A.   Yes, I see that.  I see that.
13         Q.   Okay.  Customer understood and customer
14  accepted terms and conditions, right?
15         MR. ASCHENBRENER:  Objection, form.
16         THE WITNESS:  I -- I see that's what it
17  says, yes.
18         BY MS. WIZIG:
19         Q.   Okay.  But you don't recall making that
20  call.
21         A.   No.
22         Q.   Do you have any reason to dispute that
23  you enrolled in that 14-month fixed-rate contract?
24         A.   Again, I -- I did -- I don't dispute it
25  except for the word enrolled.  It implies to me
```

Page 33

```
 1                    Richard Schafer
 2   that I somehow took some action or something.
 3        I believe I was enrolled, but that I
 4   enrolled is the -- you know, it's that term
 5   enrolled that gets me, because it implies that I
 6   knew about it, and I don't remember it.
 7        But I don't argue with what it says here.
 8        Q.   Okay.  You'd agree with me that making
 9   a phone call is some action, right?
10        A.   Yes.  In other words, some -- I'm not
11   saying I'm enrolling or signing something or
12   something like that.  I don't recall that.
13        Q.   Okay.  But you don't dispute that you
14   called.
15        MR. ASCHENBRENER:  Objection, misstates
16   prior testimony.
17        BY MS. WIZIG:
18        Q.   Direct Energy?
19        A.   Okay.  My answer to that question is I
20   don't remember -- I don't recall making a call -- a
21   phone call to Direct Energy.
22        Q.   Do you recall doing anything in
23   response --
24        A.   Well, what's the date on this?  Wait a
25   second.  Where are we date-wise?
```

Veritext Legal Solutions
346-293-7000

```
 1                      Richard Schafer
 2          1/25/15.  Oh, no, no, nothing in 2015, no.
 3   I stand by what I said.  I did not -- do not
 4   recall.
 5          Q.   You do not recall calling Direct Energy
 6   on November 25th, 2015.
 7          A.   No.
 8          Q.   Looking back at Exhibit 2 --
 9          A.   Okay.
10          Q.   -- what, if anything, did you do in
11   response to that letter?
12          A.   Nothing.  I'm sorry.  The answer is
13   nothing that I can recall.
14          Q.   What would you have done with that
15   letter?
16          A.   I -- that letter I put in the -- I
17   think I put that letter in a folder relating to my
18   residence, and that's why I have it.  I still have
19   that letter, I think.
20          Q.   Okay.  So you got the letter in the
21   mail, and you read it; is that right?
22          A.   I -- well, I -- yes, I guess I read it,
23   yes.  I can't recall exactly reading it, but I must
24   have looked at it.
25          Q.   Is it your practice to read letters you
```

Page 35

```
 1                    Richard Schafer
 2    get in the mail from --
 3           A.   Yes, but sometimes -- I'm sorry, I
 4    didn't mean to -- you can finish your question.
 5           Q.   Is it your practice to review letters
 6    that you get in the mail from your energy company?
 7           A.   I would say the answer is yes, up to
 8    the point where I begin to think I know what it's
 9    about, and I might not read the rest of it.
10           Q.   So it's possible --
11           A.   It's possible that I didn't read it
12    all.  I'm sorry.
13           Q.   That's okay.  It's a very unnatural --
14           A.   Yes, right.  Okay, I'm sorry.
15           Q.   But --
16           MS. WIZIG:  Can you read back his last
17    answer?
18           (The record was read as requested.)
19           BY MS. WIZIG:
20           Q.   So it's possible you saw the headline
21    that you remember and did not read the remainder.
22           A.   The remainder or part of the remainder,
23    that's -- that is possible, yes.
24           Q.   And then you put it in your file,
25    right?
```

Page 36

```
 1                    Richard Schafer
 2          A.   I put it in a folder, yes.
 3          Q.   And did you didn't look at it ever
 4    again.
 5          A.   Not until recently in -- in connection
 6    with this.
 7          Q.   Not until you started talking to your
 8    attorneys.
 9          A.   Correct.
10          Q.   Mr. Schafer, do you recall receiving a
11    copy of your contract with a welcome letter in
12    November of 2015?
13          A.   No.
14          Q.   Do you dispute that you got one, or you
15    just don't recall?
16          A.   Don't recall.
17          MS. WIZIG:  This will be 3.
18    The following was marked for Identification:
19      SCHAFER EXH. 3      letter to Schafer from
20                          Direct Energy dated
21                          November 30, 2015, eight
22                          pages
23          BY MS. WIZIG:
24          Q.   Mr. Schafer, does this refresh your
25    recollection of whether you received a letter in
```

Page 37

```
 1                    Richard Schafer
 2   November of 2015 from Direct Energy?
 3          A.   No, I still don't recognize it.  I
 4   don't recall it.
 5          Q.   So you don't know whether this is a
 6   copy of your contract?
 7          A.   I don't know if I have even gotten --
 8   no.  Is this a contract?  It looks just like a
 9   letter to me.  Doesn't look like a contract.  Let
10   me -- let turn the page here.
11          I really don't recall this.
12          Q.   You don't recall ever seeing this
13   before today.
14          A.   I don't recall that.  I -- I think I'd
15   recognize that kind of a page.  I do not recall
16   that.
17          Q.   And this is a copy that my client
18   produced, so it's fair to say you don't have a copy
19   of this in your possession.
20          A.   No.  That's correct.
21          Q.   If you could look at the second page
22   with me.
23          A.   Okay.  Let me get there.  The second
24   paper.
25          Q.   The back, yes.
```

Page 38

```
 1                    Richard Schafer
 2          A.    The back?  Okay.
 3          Q.    What does this say about what type of
 4   rate you will get?
 5          A.    In the -- it says rate plan selected,
 6   fixed.  Is that what you're referring to?  Rate
 7   plan selected, fixed, and it has a number 0.06290.
 8          Q.    So a fixed rate at 6.29 cents --
 9          A.    Right.
10          Q.    -- per kilowatt hour; is that right?
11          How long does it say that rate will last?
12          MR. ASCHENBRENER:  Well, objection, form.
13          MS. WIZIG:  To which question?
14          MR. ASCHENBRENER:  Most recent question.
15   Objection, misstates written document.
16          BY MS. WIZIG:
17          Q.    Mr. Schafer, how long does it say that
18   rate will last?
19          A.    It says rate plan, and then it says
20   effective through 14 billing cycles.
21          Q.    And you were able to find that
22   information pretty quickly, right?
23          A.    Now that I'm looking at it and you've
24   pointed it to me, yes.
25          Q.    Okay.  And if you had read it in 2015,
```

Page 39

<pre>
 1                     Richard Schafer
 2    you could have quickly learned you were getting a
 3    fixed rate for 14 billing cycles, right?
 4          MR. ASCHENBRENER:  Objection.
 5          THE WITNESS:  Had I read it, yes.
 6          MR. ASCHENBRENER:  You may answer.
 7          MS. WIZIG:  He did.
 8          THE WITNESS:  I think I did answer.
 9          MR. ASCHENBRENER:  Okay.
10          THE WITNESS:  If I had read it, I would have
11    known that.
12          BY MS. WIZIG:
13          Q.   Okay.  And do you see where it tells
14    you to review your terms and conditions?
15          A.   Where it says to review them?
16          Q.   Yes.
17          A.   I see the terms and conditions.
18          I'm sorry, it says:  Please review all the
19    information contained in this package and retain it
20    for your records.
21          Q.   Okay.  But you didn't do that in 2015.
22          A.   I did not.  I --
23          Q.   Let's look at those terms and
24    conditions.
25          A.   Okay.  Is that this stuff here?
</pre>

Page 40

```
 1                    Richard Schafer
 2         Q.   Um-hum.
 3         A.   Okay.
 4         Q.   And you've -- your testimony is you've
 5    never seen this document before, right?
 6         A.   I don't recall ever seeing this,
 7    honestly.
 8         Q.   Okay.
 9         A.   Well, everything's honest.  I do not
10    recognize any of this.
11         Q.   Do you see the section related to the
12    prices that you'll pay?
13         A.   If you can give me the -- price.  It
14    says -- item 6 says price, the rate and daily fee.
15         Is that what you're referring to?
16         Q.   Right.  It says in paragraph -- it says
17    number 6, Price, the Rate and Daily Fee, right?
18         A.   Right.
19         Q.   And you were able to find that pretty
20    quickly.
21         A.   Somewhat quickly, yes, because the
22    words -- it's bolded compared to the other small --
23    or the other type, yes.
24         Q.   Do you see the pricing language that
25    explains what will happen to your price after the
```

Page 41

```
 1                    Richard Schafer
 2    initial term expires?
 3         A.    Not offhand.  Maybe if I read it all,
 4    I'll see that.
 5         Q.    Take your time.
 6         A.    I'm sorry.  Okay, I'll -- let me read.
 7         What was the question?  What am I looking
 8    for?  That it would be variable?  Is that what I'm
 9    looking for?
10         Q.    The question was do you see the pricing
11    language that explains what will happen to your
12    price after the initial term expires.
13         A.    I think I see what you're referring to.
14         Q.    Okay.  It says:  After the initial term
15    and during the renewal term, your rate per kilowatt
16    hour as well as the daily fee will both be
17    variable.
18         A.    Yes.
19         Q.    And just by reading that paragraph, you
20    were able to find that language, right?
21         A.    Yes.  Obviously, yes.  I found it
22    reading it now, yes.
23         Q.    And you would, after reading it,
24    understand that at the end of your fixed-rate term,
25    the price will become variable.
```

Page 42

```
                         Richard Schafer
 1
 2         A.   I understand that that's what it says,
 3    yes.
 4         Q.   You understand the words and what they
 5    mean.
 6         A.   Yes, I do.
 7         Q.   Let's turn to the last page titled
 8    Direct Energy Customer Disclosure Statement.
 9         A.   Okay, I'm there.
10         Q.   Have you ever seen this document
11    before?
12         A.   Not to my recollection, no.
13         Q.   Do you see the section that states what
14    your rate will be?
15         A.   It says if -- what my rate will be and
16    the number?  It says price, .06, et cetera,
17    kilowatt hour.  Is that what you're referring to?
18         Q.   So right at the top it tells you what
19    your rate will be --
20         A.   Right.
21         Q.   -- right?
22         A.   Six-tenths of a cent.
23         Q.   And it says that will be fixed?
24         A.   It says fixed rate.
25         Q.   Do you see the section that tells you
```

Page 43

1                    Richard Schafer
2    how long that rate will be fixed?
3          A.   Yes, I see it says length of agreement,
4    which I assume is what that -- you're referring to.
5    It says 14 monthly billing cycles.
6          Q.   Do you see the section that says what
7    will happen when the term ends and the agreement
8    renews?
9          A.   I'm not really quite sure.  I see that
10   it says process for the recession -- rescission of
11   the agreement without penalty.  It says customer
12   may contact us, and it has a phone number, to
13   rescind within three business days.  It says early
14   termination fee, $99.
15         Are we -- am I still looking for more?  You
16   asked me do I see a section, and I'm not sure
17   whether I do see -- whether I see exactly what
18   you're saying.
19         Q.   Do you see there's a box that says
20   Provisions for Renewal of the Agreement --
21         A.   Yes.
22         Q.   -- in bold?
23         A.   Yes.
24         Q.   So if you had read this in 2015, you
25   could have easily seen that your rate would be

Veritext Legal Solutions
346-293-7000

```
 1                      Richard Schafer
 2    fixed for 14 months, right?
 3            MR. ASCHENBRENER:  Objection, form.
 4            THE WITNESS:  I -- yes.
 5            BY MS. WIZIG:
 6            Q.   And you would have easily seen that the
 7    fixed rate was 6.29 cents per kilowatt hour.
 8            MR. ASCHENBRENER:  Objection, form.
 9            THE WITNESS:  Yes, except for the easily
10    part because of the size of the type and all the
11    other stuff that preceded it.  I might never have
12    gotten to this page.
13            BY MS. WIZIG:
14            Q.   But if you had looked at this
15    disclosure --
16            A.   If I had looked at it, yes, the answer
17    to the question is yes.
18            Q.   Okay.  If you -- just to make it clear
19    for the court reporter, if you had looked at this
20    disclosure statement, you could have easily seen
21    what your rate would be, right?
22            MR. ASCHENBRENER:  Objection, form.  You may
23    answer.
24            THE WITNESS:  I could have seen.  I -- I --
25    it bothers me the word easily.  That's all.
```

Page 45

```
 1                   Richard Schafer
 2          BY MS. WIZIG:
 3          Q.   The -- the 6.29 cents is at the very
 4   top of the page, right?
 5          A.   Right.
 6          Q.   And you found it almost immediately --
 7          A.   Right.
 8          Q.   -- when I asked you, right?
 9          A.   Right.
10          MR. ASCHENBRENER:  Objection, misstates
11   prior testimony.
12          THE WITNESS:  Sorry, excuse me.
13          BY MS. WIZIG:
14          Q.   And you also saw as soon as I asked
15   that the rate was fixed, right?
16          MR. ASCHENBRENER:  Objection, misstates
17   prior testimony.
18          THE WITNESS:  Correct.
19          BY MS. WIZIG:
20          Q.   And you also saw that that would last
21   14 monthly billing cycles.
22          A.   Yes.
23          Q.   And there's also a provision in bold
24   that says Provisions for Renewal of the Agreement,
25   right?
```

Page 46

```
 1                    Richard Schafer
 2        A.   Yes.
 3        Q.   Okay.  And that provision explains what
 4   will happen at the end of the fixed rate.
 5        MR. ASCHENBRENER:  Objection, form.
 6        THE WITNESS:  Yes.
 7        BY MS. WIZIG:
 8        Q.   So if you had read this document, you
 9   could have understood that at the end of the fixed
10   rate, your rate would go variable, right?
11        A.   Yes.
12        MS. WIZIG:  We're on 4?
13        MR. ASCHENBRENER:  Is this a good time for a
14   break?
15        MS. WIZIG:  Yes, absolutely.
16        (A recess was then taken at 1024.)
17   The following was marked for Identification:
18    SCHAFER EXH. 4      document Bates numbers
19                        DE_SCHAFER_010 through
20                        DE_SCHAFER_015
21        (On the record at 1040.)
22        BY MS. WIZIG:
23        Q.   Mr. Schafer, if we could look back at
24   Exhibit 3, that last page called a disclosure
25   statement that we were talking about before the
```

Page 47

```
 1                    Richard Schafer
 2   break.
 3           A.    This one?
 4           Q.    Yes.  You took issue with the word
 5   easily, right?
 6           A.    Yes.  I recall saying that, yes.
 7           Q.    Okay.  But there's only nine items on
 8   this page, right?
 9           A.    Right.
10           MR. ASCHENBRENER:  Objection, form.
11           BY MS. WIZIG:
12           Q.    And it's in a box, right?
13           A.    Yes.
14           Q.    And there's bolded headings, right?
15           A.    Yep.  Yes.  I should say yes.
16           Q.    And when you read it, you understood
17   it, right?
18           A.    Yes.  Yes, I understand it, yes.
19           Q.    Having read this today, you understand
20   that when your fixed rate expired, you would
21   automatically renew on a month-to-month variable
22   rate, right?
23           MR. ASCHENBRENER:  Objection, misstates
24   prior testimony.  You may answer.
25           THE WITNESS:  I understand that that's what
```

Page 48

```
 1                      Richard Schafer
 2    it says, yes.
 3            BY MS. WIZIG:
 4            Q.   Having read it today.
 5            A.   Having -- that's very -- exactly.
 6            Q.   Having read it today, you quickly
 7    understood it, right?
 8            A.   Correct.
 9            Q.   Okay.  This will be Exhibit 4.  I gave
10    you one?
11            A.   Exhibit 4.
12            Q.   Do you recall receiving this letter?
13            A.   No.
14            Q.   Do you recall receiving any renewal
15    notice from Direct Energy in 2016?
16            A.   Not specifically, no.  I don't recall
17    seeing this letter or specifically renewing all
18    this, no.
19            Q.   What do you recall --
20            A.   No, I mean specifically this letter.
21    The thing -- the reason I'm hesitant in the answer
22    is -- is I may have seen something that had -- much
23    similar to this that said renewal.
24            In other words, I might not have even read
25    it because I just thought it was renewed, you know,
```

Page 49

```
 1                    Richard Schafer
 2   at a fixed rate, I would assume, or a decent rate.
 3           Q.   So do you have a general recollection
 4   of receiving a renewal notice?
 5           A.   No, not -- no.  No.  My answer to that
 6   question is no.
 7           Q.   You just think it's possible.
 8           A.   Yes.
 9           Q.   And you do not recognize Exhibit 4?
10           A.   No.
11           Q.   It doesn't refresh your recollection of
12   receiving a renewal notice?
13           A.   No, I would say the opposite.  When I
14   come to this, I don't remember ever seeing this.
15           Q.   And by this, you're pointing to the --
16           A.   I'm pointing -- I'm sorry.
17           MR. ASCHENBRENER:  Slow down.  Let her
18   finish.
19           BY MS. WIZIG:
20           Q.   -- terms and conditions with two
21   columns.
22           A.   Yes.
23           Q.   You don't think you've ever seen that
24   document in your life.
25           A.   I don't recall it.
```

Page 50

```
1                    Richard Schafer
2         Q.   Do you --
3         A.   Therefore, I don't think I've seen
4    it -- think I've seen it, yes.
5         Q.   Okay.  Looking at Exhibit 4, that first
6    page, do you have any reason to dispute that Direct
7    Energy sent you this letter?
8         A.   I can't -- I can't dispute it, because
9    I can't speak for Direct Energy.
10        Q.   Mr. Schafer, looking at that renewal
11   notice, do you see where it tells you what your
12   renewal price will be?
13        A.   Price, renewal price.  I -- I see it
14   says varies month to month.  Is that what you're
15   referring to here, or is there a price on here?
16        Q.   It says renewal price varies month to
17   month, right?
18        A.   Yes, I see that.  That's why I was
19   looking for a number.  I see, yes.
20        Q.   And you found that rather quickly,
21   right?
22        A.   Well, not as quickly as some other
23   things, but yes, within reason -- reasonably
24   quickly.
25        Q.   When you looked to see what the price
```

Veritext Legal Solutions
346-293-7000

```
 1                    Richard Schafer
 2   would be, you found it.
 3          MR. ASCHENBRENER:  Objection, misstates
 4   prior testimony.  Objection, form.
 5          THE WITNESS:  Yes, I -- except I don't see
 6   the price.  I see the way the price changes.
 7          BY MS. WIZIG:
 8          Q.   So you see that once your fixed rate
 9   expires, the price will vary month to month, right?
10          A.   I see the -- the word agreement --
11   rate -- renewal price, and then it says varies
12   month to month.
13          So therefore, there's no price, but it tells
14   me that whatever it is, it varies month to month.
15          Q.   And do you see where it says Product
16   Type?
17          A.   Yes, I do.
18          Q.   And that says variable, too, right?
19          A.   Correct.
20          Q.   And it says:  Rate changes month to
21   month based on business and market conditions.
22          A.   Yes, it says that.
23          Q.   So in two places in this box, it tells
24   you that your rate will be variable, right?
25          A.   I see the word variable twice,
```

Page 52

1                    Richard Schafer

2    absolutely.  I see variable and varies, yes.

3           Q.   And does it tell you when your variable

4    rate will start?

5           A.   Oh, at the very last -- I'm sorry,

6    you're going down there.  It says Term Start/End

7    Date, and then it says:  Start 1/28/17 and

8    continues month to month.

9           Is that what you're referring to?

10          Q.   So if you had received this and read it

11   in 2016, you would have known that your rate would

12   vary month to month, right?

13          A.   Yes.

14          Q.   Let me finish, sorry.

15          A.   I'm sorry.

16          Q.   I know it's very unnatural.

17          And you would have also seen that that

18   variable rate would start January 28th, 2017.

19          A.   Yes.

20          Q.   So in January 2017, your fixed-rate

21   term expired, right?

22          A.   Are we referring to this document here?

23   Are -- are we referring to this document with that

24   question?

25          Q.   In general.  Do you know when you were

Page 53

```
1                    Richard Schafer
2    first charged a variable rate?
3          A.   No.
4          Q.   Do you have any reason to dispute that
5    that started in January of 2017?
6          A.   No reason to dispute that the rate
7    changed.
8          Q.   But without looking at this document,
9    you didn't know when that happened, correct?
10         A.   Correct.
11         Q.   Let's look back at Exhibit 10 -- or
12   sorry, Exhibit 1.
13         A.   Okay.  Exhibit 1.  Schafer 1, yes.
14         Q.   And let's look at the fifth page.  It
15   says --
16         A.   This last page, yes.
17         Q.   Yes, and it says Electric Rates.
18         A.   Yep.  Yes.
19         Q.   And it says on January 1, 2018, 2017
20   (sic), you began a transitional variable rate,
21   right?
22         A.   Did you say 2018?
23         Q.   I meant to say 2017.  I might have
24   misspoken.
25         A.   It says Glide Path, 1/28/17?  That
```

Page 54

```
1                    Richard Schafer
2    line?
3          Q.   Yes, sir.  We're looking at the
4    second-to-last line.
5          A.   I am reading the second-to-last line.
6          Q.   And you see it says Glide Path
7    transitional variable rate, right?
8          A.   Yes.
9          Q.   Okay.  And that date matches the date
10   on Exhibit 4 that -- or -- Exhibit 4 that we were
11   just looking at, right?
12         A.   Yes, I have no reason to dispute what
13   you're saying.
14         Q.   Well, if you want to look at Exhibit 4,
15   you can.
16         A.   No, I'll -- no, I'll -- that's okay.
17   Yes, it's -- I agree.
18         Q.   You remember it --
19         A.   Yes, I remember.
20         Q.   Okay.  And then the very last line on
21   this page says DER Variable, Start Date
22   February 28th, 2017, right?
23         A.   Correct.
24         Q.   Do you have any reason to dispute these
25   records showing that you went variable beginning in
```

Page 55

```
 1                    Richard Schafer
 2     2017?
 3          A.   No.
 4          Q.   You just don't recall one way or the
 5     other.
 6          A.   I don't recall.
 7          MS. WIZIG:  Exhibit 5.
 8     The following was marked for Identification:
 9      SCHAFER EXH. 5       document Bates numbers
10                           FORTE000377 through
11                           FORTE000385
12          THE WITNESS:  Thank you.
13          BY MS. WIZIG:
14          Q.   Mr. Schafer, do you recognize these
15     documents?
16          A.   This appears to be a photocopy of a
17     bill, maybe it's more -- of a bill from RG&E.  More
18     than one bill.
19          Q.   And these are bills you provided to
20     your lawyers, right?
21          A.   As -- yes, probably, yes.
22          Q.   Okay.  Do you recall reviewing these
23     bills when they came in?
24          A.   No.  When I received them, I probably
25     paid them, but I don't recall specifically when
```

Page 56

1                    Richard Schafer

2    they came to me.  I probably looked at them,

3    because I had to pay them.

4         Q.    When you did review them, did you see

5    the rate?

6         A.    I -- I doubt if I noticed it.

7         Q.    Okay.  But it has the rate on there,

8    right?

9         A.    Yes, absolutely.

10        Q.    And you had an opportunity to see the

11   rate, right?

12        A.    Correct.

13        Q.    Every month?

14        A.    Every month.

15        Q.    And you chose not to.

16        A.    Yes, I didn't regard it as a choice.

17   It's just something that I did.  I didn't say I'm

18   going to -- I'm going to or I'm not going to, that

19   is.

20        Q.    Understood, but you got this type of

21   bill every month.

22        A.    Every month, and I did not look at the

23   rate.

24        Q.    Thank you.  You became aware at some

25   point that Direct Energy was charging you variable

Page 57

1                      Richard Schafer
2    rates, right?
3            A.   Yes, I did.
4            Q.   When was that?
5            A.   That was -- oh, boy.  Trying to
6    remember.  That was, I -- I think, in May of 2019.
7            I know how I saw it.  I saw it on
8    television.
9            Q.   Okay.
10           A.   But I -- I -- I'd have to look at
11   something that I don't have here to tell you the
12   exact date, but I did see it on television that
13   there was an issue.
14           MS. WIZIG:  This will be 6.
15   The following was marked for Identification:
16    SCHAFER EXH. 6       document entitled Exhibit 5,
17                         Declaration of Richard
18                         Schafer, four pages
19           THE WITNESS:  6.  Here we go.
20           BY MS. WIZIG:
21           Q.   Mr. Schafer, do you recognize this
22   document?
23           A.   I'll tell you I -- I recognize the
24   information on it.  The exact document, I'm not --
25   I must have seen it because of this name here.

                                        Page 58

1                       Richard Schafer
2           I -- I -- I can only say I recognize the
3    information on it.  It seems reasonable that I got
4    it, but I don't recall this particular document
5    with -- what does it say -- Exhibit 5, with that on
6    it.  That's all.
7           But I've -- but I've -- I have received some
8    things from KamberLaw from whatever this is.  That
9    may have been that.
10          Anyway, but what's on there, as near as I
11   can see, is correct.
12          Q.   And you -- when you were saying this
13   says May 10th, 2019, that was -- you're referring
14   to paragraph 4; is that right?
15          A.   That's correct.
16          Q.   Okay.
17          A.   This says --
18          Q.   3 and 4.
19          A.   Yes, yes, that's right.  The 3
20   especially is, yes.
21          Q.   So I think we found that report, and it
22   was about certain customers being charged more by
23   Direct Energy than they would have with the
24   utility, right?
25          A.   Correct.

                                              Page 59

                        Richard Schafer

1

2          Q.    So it was all about pricing; is that

3    right?

4          A.    Pricing and people -- and individual

5    people dealing with pricing, yes.

6          Q.    It was all about how Direct Energy's

7    variable rates for those people were higher than

8    the utilities' rates.

9          A.    Correct, for the people in the video

10   and people they referred to in the video.

11         Q.    Understood.  Do you know whether you

12   have pricing claims in this lawsuit?

13         A.    If I have what?

14         Q.    Pricing claims?

15         A.    I'm not quite sure what you mean.

16         MR. ASCHENBRENER:  Objection, calls for a

17   legal conclusion.

18         BY MS. WIZIG:

19         Q.    Do you know how many claims you have?

20         A.    No.

21         Q.    So you don't know what those claims are

22   either.

23         MR. ASCHENBRENER:  Objection, misstates

24   prior testimony.  Objection, calls for a legal

25   conclusion.

                                        Page 60

```
 1                     Richard Schafer
 2          THE WITNESS:  Repeat the question?  Please,
 3     I'm sorry.  I shouldn't be giving directions.
 4          BY MS. WIZIG:
 5          Q.   So you don't know what your claims are
 6     in this lawsuit; is that right?
 7          A.   Well, in the vernacular, the word
 8     claim, I'm claiming that -- that I was unaware of
 9     a -- of a significant price increase in my electric
10     bill, and I claim that -- that I -- that that
11     shouldn't have happened, I guess, to put it in
12     layman's terms or my terms.
13          Q.   If I told you there were no pricing
14     claims in that -- this lawsuit, would that be
15     significant to you?
16          A.   The way you said it, it would be.  To
17     my understanding of what you're saying, yes.
18          Q.   Okay.  Because you became concerned
19     with this lawsuit based on the prices that were
20     being charged, right?
21          A.   How did I become aware of the lawsuit?
22     Is that the question?
23          Q.   The question was you became aware of
24     this lawsuit and concerned with it because of the
25     prices that Direct Energy was charging.
```

Page 61

                          Richard Schafer

1

2          A.    I became in the lawsuit because I

3   learned of the prices that they were charging, and

4   I proactively sought to see if there was a class

5   action suit, and I found it.  I found this suit.

6          Q.    And I don't want to know about anything

7   that you talked about with your lawyers, but how

8   did you come to know them?

9          A.    I had -- I did a search online to see

10  if there were -- was a class action suit with

11  respect to what I had seen on television, and I

12  came across this law firm, KamberLaw.

13          I'm not sure if I answered the question you

14  asked or not.

15          Q.    Mr. Schafer, you cancelled your service

16  with Direct Energy, right?

17          A.    I did.

18          Q.    And you did it the same day you saw the

19  news segment, on May 10th, 2019?

20          A.    Almost.  It was -- excuse me.

21          The answer to the question is I did, either

22  that day or immediately -- I did that immediately.

23  That was my action that I took at that time.

24          Q.    Understood.  And if we look at what is

25  Exhibit 6 in front of you --

                                              Page 62

                        Richard Schafer

1

2           A.    Yes.

3           Q.    -- it says that you contacted KamberLaw

4    on June 5th.

5           A.    That's -- that's -- that seems correct,

6    yes.

7           Q.    Did you do anything else between

8    May 10th and June 5th to find counsel?

9           MR. ASCHENBRENER:   Objection, form.

10          THE WITNESS:   I -- I searched for -- well,

11   I -- I found them online.  I don't -- I'm not sure

12   what you're asking.

13          BY MS. WIZIG:

14          Q.    Sure, and that was probably a bad

15   question on my part.

16          Did you contact any other lawyers before

17   KamberLaw?

18          A.    I think I -- I think I called one I

19   couldn't recall, but I found out that they were

20   not -- that they wouldn't help me out in this

21   situation.

22          But I can't tell you who it was or why I

23   thought I -- they might know, and I can't tell you

24   the name of it.  At that -- I'm just trying to go

25   to my recollection.

Veritext Legal Solutions
346-293-7000

Richard Schafer

1

2         I think I called, talked to some law firm,

3   maybe one that I found online or something, but it

4   went nowhere.

5         Q.   Okay.  Do you have any records at home

6   that would tell you what that law firm was?

7         A.   I don't know.  I might.  I don't know.

8         Q.   And so you contacted that law firm, and

9   they couldn't help you, right?

10        A.   Yes, that's -- that's correct.  That's

11  my recollection.

12        Q.   And were there any other law firms that

13  you reached out to --

14        A.   No, no, then I found -- I'm sorry.

15        Q.   Were there any other law firms that you

16  reached out to in between that law firm you were

17  talking about and KamberLaw?

18        A.   No.

19        Q.   And how did you reach out to KamberLaw?

20        A.   I would think it was a phone call.  It

21  could have been an email, but I was -- I believe it

22  was a phone call.

23        And I really can't recall.  I must have

24  called them, you know.  That's reasoning, not what

25  I recall.

Page 64

                         Richard Schafer

1

2          Q.   So it's -- it's more likely that you

3    would have called than emailed.

4          A.   Yes, that's correct.

5          Q.   Has KamberLaw or any of the lawyers

6    there ever represented you before?

7          A.   No.

8          Q.   Did you know of any KamberLaw lawyers

9    before you retained them for this lawsuit?

10         A.   No.

11         Q.   Who are your lawyers in this lawsuit?

12         A.   Who are my lawyers in the -- KamberLaw.

13         Q.   Any names in particular?

14         A.   Well, Michael Aschenbrener.

15         Q.   Have you spoken to anyone else at

16   KamberLaw?

17         A.   Well, this gentleman here is --

18   Mr. Steelman is not at KamberLaw, but I've spoken

19   to him.

20         I don't think so.  Conceivably someone who

21   took the phone, but most of my -- most of my

22   interaction has been by email with Mr. Aschenbrener.

23         Q.   Do you know if you have any other

24   lawyers representing you in this case besides these

25   two gentlemen?

                                           Page 65

```
 1                    Richard Schafer
 2        A.    I have none.
 3        Q.    Mr. Schafer, would you agree with me
 4   that you have a responsibility to read the
 5   contracts and correspondence that your energy
 6   company sends you?
 7        MR. ASCHENBRENER:  Objection, calls for a
 8   legal conclusion.
 9        THE WITNESS:  Could you repeat that, because
10   I -- say that -- the responsibility?
11        BY MS. WIZIG:
12        Q.    To read contracts and correspondence
13   that an energy company sends you.
14        A.    I think it's advisable.  The word
15   responsibility sounds stronger than what I would
16   choose.
17        Q.    So you think energy customers should
18   read what is sent to them.
19        MR. ASCHENBRENER:  Objection, misstates
20   prior testimony.  You may answer.
21        THE WITNESS:  In retrospect, I would say
22   yes.
23        BY MS. WIZIG:
24        Q.    And you don't dispute that once you
25   enter into an agreement, you're bound by those
```

Page 66

```
 1                    Richard Schafer
 2   terms, right?
 3          A.   Don't dispute that.
 4          Q.   And so you'd agree with me that it's
 5   important to understand what you're agreeing to.
 6          A.   I understand the importance.
 7          Q.   We looked at some correspondence
 8   earlier that you don't recall receiving, right?
 9          A.   Yes.
10          Q.   But you also can't dispute that Direct
11   Energy made attempts to send that to you.
12          A.   I can't -- I can't make any judgment
13   about what Direct Energy was trying to do or did.
14          Q.   And you can't say that Direct Energy
15   didn't tell you that you would get a variable rate.
16          MR. ASCHENBRENER:  Objection, form.
17          THE WITNESS:  I -- I can't say that they did
18   not send me some information.  Tell -- tell is the
19   thing I was hung up on there.  I wasn't talking to
20   them.
21          (Discussion off the record.)
22          THE WITNESS:  I might have paused, but --
23   but I said it was the word tell, as if I had spoken
24   to them, and I don't recall that -- I'm pretty sure
25   I have not spoken to them.
```

Veritext Legal Solutions
346-293-7000

```
 1                      Richard Schafer
 2          But they may have sent me things.  It's
 3     conceivable I received them.
 4          BY MS. WIZIG:
 5          Q.   So taking out the word tell, you can't
 6     say that Direct Energy didn't send you letters that
 7     said your rate would go variable.
 8          A.   They did not -- I can't dispute that
 9     they did not send those letters.
10          Q.   And you've agreed that those letters
11     say that your rate will go variable after 14
12     months.
13          A.   The letters that they allegedly sent, I
14     do not -- do -- I agree.
15          Q.   Mr. Schafer, do you know Martin Forte?
16          A.   No.
17          Q.   Have you ever spoken to him?
18          A.   No.
19          Q.   What about his wife, Connie Forte?
20          A.   No.
21          Q.   Looking at Exhibit 6 that's in front of
22     you --
23          A.   Right.
24          Q.   -- in paragraph 12 --
25          A.   Yes.
```

Page 68

```
1                    Richard Schafer
2          Q.    -- you see where it says:  I support
3    Plaintiff Martin Forte as a class representative.
4          A.    Where it says I support?
5          While I support Plaintiff Martin Forte at --
6    for -- as a class representative, Magistrate Judge
7    Baxter on the record September 18th, 2019, comments
8    about Plaintiff Forte's supposed inadequacy leave
9    me no choice but to move to intervene at this time.
10         I see that, yes.
11         Q.    And with respect to the portion about
12   you supporting Plaintiff Martin Forte as a class
13   representative --
14         A.    Yes.
15         Q.    -- do you stand by that statement?
16         A.    I would say yes, based on -- I -- yes,
17   based on what I understand from the lawyers at
18   KamberLaw.
19         Q.    Okay.
20         A.    In other words, I did not know
21   Mr. Forte.  That's all.
22         Q.    Right.  So you made this statement
23   without having ever spoke to Martin Forte; is that
24   right?
25         A.    I never spoke to Martin Forte.
```

Page 69

```
 1                      Richard Schafer
 2          Q.   That's a yes?
 3          A.   Yes, that's a yes.
 4          Q.   Do you know Jerry Baglione?
 5          A.   No.
 6          Q.   Have you ever spoken to him?
 7          A.   No.
 8          Q.   What about his wife, Tina Baglione?
 9          A.   Tina?  No.
10          Q.   Do you know a Thomas Aurelia?
11          A.   No.
12          Q.   Have you ever spoken to him?
13          A.   No.
14          Q.   Do you know if they have any
15   involvement in this lawsuit?
16          A.   I don't know whether or not they do.
17          Q.   You don't know one way or the other who
18   they are.
19          A.   Not sitting here, no.
20          Q.   Same goes for Connie and Martin Forte.
21   You don't know who they are.
22          A.   No.
23          Q.   Mr. Schafer, you can't say why other
24   customers sign up for Direct Energy, right?
25          A.   I can't say --
```

Page 70

Richard Schafer

1

2       Q.   Why any other customer would choose to

3   sign up with Direct Energy.

4       A.   No, I wouldn't -- wouldn't know.

5       Q.   And you don't know what factors other

6   customers consider when they sign up?

7       A.   No.

8       Q.   You don't know what's important to

9   other customers.

10      A.   I don't know that, no.

11      Q.   And you don't know what Direct Energy

12  disclosed to other customers about variable rates,

13  right?

14      A.   No.  That's correct.

15      Q.   You don't know whether other customers

16  reviewed their contract?

17      A.   I wouldn't know.

18      Q.   And you don't know whether other

19  customers understood that the fixed rate would

20  automatically convert to a variable rate, right?

21      A.   With the exception of the people I saw

22  on television, the answer would be that's correct.

23      Q.   Do you believe that those people said

24  that they didn't understand they were on a variable

25  rate?

Page 71

Richard Schafer

1

2          A.   I can't remember whether those -- those

3    words were spoken.  They inferred that.

4          Q.   You inferred that they didn't know, but

5    they didn't say that.

6          A.   I don't know whether they said it or

7    not.

8          Q.   Okay.

9          A.   But the rest is true.

10         Q.   When we talked about that segment

11   earlier, you told me that your understanding of

12   that segment was about the prices that were

13   charged, right?

14         A.   Correct.

15         Q.   Okay.  Do you know anything about the

16   correspondence that Direct Energy sends other

17   customers?

18         A.   No.

19         Q.   Have you ever looked at Direct Energy's

20   website?

21         A.   Seems -- it seems like I would have,

22   but honestly, I don't think I did.

23         Q.   So you didn't look at it before you

24   enrolled in 2015.

25         A.   No.

Page 72

```
 1                      Richard Schafer
 2          Q.   Or before filing this lawsuit.
 3          A.   Not to my recollection.  It's
 4   conceivable, since I called them -- sometimes I
 5   look at a website to get a phone number, because --
 6   you know, but I don't remember exactly that.
 7          Q.   Understood.  You don't have a specific
 8   recollection of --
 9          A.   No.
10          Q.   -- calling them.
11          A.   Well, I have a -- the only recollection
12   of calling was to discontinue the service.
13          Q.   Understood.
14          A.   To -- yes, right.  That's the only time
15   I called.
16          MS. WIZIG:  This will be Exhibit 7.
17   The following was marked for Identification:
18    SCHAFER EXH. 7      Intervenor-Plaintiffs' Class
19                        Action Complaint
20          THE WITNESS:  Thank you.  Okay.  I see this,
21   yes.
22          BY MS. WIZIG:
23          Q.   Have you ever seen this document
24   before?
25          A.   I believe I have.  To say this specific
```

Veritext Legal Solutions
346-293-7000

```
 1                     Richard Schafer
 2    document, I have received a couple of documents
 3    that -- like this or -- or this one from KamberLaw.
 4    It seems to be a Complaint, I think.
 5            Q.    And do you remember reviewing this
 6    before it was filed?
 7            A.    Actually, I do.  I remember -- I
 8    remember -- whether -- I remember reviewing this
 9    document or one like it before it was filed, yes.
10            MS. WIZIG:  This will be 8.
11    The following was marked for Identification:
12      SCHAFER EXH. 8        Plaintiff's Answers and
13                            Objections to Defendant's
14                            First Set of Interrogatories
15            THE WITNESS:  Thank you.  Okay.  Generally
16    I've looked at this.
17            BY MS. WIZIG:
18            Q.    Do you remember seeing this document
19    before?
20            A.    Not this document.
21            Q.    So you never reviewed this before
22    today?
23            A.    I don't recall --
24            Q.    You --
25            A.    I don't recall ever seeing this, and
```

Page 74

1                    Richard Schafer

2    I -- because it has things like Interrogatory

3    and -- I don't recall it.

4         Q.   Okay.  Let's look at Interrogatory

5    Number 4, which starts on page 3 --

6         A.   Right.

7         Q.   -- where it says:  Please describe the,

8    quote --

9         A.   Right.

10        Q.   -- financial injury referenced in your

11   Complaint.

12        A.   Right.

13        Q.   And then as part of your answer -- feel

14   free to read the whole thing, but I want to point

15   to you --

16        A.   What do you want to point me to?

17        Q.   The last sentence, it says you were

18   damaged in an amount equal to the difference

19   between the cost of the electricity supply you

20   purchased from Direct Energy and the cost of the

21   electricity supply you would have purchased from

22   the regulated utility serving your address.

23        A.   What page are we on here, just so I'm

24   looking at --

25        Q.   We're on page 4.

```
1                    Richard Schafer
2          A.   Page 4 at the top, right?  I'm sorry.
3    I'm sorry.  Yes, I see that.
4          Q.   You see that?
5          A.   Yes.
6          Q.   Do you know how much that is?
7          A.   No.
8          Q.   So you don't know if you saved or lost
9    money overall by buying from Direct Energy; is that
10   right?
11         A.    In looking -- the answer is I'm aware
12   that I was paying more, but it was a conclusion
13   drawn by looking at a couple bills, you know, a few
14   bills.
15         Q.    Objection, nonresponsive.
16         So you don't know if, over the whole time
17   you were a customer with Direct Energy, whether you
18   saved or lost money, right?
19         A.    That's -- that's correct, and I
20   believed when I signed up with Energetix, I would
21   save a little money.  That's why I signed up.
22         MS. WIZIG:  Take a quick break --
23         MR. ASCHENBRENER:  Yes.
24         MS. WIZIG:  -- and then wrap up?
25         (A recess was then taken at 1115.)
```

Veritext Legal Solutions
346-293-7000

```
 1                    Richard Schafer
 2           (On the record at 1131.)
 3           BY MS. WIZIG:
 4           Q.   Mr. Schafer, you understand that you're
 5      a Plaintiff in this lawsuit, right?
 6           A.   Yes.
 7           Q.   And you're seeking to represent a class
 8      of people who, like you, were charged variable
 9      rates for electricity in New York?
10           A.   Yes.
11           Q.   And you understand that as a named
12      Plaintiff, you have a duty to represent their
13      interests?
14           A.   Yes.
15           Q.   And you think you can do that.
16           A.   Yes.
17           Q.   Do you understand that you'll have to
18      attend trial?
19           A.   Yes.
20           Q.   In Syracuse?
21           A.   Yes.
22           Q.   Are you willing to assist your
23      attorneys through the end?
24           A.   Yes.
25           Q.   And do you understand that at the end
```

Page 77

1                    Richard Schafer

2    of the day, you may not be compensated any more

3    than the rest of the class members?

4          A.   I understand that.

5          MS. WIZIG:  That's all I have.  Pass the

6    witness.

7          MR. ASCHENBRENER:  No redirect.

8          (Proceedings of 02/26/20 were then concluded

9    at 1132.)

10

11                    *    *    *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                        Page 78

1

2        I hereby CERTIFY that I have read the

3    foregoing 78 pages, and that they are a true and

4    accurate transcript of the testimony given by me in

5    the above entitled action on February 26, 2020.

6

7

8                        ------------------------

                         RICHARD SCHAFER

9

10   Sworn to before me this

11

12   -------- day of  ---------, 2020.

13

14   --------------------------

15   NOTARY PUBLIC.

16

17

18

19

20

21

22

23

24

25

                                        Page 79

1

2  STATE OF NEW YORK )

3                        ss:

4  COUNTY OF ERIE    )

5

6       I DO HEREBY CERTIFY as a Notary Public in and

7  for the State of New York, that I did attend and

8  report the foregoing deposition, which was taken

9  down by me in a verbatim manner by means of machine

10 shorthand.  Further, that the deposition was then

11 reduced to writing in my presence and under my

12 direction.  That the deposition was taken to be

13 used in the foregoing entitled action.  That the

14 said deponent, before examination, was duly sworn

15 to testify to the truth, the whole truth and

16 nothing but the truth, relative to said action.

17

18

19

20                   LORI K. BECK,
                    CSR, RDR, CRR,
21                  Notary Public.

22

23

24

25

```
 1
 2                    INDEX TO EXHIBITS
 3   Exhibit          Description              Page
 4    Exhibit 1      document entitled Notes, 16      25
                     pages
 5
      Exhibit 2      letter to Schafer from Duda      30
 6                   dated September 18, 2015,
                     two pages
 7
      Exhibit 3      letter to Schafer from           37
 8                   Direct Energy dated
                     November 30, 2015, eight
 9                   pages
10    Exhibit 4      document Bates numbers           47
                     DE_SCHAFER_010 through
11                   DE_SCHAFER_015
12    Exhibit 5      document Bates numbers           56
                     FORTE000377 through
13                   FORTE000385
14    Exhibit 6      document entitled Exhibit        58
                     5, Declaration of Richard
15                   Schafer, four pages
16    Exhibit 7      Intervenor-Plaintiffs'           73
                     Class Action Complaint
17
      Exhibit 8      Plaintiff's Answers and          74
18                   Objections to Defendant's
                     First Set of
19                   Interrogatories
20
21   *Original exhibits attached to original transcript.
      Copies of exhibits supplied to all counsel.
22
23
24
25
```

```
 1
 2                        INDEX TO WITNESSES
 3    Witness                  Examination                 Page
 4     RICHARD SCHAFER      BY MS. WIZIG:                     4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Veritext Legal Solutions
346-293-7000

1    masch@kamberlaw.com

2                         March 10, 2020

3    RE: Forte    v. Direct Energy Services, LLC

4    DEPOSITION OF: Richard Schafer (# 3985850)

5         The above-referenced witness transcript is

6    available for read and sign.

7         Within the applicable timeframe, the witness

8    should read the testimony to verify its accuracy. If

9    there are any changes, the witness should note those

10   on the attached Errata Sheet.

11        The witness should sign and notarize the

12   attached Errata pages and return to Veritext at

13   errata-tx@veritext.com.

14        According to applicable rules or agreements, if

15   the witness fails to do so within the time allotted,

16   a certified copy of the transcript may be used as if

17   signed.

18                         Yours,

19                         Veritext Legal Solutions

20

21

22

23

24

25

                                        Page 83

**[& - ago]**

**&**

**&** 2:5 3:22 18:21 19:17,18,23,25 20:10 23:4

**0**

**0.06290.** 39:7
**010** 47:19 81:10
**015** 47:20 81:11
**02/26/20** 78:8
**0264** 1:8
**06** 43:16

**1**

**1** 25:23,25 26:8 28:17 31:10 54:12 54:13,13,19 81:4
**1/25/15** 35:2
**1/28/17** 53:7 54:25
**10** 54:11 83:2
**1001** 2:12
**1024** 47:16
**1040** 47:21
**10th** 59:13 62:19 63:8
**11** 28:11
**110** 2:6
**1115** 76:25
**1131** 77:2
**1132** 78:9
**12** 33:4,5 68:24
**12th** 4:25
**14** 31:21 33:23 39:20 40:3 44:5 45:2 46:21 68:11
**14618** 4:10
**16** 25:25 81:4
**18** 30:14 81:6
**18th** 69:7
**1936** 4:25
**1958** 8:8,11,12,17

**1993** 8:21 14:16
**1st** 27:10 28:19 29:3,9

**2**

**2** 30:9,13 35:8 81:5
**2000s** 23:24 24:2
**2002** 23:20 24:23 25:4,11,17 27:6,8 28:11
**2012** 27:10
**2013** 28:17,19 29:3 29:9,16
**2015** 16:24 29:11 29:16 30:14 31:6 31:17 35:2,6 37:12,21 38:2 39:25 40:21 44:24 72:24 81:6,8
**2016** 17:18 49:15 53:11
**2017** 31:19 53:18 53:20 54:5,19,23 55:22 56:2
**2018** 54:19,22
**2019** 19:21 58:6 59:13 62:19 69:7
**2020** 1:21 3:11 79:5,12 83:2
**212** 2:4
**220** 2:3
**23** 27:8
**23089** 80:19
**23rd** 27:5
**25** 81:4
**25th** 29:11 31:17 35:6
**26** 1:21 3:11 79:5
**2700** 2:12
**28th** 31:19 53:18 55:22

**3**

**3** 37:17,19 47:24 59:18,19 75:5 81:7
**30** 37:21 81:5,8
**33** 13:5
**333-5889** 2:13
**341-8336** 2:7
**37** 81:7
**39** 9:21 10:4
**3985850** 83:4

**4**

**4** 47:12,18 49:9,11 50:9 51:5 55:10 55:10,14 59:14,18 75:5,25 76:2 81:10 82:4
**4/12** 27:8
**47** 81:10

**5**

**5** 56:7,9 58:16 59:5 81:12,14
**50** 26:21 27:3,4,14 28:10
**50/50** 26:21
**510** 1:20 3:10
**56** 81:12
**573** 2:7
**58** 81:14
**5th** 63:4,8

**6**

**6** 41:14,17 58:14 58:16,19 62:25 68:21 81:14
**6.29** 31:21 33:8 39:8 45:7 46:3
**60** 14:10
**60607** 2:3
**65401** 2:7

**684** 4:9 8:19
**6:17** 1:8

**7**

**7** 73:16,18 81:16
**70** 14:10
**713** 2:13
**73** 81:16
**74** 81:17
**75** 3:9
**77002** 2:12
**78** 79:3

**8**

**8** 74:10,12 81:17
**80** 14:10

**9**

**90** 14:9
**901** 2:6
**920-3072** 2:4
**93** 14:9,10,11,12
**99** 33:11 44:14

**a**

**a.m.** 1:23
**able** 39:21 41:19 42:20
**absolutely** 22:19 47:15 53:2 57:9
**accepted** 33:14
**account** 31:15 32:8,10
**accuracy** 83:8
**accurate** 79:4
**action** 1:8 34:2,9 62:5,10,23 73:19 79:5 80:13,16 81:16
**address** 75:22
**advisable** 66:14
**ago** 4:17 9:5

Page 1

**[agree - cetera]**

| | | | |
|---|---|---|---|
| **agree** 28:7 32:25 34:8 55:17 66:3 67:4 68:14<br>**agreed** 27:17 68:10<br>**agreeing** 27:23 67:5<br>**agreement** 44:3,7 44:11,20 46:24 52:10 66:25<br>**agreements** 83:14<br>**al** 3:6<br>**allegedly** 68:13<br>**allotted** 83:15<br>**alternative** 21:24<br>**amount** 75:18<br>**announcement** 25:6 30:2<br>**answer** 6:6 20:12 20:13,16,17 21:18 27:20,22,23 34:19 35:12 36:7,17 40:6,8 45:16,23 48:24 49:21 50:5 62:21 66:20 71:22 75:13 76:11<br>**answered** 62:13<br>**answering** 5:13 6:19<br>**answers** 5:23 74:12 81:17<br>**anticipate** 24:11<br>**anyway** 59:10<br>**apartment** 9:13<br>**appearances** 2:2<br>**appearing** 2:8,14<br>**appears** 56:16<br>**applicable** 83:7,14<br>**april** 27:5<br>**argue** 34:7 | **aschenbrener** 2:2 3:20,20 4:6 7:20 15:18 16:19 17:2 17:14 20:11 23:10 25:13 26:12 27:19 27:21 33:15 34:15 39:12,14 40:4,6,9 45:3,8,22 46:10,16 47:5,13 48:10,23 50:17 52:3 60:16 60:23 63:9 65:14 65:22 66:7,19 67:16 76:23 78:7<br>**asked** 44:16 46:8 46:14 62:14<br>**asking** 22:18 63:12<br>**assist** 77:22<br>**assume** 6:7 17:7 32:20 44:4 50:2<br>**atb** 1:8<br>**attached** 81:21 83:10,12<br>**attempts** 67:11<br>**attend** 77:18 80:7<br>**attention** 18:9<br>**attorney** 30:11<br>**attorneys** 7:5 21:4 37:8 77:23<br>**aurelia** 1:9 70:10<br>**automatically** 48:21 71:20<br>**available** 83:6<br>**avenue** 3:10<br>**aware** 15:7,16 16:14 57:24 61:21 61:23 76:11<br>**awful** 19:2 | **b**<br>**back** 31:10 32:4 35:8 36:16 38:25 39:2 47:23 54:11<br>**bad** 6:3 63:14<br>**baglione** 1:9 70:4 70:8<br>**based** 52:21 61:19 69:16,17<br>**bates** 47:18 56:9 81:10,12<br>**bathroom** 6:11<br>**baxter** 69:7<br>**beck** 1:23 3:15 80:20<br>**began** 54:20<br>**beginning** 28:11 55:25<br>**behalf** 2:9<br>**believe** 11:18 17:11 24:8,10 30:18 34:3 64:21 71:23 73:25<br>**believed** 76:20<br>**bill** 18:16,18,22,23 19:2,4,5,7 21:9,10 56:17,17,18 57:21 61:10<br>**billing** 39:20 40:3 44:5 46:21<br>**bills** 18:12 20:18 21:2,4,8,13 56:19 56:23 76:13,14<br>**birth** 4:24<br>**birthday** 4:25<br>**bit** 14:18 15:22 20:14<br>**blend** 26:21,21 27:3,4,14 28:10<br>**blended** 27:17 | **bold** 44:22 46:23<br>**bolded** 41:22 48:14<br>**bothers** 45:25<br>**bound** 66:25<br>**box** 44:19 48:12 52:23<br>**boy** 58:5<br>**break** 6:10,12 47:14 48:2 76:22<br>**brighter** 33:4,5<br>**business** 1:20 3:9 44:13 52:21<br>**buying** 76:9<br>**c**<br>**c** 4:9,9<br>**call** 33:20 34:9,20 34:21 64:20,22<br>**called** 4:10 27:14 28:10 29:6 34:14 47:24 63:18 64:2 64:24 65:3 73:4 73:15<br>**calling** 35:5 73:10 73:12<br>**calls** 15:19 60:16 60:24 66:7<br>**cancellation** 33:11<br>**cancelled** 62:15<br>**case** 3:4 4:19 65:24<br>**cent** 43:22<br>**centers** 1:20 3:9<br>**cents** 31:22 33:8 39:8 45:7 46:3<br>**certain** 59:22<br>**certainly** 19:3<br>**certified** 83:16<br>**certify** 79:2 80:6<br>**cetera** 43:16 |

**[change - deponent]**

**change** 13:7 16:8
  20:13
**changed** 15:6 54:7
**changes** 52:6,20
  83:9
**changing** 25:7
  30:2,4,5
**charged** 16:2
  29:19 54:2 59:22
  61:20 72:13 77:8
**charging** 57:25
  61:25 62:3
**check** 18:15 21:9
**chicago** 2:3
**child** 9:24
**choice** 57:16 69:9
**choose** 23:25
  66:16 71:2
**chose** 24:18,19
  57:15
**christina** 2:16 4:4
**civil** 1:8,19
**claim** 61:8,10
**claiming** 61:8
**claims** 60:12,14,19
  60:21 61:5,14
**clarification** 6:4
**class** 2:9 3:21,24
  62:4,10 69:3,6,12
  73:18 77:7 78:3
  81:16
**clear** 16:25 30:3
  45:18
**client** 38:17
**clinton** 1:20 3:9
**cm** 1:23
**columns** 50:21
**come** 21:8 50:14
  62:8
**commencing** 1:21
  3:11

**comments** 69:7
**communications**
  24:22 25:3
**company** 12:21,23
  13:11,21 17:8
  18:21 21:23 30:3
  36:6 66:6,13
**compared** 41:22
**compensated** 78:2
**complaint** 73:19
  74:4 75:11 81:16
**completely** 23:11
**conceivable** 18:8
  23:22 68:3 73:4
**conceivably** 65:20
**concerned** 61:18
  61:24
**concluded** 78:8
**conclusion** 15:19
  60:17,25 66:8
  76:12
**conditions** 33:14
  40:14,17,24 50:20
  52:21
**confidential** 26:23
**congratulations**
  13:6
**connection** 37:5
**connie** 68:19
  70:20
**consider** 71:6
**considering** 24:17
**consulting** 14:3,19
**contact** 44:12
  63:16
**contacted** 63:3
  64:8
**contained** 40:19
**continues** 53:8
**continuously** 8:17

**contract** 25:11,16
  25:20 28:15 33:23
  37:11 38:6,8,9
  71:16
**contracts** 66:5,12
**convert** 71:20
**copies** 81:21
**copy** 37:11 38:6
  38:17,18 83:16
**correct** 4:22 7:21
  8:2 9:19 16:11
  23:22 25:21 29:10
  31:20 37:9 38:20
  46:18 49:8 52:19
  54:9,10 55:23
  57:12 59:11,15,25
  60:9 63:5 64:10
  65:4 71:14,22
  72:14 76:19
**correctly** 15:24
**correspondence**
  66:5,12 67:7
  72:16
**cost** 75:19,20
**counsel** 2:17 3:17
  3:18 63:8 81:21
**counting** 32:4
**county** 80:4
**couple** 10:16 31:5
  74:2 76:13
**court** 1:4 3:5,13
  5:14 30:9 45:19
**courtroom** 5:9
**cp** 1:23
**crr** 80:20
**csr** 1:23 80:20
**current** 19:14,24
  32:13
**customer** 20:19
  33:13,13 43:8
  44:11 71:2 76:17

**customers** 21:24
  59:22 66:17 70:24
  71:6,9,12,15,19
  72:17
**cv** 1:8
**cx** 33:11
**cycles** 39:20 40:3
  44:5 46:21

| d |
| --- |

**d** 2:15 4:9
**daily** 41:14,17
  42:16
**damaged** 75:18
**date** 4:24 28:17,19
  34:24,25 53:7
  55:9,9,21 58:12
**dated** 30:14 37:20
  81:6,8
**dates** 14:13
**daughter** 9:25
  10:3
**david** 2:6 3:22
**day** 62:18,22 78:2
  79:12
**days** 44:13
**de** 47:19,20 81:10
  81:11
**dealing** 60:5
**decent** 50:2
**decide** 12:7
**declaration** 58:17
  81:14
**defendant** 1:14
  2:14 3:18 4:2
**defendant's** 74:13
  81:18
**degree** 10:17,24
  11:3,14 12:5
**deny** 18:5
**deponent** 80:14

[deposed - exactly]

**deposed** 5:3
**deposition** 5:5
  6:23,25 25:23
  30:9 31:11 80:8
  80:10,12 83:4
**der** 29:6,8 55:21
**describe** 75:7
**description** 81:3
**diane** 2:11 3:25
  4:18
**diane.wizig** 2:13
**difference** 75:18
**dillard** 2:16 4:5
**direct** 1:13 2:17
  3:6 4:2,4,5,18
  15:3,9,25 16:23
  17:6,12 19:20,22
  20:19 21:25 22:7
  22:13,22 24:18
  25:7 28:3 29:23
  29:24 30:6,6,7
  31:4,7,15 32:15
  34:18,21 35:5
  37:20 38:2 43:8
  49:15 51:6,9
  57:25 59:23 60:6
  61:25 62:16 67:10
  67:13,14 68:6
  70:24 71:3,11
  72:16,19 75:20
  76:9,17 81:8 83:3
**direction** 80:12
**directions** 61:3
**directly** 11:2,5
**disagree** 28:12
**discarding** 20:25
**disclosed** 71:12
**disclosure** 43:8
  45:15,20 47:24
**discontinue** 73:12

**discussion** 8:9
  67:21
**dispute** 28:3,8,9
  29:2,18 33:22,24
  34:13 37:14 51:6
  51:8 54:4,6 55:12
  55:24 66:24 67:3
  67:10 68:8
**district** 1:4,4 3:4,5
**document** 25:25
  26:5 32:3 39:15
  41:5 43:10 47:8
  47:18 50:24 53:22
  53:23 54:8 56:9
  58:16,22,24 59:4
  73:23 74:2,9,18,20
  81:4,10,12,14
**documents** 7:8,11
  56:15 74:2
**doing** 5:25 34:22
**double** 26:13
**doubt** 57:6
**drawn** 76:13
**drink** 6:11
**dsteelman** 2:8
**duda** 30:13 81:5
**due** 19:8,9
**duly** 4:10 80:14
**duty** 77:12

**e**

**e** 4:9
**earlier** 19:21 22:9
  67:8 72:11
**early** 23:24 24:2
  44:13
**easily** 44:25 45:6,9
  45:20,25 48:5
**eastbrooke** 4:9 8:3
  8:20 9:7,11,18
  10:10 14:21

**eastman** 12:20,23
  13:4
**education** 10:15
**effective** 39:20
**eight** 9:5 37:21
  81:8
**either** 60:22 62:21
**electric** 18:21
  19:17,23,25 20:5
  20:10 23:4 54:17
  61:9
**electrical** 26:24
**electricity** 9:9,12
  9:17 10:11 15:5
  15:12 19:14,19
  20:9 21:24 22:7
  22:20 75:19,21
  77:9
**email** 64:21 65:22
**emailed** 65:3
**emily** 10:7,8
**emily's** 10:11
**employment** 14:17
**ended** 27:9 29:11
**ends** 44:7
**energetix** 15:3
  17:9 22:10,13,20
  23:6,15,18,20 24:2
  24:5,19,22 25:3
  30:6 31:3 76:20
**energy** 1:13 2:17
  3:7 4:2,4,5,18
  15:3,9,25 17:6,12
  18:12 19:20,22
  20:19 21:20,24,25
  22:7,10,12,13,22
  25:7 29:23,24
  30:6,7 31:4,4,7
  32:16 34:18,21
  35:5 36:6 37:20
  38:2 43:8 49:15

  51:7,9 57:25
  59:23 61:25 62:16
  66:5,13,17 67:11
  67:13,14 68:6
  70:24 71:3,11
  72:16 75:20 76:9
  76:17 81:8 83:3
**energy's** 16:23
  28:3 60:6 72:19
**engineer** 12:25
  13:2,10,12,14,18
**enroll** 23:25
**enrolled** 29:3
  33:23,25 34:3,4,5
  72:24
**enrolling** 23:19
  25:11 34:11
**enrollment** 24:23
  24:24 25:4 28:3,6
  28:24
**enter** 66:25
**entitled** 25:25
  58:16 79:5 80:13
  81:4,14
**equal** 75:18
**erie** 80:4
**errata** 83:10,12,13
**esco** 21:19 22:7
  23:7
**escos** 22:24 23:2
  24:18
**especially** 59:20
**esq** 2:2,6,11,15,16
**et** 3:6 43:16
**evening** 7:15
**everything's** 41:9
**exact** 58:12,24
**exactly** 20:2 21:2
  23:21 27:11 35:23
  44:17 49:5 73:6

Page 4

[examination - happen]

**examination** 1:17
  4:13 80:14 82:3
**exception** 71:21
**excuse** 12:23
  16:13 46:12 62:20
**exh** 25:25 30:13
  37:19 47:18 56:9
  58:16 73:18 74:12
**exhibit** 25:23 26:8
  30:9 31:10 35:8
  47:24 49:9,11
  50:9 51:5 54:11
  54:12,13 55:10,10
  55:14 56:7 58:16
  59:5 62:25 68:21
  73:16 81:3,4,5,7
  81:10,12,14,14,16
  81:17
**exhibits** 81:2,21
  81:21
**exists** 25:21
**expectation** 24:3
**experience** 16:22
**expired** 17:23
  48:20 53:21
**expires** 42:2,12
  52:9
**explained** 17:21
**explains** 41:25
  42:11 47:3

**f**

**f** 4:9
**facility** 13:16
**factors** 71:5
**fails** 83:15
**fair** 6:7,8 20:8
  25:19 38:18
**familiar** 21:19,22
**fannin** 2:12
**far** 5:12 11:25

**february** 1:21
  3:11 55:22 79:5
**federal** 1:19
**fee** 33:11 41:14,17
  42:16 44:14
**feel** 75:13
**felt** 15:15
**fifth** 26:10,16
  54:14
**file** 36:24
**filed** 74:6,9
**filing** 73:2
**film** 13:20
**finances** 19:11
**financial** 75:10
**find** 39:21 41:19
  42:20 63:8
**finish** 6:17 12:9
  23:11 36:4 50:18
  53:14
**firm** 3:14,16 62:12
  64:2,6,8,16
**firms** 64:12,15
**first** 11:4 23:7
  26:25 29:22,24
  30:23 51:5 54:2
  74:14 81:18
**fixed** 15:4 16:24
  17:6,22 23:15,18
  28:14,21 29:3
  31:6,14 33:23
  39:6,7,8 40:3
  42:24 43:23,24
  44:2 45:2,7 46:15
  47:4,9 48:20 50:2
  52:8 53:20 71:19
**fjs** 1:8
**flip** 26:10
**folder** 21:12,17
  35:17 37:2

**folders** 21:13
**follow** 28:13 29:5
**followed** 3:18
  13:18
**following** 25:24
  30:12 37:18 47:17
  56:8 58:15 73:17
  74:11
**follows** 4:11
**foregoing** 79:3
  80:8,13
**form** 17:2,14
  20:11 27:19 33:15
  39:12 45:3,8,22
  47:5 48:10 52:4
  63:9 67:16
**forte** 1:6 3:6 68:15
  68:19 69:3,5,12,21
  69:23,25 70:20
  83:3
**forte's** 69:8
**forte000377** 56:10
  81:12
**forte000385** 56:11
  81:13
**found** 42:21 46:6
  51:20 52:2 59:21
  62:5,5 63:11,19
  64:3,14
**four** 58:18 81:15
**fourth** 28:14
**free** 75:14
**front** 32:4,4 62:25
  68:21
**further** 80:10

**g**

**gas** 10:12 15:5
  18:21 19:17,18,23
  19:25 20:10 23:4
**gaunt** 2:5 3:23

**general** 20:4,6
  50:3 53:25
**generally** 74:15
**gentleman** 65:17
**gentlemen** 7:20
  14:24 65:25
**getting** 17:20,25
  18:5 25:16 29:25
  40:2
**give** 41:13
**given** 79:4
**giving** 61:3
**glide** 54:25 55:6
**go** 10:21 11:2
  30:11 32:12 47:10
  58:19 63:24 68:7
  68:11
**goes** 70:20
**going** 5:13 25:22
  30:8 53:6 57:18
  57:18,18
**good** 4:15,16 5:11
  14:13 47:13
**gotten** 25:8 38:7
  45:12
**graduate** 10:16,17
  11:3,6
**great** 5:16
**green** 2:3
**group** 13:13
**guess** 13:2 35:22
  61:11

**h**

**h** 4:9,9
**half** 7:17
**halfway** 32:7
**hand** 30:8
**handle** 19:10
**happen** 41:25
  42:11 44:7 47:4

Page 5

**happened** 54:9 61:11
**head** 5:19
**headings** 48:14
**headline** 30:24 31:2 36:20
**heard** 29:23,24
**help** 63:20 64:9
**hesitant** 49:21
**hetherington** 2:11 2:15 4:2,4
**higher** 60:7
**highest** 10:15
**history** 27:16
**hold** 4:6
**home** 8:23 9:7,10 9:11,13 14:21 64:5
**honest** 41:9
**honestly** 41:7 72:22
**hour** 7:17 31:22 33:8 39:10 42:16 43:17 45:7
**hours** 7:18
**house** 2:17 4:5
**household's** 19:11
**houston** 2:12
**hum** 41:2
**hung** 67:19

**i**

**idea** 20:4,7
**identification** 25:24 30:12 37:18 47:17 56:8 58:15 73:17 74:11
**illinois** 2:3
**immediately** 46:6 62:22,22
**implies** 28:6 33:25 34:5

**importance** 67:6
**important** 67:5 71:8
**inadequacy** 69:8
**increase** 15:11,11 16:18 61:9
**increasing** 16:10
**independent** 21:23
**index** 81:2 82:2
**indicated** 3:12
**individual** 60:4
**individually** 2:9
**individuals** 2:10
**inferred** 72:3,4
**information** 16:4 19:2 39:22 40:19 58:24 59:3 67:18
**initial** 42:2,12,14
**injury** 75:10
**instrument** 13:12
**interaction** 65:22
**interests** 77:13
**interrogatories** 74:14 81:19
**interrogatory** 75:2,4
**interrupt** 26:12
**intervene** 69:9
**intervenor** 1:11,18 73:18 81:16
**introduce** 3:17 25:22
**involvement** 70:15
**issue** 15:25 16:3 16:16 48:4 58:13
**item** 41:14
**items** 48:7

**j**

**january** 27:10 28:17 29:3 31:19 53:18,20 54:5,19

**jerry** 1:9 70:4
**job** 5:11 12:16,19 12:20 13:7,22
**jobs** 13:25
**jr** 2:15
**judge** 5:9 69:6
**judgment** 67:12
**july** 28:19 29:9
**june** 63:4,8
**jury** 5:9 14:24

**k**

**k** 1:23 32:8,9 80:20
**kamberlaw** 2:2 3:21 59:8 62:12 63:3,17 64:17,19 65:5,8,12,16,18 69:18 74:3
**kamberlaw.com** 2:4 83:1
**keep** 5:13
**kilowatt** 31:22 33:8 39:10 42:15 43:17 45:7
**kind** 12:24 15:21 21:15 38:15
**knew** 34:6
**know** 6:10 7:5 13:2 16:13 17:5 18:9 19:13,24 20:2,8,13,25 21:3 24:9 34:4 36:8 38:5,7 49:25 53:16,25 54:9 58:7 60:11,19,21 61:5 62:6,8 63:23 64:7,7,24 65:8,23 68:15 69:20 70:4 70:10,14,16,17,21 71:4,5,8,10,11,15 71:17,18 72:4,6,15

73:6 76:6,8,13,16
**known** 40:11 53:11
**kodak** 12:20,23 13:4,14 14:2,4

**l**

**l** 2:6
**lack** 16:4
**ladies** 14:24
**lane** 4:9 8:3,20 9:7 9:11,18 10:10 14:21
**language** 41:24 42:11,20
**law** 62:12 64:2,6,8 64:12,15,16
**lawsuit** 14:25 60:12 61:6,14,19 61:21,24 62:2 65:9,11 70:15 73:2 77:5
**lawyers** 56:20 62:7 63:16 65:5,8 65:11,12,24 69:17
**layman's** 61:12
**learned** 30:7 40:2 62:3
**leave** 69:8
**left** 14:4,6
**legal** 15:19 60:17 60:24 66:8 83:19
**length** 44:3
**letter** 17:20,25 30:13,17,18,20 35:11,15,16,17,19 35:20 37:11,19,25 38:9 49:12,17,20 51:7 81:5,7
**letters** 18:5,8 35:25 36:5 68:6,9 68:10,13

**[level - number]**

**level**  10:15
**life**  50:24
**line**  26:25 28:14
  31:14 55:2,4,5,20
**litigation**  20:22
**little**  14:3,18 15:22
  20:14 76:21
**live**  7:24 8:25 33:4
  33:4,5
**lived**  8:16,19 9:3,4
  10:8
**llc**  1:13 2:17 3:7
  83:3
**llp**  2:2,11,15
**long**  7:16 8:5,19
  13:3 19:18 39:11
  39:17 44:2
**look**  7:11 19:3,7,8
  31:10 32:2 37:3
  38:9,21 40:23
  47:23 54:11,14
  55:14 57:22 58:10
  62:24 72:23 73:5
  75:4
**looked**  35:24
  45:14,16,19 51:25
  57:2 67:7 72:19
  74:16
**looking**  26:24 35:8
  39:23 42:7,9
  44:15 51:5,10,19
  54:8 55:3,11
  68:21 75:24 76:11
  76:13
**looks**  26:11,14
  32:11 38:8
**lori**  1:23 3:15
  80:20
**lost**  76:8,18
**lot**  19:2 20:25

**m**

**ma'am**  5:21
**machine**  80:9
**mad**  5:14
**magistrate**  69:6
**mail**  17:21 18:16
  18:22,24 21:8
  25:5 29:25 35:21
  36:2,6
**making**  33:19 34:8
  34:20
**manager**  13:20
**manner**  80:9
**manufacturing**
  13:15
**march**  83:2
**mark**  30:10
**marked**  25:24
  30:12 37:18 47:17
  56:8 58:15 73:17
  74:11
**market**  52:21
**marketing**  13:18
  13:19
**marriage**  10:4
**married**  12:13
**martin**  1:6 3:6
  68:15 69:3,5,12,23
  69:25 70:20
**masch**  2:4 83:1
**masters**  12:6
**matches**  55:9
**materials**  20:25
**math**  14:10
**matt**  4:3
**matter**  3:6 15:5
**matthews**  2:15 4:3
**mcdowell**  2:11,15
  3:25 4:3
**mean**  24:7 26:13
  31:2 36:4 43:5

49:20 60:15
**means**  80:9
**meant**  54:23
**medications**  6:18
**meet**  7:4,6,14,16
**members**  78:3
**met**  4:17,20 7:12
**mhllp.com**  2:13
**michael**  2:2,15
  3:20 65:14
**middle**  6:14
**minus**  8:22
**minutes**  4:17
**missouri**  2:7 3:23
**misspoken**  54:24
**misstates**  16:19
  25:13 34:15 39:15
  46:10,16 48:23
  52:3 60:23 66:19
**money**  24:4,6,11
  24:16 76:9,18,21
**month**  17:22,22
  18:19,22,23 20:9,9
  21:12,14 28:21
  33:23 48:21,21
  51:14,14,16,17
  52:9,9,12,12,14,14
  52:20,21 53:8,8,12
  53:12 57:13,14,21
  57:22
**monthly**  44:5
  46:21
**months**  31:5,21
  33:4,5 45:2 68:12
**morning**  4:15,16
**motion**  13:20
**move**  8:13 69:9
**moved**  8:11 14:21

**n**

**n**  2:3,6
**name**  3:15 4:17
  9:22,23 10:6 17:9
  30:2,5 58:25
  63:24
**named**  3:23 77:11
**names**  65:13
**natural**  10:12
**near**  59:10
**needed**  12:16
**never**  4:20 41:5
  45:11 69:25 74:21
**new**  1:4,21 3:5,10
  4:10 7:25 8:5,7
  31:6 77:9 80:2,7
**news**  62:19
**nine**  9:5 14:8 48:7
**ninth**  33:8
**nods**  5:18
**nonresponsive**
  76:15
**northern**  1:4 3:5
**notarize**  83:11
**notary**  1:23 3:13
  79:15 80:6,21
**note**  83:9
**notes**  25:25 32:15
  81:4
**notice**  49:15 50:4
  50:12 51:11
**noticed**  57:6
**notwithstanding**
  15:15
**november**  29:11
  31:6,17 35:6
  37:12,21 38:2
  81:8
**number**  39:7
  41:17 43:16 44:12
  51:19 73:5 75:5

[numbers - price]

**numbers** 19:4,4 28:8 47:18 56:9 81:10,12

**o**

**oath** 5:8
**objection** 15:18 16:19 17:2,14 20:11 25:13 27:19 33:15 34:15 39:12 39:15 40:4 45:3,8 45:22 46:10,16 47:5 48:10,23 52:3,4 60:16,23,24 63:9 66:7,19 67:16 76:15
**objections** 74:13 81:18
**obviously** 10:18 42:21
**occasions** 27:17
**offered** 33:3,5
**offhand** 42:3
**office** 3:8
**oh** 31:12 33:9 35:2 53:5 58:5
**okay** 4:23 5:5,7,11 5:17 6:5,9 7:2,8 7:11,14,16,19,22 7:24 8:16,19,23 9:9,15,20,22,24 10:2,5,10,14,18,24 11:2,7,10,13,19 12:2,12,15,19 13:3 13:9,22,25 14:5,14 14:20,23 15:21,23 16:6,9,12,16 17:10 17:20 18:11,18,23 19:10,16 20:8,16 20:18,21 21:6,22 22:3,6,15 23:3,9 23:19,23,25 24:5

24:17 25:10 27:2 28:2,9,13 29:13,22 30:20 31:2,5,10,12 32:6,22 33:3,10,13 33:19 34:8,13,19 35:9,20 36:13,14 38:23 39:2,25 40:9,13,21,25 41:3 41:8 42:6,14 43:9 45:18 47:3 48:7 49:9 51:5 54:13 55:9,16,20 56:22 57:7 58:9 59:16 61:18 64:5 69:19 72:8,15 73:20 74:15 75:4
**old** 9:20 21:16
**older** 20:25
**once** 16:10 17:7,13 52:8 66:24
**online** 62:9 63:11 64:3
**open** 19:5,7 21:9
**opportunity** 57:10
**opposite** 50:13
**original** 24:22,24 25:3 81:21,21
**overall** 76:9

**p**

**package** 40:19
**page** 22:4 26:10,14 26:16,19 32:3,24 38:10,15,21 43:7 45:12 46:4 47:24 48:8 51:6 54:14 54:16 55:21 75:5 75:23,25 76:2 81:3 82:3
**pages** 26:2,13 30:15 37:22 58:18 79:3 81:4,6,9,15

83:12
**paid** 9:12 10:11 56:25
**paper** 18:16,18 38:24
**paragraph** 41:16 42:19 59:14 68:24
**park** 13:15
**part** 36:22 45:10 63:15 75:13
**particular** 6:24 24:13 59:4 65:13
**pass** 78:5
**path** 54:25 55:6
**paused** 67:22
**pay** 18:9,11,14,15 18:25 19:8 21:9 21:14,17 41:12 57:3
**paying** 15:12 76:12
**payment** 9:17
**penalty** 44:11
**pennsylvania** 10:23
**people** 60:4,5,7,9 60:10 71:21,23 77:8
**peter** 9:23
**phone** 4:3 7:22 34:9,21 44:12 64:20,22 65:21 73:5
**photocopy** 56:16
**physics** 10:25 12:6
**picture** 13:20
**piece** 29:25
**pine** 2:6
**places** 52:23
**plaintiff** 1:7,18 2:8 3:17 69:3,5,8,12

77:5,12
**plaintiff's** 74:12 81:17
**plaintiffs** 1:11 3:21,23 73:18 81:16
**plan** 26:21 27:2,9 27:16 39:5,7,19
**please** 4:24 6:4,9 14:23 40:18 61:2 75:7
**plus** 8:22
**point** 20:24 33:9 36:8 57:25 75:14 75:16
**pointed** 39:24
**pointing** 50:15,16
**portion** 69:11
**position** 13:10
**possession** 38:19
**possible** 11:20 36:10,11,20,23 50:7
**practice** 35:25 36:5
**preceded** 45:11
**pregnant** 12:8,14
**preparation** 7:3
**prepare** 6:22
**presence** 80:11
**present** 2:15
**presentation** 16:4
**presented** 21:3
**pretty** 39:22 41:19 67:24
**prevent** 6:19
**price** 41:13,14,17 41:25 42:12,25 43:16 51:12,13,13 51:15,16,25 52:6,6 52:9,11,13 61:9

[prices - regard]

| | | | |
|---|---|---|---|
| **prices** 41:12 61:19 61:25 62:3 72:12 | **q** | 68:7,11 71:19,20 71:25 | 56:6,22,25 59:4 63:19 64:23,25 |
| **pricing** 41:24 42:10 60:2,4,5,12 60:14 61:13 | **question** 5:12 6:3 6:6,15 15:19 17:3 21:18 22:17 24:25 | **rates** 15:25 16:23 26:24 27:14 32:13 54:17 58:2 60:7,8 71:12 77:9 | 67:8,24 74:23,25 75:3 **receive** 22:16 **received** 22:6,9,12 |
| **prior** 16:20 25:14 34:16 46:11,17 48:24 52:4 60:24 66:20 | 34:19 36:4 39:13 39:14 42:7,10 45:17 50:6 53:24 | **rdr** 80:20 **reach** 64:19 **reached** 64:13,16 | 22:20,25 25:5 37:25 53:10 56:24 59:7 68:3 74:2 **receiving** 37:10 |
| **proactively** 62:4 **probably** 7:17 20:23 23:3 25:5 | 61:2,22,23 62:13 62:21 63:15 **questions** 6:3 23:11 | **read** 35:21,22,25 36:9,11,16,18,21 39:25 40:5,10 42:3,6 44:24 47:8 | 49:12,14 50:4,12 67:8 **recess** 47:16 76:25 **recession** 44:10 |
| 56:21,24 57:2 63:14 **procedure** 1:19 | **quick** 76:22 **quickly** 39:22 40:2 41:20,21 49:6 | 48:16,19 49:4,6,24 53:10 66:4,12,18 75:14 79:2 83:6,8 **reading** 32:18,19 | **recognize** 38:3,15 41:10 50:9 56:14 58:21,23 59:2 **recollection** 37:25 |
| **proceedings** 78:8 **process** 44:10 **produced** 20:22 38:18 | 51:20,22,24 **quite** 44:9 60:15 **quote** 75:8 | 35:23 42:19,22,23 55:5 **real** 14:12 | 43:12 50:3,11 63:25 64:11 73:3 73:8,11 **record** 4:24 8:9 |
| **product** 13:14,18 13:19 52:15 **properties** 9:6 | **r** | **really** 15:3 38:11 44:9 64:23 **reason** 28:2,8,9,12 | 36:18 47:21 67:21 69:7 77:2 **recorded** 3:3 |
| **provided** 56:19 **provision** 46:23 47:3 | **r** 4:9,9,9 **rahner** 3:15 **rate** 15:5,7,12 16:3 | 29:2,18 33:22 49:21 51:6,23 54:4,6 55:12,24 **reasonable** 59:3 | **records** 28:3 40:20 55:25 64:5 **red** 31:3 **redirect** 78:7 |
| **provisions** 44:20 46:24 **public** 1:25 3:13 79:15 80:6,21 | 16:8,9,10,14,17,18 16:24 17:6,18,21 17:22 18:2,3 19:24 20:9 23:16 | **reasonably** 51:23 **reasoning** 24:15 64:24 **recall** 17:24,25 | **reduced** 80:11 **referenced** 75:10 83:5 **referred** 60:10 |
| **purchased** 75:20 75:21 **pursuant** 1:18 | 23:18 26:21 27:2 27:16,17 28:10,14 29:3,6,15,19 31:7 31:15 33:23 39:4 | 18:7,10 23:19,21 24:12 25:6,8,9,16 27:23,23 28:24 29:15 31:8,24 | **referring** 39:6 41:15 42:13 43:17 44:4 51:15 53:9 53:22,23 59:13 |
| **pursuing** 12:5,6 **put** 16:14,17 21:12 21:14,15,17 35:16 35:17 36:24 37:2 | 39:5,6,8,11,18,19 40:3 41:14,17 42:15,24 43:14,15 43:19,24 44:2,25 | 33:19 34:12,20,22 35:4,5,13,23 37:10 37:15,16 38:4,11 38:12,14,15 41:6 | **refresh** 37:24 50:11 **regard** 57:16 |
| 61:11 **putative** 3:21,24 | 45:7,21 46:15 47:4,10,10 48:20 48:22 50:2,2 52:8 52:11,20,24 53:4 | 48:6 49:12,14,16 49:19 50:25 56:4 | |
| | 53:11,18,20 54:2,6 54:20 55:7 57:5,7 57:11,23 67:15 | | |

Veritext Legal Solutions
346-293-7000

**regulated** 75:22
**regus** 1:19 3:9
**related** 41:11
**relating** 35:17
**relative** 80:16
**remainder** 36:21
36:22,22
**remember** 8:22
11:17,25 13:13
17:17,19,20 18:6
23:14 24:21 25:2
25:10 29:25 30:19
30:25 34:6,20
36:21 50:14 55:18
55:19 58:6 72:2
73:6 74:5,7,8,8,18
**remind** 23:10
**reminding** 18:2
**renew** 48:21
**renewal** 28:22
42:15 44:20 46:24
49:14,23 50:4,12
51:10,12,13,16
52:11
**renewed** 16:23
49:25
**renewing** 49:17
**renews** 44:8
**repeat** 22:17 24:25
61:2 66:9
**report** 59:21 80:8
**reporter** 3:13,19
5:14 30:10 45:19
**reporting** 3:14
**represent** 4:18
77:7,12
**representative**
69:3,6,13
**represented** 65:6
**representing**
65:24

**requested** 36:18
**rescind** 44:13
**rescission** 44:10
**research** 13:15
**residence** 35:18
**resident** 8:6,7
**respect** 62:11
69:11
**response** 34:23
35:11
**responsibility**
66:4,10,15
**responsible** 9:18
**rest** 36:9 72:9 78:3
**retain** 40:19
**retained** 65:9
**retired** 13:23
**retrospect** 66:21
**return** 83:12
**review** 4:7 7:8
18:24,25 36:5
40:14,15,18 57:4
**reviewed** 71:16
74:21
**reviewing** 25:10
56:22 74:5,8
**rg&e** 18:20 20:18
56:17
**richard** 1:1,10,17
3:1,3 4:1 5:1 6:1
7:1 8:1 9:1 10:1
11:1 12:1 13:1
14:1 15:1 16:1
17:1 18:1 19:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1,8,9 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1

41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1,17
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:8
81:14 82:1 83:4
**right** 4:21 5:9,24
7:25 8:4 16:2,24
18:24 19:5 20:10
22:10,13 23:5
27:6,9,10,14,18,22
28:22 29:8 31:7
31:18,19,22 32:13
32:24 33:14 34:9
35:21 36:14,25
39:9,10,22 40:3
41:5,16,17,18
42:20 43:18,20,21
45:2,21 46:4,5,7,8
46:9,15,25 47:10
48:5,8,9,12,14,17
48:22 49:7 51:17
51:21 52:9,18,24
53:12,21 54:21
55:7,11,22 56:20
57:8,11 58:2
59:14,19,24 60:3
61:6,20 62:16
64:9 67:2,8 68:23
69:22,24 70:24
71:13,20 72:13
73:14 75:6,9,12
76:2,10,18 77:5

**rochester** 1:20
3:10 4:10 7:25
8:13,16 11:9,15
12:3 18:21 19:17
19:18,23,25 20:10
23:4
**rolla** 2:7 3:23
**roughly** 9:21 10:4
**row** 33:8
**rules** 1:19 83:14

**s**

**s** 2:11 4:9
**save** 24:3,6,11,16
76:21
**saved** 76:8,18
**saw** 36:20 46:14
46:20 58:7,7
62:18 71:21
**saying** 34:11 44:18
48:6 55:13 59:12
61:17
**says** 26:21 27:3,7
27:7,11 28:14,21
31:3,14,21,23 32:8
32:21,24 33:3,11
33:17 34:7 39:5
39:19,19 40:15,18
41:14,14,16,16
42:14 43:2,15,16
43:23,24 44:3,5,6
44:10,11,13,19
46:24 49:2 51:14
51:16 52:11,15,18
52:20,22 53:6,7
54:15,17,19,25
55:6,21 59:13,17
63:3 69:2,4 75:7
75:17
**schafer** 1:1,10,18
3:1,3 4:1,15 5:1,2
6:1,18 7:1,24 8:1

[schafer - state]

9:1,23 10:1,14
11:1 12:1 13:1
14:1,23 15:1 16:1
16:22 17:1 18:1
18:11 19:1,13
20:1 21:1 22:1
23:1 24:1 25:1,25
26:1,4 27:1 28:1
29:1,22 30:1,13,13
31:1 32:1,8,9 33:1
34:1 35:1 36:1
37:1,10,19,19,24
38:1 39:1,17 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1,18,19,20,23
48:1 49:1 50:1
51:1,10 52:1 53:1
54:1,13 55:1 56:1
56:9,14 57:1 58:1
58:16,18,21 59:1
60:1 61:1 62:1,15
63:1 64:1 65:1
66:1,3 67:1 68:1
68:15 69:1 70:1
70:23 71:1 72:1
73:1,18 74:1,12
75:1 76:1 77:1,4
78:1 79:8 81:5,7
81:10,11,15 82:4
83:4
**school**  10:17,19
11:3,6
**scientist**  12:25
**screen**  3:12
**search**  62:9
**searched**  63:10
**second**  34:25
38:21,23 55:4,5
**section**  41:11
43:13,25 44:6,16

**see**  5:18 12:17
26:20,22,23 27:2
28:16,18 29:7
31:16 32:7,9,10,21
33:10,12,12,16
40:13,17 41:11,24
42:4,10,13 43:13
43:25 44:3,6,9,16
44:17,17,19 51:11
51:13,18,19,25
52:5,6,8,10,15,25
53:2 55:6 57:4,10
58:12 59:11 62:4
62:9 69:2,10
73:20 76:3,4
**seeing**  38:12 41:6
49:17 50:14 74:18
74:25
**seeking**  77:7
**seen**  5:5 26:4
30:17 41:5 43:10
44:25 45:6,20,24
49:22 50:23 51:3
51:4 53:17 58:25
62:11 73:23
**segment**  62:19
72:10,12
**selected**  39:5,7
**send**  67:11,18 68:6
68:9
**sends**  66:6,13
72:16
**sent**  24:9 51:7
66:18 68:2,13
**sentence**  75:17
**september**  4:25
30:14 69:7 81:6
**service**  9:10 31:4
62:15 73:12
**services**  1:13 2:17
3:7,14 83:3

**serving**  75:22
**set**  19:8 74:14
81:18
**setup**  21:13
**sheet**  83:10
**shorthand**  80:10
**showing**  55:25
**shows**  27:16
**sic**  54:20
**sided**  26:13
**sign**  70:24 71:3,6
83:6,11
**signature**  4:6
80:19
**signed**  17:8,8,11
23:6,7,14,18 24:15
31:6 76:20,21
83:17
**significant**  61:9,15
**signing**  15:2 31:8
34:11
**similar**  49:23
**similarly**  2:9 5:18
**single**  19:3
**sir**  55:3
**sister**  10:4
**sitting**  70:19
**situated**  2:9
**situation**  63:21
**six**  28:21 43:22
**sixth**  31:14
**size**  45:10
**slow**  50:17
**slowly**  15:11
**small**  41:22
**solutions**  83:19
**somewhat**  41:21
**son**  9:4,20,21
**son's**  9:12
**soon**  46:14

**sorry**  11:12 12:10
12:10,18,22 14:7
14:12 17:15 18:22
22:16 23:12 26:6
26:12,21 31:12
32:14 33:7,9
35:12 36:3,12,14
40:18 42:6 46:12
50:16 53:5,14,15
54:12 61:3 64:14
76:2,3
**sought**  62:4
**sound**  27:18
**sounds**  28:6 66:15
**south**  3:9
**speak**  11:12 51:9
**specialist**  13:19,19
**specific**  73:7,25
**specifically**  8:14
24:14 25:8 49:16
49:17,20 56:25
**spoke**  69:23,25
**spoken**  65:15,18
67:23,25 68:17
70:6,12 72:3
**sprint**  6:9
**square**  1:20
**ss**  80:3
**stand**  35:3 69:15
**standardization**
13:13
**start**  18:2 27:7
28:17 31:17 53:4
53:6,7,18 55:21
**started**  13:9 14:10
27:5 29:9 37:7
54:5
**starts**  75:5
**state**  4:23 20:6
80:2,7

Veritext Legal Solutions
346-293-7000

[statement - understand]

**statement** 43:8
45:20 47:25 69:15
69:22
**states** 1:4 3:4
43:13
**station** 11:21
**steelman** 2:5,6
3:22,22,22 7:20
65:18
**steelmanandgau...**
2:8
**street** 2:3,6,12
**strike** 17:10
**stronger** 66:15
**stuff** 21:2 40:25
45:11
**suit** 62:5,5,10
**suite** 2:6,12 3:10
**summer** 11:17,24
**supplied** 81:21
**supplier** 19:14,19
**supplies** 21:23
**supply** 75:19,21
**support** 69:2,4,5
**supporting** 69:12
**supposed** 69:8
**sure** 6:3,13 11:22
15:23 20:6 24:7
25:2 30:4 44:9,16
60:15 62:13 63:11
63:14 67:24
**swear** 3:19
**sworn** 4:11 79:10
80:14
**syracuse** 77:20

**t**

**table** 26:25 27:2
**take** 5:15 6:10,12
15:25 16:3,16
42:5 76:22

**taken** 1:18 3:3,8
47:16 76:25 80:8
80:12
**talked** 7:6 62:7
64:2 72:10
**talking** 30:21 37:7
47:25 64:17 67:19
**technician** 3:16
**telephone** 2:15
**television** 11:20
58:8,12 62:11
71:22
**tell** 14:24 20:5
21:2 53:3 58:11
58:23 63:22,23
64:6 67:15,18,18
67:23 68:5
**tells** 40:13 43:18
43:25 51:11 52:13
52:23
**tenths** 43:22
**term** 17:23 21:19
22:3 34:4 42:2,12
42:14,15,24 44:7
53:6,21
**termination** 44:14
**terms** 6:24 33:14
40:14,17,23 50:20
61:12,12 67:2
**testified** 4:11 22:9
22:19
**testify** 80:15
**testimony** 3:3,8
16:20 25:14 34:16
41:4 46:11,17
48:24 52:4 60:24
66:20 79:4 83:8
**texas** 2:12
**thank** 5:2 23:12
31:12 33:10 56:12
57:24 73:20 74:15

**thereof** 16:5
**thing** 13:17 25:6
49:21 67:19 75:14
**things** 51:23 59:8
68:2 75:2
**think** 11:17,23
14:7,8,25 15:2,8
15:10,14,14 21:4
23:24 24:6 25:5
30:4 32:6 35:17
35:19 36:8 38:14
40:8 42:13 50:7
50:23 51:3,4 58:6
59:21 63:18,18
64:2,20 65:20
66:14,17 72:22
74:4 77:15
**thinking** 23:4
**third** 32:2
**thomas** 1:9 70:10
**thought** 15:4
49:25 63:23
**three** 27:17 44:13
**thrown** 21:16
**time** 3:11 9:10
13:7 14:20,22
15:4,13 20:19
23:7 24:18 29:20
29:23,24 42:5
47:13 62:23 69:9
73:14 76:16 83:15
**timeframe** 83:7
**times** 14:15 17:5
17:11
**tina** 70:8,9
**titled** 43:7
**today** 4:20 5:7 6:4
6:19,23 22:3
38:13 48:19 49:4
49:6 74:22

**told** 24:10 61:13
72:11
**top** 26:20 43:18
46:4 76:2
**transcript** 4:7
5:19 79:4 81:21
83:5,16
**transitional** 54:20
55:7
**trial** 1:17 77:18
**tried** 3:4
**true** 72:9 79:3
**truth** 20:6 80:15
80:15,16
**truthfully** 6:20
**trying** 11:16 14:7
58:5 63:24 67:13
**turn** 38:10 43:7
**twice** 52:25
**two** 7:17,19 12:4
27:13 30:15 50:20
52:23 65:25 81:6
**tx** 83:13
**tyler** 3:15
**type** 39:3 41:23
45:10 52:16 57:20
**typos** 32:12,20

**u**

**um** 41:2
**unaware** 16:7,9
61:8
**undergraduate**
10:19,22 11:3,14
**understand** 5:7
6:2 10:5 15:24
32:17 42:24 43:2
43:4 48:18,19,25
67:5,6 69:17
71:24 77:4,11,17
77:25 78:4

Veritext Legal Solutions
346-293-7000

[understanding - york]

**understanding** 23:17 61:17 72:11
**understood** 6:7,16 33:13 47:9 48:16 49:7 57:20 60:11 62:24 71:19 73:7 73:13
**united** 1:4 3:4
**university** 10:23 11:8,14 12:3
**unnatural** 36:13 53:16
**unpack** 15:21
**upenn** 11:7,14
**use** 22:3 28:5
**utilities** 60:8
**utility** 21:25 59:24 75:22

**v**

**v** 83:3
**variable** 15:6 16:10,14,17,23 17:18,22 18:2,3 23:16 29:7,8,15,19 42:8,17,25 47:10 48:21 52:18,24,25 53:2,3,18 54:2,20 55:7,21,25 57:25 60:7 67:15 68:7 68:11 71:12,20,24 77:8
**varies** 20:9 51:14 51:16 52:11,14 53:2
**vary** 52:9 53:12
**verbalize** 5:22
**verbatim** 80:9
**verified** 32:8,10
**verify** 83:8
**veritext** 3:14 83:12,19

**veritext.com.** 83:13
**vernacular** 61:7
**versus** 3:6
**video** 3:2,12,16 5:19 60:9,10
**videographer** 3:2
**vs** 1:12

**w**

**wait** 34:24
**waiting** 5:12
**want** 6:10 7:5 55:14 62:6 75:14 75:16
**wanted** 32:12
**way** 10:20 12:11 52:6 56:4 61:16 70:17
**website** 72:20 73:5
**welcome** 37:11
**went** 10:18 11:5,5 18:3,8 20:24 55:25 64:4
**wife** 12:13 68:19 70:8
**willing** 77:22
**wise** 34:25
**witness** 3:19 17:3 17:15 20:12 23:12 26:16 27:20,22 33:16 40:5,8,10 45:4,9,24 46:12,18 47:6 48:25 52:5 56:12 58:19 61:2 63:10 66:9,21 67:17,22 73:20 74:15 78:6 82:3 83:5,7,9,11,15
**witnesses** 82:2
**wizig** 2:11 3:25,25 4:13,18 8:10

15:20 16:21 17:4 17:16 20:15 23:13 25:15,22 26:3,14 26:17 27:25 30:16 33:18 34:17 36:16 36:19 37:17,23 39:13,16 40:7,12 45:5,13 46:2,13,19 47:7,12,15,22 48:11 49:3 50:19 52:7 56:7,13 58:14,20 60:18 61:4 63:13 66:11 66:23 68:4 73:16 73:22 74:10,17 76:22,24 77:3 78:5 82:4
**word** 28:6 33:25 45:25 48:4 52:10 52:25 61:7 66:14 67:23 68:5
**words** 16:7 34:10 41:22 43:4 49:24 69:20 72:3
**work** 11:4,13 12:24
**worked** 11:17,20
**works** 10:20
**wow** 13:6
**wrap** 76:24
**writing** 80:11
**written** 32:25 39:15
**wrong** 15:9,10,14 15:17

**y**

**year** 8:22 14:5 21:14,16
**years** 9:5,5 10:16 12:2 13:5 28:11

**yep** 48:15 54:18
**york** 1:4,21 3:5,10 4:10 7:25 8:5,7 77:9 80:2,7

Page 13

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# EXHIBIT F

**New York Legislative Bill Jacket for Chapter 416 of the
Laws of 2010 (New York General Business Law 349-d)**

CHAPTER _416_

LAWS OF 20 _10_

SENATE BILL _____          ASSEMBLY BILL _1558 C_

_____                  _____

# STATE OF NEW YORK

1558--C

Cal. No. 137

2009-2010 Regular Sessions

## IN ASSEMBLY

### (Prefiled)

January 7, 2009

_____

Introduced by M. of A. GIANARIS, PHEFFER, ROBINSON, DINOWITZ, GABRYSZAK, ROSENTHAL, SCHIMEL, CLARK, SCHROEDER, COLTON -- Multi-Sponsored by -- M. of A.  ALFANO, BOYLAND, BRENNAN, CROUCH, ERRIGO, FIELDS, GALEF, GIGLIO, GLICK, GOTTFRIED, GUNTHER, HYER-SPENCER, KELLNER, KOON, LATIMER, V. LOPEZ, MAGEE, MAISEL, McDONOUGH, McKEVITT, MILLMAN, REILLY, J. RIVERA, SALADINO, SWEENEY, WEISENBERG, WRIGHT -- read once and referred to the Committee on Consumer Affairs and Protection -- reported from committee, advanced to a third reading, amended and ordered reprinted, retaining its place on the order of third reading -- passed by Assembly and delivered to the Senate, recalled from the Senate, vote reconsidered, bill amended, ordered reprinted, retaining its place on the order of third reading -- passed by Assembly and delivered to the Senate, recalled from the Senate, vote reconsidered, bill amended, ordered reprinted, retaining its place on the special order of third reading

AN ACT to amend the general business law, in relation to establishing an energy service company consumers bill of rights

_S. 2361C Parker_

_____

_____

DATE RECEIVED BY GOVERNOR:

**AUG 0 3 2010**

ACTION MUST BE TAKEN BY:

**AUG 1 4 2010**

DATE GOVERNOR'S ACTION TAKEN:

**AUG 1 3 2010**

SENATE VOTE __*49*__ Y __*12*__ N          HOME RULE MESSAGE ____ Y ____ N

DATE __*6/29/10*__

ASSEMBLY VOTE __*145*__ Y __*0*__ N

DATE __*6/29/10*__

**A1558-C** Gianaris (MS)   Same as S 2361-C PARKER

| | | | | | |
|---|---|---|---|---|---|
| 06/29/10 | A1558-C | Assembly Vote | Yes: 145 | No : 0 | |
| 06/29/10 | A1558-C | Senate Vote | Aye: 49 | Nay: 12 | |
| 02/02/10 | A1558-B | Assembly Vote | Yes: 144 | No : 0 | |
| 06/02/09 | A1558-B | Assembly Vote | Yes: 142 | No : 0 | |
| 03/09/09 | A1558-A | Assembly Vote | Yes: 141 | No : 0 | |

Go to Top of Page

**Floor Votes:**

06/29/10 A1558-C   Assembly Vote  Yes: 145  No : 0

| | | | |
|---|---|---|---|
| Yes Abbate | Yes Alessi | Yes Alfano | Yes Amedore |
| Yes Arroyo | Yes Aubry | Yes Bacalles | Yes Ball |
| Yes Barclay | Yes Barra | Yes Barron | Yes Benedetto |
| Yes Benjamin | Yes Bing | Yes Boyland | Yes Boyle |
| Yes Brennan | Yes Brodsky | Yes Brook-Krasny | Yes Burling |
| Yes Butler | Yes Cahill | Yes Calhoun | Yes Camara |
| Yes Canestrari | ER Carrozza | Yes Castelli | Yes Castro |
| Yes Christensen | Yes Clark | Yes Colton | Yes Conte |
| ER Cook | Yes Corwin | Yes Crespo | Yes Crouch |
| Yes Cusick | Yes Cymbrowitz | Yes DelMonte | Yes DenDekker |
| Yes Destito | Yes Dinowitz | Yes Duprey | Yes Englebright |
| Yes Errigo | Yes Espaillat | Yes Farrell | Yes Fields |
| Yes Finch | Yes Fitzpatrick | Yes Gabryszak | Yes Galef |
| Yes Gantt | Yes Gianaris | Yes Gibson | Yes Giglio |
| Yes Glick | Yes Gordon | Yes Gottfried | Yes Gunther A |
| Yes Hawley | Yes Hayes | Yes Heastie | Yes Hevesi |
| Yes Hikind | Yes Hooper | Yes Hoyt | Yes Hyer-Spencer |
| Yes Jacobs | Yes Jaffee | Yes Jeffries | Yes John |
| Yes Jordan | Yes Kavanagh | Yes Kellner | Yes Kolb |
| Yes Koon | Yes Lancman | Yes Latimer | Yes Lavine |
| Yes Lentol | Yes Lifton | Yes Lopez P | Yes Lopez V |
| Yes Lupardo | Yes Magee | Yes Magnarelli | Yes Maisel |
| Yes Markey | Yes Mayersohn | Yes McDonough | Yes McEneny |
| Yes McKevitt | Yes Meng | Yes Miller J | Yes Miller M |
| Yes Millman | ER Molinaro | Yes Montesano | Yes Morelle |
| Yes Murray | Yes Nolan | Yes Oaks | Yes O'Donnell |
| Yes O'Mara | Yes Ortiz | Yes Parment | Yes Paulin |
| Yes Peoples-Stokes | Yes Perry | Yes Pheffer | Yes Powell |
| Yes Pretlow | Yes Quinn | Yes Rabbitt | Yes Raia |
| Yes Ramos | Yes Reilich | Yes Reilly | Yes Rivera J |

000003

| | | | |
|---|---|---|---|
| **ER** Rivera N | **Yes** Rivera P | **Yes** Robinson | **Yes** Rosenthal |
| **Yes** Russell | **Yes** Saladino | **Yes** Sayward | **Yes** Scarborough |
| **Yes** Schimel | **Yes** Schimminger | **Yes** Schroeder | **Yes** Scozzafava |
| **Yes** Skartados | **Yes** Spano | **Yes** Stirpe | **Yes** Sweeney |
| **Yes** Tedisco | **Yes** Thiele | **Yes** Titone | **Yes** Titus |
| **Yes** Tobacco | **Yes** Towns | **Yes** Townsend | **Yes** Weinstein |
| **Yes** Weisenberg | **Yes** Weprin | **Yes** Wright | **Yes** Zebrowski K |
| **Yes** Mr. Speaker | | | |

Go to Top of Page

## Floor Votes:

06/29/10 A1558-C   Senate Vote   Aye: 49 Nay: 12

| | | | |
|---|---|---|---|
| **Aye** Adams | **Aye** Addabbo | **Aye** Alesi | **Aye** Aubertine |
| **Aye** Bonacic | **Aye** Breslin | **Nay** DeFrancisco | **Aye** Diaz |
| **Aye** Dilan | **Aye** Duane | **Aye** Espada | **Nay** Farley |
| **Nay** Flanagan | **Aye** Foley | **Nay** Fuschillo | **Nay** Golden |
| **Aye** Griffo | **Aye** Hannon | **Aye** Hassell-Thompson | **Aye** Huntley |
| **Aye** Johnson C | **Nay** Johnson O | **Aye** Klein | **Aye** Krueger |
| **Aye** Kruger | **Aye** Lanza | **Aye** Larkin | **Aye** LaValle |
| **Aye** Leibell | **Aye** Libous | **Aye** Little | **Aye** Marcellino |
| **Nay** Maziarz | **Aye** McDonald | **Aye** Montgomery | **Exc** Morahan |
| **Aye** Nozzolio | **Aye** Onorato | **Aye** Oppenheimer | **Aye** Padavan |
| **Aye** Parker | **Aye** Peralta | **Aye** Perkins | **Nay** Ranzenhofer |
| **Aye** Robach | **Nay** Saland | **Aye** Sampson | **Aye** Savino |
| **Aye** Schneiderman | **Aye** Serrano | **Nay** Seward | **Nay** Skelos |
| **Aye** Smith | **Aye** Squadron | **Aye** Stachowski | **Aye** Stavisky |
| **Aye** Stewart-Cousins | **Aye** Thompson | **Aye** Valesky | **Aye** Volker |
| **Aye** Winner | **Nay** Young | | |

Go to Top of Page

## Floor Votes:

02/02/10 A1558-B   Assembly Vote  Yes: 144  No : 0

| | | | |
|---|---|---|---|
| **Yes** Abbate | **Yes** Alessi | **Yes** Alfano | **Yes** Amedore |
| **Yes** Arroyo | **Yes** Aubry | **Yes** Bacalles | **Yes** Ball |
| **Yes** Barclay | **Yes** Barra | **Yes** Barron | **Yes** Benedetto |
| **Yes** Benjamin | **Yes** Bing | **Yes** Boyland | **Yes** Boyle |
| **Yes** Brennan | **Yes** Brodsky | **ER** Brook-Krasny | **Yes** Burling |
| **Yes** Butler | **Yes** Cahill | **Yes** Calhoun | **Yes** Camara |
| **Yes** Canestrari | **Yes** Carrozza | **Yes** Castro | **Yes** Christensen |
| **Yes** Clark | **Yes** Colton | **Yes** Conte | **Yes** Cook |

000004

| | | | |
|---|---|---|---|
| Yes Corwin | Yes Crespo | Yes Crouch | Yes Cusick |
| Yes Cymbrowitz | Yes DelMonte | Yes DenDekker | Yes Destito |
| Yes Dinowitz | Yes Duprey | Yes Englebright | Yes Errigo |
| Yes Espaillat | Yes Farrell | Yes Fields | Yes Finch |
| Yes Fitzpatrick | Yes Gabryszak | Yes Galef | Yes Gantt |
| Yes Gianaris | Yes Gibson | Yes Giglio | Yes Glick |
| Yes Gordon | Yes Gottfried | Yes Gunther A | Yes Hawley |
| Yes Hayes | Yes Heastie | Yes Hevesi | ER Hikind |
| Yes Hooper | Yes Hoyt | Yes Hyer-Spencer | Yes Jacobs |
| Yes Jaffee | Yes Jeffries | Yes John | Yes Jordan |
| Yes Kavanagh | Yes Kellner | Yes Kolb | Yes Koon |
| Yes Lancman | Yes Latimer | Yes Lavine | Yes Lentol |
| Yes Lifton | Yes Lopez P | Yes Lopez V | Yes Lupardo |
| Yes Magee | Yes Magnarelli | Yes Maisel | Yes Markey |
| Yes Mayersohn | Yes McDonough | Yes McEneny | Yes McKevitt |
| Yes Meng | Yes Miller J | Yes Miller M | Yes Millman |
| Yes Molinaro | Yes Morelle | Yes Nolan | Yes Oaks |
| Yes O'Donnell | Yes O'Mara | Yes Ortiz | Yes Parment |
| Yes Paulin | Yes Peoples-Stokes | Yes Peralta | Yes Perry |
| Yes Pheffer | Yes Powell | Yes Pretlow | Yes Quinn |
| Yes Rabbitt | Yes Raia | Yes Ramos | Yes Reilich |
| Yes Reilly | Yes Rivera J | Yes Rivera N | Yes Rivera P |
| Yes Robinson | Yes Rosenthal | Yes Russell | Yes Saladino |
| Yes Sayward | Yes Scarborough | Yes Schimel | Yes Schimminger |
| Yes Schroeder | Yes Scozzafava | Yes Skartados | Yes Spano |
| Yes Stirpe | Yes Sweeney | Yes Tedisco | Yes Thiele |
| Yes Titone | Yes Titus | Yes Tobacco | Yes Towns |
| Yes Townsend | Yes Weinstein | Yes Weisenberg | Yes Wright |
| Yes Zebrowski K | Yes Mr. Speaker | | |

Go to Top of Page

**Floor Votes:**

06/02/09 A1558-B   Assembly Vote  Yes: 142  No : 0

| | | | |
|---|---|---|---|
| Yes Abbate | Yes Alessi | Yes Alfano | Yes Amedore |
| Yes Arroyo | Yes Aubry | Yes Bacalles | Yes Ball |
| Yes Barclay | Yes Barra | Yes Barron | Yes Benedetto |
| Yes Benjamin | Yes Bing | Yes Boyland | Yes Boyle |
| Yes Bradley | Yes Brennan | Yes Brodsky | Yes Brook-Krasny |
| Yes Burling | Yes Butler | Yes Cahill | Yes Calhoun |
| Yes Camara | Yes Canestrari | ER Carrozza | ER Castro |
| Yes Christensen | Yes Clark | Yes Colton | Yes Conte |
| Yes Cook | Yes Corwin | Yes Crouch | Yes Cusick |

000005

| | | | |
|---|---|---|---|
| ER Cymbrowitz | Yes DelMonte | Yes DenDekker | Yes Destito |
| Yes Dinowitz | Yes Duprey | Yes Eddington | Yes Englebright |
| Yes Errigo | Yes Espaillat | Yes Farrell | Yes Fields |
| Yes Finch | Yes Fitzpatrick | Yes Gabryszak | Yes Galef |
| Yes Gantt | Yes Gianaris | Yes Giglio | Yes Glick |
| Yes Gordon | Yes Gottfried | Yes Gunther A | Yes Hawley |
| Yes Hayes | ER Heastie | Yes Hevesi | Yes Hikind |
| Yes Hooper | Yes Hoyt | Yes Hyer-Spencer | Yes Jacobs |
| Yes Jaffee | Yes Jeffries | Yes John | Yes Jordan |
| Yes Kavanagh | Yes Kellner | Yes Kolb | Yes Koon |
| Yes Lancman | Yes Latimer | Yes Lavine | Yes Lentol |
| Yes Lifton | Yes Lopez P | Yes Lopez V | Yes Lupardo |
| Yes Magee | Yes Magnarelli | Yes Maisel | Yes Markey |
| Yes Mayersohn | Yes McDonough | Yes McEneny | Yes McKevitt |
| Yes Meng | Yes Miller | Yes Millman | Yes Molinaro |
| Yes Morelle | Yes Nolan | Yes Oaks | Yes O'Donnell |
| Yes O'Mara | Yes Ortiz | Yes Parment | Yes Paulin |
| Yes Peoples | Yes Peralta | Yes Perry | Yes Pheffer |
| Yes Powell | Yes Pretlow | Yes Quinn | Yes Rabbitt |
| Yes Raia | Yes Ramos | Yes Reilich | Yes Reilly |
| Yes Rivera J | Yes Rivera N | Yes Rivera P | Yes Robinson |
| Yes Rosenthal | Yes Russell | Yes Saladino | Yes Sayward |
| ER Scarborough | Yes Schimel | Yes Schimminger | Yes Schroeder |
| Yes Scozzafava | Yes Seminerio | Yes Skartados | Yes Spano |
| Yes Stirpe | Yes Sweeney | Yes Tedisco | Yes Thiele |
| ER Titone | Yes Titus | Yes Tobacco | Yes Towns |
| Yes Townsend | Yes Walker | Yes Weinstein | Yes Weisenberg |
| Yes Weprin | Yes Wright | Yes Zebrowski K | Yes Mr. Speaker |

Go to Top of Page

**Floor Votes:**

03/09/09 A1558-A   Assembly Vote Yes: 141 No : 0

| | | | |
|---|---|---|---|
| Yes Abbate | Yes Alessi | Yes Alfano | ER Amedore |
| Yes Arroyo | Yes Aubry | Yes Bacalles | Yes Ball |
| Yes Barclay | Yes Barra | Yes Barron | Yes Benedetto |
| Yes Benjamin | Yes Bing | ER Boyland | Yes Boyle |
| Yes Bradley | Yes Brennan | Yes Brodsky | Yes Brook-Krasny |
| Yes Burling | Yes Butler | Yes Cahill | Yes Calhoun |
| ER Camara | Yes Canestrari | Yes Carrozza | ER Castro |
| Yes Christensen | Yes Clark | Yes Colton | Yes Conte |
| Yes Cook | Yes Corwin | Yes Crouch | Yes Cusick |
| Yes Cymbrowitz | Yes DelMonte | Yes DenDekker | Yes Destito |

000006

| | | | |
|---|---|---|---|
| Yes Diaz | Yes Dinowitz | Yes Duprey | Yes Eddington |
| Yes Englebright | Yes Errigo | Yes Espaillat | Yes Farrell |
| Yes Fields | Yes Finch | Yes Fitzpatrick | Yes Gabryszak |
| Yes Galef | Yes Gantt | Yes Gianaris | Yes Giglio |
| Yes Glick | Yes Gordon | Yes Gottfried | Yes Greene |
| Yes Gunther A | Yes Hawley | Yes Hayes | Yes Heastie |
| Yes Hevesi | ER Hikind | ER Hooper | Yes Hoyt |
| Yes Hyer-Spencer | Yes Jacobs | Yes Jaffee | Yes Jeffries |
| Yes John | Yes Jordan | Yes Kavanagh | Yes Kellner |
| Yes Kolb | Yes Koon | Yes Lancman | Yes Latimer |
| Yes Lavine | Yes Lentol | Yes Lifton | Yes Lopez P |
| Yes Lopez V | Yes Lupardo | Yes Magee | Yes Magnarelli |
| Yes Maisel | Yes Markey | Yes Mayersohn | Yes McDonough |
| Yes McEneny | Yes McKevitt | Yes Meng | Yes Miller |
| Yes Millman | Yes Molinaro | Yes Morelle | Yes Nolan |
| Yes Oaks | Yes O'Donnell | Yes O'Mara | Yes Ortiz |
| Yes Parment | Yes Paulin | ER Peoples | Yes Peralta |
| Yes Perry | Yes Pheffer | Yes Powell | Yes Pretlow |
| Yes Quinn | Yes Rabbitt | Yes Raia | Yes Ramos |
| Yes Reilich | Yes Reilly | Yes Rivera J | ER Rivera N |
| Yes Rivera P | Yes Robinson | Yes Rosenthal | Yes Russell |
| Yes Saladino | Yes Sayward | Yes Scarborough | Yes Schimel |
| Yes Schimminger | Yes Schroeder | ER Scozzafava | Yes Seminerio |
| Yes Skartados | Yes Spano | Yes Stirpe | Yes Sweeney |
| Yes Tedisco | Yes Thiele | Yes Titone | Yes Titus |
| Yes Tobacco | Yes Towns | Yes Townsend | Yes Walker |
| Yes Weinstein | Yes Weisenberg | Yes Weprin | Yes Wright |
| Yes Zebrowski K | Yes Mr. Speaker | | |

000007

C41?



THE ASSEMBLY
STATE OF NEW YORK
ALBANY

CO-CHAIR
Administrative Regulations
Review Commission

COMMITTEES
Consumer Affairs and Protection
Election Law
Environmental Conservation
Judiciary
Tourism, Arts and Sports Development

MICHAEL N. GIANARIS
Assemblyman 36TH District
Queens County

August 10, 2010

to: KRISTIN

Peter J. Kiernan
Counsel to the Governor
Executive Chamber - State Capitol
Albany, NY 12224

Dear Mr. Kiernan:

I am the Assembly sponsor of legislation (A.1558-C) that is currently before the Governor for executive action.  This bill adds a new §349-d to the General Business Law to protect consumers from deceptive practices in the marketing and sale of energy services.   In the 1990s, in an effort to lower New Yorker's utility bills through competition, deregulation of retail sales of electricity and natural gas brought a number of new "energy services companies" (ESCOs) into the market.  Unfortunately, one side effect has been the emergence of predatory operators that see money-making opportunities in swindling consumers through misleading information, devious sales practices and exorbitant termination fees.

These schemes to defraud utility customers have been a recurring problem around the state, with small business owners and elderly residents among the most frequent victims.  Recent media reports show that neighborhoods in Brooklyn, Manhattan and Queens are experiencing problems with aggressive ESCO marketing, and just last month National Grid warned its customers about door-to-door energy marketers claiming to be utility employees.  Western New York and the Hudson Valley have also been targeted by ESCO scam artists.

The consumer protections in the Home Energy Fair Practices Act were extended to cover ESCOs in 2002, but these provisions only apply after a contract has been signed. This legislation will establish commensurate safeguards for the offering of energy services contracts – these include prohibitions on misrepresentations, distribution by ESCOs of a state-designed "consumers bill of rights," reasonable limits on termination fees and consumer protections on contract renewals.  In addition to enforcement by the Public Service Commission (PSC) and the Long Island Power Authority, the bill empowers the Attorney General and individual consumers to pursue judicial redress.

000008

This bill was drafted in consultation with executive agencies with expertise in this area along with citizen organizations such as the American Association of Retired Persons. I would like to express my gratitude to all of them for helping to craft the final legislative language.

I believe that the provisions of A.1558-C will go a long way toward restoring an orderly competitive market for energy services, and will benefit reputable ESCOs and consumers alike. Approval by Governor Paterson will place New York State in the vanguard of those jurisdictions, such as Illinois and Michigan, which have taken progressive action to protect electricity and gas users. Some information on the recent actions of these other states is enclosed along with the sponsor's memorandum for A.1558-C.

I am sending a copy of this letter and the accompanying materials to Kristin Ross in the Legislative Secretary's Office for inclusion in the Governor's bill jacket. I urge Governor Paterson's favorable action on this bill.

Very truly yours,

Michael N. Gianaris

cc:     K. Ross

NEW YORK STATE ASSEMBLY
MEMORANDUM IN SUPPORT OF LEGISLATION
submitted in accordance with Assembly Rule III, §1(f)

Bill Number:  Assembly: *1558-C*            Memo on original
              Senate: _____          ___     draft of bill
                                        x    Memo on amended bill

Sponsors:  Members of Assembly: Gianaris, Pheffer, Robinson, Dinowitz, Gabryszak, Rosenthal

           Senators: _____

Introduced at the request of: _____

**TITLE OF BILL:**      **AN ACT** to amend the general business law, in relation to enacting
                        an energy service company consumers bill of rights

**PURPOSE OR GENERAL IDEA OF BILL**:

This bill establishes important consumer safeguards in the marketing and offering of contracts
for energy services to residential and small business customers.

**SUMMARY OF SPECIFIC PROVISIONS**:

Bill §1 adds a new §349-d to the General Business Law to set forth an energy services company
consumers bill of rights. Subdivision 1 defines the terms "energy services" (electricity and/or
natural gas), "energy services company" or "ESCO" (an entity eligible to sell energy services to
end-use customers using the transmission or distribution system of a utility), "customer" (any
person sold or offered an energy services contract by an ESCO for residential utility service or
through door-to-door sales), and "door to door sales."

Pursuant to subdivision 2, any person who sells or offers for sale any energy services for or on
behalf of an ESCO shall (a) properly identify himself or herself and the energy services company
or companies which he or she represents; (b) explain that he or she does not represent a
distribution utility; (c) explain the purpose of the solicitation; (d) provide each prospective
customer with a statement of an "ESCO consumers bill of rights" developed by the Public
Service Commission (PSC), in consultation with the Long Island Power Authority (LIPA), the
Consumer Protection Board (CPB) and the Department of Law; and (e) provide contracts and
other written materials in the language used to solicit the prospective customer.

Subdivision 3 provides that no person selling or offering energy services for or on behalf of an
ESCO shall engage in any deceptive acts or practices in such marketing.

Subdivisions 4-7 set forth the following ESCO contract requirements:

► no required prepayment for energy services – an ESCO may offer a customer an option of prepayment which can be cancelled without penalty within 90 calendar days.

► no fee for termination or early cancellation of the contract in excess of $100 if less than 12 months remain in the contract term, $200 if the remaining term is twelve months or more, or twice the estimated bill for energy services for an average month (to charge this fee, an ESCO must provide the customer, when the contract is offered, with that customer's estimated average monthly bill for energy services and the fee that would be charged thereon).

► no material changes in the terms or duration of any contract for energy services without the express consent of the customer, provided that the automatic renewal of contracts is allowed only if the ESCO follows explicit statutory requirements, including clear advance notice and a period for opting out without any termination fee, and any additional regulatory protections adopted by the PSC or LIPA.

► all variable charges shall be clearly and conspicuously identified.

Per subdivision 8, any contract for energy services which does not comply with the applicable provisions of this section shall be void and unenforceable as contrary to public policy and any waivers by a buyer shall be deemed void and unenforceable by the ESCO.

Subdivision 9 authorizes the Attorney General, upon his own motion or upon referral from the PSC, LIPA or CPB, to bring a civil action against any ESCO that violates any provision of this section and to recover (a) a civil penalty not to exceed $1000 per violation and (b) costs and reasonable attorney's fees. In any such proceeding the court may direct restitution.

Subdivision 10 authorizes a right of private action by any person who has been injured by reason of any violation of §349-d to enjoin such unlawful act or practice and/or recover actual damages or $500, whichever is greater. The court may, in its discretion, increase the award to an amount not to exceed three times the actual damages up to $10,000, if it finds a willful or knowing violation. The court may award reasonable attorney's fees to a prevailing plaintiff.

Subdivision 11 preserves the existing authority of the PSC and LIPA to limit, revoke or suspend an ESCO's eligibility for violation of requirements enforceable by the respective agency,

Subdivision 12 preserves such agencies' existing authority to adopt additional compliance requirements relating to the types of products offered by ESCOs and the manner in which they are marketed to residential and commercial customers.

Bill §§2 & 3 provide that the PSC and LIPA, respectively, shall amend their consumer protection regulations and related guidelines, practices and policies to incorporate the provisions of bill §1.

Bill §4 charges the PSC, in consultation with LIPA, CPB and the Attorney General to develop a short, plain-language statement of an "ESCO consumers bill of rights" which summarizes the protections afforded to consumers of energy services by this chapter and other applicable laws.

Bill §5 sets forth a severability clause for the provisions of the legislation.

## SUMMARY OF SPECIFIC AMENDMENTS:

New §349-d(1)(d) is amended to clarify that visits to a buyer's premises pursuant to a requested appointment are not considered "door-to-door sales."

Clarifications are made to new §349-d(2) as follows: requirements pertaining to ESCO marketer identification and provision of a copy of the ESCO consumers bill of rights are made applicable to residential customers and door-to-door sales, while the ban against engaging in deceptive acts and practices is relocated to a new subdivision 3 and remains applicable to all marketing activities. (The ensuing subdivisions are renumbered accordingly.)

Subdivision 4 of §349-d is amended to permit ESCOs to offer customers contracts providing for prepayment on an optional basis only, with an extended rescission period of 90 days. Subdivision 5 was amended to provide that the $100 limit on early termination fees applies to all contracts with less than a full year remaining in the contract. Longer contracts would be subject to a maximum fee of $200. ESCOs that offer contracts with a termination fee based on the customer's average monthly bill would have to provide the customer's estimated average bill and the actual fee amount prior to execution of the contract.

Renumbered §349-d(6) is amended to permit renewal of contracts, with additional consumer protections where the renewal is automatic (*i.e.*, without the customer's express consent).

Further amendments also exclude marketing to commercial accounts at trade or business shows, conventions or expositions from the "door-to-door sales" definition, incorporate recommendations to provide a greater role for the Consumer Protection Board in safeguarding the interests of customers, clarify an ESCO's responsibilities in soliciting new or renewal business, and provide more a realistic level of maximum recoverable damages. Finally, the bill is amended to ensure that the existing authority of the PSC and LIPA to protect consumer's interests is preserved.

## EFFECTS OF PRESENT LAW WHICH THIS BILL WOULD ALTER:

Chapter 686 of 2002 extended the provisions of the Home Energy Fair Practices Act (HEFPA) to cover ESCOs, but its protections only apply after a contract has been executed. This bill would augment recently-adopted PSC guidelines for ESCO marketing, protect consumers from excessive termination fees and deceptive marketing of initial contracts and renewals, make fair marketing standards broadly enforceable on a statewide basis, and extend protections to small

4

business customers who are often targeted by unscrupulous door-to-door marketers without being covered under any current PSC protections.

## JUSTIFICATION:

Over the past decade, New York has promoted a competitive retail model for the provision of electricity and natural gas. Consumers have been encouraged to switch service providers from traditional utilities to energy services companies. Unfortunately, consumer protection appears to have taken a back seat in this process. The pressing need for consumer protections in dealing with ESCOs is highlighted by recent news items from around the state:

▶ Stopped outside her home in Flushing by a uniformed salesman promising her utility bills will be cut in half, a senior citizen signs a contract with an energy services company (ESCO). When she finds out later that the contract is for 5 years and her monthly bills are $200 *higher*, she tries to cancel – only to be told that she must pay an $1800 "exit fee".

▶A small business owner in Brooklyn is convinced to sign an energy services contract by a sales agent's assurances that the price would be fixed and he could save at least $200 a month. After a few months, his monthly bill had *doubled*, and he learned that the contract had a variable charge that fluctuated wildly -- *and* that canceling it would cost him $7000.

▶Complaints from various communities cite ESCO marketing reps masquerading as utility employees, making misleading statements to induce people to sign a contract, and even switching consumers' energy suppliers without their knowledge or consent.

High-pressure and misleading sales tactics, onerous contracts with unfathomable fine print, short-term "teaser" rates followed by skyrocketing variable prices -- many of the problems recently seen with subprime mortgages are being repeated in energy competition. Although the PSC has recently adopted a set of guidelines, its "Uniform Business Practices" are limited and omit important consumer protections in several areas. The fact is, competition in supplying energy cannot succeed without a meaningful set of standards to weed out companies whose business model is based on taking unfair advantage of consumers.

This bill would build on the approach taken by the PSC by (1) extending consumer protections statewide, including to customers in LIPA's service territory; (2) protecting small businesses from being victimized by dishonest door-to-door marketing; (3) protecting customers from excessive termination fees, "bait-and-switch" contract changes and deceptive renewal practices; (4) allowing broader enforcement; and (5) providing clear, plain-language notices of an ESCO consumer's rights. The bill requires the PSC and LIPA to adopt regulations including the following mandatory consumer protections:

>requiring ESCO marketing reps to identify themselves as such and explain that they don't represent a utility;
>ensuring that any prepayments are at the customer's discretion and providing an adequate time period for the customer to assess the ESCO's performance before locking in a pre-payment option;

>limiting cancellation fees to $100 ($200 for a multi-year contract) or an amount twice the initial estimated average monthly bill;

>all variable charges must be clearly and conspicuously identified;

>no contract terms could be changed without the consumer's affirmative consent, and any automatic renewals would have to follow strict guidelines to protect customers; and

> a short, plain language "ESCO consumer bill of rights (to be developed by the PSC, LIPA, CPB and Attorney General) will be given to prospective customers in writing or repeated in telephone sales pitches.

These safeguards would apply to "door-to-door sales" to small businesses as well as residential customers.  The Attorney General could prosecute violations of marketing standards including those referred by the PSC, LIPA or CPB, or consumers could enforce the standards themselves through third-party actions.

These provisions will go a long way toward restoring an orderly marketplace where consumers can make informed decisions on their choices for gas and electric service with the confidence that state government will prevent fraudulent practices and ensure a level playing field.

**PRIOR LEGISLATIVE HISTORY**:

A.10180-B (2008) – passed Assembly, referred to Senate Rules Committee.

**FISCAL IMPLICATIONS FOR STATE AND LOCAL GOVERNMENTS:**   Minimal.

**EFFECTIVE DATE:**

150th day after becoming law and applicable to all energy services sold or offered for sale on or after such date; provided, however, that the PSC and LIPA are immediately authorized and directed to take any and all actions, including but not limited the promulgation of any necessary rules, necessary to fully implement the provisions of this bill on such date.

# NEW YORK STATE ASSEMBLY
## MEMORANDUM IN SUPPORT OF LEGISLATION
### submitted in accordance with Assembly Rule III, Sec 1(f)

BILL NUMBER: A1558C

SPONSOR: Gianaris (MS)

TITLE OF BILL:  An act to amend the general business law, in relation to establishing an energy service company consumers bill of rights

PURPOSE OR GENERAL IDEA OF BILL:  This bill establishes important consumer safeguards in the marketing and offering of contracts for energy services to residential and small business customers.

SUMMARY OF SPECIFIC PROVISIONS:  Bill §1 adds a new §349-d to the General Business Law to set forth an energy services company consumers bill of rights. Subdivision 1 defines the terms "energy services" (electricity and/or natural gas), "energy services company" or "ESCO" (an entity eligible to sell energy services to end-use customers using the transmission or distribution system of a utility), "customer" (any person sold or offered an energy services contract by an ESCO for residential utility service or through door-to-door sales), and "door to door sales."

Pursuant to subdivision 2, any person who sells or offers for sale any energy services for or on behalf of an ESCO shall (a) properly identify himself or herself and the energy services company or companies which he or she represents; (b) explain that he or she does not, represent a distribution utility; (c) explain the purpose of the solicitation; (d) provide each prospective customer with a statement of an "ESCO consumers bill of rights" developed by the Public Service Commission (PSC), in consultation with the Long Island Power Authority (LIPA), the Consumer Protection Board (CPB) and the Department of Law; and (e) provide contracts and other written materials in the language used to solicit the prospective customer.

Subdivision 3 provides that no person selling or offering energy services for or on behalf of an ESCO shall engage in any deceptive acts or practices in such marketing.

Subdivisions 4-7 set forth the following ESCO contract requirements:

> no required prepayment for energy services - an ESCO may offer a customer an option of prepayment which can be cancelled without penalty within 90 calendar days.

> no fee for termination or early cancellation of the contract in excess of $100 if less than 12 months remain in the contract term, $200 if the remaining term is twelve months or more, or twice the estimated bill for energy services for an average month (to charge this fee, an ESCO must provide the customer, when the contract is offered, with that customer's estimated average monthly bill for energy services and the fee that would be charged thereon).

000015

> no material changes in the terms or duration of any contract for ener-
gy services without the express consent of the customer, provided that
the automatic renewal of contracts is allowed only if the ESCO follows
explicit statutory requirements, including clear advance notice and a
period for opting out without any termination fee, and any additional
regulatory protections adopted by the PSC or LIPA.

> all variable charges shall be clearly and conspicuously identified.

Per subdivision 8, any contract for energy services which does not
comply with the applicable provisions of this section shall be void and
unenforceable as contrary to public policy and any waivers by a buyer
shall be deemed void and unenforceable by the ESCO.

Subdivision 9 authorizes the Attorney General, upon his own motion or
upon referral from the PSC, LIPA or CPB, to bring a civil action against
any ESCO that violates any provision of this section and to recover (a)
a civil penalty not to exceed $1000 per violation and (b) costs and
reasonable attorney's fees. In any such proceeding the court may direct
restitution.

Subdivision 10 authorizes a right of private action by any person who
has been injured by reason of any violation of §349-d to enjoin such
unlawful act or practice and/or recover actual damages or $500, whichev-
er is greater. The court may, in its discretion, increase the award to
an amount not to exceed three times the actual damages up to $10,000, if
it finds a willful or knowing violation. The court may award reasonable
attorney's fees to a prevailing plaintiff.

Subdivision 11 preserves the existing authority of the PSC and LIPA to
limit, revoke or suspend an ESCO's eligibility for violation of require-
ments enforceable by the respective agency,

Subdivision 12 preserves such agencies' existing authority to adopt
additional compliance requirements relating to the types of products
offered by ESCOs and the manner in- which they are marketed to residen-
tial and commercial customers.

Bill §§2 & 3 provide that the PSC and LIPA, respectively, shall amend
their consumer protection regulations and related guidelines, practices
and policies to incorporate the provisions-of bill §1.

Bill §4 charges the PSC, in consultation with LIPA, CPB and the Attorney
General to develop a short, plain-language statement of an "ESCO consum-
ers bill of rights" which summarizes the protections afforded to consum-
ers of energy services by this chapter and other applicable laws.

Bill §5 sets forth a severability clause for the provisions of the.
legislation.

SUMMARY OF SPECIFIC AMENDMENTS: New §349-d(1)(d) is amended to clari-
fy that visits to a buyer's premises pursuant to a requested appointment
are not considered "door-to-door sales."

Clarifications are made to new §349-d(2) as follows: requirements
pertaining to ESCO marketer identification and provision of a copy of
the ESCO consumers bill of rights are made applicable to residential
customers and door-to-door sales, while the ban against engaging in
deceptive acts and practices is relocated to a new subdivision 3 and

remains applicable to all marketing activities. (The ensuing subdivi-
sions are renumbered accordingly.)

Subdivision 4 of §349-d is amended to permit ESCOs to offer customers
contracts providing for prepayment on, an optional basis only, with an
extended rescission period of 90 days. Subdivision 5 was amended to
provide that the $100 limit on early termination fees applies to all
contracts with less than a full year remaining in the contract.  Longer
contracts would be subject to a maximum fee of $200. ESCOs that offer
contracts with a termination fee based on the customer's average monthly
bill would have to provide the customer's estimated average bill and the
actual fee amount prior to execution of the contract.

Renumbered §349-d(6) is amended to permit renewal of contracts, with
additional consumer protections where the renewal is automatic (i.e.
without the customer's express consent).

Further amendments also exclude marketing to commercial accounts at
trade or business shows, conventions or expositions from the "door-to-
door sales" definition, incorporate recommendations to provide a greater
role for the Consumer Protection Board in safeguarding the interests of
customers, clarify an ESCO's responsibilities in soliciting new or
renewal business, and provide more a realistic level of maximum recover-
able damages. Finally, the bill is amended to ensure that the existing
authority of the PSC and LIPA to protect consumer's interests is
preserved.

EFFECTS OF PRESENT LAW WHICH THIS BILL WOULD ALTER:  Chapter 686 of
2002 extended the provisions of the Home Energy Fair Practices Act
(HEFPA) to cover ESCOs, but its protections only apply after a contract
has been executed. This bill would augment recently adopted PSC guide-
lines for ESCO marketing, protect consumers from excessive termination
fees and deceptive marketing of initial contracts and renewals, make
fair marketing standards broadly enforceable on a statewide basis, and
extend protections to small business customers who are often targeted by
unscrupulous door-to-door marketers without being covered under any
current PSC protections.

JUSTIFICATION:  Over the past decade, New York has promoted a compet-
itive retail model for the provision of electricity and natural gas.
Consumers have been encouraged to switch service providers from tradi-
tional utilities to energy services companies. Unfortunately, consumer
protection appears to have taken a back seat in this process. The press-
ing need for consumer protections in dealing with ESCOs is highlighted
by recent news items from around the state:

> Stopped outside her home in Flushing by a uniformed salesman promising
her utility bills will be cut in half, a senior citizen signs a contract
with an energy services company (ESCO). When she finds out later that
the contract is for 5 years and her monthly bills are $200 higher, she
tries to cancel - only to be told that she must pay an $1800 "exit fee".

> A small business owner in Brooklyn is convinced to sign an energy
services contract by a sales agent's assurances that the price would be
fixed and he could save at least $200 a month. After a few months, his
monthly bill had doubled, and he learned that the contract had a vari-
able charge that fluctuated wildly -- and that canceling it would cost
him $7000.

000017

> Complaints from various communities cite ESCO marketing reps masquer-
ading as utility employees, making misleading statements to induce
people to sign a contract, and even switching consumers' energy suppli-
ers without their knowledge or consent.

High-pressure and misleading sales tactics, onerous contracts with unfa-
thomable fine print, short-term "teaser" rates followed by skyrocketing
variable prices -- many of the problems recently seen with subprime
mortgages are being repeated in energy competition.  Although the PSC
has recently adopted a set of guidelines, its "Uniform Business Prac-
tices" are limited and omit important consumer protections in several
areas. The fact is, competition in supplying energy cannot succeed with-
out a meaningful set of standards to weed out companies whose business
model is based on taking unfair advantage of consumers.

This bill would build on the approach taken by the PSC by (1) extending
consumer protections statewide, including to customers in LIPA's service
territory; (2) protecting small businesses from being victimized by
dishonest door-to-door marketing; (3) protecting customers from exces-
sive termination fees, "bait-and-switch" contract changes and deceptive
renewal practices; (4) allowing broader enforcement; and (5) providing
clear, plain-language notices of an ESCO consumer's rights. The bill
requires the PSC and LIPA to adopt regulations including the following
mandatory consumer protections:

>requiring ESCO marketing reps to identify themselves as such and
explain that they don't represent a utility;

>ensuring that any prepayments are at the customer's discretion and
providing an adequate time period for the customer to assess the ESCO's
performance before locking in a prepayment option;

>limiting cancellation fees to $100 ($200 for a multi-year contract) or
an amount twice the initial estimated average monthly bill;

>all variable charges must be clearly and conspicuously identified;

>no contract terms could be changed without the consumer's affirmative
consent, and any automatic renewals would have to follow strict guide-
lines to protect customers; and

> a short, plain language "ESCO consumer bill of rights (to be developed
by the PSC, LIPA, CPB and Attorney General) will be given to prospective
customers in writing or repeated in telephone sales pitches.

These safeguards would apply to "door-to-door sales" to small businesses
as well as residential customers. The Attorney General could prosecute
violations of marketing standards including those referred by the PSC,
LIPA or CPB, or consumers could enforce the standards themselves through
third-party actions.

These provisions will go a long way toward restoring an orderly market-
place where consumers can make informed decisions on their choices for
gas and electric service with the confidence that state government will
prevent fraudulent practices and ensure a level playing field.


PRIOR LEGISLATIVE HISTORY:

<u>FISCAL IMPLICATIONS FOR STATE AND LOCAL GOVERNMENTS</u>:  Minimal.

<u>EFFECTIVE DATE</u>:  150th day after becoming law and applicable to all
energy services sold or offered for sale on or after such date;
provided, however, that the PSC and LIPA are immediately authorized and
directed to take any and all actions, including but not limited the
promulgation of any necessary rules, necessary to fully implement the
provisions of this bill on such date.

## DIVISION OF THE BUDGET BILL MEMORANDUM

**Session Year 2010**

<u>**SENATE:**</u>                                                                                          <u>**ASSEMBLY:**</u>
**No.**                                                                                                 **No. 1558-C**

**Primary Sponsor:    Assemblyman Gianaris**

**Law:    General Business**                                    **Sections:    349-d (new)**

**Division of the Budget recommendation on the above bill**

**APPROVE:**                                    **NO OBJECTION:   X**

1.    <u>Subject and Purpose</u>:

The bill creates an energy service company (ESCO) Consumers Bill of Rights to provide New
Yorkers with safeguards related to the marketing and contractual practices of ESCOs.  An
ESCO sells natural gas and/or electricity directly to consumers, while relying on utility
companies' distribution networks to transport the energy product to the consumer.  This bill
specifically outlines the rules governing any service offering by an ESCO or their
representative, including:
- information required to be provided to consumers;
- prohibition on deceptive marketing practices;
- limitations on contractual prepayments, cancelations and change of terms; and
- authorization for the Attorney General to prosecute violators of the bill's provisions and
  impose civil penalties.

2.    <u>Budget Implications</u>:

The bill has no State fiscal impact.

3.    <u>Recommendation</u>:

The bill establishes an ESCO Consumers Bill of Rights to provide New Yorkers with
safeguards involving the marketing and offering of ESCO services.  It has no State fiscal
impact.  Accordingly, the Division of the Budget has no objection to this bill.



**DEPARTMENT OF STATE**
ONE COMMERCE PLAZA
99 WASHINGTON AVENUE
ALBANY, NY 12231-0001

DAVID A. PATERSON
GOVERNOR

LORRAINE A. CORTÉS-VÁZQUEZ
SECRETARY OF STATE

## MEMORANDUM

To:        Honorable Peter J. Kiernan, Esq.
           Counsel to the Governor

From:      Matthew W. Tebo, Esq.
           Legislative Counsel

Date:      July 15, 2010

Subject:   A.1558-C (M. of A. Gianaris)
           Recommendation:  <u>No comment</u>

The Department of State has no comment on the above referenced bill.

If you have any questions or comments regarding our position on the bill, or if we can otherwise assist you, please feel free to contact me at (518) 474-6740.

MWT/mel

000021



**STATE OF NEW YORK**

**DAVID A. PATERSON**
GOVERNOR

**PETER J. KIERNAN**
COUNSEL TO THE GOVERNOR

June 30, 2010

Honorable Michael Gianaris
New York State Assembly
Room 742
Legislative Office Building
Albany, New York 12248

Honorable Kevin Parker
New York State Senate
Room 412
Legislative Office Building
Albany, New York 12247

Dear Assemblyman Gianaris and Senator Parker:

As you know, legislation that you have sponsored (A.1558-C/ S.2361-C) has now passed both houses of the Legislature, and will soon be sent to the Governor for action.

In order to assist the Governor in reviewing this legislation and deciding whether it should be signed into law, we would greatly appreciate receiving any relevant documents or information that you have on this bill. In particular, we would very much like to receive:

- copies of the sponsor's memorandum in support of this bill;

- copies of any comment letters in support of or in opposition to this bill that you received from outside organizations, individuals or other third parties;

- if hearings were held on the bill, copies of the transcripts of those hearings; and

- any other documents or information that you believe should be considered by the Governor.

000022

The State Constitution gives the Governor only 10 days to act on bills after they have been forwarded by the Legislature, and we therefore would appreciate receiving the above information at your earliest convenience.  Please send any materials you have to:

> Kristin Ross
> Legislative Secretary's Office
> Executive Chamber
> State Capitol – Room 225
> Albany, New York 12224

Any information that you provide will be included in the bill jacket that is maintained by the State Archives and constitutes the legislative history of bills that have been signed into law.

Thank you for your consideration and assistance, and please feel free to contact this office if you have any questions.

Very truly yours,

Peter J. Kiernan
Counsel to the Governor

cc:    K. Ross

000023

## STATE OF NEW YORK DEPARTMENT OF PUBLIC SERVICE
## THREE EMPIRE STATE PLAZA, ALBANY, NY 12223-1350
www.dps.state.ny.us

**PUBLIC SERVICE COMMISSION**

**GARRY A. BROWN**
*Chairman*
**PATRICIA L. ACAMPORA**
**MAUREEN F. HARRIS**
**ROBERT E. CURRY JR.**
**JAMES L. LAROCCA**
*Commissioners*



**PETER McGOWAN**
*General Counsel*

**JACLYN A. BRILLING**
*Secretary*

August 5, 2010

TO:         Peter Kiernan
            Counsel to the Governor

FROM:       Peter McGowan
            General Counsel

SUBJECT:    A.1558-C (Gianaris)

Recommendation:  Disapproval

      This bill would amend the General Business Law (GBL) by adding a new §349-d to establish an energy services company (ESCO) consumer bill of rights.[1]  Specifically, the bill would require door-to-door ESCO salespersons to identify themselves and the purpose of the solicitation, and prohibit "deceptive acts."  ESCOs may not require customer prepayment for energy services; however, prepayment may be offered as an option for the customer.  An ESCO customer may cancel any contract providing for prepayment at any time; and, the ESCO is required to return the unused portion of the prepayment.  Moreover, no contract may require an early termination fee in excess of 1) $100 with a remaining term of less than twelve months, 2) more than $200 for a remaining term of twelve months or more, or 3) twice the estimated bill for an average month.

      The bill would prohibit changes to the duration of the contract without the express consent of the customer, require clear identification of all variable charges for customers, and provide that any contract that fails to meet the requirements of this bill shall be unenforceable.  The Attorney General may bring a civil action for violations of these provisions, and a civil penalty of up to $1,000 per violation is established in the legislation.  Any individual harmed may also bring an action to recover actual damages, or $500, whichever is greater.

      Finally, the bill would require the Public Service Commission (PSC), in consultation with the Long Island Power Authority, the State Consumer Protection Board, and the Department of Law, to prepare a short "plain language" statement of an "ESCO Consumer Bill of Rights" summarizing the bill's provisions and other applicable laws.  The bill would take effect 150 days after it becomes law.

      Commission orders require most of the rights established in this bill; and, in some cases provide additional and more comprehensive protections to consumers.  For example, Section 10 (Marketing Standards) of the Uniform Business Practices (UBP) provides standards that ESCOs and their

---

[1] As noted below, many of the same rights set forth in this bill are already protected under law.  These rights were codified under the Home Energy Fair Practices Act (HEFPA), incorporated into Article 2 of the Public Service Law (PSL), and further applicable to contracting with ESCOs under the Uniform Business Practices set forth in Case 98-M-1343, In the Matter of Retail Access Business Rules.

marketing representatives must follow when soliciting business. These standards require salespersons to produce identification, specify who they represent, leave written material upon request, and immediately leave the property when prompted by the owner. The standards set forth by the UBP go beyond the protections offered in this bill, and require salespersons to explain that the utility will continue to deliver energy and will respond to emergencies, even though the customer may contract with an ESCO.

The few additional requirements established in this bill not covered in regulations may actually limit options presented to consumers. For example, this bill provides the consumer with the right to terminate a contract at any time and receive a refund for the unused portion of any prepayment. As a result, an ESCO may be unable to financially offer an option to prepay for service at a reduced price. The current voluntary prepayment model provides security to both the consumer who receives a fixed price on energy, and the ESCO in the form of a prepayment. By authorizing early termination with refunds and a limited termination fee, the existing risk/reward balance will be undermined. With only a limited penalty for early cancellation of the contract, only the consumer would receive the security benefit of a fixed rate when the market price is higher than the contract cost.

When the market price drops, there is little disincentive for a customer to break the ESCO contract. While ESCOs may find ways to work around the limitations in the legislation, *e.g.*, by defining the "unused portion" of the prepayment as the difference between the contract price and the market price, this interpretation may be subject to court review. Without an ability to recover from an early termination, some ESCOs may be unable to survive financially in the marketplace; they may not be able to offer any model different from the utilities. Without appropriate flexibility, the ESCOs may be forced to leave the State, which reduces competitive offerings and jobs.

In sum, the bill would add little to the protections already afforded to ESCO consumers pursuant to the Commission's Uniform Business Practices. Instead, although the bill strives to benefit consumers, the limitations placed on the ESCOs raise the specter of fewer energy service options in the marketplace. Thus, the Department of Public Service recommends disapproval of this legislation.



| David A. Paterson<br>Governor | **STATE OF NEW YORK**<br>EXECUTIVE DEPARTMENT<br>CONSUMER PROTECTION BOARD | Mindy A. Bockstein<br>Chairperson and Executive Director |
|---|---|---|

| | |
|---|---|
| TO: | Peter J. Kiernan, Counsel to the Governor |
| FROM: | Lisa R. Harris-Eglin, Deputy Executive Director and General Counsel |
| | Paula J. O'Brien, Legislative Counsel |
| SUBJECT: | A.1558-C (Gianaris)/S.2361-C (Parker) |
| DATE: | July 26, 2010 |

**CPB Position:  Support**.

Thank you for inviting the Consumer Protection Board (CPB) to comment on A.1558-C / S.2361-C.

**Proposed Amendments:**

The General Business Law (GBL) is amended to add a new section 349-d to provide for the energy services company consumers bill of rights.  This bill establishes and codifies certain consumer safeguards related to contractual language, and marketing of energy services to residential and small business customers by Energy Service Companies ("ESCOs").

A new section (d) of General Business Law ("GBL") § 349-a is added to inter alia, establish an ESCO bill of rights which will be distributed to all potential customers subject to door-to-door marketing efforts by or on behalf of ESCOs in New York State .

**Comment:**

The CPB supports enactment of the proposed legislation. Although the Home Energy Fair Practices Act ("HEFPA"), outlining consumer protection standards for provision of service, was made applicable to ESCOs in 2002, provisions included in HEFPA do not address door-to-door marketing of services by ESCOs.

The proposed addition to the GBL will enhance safeguards and protections currently in place in the Public Service Law (PSL) and the Public Service Commission (PSC) Uniform Business Practice (UBP) guidelines regarding door-to-door ESCO marketing practices.  The CPB has long advocated for enhanced consumer protections and oversight related to door-to-door marketing of energy products by ESCOs and views this legislation as a natural extension to the modifications already made to UBP guidelines in 2008 resulting from a petition filed at the PSC by the CPB and the New York City Department of Consumers Affairs. The ramifications for violation of the UPB guidelines is limited to potential action on behalf of the PSC with the most pernicious action being the revocation by the Commission of the ESCOs right to operate in the State. Enactment of the proposed legislation would greatly strengthen consumer safeguards by allowing for a private right of action and State civil actions against ESCOs in violations of

---

5 Empire State Plaza, Suite 2101, Albany, New York 12223
Tel: 518-474-3514 • Fax: 518-474-2474

1740 Broadway, 15th Floor, New York, New York 10019
Tel: 212-459-8850 • Fax: 212-459-8855



Consumer Hotline 800-697-1220

www.nysconsumer.gov

*- Advocating for and Empowering NY Consumers -*

*Celebrating 40 Years of Results*

000026



these provisions.

The CPB strongly supports all aspects of the proposed legislation particularly the mandate for the creation in statute of an ESCO service company "Consumers Bill of Rights" for distribution to potential customers, the codification of contractual standards and requirements related to agreements entered into by residential consumers for service from ESCOs and the creation of contractual safeguards which protect consumers by allowing for reasonable periods of time to cancel ESCO service with minimal financial repercussions.

Thus, this legislation is necessary as the CPB continues to receive inquires and complaints from consumers about ESCO services. The CPB has conducted educational workshops to community-based organizations seeking to provide consumers with greater protections and information about these companies.

Accordingly, the CPB *supports* this legislation that will further protect consumers from the potential for exposure to unsavory door-to-door ESCO marketing practices.

5 Empire State Plaza, Suite 2101, Albany, New York 12223
Tel: 518-474-3514 ▪ Fax: 518-474-2474

Consumer Hotline 800-697-1220

1740 Broadway, 15th Floor, New York, New York 1001'
Tel: 212-459-8850 ▪ Fax: 212-459-885.

www.nysconsumer.gov

- Advocating for and Empowering NY Consumers -

*Celebrating 40 Years of Results*

000027

**Kristin Ross**

| | |
|---|---|
| **From:** | carol_coyne@dps.state.ny.us |
| **Sent:** | Tuesday, August 10, 2010 3:10 PM |
| **To:** | Legislative Secretary |
| **Cc:** | Glen Bruening |
| **Subject:** | A.1558-C |
| **Attachments:** | a1558-c_10_govmemo_final_rev 8-10-10.docx |

Attached please find a revised memo setting forth the position of the Department of Public Service re A.1558-C. The Department requests that the earlier memo, submitted on August 5, 2010, be withdrawn and replaced with the attached memo. We apologize for any inconvenience this may cause.

Thank you.

Carol E. Coyne
Assistant Counsel
NYS Department of Public Service
Three Empire State Plaza
Albany, NY 12223-1350
Ph: (518) 473-4225  Fax: (518) 473-7081

 Please consider the environment before printing this e-mail.

# DAVIDOFF MALITO & HUTCHER LLP

<table>
<tr><td>NEW YORK<br>605 THIRD AVENUE<br>NEW YORK, N.Y. 10158<br>(212) 557-7200</td><td>ATTORNEYS AT LAW<br>200 GARDEN CITY PLAZA<br>SUITE 315<br>GARDEN CITY, NEW YORK 11530</td><td>ALBANY<br>150 STATE STREET<br>ALBANY, N.Y. 12207<br>(518) 465-8230</td></tr>
</table>

WRITER'S DIRECT: (516) 247-4430
E-MAIL: sam@dmlegal.com

(516) 248-6400
FAX (516) 248-6422
WWW.DMLEGAL.COM

WASHINGTON, D.C.
444 NORTH CAPITOL STREET, N.W.
WASHINGTON, D.C. 20001
(202) 347-1117

August 5, 2010

Mr. Peter J. Kiernan, Esq.
Counsel to the Governor
Governor's Office Executive Chamber
State Capitol
Albany, NY   12224

**RE: S.2361C/A.1558C**

Dear Mr. Kiernan,

Thank you for the opportunity to comment on the above referenced bill which we are hopeful will be vetoed by the Governor. This bill amends the general business law to establish an energy service company consumers bill of rights.

On behalf of our client, IDT Energy, we respectfully oppose the above-referenced bill. During the past five years, the Public Service Commission (PSC) has been working with energy service companies (ESCOs) to dramatically reduce consumer complaints. It is clearly working.

Complaints:
2006 - 2847
2007 - 1903
2008 - 2238
2009 - 1444
2010 thru May - 403 (which projects to approx. 967)

The trend is clear and the complaints have dropped dramatically since 2006. The statistics show that what is being done by the PSC right now is working. There is no need to codify this bill of rights at this time and it might even be counterproductive. In fact, it has been our understanding during this entire legislative session that the PSC agrees with our position that this bill is unnecessary. It is difficult to understand why the legislature is trying to force a public policy change that is contrary to the governing agency's interests specifically when the current process and dialog is producing excellent results.

80067949

DAVIDOFF MALITO & HUTCHER LLP
Mr. Peter J. Kiernan, Esq.
August 5, 2010
Page 2

In addition, the PSC already has a list of Market Standards that ESCOs adhere to. The ESCOs sign on and agree to abide by it. Codifying this Bill of Rights would actually hinder the progress of reducing complaints because it would add another bureaucracy, the Consumer Protection Board (CPB), into the mix and lock in the standards. This will invariably weaken accountability, muddle responsibility, invite bureaucratic turf battles, and ultimately make it more difficult for consumer complaints / issues to be resolved. Furthermore, this is a first step leaning towards re-regulation of the deregulated market. There are no statistics suggesting this is necessary and the market is still emerging. This is regressive and counter to New York's policy decision to deregulate this market.

Another issue is whether there is a hidden fiscal impact to this bill. By requiring the PSC to amend guidelines, practices, policies, rules and/or regulations in relation to ESCOs in coordination with the CPB, it would appear a significant amount of resources and manpower will be required to accomplish this task. In a time when New York is working hard to save resources, this would seem to spend them on a solution that is looking for a problem. Furthermore, in order to continue to preserve resources, we suggest that only one agency, the PSC, have any regulatory authority over ESCOs.

Finally, the overwhelming bulk of complaints go to the PSC. So, the complaint reduction above is accurate. Every ESCO bill has an area on it that tells the customer to specifically call the PSC if they have a complaint. Not the ESCO. Not the CPB. The PSC gets the overwhelming amount of complaints and they have been posting them on their website for years. Those complaints continue to drop even as the ESCO market continues to grow. Consequently, the justification for this bill is outdated and unrepresentative of the strides the industry and PSC have made to make the market better for consumers.

**For the foregoing reasons, we respectfully request that the Governor veto this legislation.**

Sincerely,

Stephen A. Malito

SAM:mm

80067949

000030

Skip Navigation

ILLINOIS ATTORNEY GENERAL **Lisa Madigan**

www.IllinoisAttorneyGeneral.gov

Home | Press Room | Legislation | Opinions | Español | Other Languages | Photos | Site Map | Contact Us

Press Releases

About Us

Protecting Consumers

Advocating for Women

Keeping Communities Safe

Advocating for Older Citizens

Safeguarding Children

Defending Your Rights

Preserving the Environment

Helping Crime Victims

Ensuring Open and Honest Government

Building Better Charities

MethNet

May 14, 2009

## MADIGAN SECURES $1 MILLION IN CONSUMER RESTITUTION FROM ALTERNATIVE GAS SUPPLIER FOR DECEPTIVE CLAIMS

### Attorney General's Agreement Follows Drafting of a New Law Requiring Stricter Consumer Disclosures and Limiting Early Cancellation Fees

Chicago — Attorney General Lisa Madigan today announced an agreement with U.S. Energy Savings Corp. that will allow hundreds of Illinois consumers to terminate contracts and receive $1 million in restitution as a result of a lawsuit filed last year alleging that the alternative gas supplier sold fixed-rate gas contracts using misleading sales tactics that falsely promised significant consumer savings.

"My office has received a nearly unprecedented number of calls from consumers who were deceived by false assurances that they would receive significant savings by switching to this alternative gas supplier," Madigan said. "This agreement will help to protect Illinois consumers and ensure that this company provides full, upfront disclosures about its products' terms and conditions so that consumers can make informed decisions."

Madigan's lawsuit alleged that Illinois Energy Savings Corp., which does business as U.S. Energy Savings Corp., sold its "Natural Gas Fixed Price Program" to the participants of Northern Illinois Gas Company's (Nicor) Customer Select and Peoples Energy Choices for YouSM programs with deceptive claims that the fixed-rate program would offer significant savings by locking consumers into a consistent gas price before rates spiked. As part of this sales pitch, however, the company's door-to-door sales representatives failed to disclose that the fixed gas price was actually higher than prices historically offered by regulated utility suppliers such as Nicor. According to Madigan's complaint, consumers were led to believe that they would automatically save money by enrolling in the U.S. Energy Savings' program.

The Attorney General's lawsuit further alleged that U.S. Energy Savings' sales representatives violated the Illinois Consumer Fraud and Deceptive Business Practices Act by failing to disclose the existence of an early termination fee, failing to properly identify themselves as representatives of an alternative natural gas company and failing to obtain consent from the account holder to switch gas suppliers from the regulated utility to an alternative supplier. U.S. Energy Savings denied the allegations in the lawsuit.

Today's agreement requires U.S. Energy Savings to make $1 million available to pay as restitution to Illinois consumers. Eligible consumers will receive notice of the settlement within 30 days and must submit claim forms to U.S. Energy Savings by Aug.12, 2009. Also as part of the agreement, U.S. Energy Savings must allow current eligible customers to cancel contracts without paying an early termination fee.

In addition, the agreement prohibits U.S. Energy Savings from using deceptive or unfair practices during the course of soliciting customers for natural gas supply contracts. Under the agreement, during solicitation, in any print materials, on its Web site and in its Welcome Letter for new customers, the company must make clear and conspicuous disclosures regarding: the type of product that consumers will receive, the price for service, terms and conditions of service, and the existence of any early termination fee. U.S. Energy Savings also must clearly disclose that consumers will be leaving their regulated utility company to enroll with the reseller of natural gas. The agreement also places a $50 cap on the amount that U.S. Energy Savings can charge customers for early termination. Finally, the agreement requires U.S. Energy Savings to investigate and terminate sales representatives who mislead consumers, provide false information during solicitations and forge contracts or agreements.

Since 2005, the Attorney General has filed four lawsuits against alternative gas suppliers, and earlier this year, she drafted and negotiated pro-consumer legislation to regulate the alternative suppliers. The legislation, which was drafted by the Attorney General's office and sponsored by Rep. Thomas Holbrook (D-Belleville), Rep. Marlow Colvin (D-Chicago) and Sen. Don Harmon (D-Oak Park), was enacted in April 2009 and requires stricter disclosure practices and limits termination fees.

Specifically, the new law:

- Requires all sales solicitations to clearly disclose the prices, terms and conditions of all products and services;
- Prohibits suppliers from misrepresenting their affiliation with a gas utility, governmental body or consumer group;
- Provides consumers with a right to cancel within 10 days after the gas utility notifies them of the switch and 10 days after the date of the first bill if they find that the service is not as promised;
- Limits early termination fees to $50 and requires any agreement containing an early termination clause to disclose the total cancellation fee.

000031

Consumers who would like more information about today's agreement or the new law should contact Madigan's Consumer Fraud Bureau at (800) 386-5438.

Assistant Attorney General Christine Nielsen handled the case for Madigan's Consumer Fraud Bureau.

-30-

Return to May 2009 Press Releases

Home • Privacy Policy • Contact Us

000032

8/10/2010 1:28 PM

www.michigan.gov
(To Print: use your browser's print function)

Release Date: October 13, 2009
Last Update: October 13, 2009

**Contact:** Judy Palnau (517) 241-3323

## MPSC Approves Settlement Agreement that Enhances Customer Protections for Natural Gas Choice Customers

**October 13, 2009**

The Michigan Public Service Commission (MPSC) today approved a settlement agreement that enhances the customer protections for natural gas choice customers.

The settlement agreement authorizes Consumers Energy Company, Michigan Consolidated Gas Company, Michigan Gas Utilities Corporation, and SEMCO Energy Gas Company to revise their gas customer choice tariffs.

"My fellow Commissioners and I are pleased to approve this settlement agreement," said MPSC Chairman Orjiakor Isiogu. "It significantly improves protections for gas choice customers."

Highlights of the changes include:

- Expanding protections to small commercial customers who use 500 thousand cubic feet (Mcf) or less per year. Previously, only small commercial customers using up to 200 Mcf were covered by protections.

- Choice customers may terminate participation with an AGS at any time after the unconditional cancellation period, through verbal or written communication with the AGS. The AGS is required to execute a customer's request for cancellation without delay, regardless of whether an early termination fee or other penalty is paid to the AGS.

- Customers enrolling through verbal means shall have the entire contract - including the rate, terms and conditions included in the contract -- provided to them in writing via U.S. mail or verifiable electronic mail. The correspondence shall be postmarked within seven days of the customer's verbal enrollment.

- Customers enrolling through electronic means shall have the entire contract - including the rate, terms and conditions included in the contract -- provided to them in writing via U.S. mail and by verifiable electronic mail. These correspondences shall be postmarked within seven days of the customer's electronic enrollment with the AGS.

- The maximum early termination fee for residential contracts for one year or less shall not exceed $50. The maximum early termination fee for residential contracts of longer than one year shall not exceed $100.

- The maximum early termination fee for small commercial contracts of one year or less shall not exceed $150. The maximum early termination fee for small commercial contracts or longer than one year shall not exceed $250.

- Contracts may continue after an initial term expiration on a month-to-month basis, cancelable at anytime without penalty.

- Any contract that is not signed by the customer or legally authorized person shall be considered null and void. Only the customer account holder or legally authorized person shall be permitted to sign a contract.

The MPSC is an agency within the Department of Energy, Labor & Economic Growth.

000033

Case No. U-15929

Copyright © 2010 State of Michigan

000034

LAW OFFICE

# USHER FOGEL
### ATTORNEY AT LAW

557 CENTRAL AVENUE, SUITE 4A     CEDARHURST, NY 11516

TEL: 516.374.8400 X 108
FAX: 516.374.2600
CELL: 516.967.3242
E-MAIL: ufogel@aol.com

Hon. Peter Kiernan
Counsel to the Governor
New York State Capitol
Albany, New York 12224-0341

August 4, 2010

Re: Bill A.1558-C/S2361-C

Dear Mr. Kiernan:

The Small Customer Market Coalition (SCMC) a coalition of energy service companies (ESCO's) engaged in the sale and provision at retail of energy products and services in New York State, including electricity and natural gas, respectfully urge that the Governor veto the above-referenced bill.

Although SCMC is in agreement with and supports the commendable consumer protection goals of this bill, its well-intention purpose is undermined because the provisions of the bill are redundant, burdensome, may interfere with or harm existing consumer protection provisions, and could impair the orderly functioning of the retail competitive energy market.

As more specifically detailed in the accompanying opposition memo, the New York State Public Service Commission has undertaken various proceedings and implemented regulations that govern the retail marketing standards of ESCO's operating in New York and which provide consumers with full protection and safeguards. The details and specifics of the Commission's actions and existing regulatory scheme are discussed in the attached memorandum.

For the reasons stated therein and above, SCMC respectfully requests that the Governor disapprove this legislation.

Respectfully submitted,

Usher Fogel, Esq.
Counsel to SCMC

000035



LAW OFFICE

# USHER FOGEL
ATTORNEY AT LAW

557 CENTRAL AVENUE, SUITE 4A        CEDARHURST, NY 11516

TEL: 516.374.8400 X 108
FAX: 516.374.2600
CELL: 516.967.3242
E-MAIL: ufogel@aol.com

**Small Customer Marketer Coalition
Memorandum Urging the Governor's Veto of
A.1558C (Gianaris)/S2361C (Parker)**

An act to amend the general business law, in relation to establishing
an energy service company consumer bill of rights

The Small Customer Marketer Coalition ("SCMC") is a coalition of Energy Service Companies ("ESCOs") engaged in the sale and provision of retail energy products and services, including electricity and natural gas, to residential and commercial customers throughout New York State.

SCMC is in agreement with and supports the admirable consumer protection goals of this bill. That is why SCMC has participated in various proceedings before the New York State Public Service Commission concerning consumer protections and ESCO business practices. Despite the bill's well intentioned purpose, SCMC is constrained to oppose this legislation because its provisions, even after amendments, are redundant, burdensome, may interfere with or harm existing consumer protection provisions, and can impair the orderly functioning of the retail competitive energy markets.

On November 27, 2008, in Case 98-M-1343, the Public Service Commission issued its *Order Adopting Amendments to the Uniform Business Practices, Granting in Part Petition on Behalf of Customers and Rejecting National Fuel Gas Distribution Company's Tariff Filing* ("Order). In this Order the PSC adopted new and additional standards in the Uniform Business Practices ("UBP") governing the retail marketing standards of ESCOs operating in New York, which fully protect the interests of consumers, and obviate the need for this bill. Specific examples follow.

Subdivision 2 of the proposed new section 349-d of the General Business Law (GBL) requires proper identification by the ESCO representative and requires that an "ESCO consumer's bill of rights" be supplied to each prospective customer. These are currently mandated. The Commission's Order requires, among other things, that the ESCO representative provide clear identification and further prohibits the ESCO employee or agent from representing himself/herself as acting on behalf of the distribution utility. Thus, the identification concerns addressed in the bill are already covered in the UBP.

Similarly, the bill's requirement for a consumer bill of rights already exists. The Commission's Order requires that each ESCO prominently display on the first page of each contract a **"Customer Disclosure Statement"** that is presented in the"Schumer-Box" format and discloses to the customer, information dealing with price, variable charges, term of the contract, rescission process, amount of any early termination fees and how they are calculated, late payment fees, renewal provisions, and the conditions under which savings are guaranteed. The ESCO must comply with the provisions contained in the Customer Disclosure Statement, and file such contract formats with the Commission.

Further, under Section 44 (3) of the Public Service Law adopted as part of the Home Energy Fair Practices Act ("HEFPA"), each residential Customer is provided at the time service is initiated and annually thereafter, with a Notice summarizing the customer's rights relating to the rendition of service by ESCOs and the distribution utility. In view of the Customer Disclosure Statement provided at the time the contract is initiated and the Notice provide under HEFPA, there is no need to impose the additional burden of developing and providing a Customer Bill of Rights.

Subdivision 3 of the proposed GBL § 349-d, prohibits the ESCO from engaging in deceptive acts and practices. Since, this prohibition is already codified in Section 10 of the UBP and Section 349 of the General Business Law, it is unnecessary.

Proposed subdivision 4 places severe restrictions on the use of customer prepayments by limiting its use to an option chosen by the customer. This provision is unnecessary and unduly restrictive. Section 36 of the Public Service Law, also part of HEFPA, allows for deposits but provides various conditions governing their applicability and use to protect the consumer. Additionally, where an ESCO does request that the customer provide any type of prepayment, the ESCO is obligated to post some form of security with the PSC to protect such funds. In addition, any prepayments would need to be disclosed in the "Customer Disclosure Statement" and in the body of the contract. It is unreasonable to restrict prepayment to a mere option thereby interfering unnecessarily in general business conduct. Moreover, by allowing customers to cancel a prepayment contract within 90 days, the bill will effectively preclude the use of such a contractual relationship.

Subdivision 5 of GBL § 349-d imposes limitations on the use of early termination fees. This provision is unnecessary and overly restrictive. The ESCO is obligated to include in the "Customer Disclosure Statement" and in the contract with the customer the amount of any early termination fee and the "method of calculation. Therefore, from the very beginning of the commercial relationship, the customer is informed whether there is exposure for early termination fees, and, if so, how they will be calculated. Imposing a dollar limit on the early termination fee depending on the length of the remaining term is also illogical as the ESCO does not necessarily know what the fee will be at the outset of the contract as the fee can vary depending upon when during the contract termination actually occurs. Moreover, it is extremely difficult for the ESCO to provide the customer at the time the contract is offered with an estimate of the average monthly bill the customer will be charged prospectively for service. The prospective average monthly variable bill is a direct function of the movement in commodity prices, weather conditions, and actual usage patterns. No ESCO can predict these factors.

Subdivision 6 contained in the legislation places restrictions on the renewal of contracts. The Commission's Order requires the ESCO to disclose the provisions governing renewal of the contract in the Customer Disclosure Statement, and the ESCO must adhere to information contained therein. Thus, under law and practice, the customer is already notified of the applicable renewal process. Additionally, the proposed GBL §349-d (6) is highly problematic because it allows the customer to object to renewal until 3 business days after receiving the first bill. This is impractical and highly injurious. By the time the first bill is received, the ESCO has already secured the supplies needed to serve the customer and can suffer significant financial loss due to the late rescission.

The section's subdivision 7 requires the identification of all variable charges. However, under the UBP the ESCO must already disclose all charges, variable, fixed or other, in the Customer Disclosure Statement.

Subdivision 10 provides the customer with a new private right of action. This provision is unneeded and exposes both the consumer and the ESCO to costly and wasteful litigation. Pursuant to Section 43 of the Public Service Law, the PSC has jurisdiction to resolve residential billing complaints with an ESCO, including restrictions on the termination of service and settling amounts in dispute. All ESCOs are subject to the Commission's residential complaint handling procedures which are available at no cost to the customer and which provide the customer with DPS personnel that possess expertise in the area of consumer complaints. As the customer already has such a free and complete avenue of relief there is no useful purpose to authorize the availability of costly litigation.

For these reasons, SCMC respectfully requests that the Governor disapprove A1558C/S2361C.

Contact: Usher Fogel, Esq.
         August 4, 2010



**July 6, 2010**

New York State Energy Marketers Coalition

# Memo in Opposition to S2361C/A1558C

### - *Legislation duplicates newly implemented Uniform Business Rules for ESCOs* -

The New York State Energy Marketers Coalition (NYSEMC)[1] is opposed to S2361C/A1558C, which would impose duplicative requirements on energy services companies ("ESCOs") to those which already exist through Uniform Business Practices ("UBPs") that have been established by the New York State Public Service Commission ("PSC" or "Commission") on October 27, 2008[2] and are currently undergoing Phase 2 revisions. These rules have been developed through an ongoing collaborative effort involving ESCOs, utilities, the New York State Consumer Protection Board ("CPB") and New York City Department of Consumer Affairs ("DCA").

The perceived need for this legislation originates from a small number of incidents involving questionable marketing and enrollment practices by a few ESCOs during their attempt to sign up residential and small commercial consumers for the sale of natural gas and/or electricity.

The vast majority of ESCOs operating in the State take special care with consumer protection, recognizing the importance of fair marketing practices and good customer relations to developing a successful, long-term business. NYSEMC members have extensive energy marketing experience, and have participated in many proceedings to introduce and advance competitive markets across the country. In each instance, the philosophy of providing the highest quality customer experience and providing the maximum level of consumer protection has been demonstrated in the positions taken by and, more importantly, the actions of each individual member. This philosophy is critical to an ESCO's ongoing success. NYSEMC members recognize the important public policy and business premise that consumers must be treated fairly and respectfully at all times, be provided full and timely disclosure of all consumer contract elements, and work diligently to ensure continued consumer protection criteria in all transactions – including marketing, sales, contract presentation and approval, product delivery, billing, and credit and collection.

The UBPs provide a regulatory framework that enables the Commission to oversee ESCO business practices while exercising flexibility in addressing changing circumstances as the competitive market continues to evolve. The UBPs require ESCOs to adhere to specific marketing standards when marketing and selling natural gas and electricity, to provide training to their employees, and to disclose in detail contract terms, termination fees, and all other terms and conditions to consumers before enrolling them in utility retail access programs. ESCOs are subject to disqualification from selling natural gas and electricity in the State of New York if they violate the UBPs. We believe these requirements provide significantly-enhanced consumer protections and represent the commitment of ESCOs, utilities, Commission staff, and numerous consumer advocate groups who have worked diligently and have spent hundreds of man-hours vetting the amended UBP to ensure proper and thorough implementation.

For these reasons, NYSEMC opposes S2361C/A1558C in that it creates unnecessary duplication of the Commission-imposed UBP requirements, does not allow for the Commission flexibility to address changing circumstances, creates additional cost, and imposes undue burden on ESCOs. For more information, please contact Michael Meath, New York State Energy Marketers Coalition, at 315.463.2325, or mmeath@stratcomllc.com.

---

[1] The NYSEMC is a coalition of independent energy service companies that provide natural gas and electricity to consumers who elect to purchase their energy from competitive suppliers. NYSEMC members include Interstate Gas Supply, Inc. (www.igsenergy.com), Vectren Retail, LLC (www.vectrensource.com), Energy Plus Company LLC (www.energypluscompany.com) and Agway Energy Services, LLC (www.suburbanpropane.com/agway.html).  The NYSEMC collectively serves more than one million residential and small commercial natural gas and electricity customers in deregulated markets located throughout twelve states across the U.S.

[2] Case 98-M-1343, *In the Matter of Retail Access Business Rules,* issued and effective October 27, 2008.

000038

# STATE OF NEW YORK

---

1558--C

Cal. No. 137

2009-2010 Regular Sessions

# IN ASSEMBLY

### (Prefiled)

January 7, 2009

---

Introduced by M. of A. GIANARIS, PHEFFER, ROBINSON, DINOWITZ, GABRYSZAK, ROSENTHAL, SCHIMEL, CLARK, SCHROEDER, COLTON -- Multi-Sponsored by -- M. of A.   ALFANO, BOYLAND, BRENNAN, CROUCH, ERRIGO, FIELDS, GALEF, GIGLIO, GLICK, GOTTFRIED, GUNTHER, HYER-SPENCER, KELLNER, KOON, LATIM-ER, V. LOPEZ, MAGEE, MAISEL, McDONOUGH, McKEVITT, MILLMAN, REILLY, J. RIVERA, SALADINO, SWEENEY, WEISENBERG, WRIGHT -- read once and referred to the Committee on Consumer Affairs and Protection -- reported from committee, advanced to a third reading, amended and ordered reprinted, retaining its place on the order of third reading -- passed by Assembly and delivered to the Senate, recalled from the Senate, vote reconsidered, bill amended, ordered reprinted, retaining its place on the order of third reading -- passed by Assembly and delivered to the Senate, recalled from the Senate, vote reconsidered, bill amended, ordered reprinted, retaining its place on the special order of third reading

AN ACT to amend the general business law, in relation to establishing an energy service company consumers bill of rights

The People of the State of New York, represented in Senate and Assembly, do enact as follows:

1   Section 1. The general business law is amended by adding a new section
2  349-d to read as follows:
3    § 349-d. Energy services company consumers bill of rights. 1.  For the
4  purpose of this section:
5    (a) "Energy services" shall mean electricity and/or natural gas;
6    (b) "Energy services company" or "ESCO" shall mean an entity eligible
7  to  sell  energy services to end-use customers using the transmission or
8  distribution system of a utility;
9    (c) "Customer" shall mean any person who is sold or offered an  energy
10 services  contract  by  an  ESCO (i) for residential utility service, or
11 (ii) through door-to-door sales; and

EXPLANATION--Matter in _italics_ (underscored) is new; matter in brackets
[-] is old law to be omitted.

LBD03848-12-0

A. 1558--C                        2

1   (d) "Door-to-door sales" shall mean the sale  of  energy  services  in
2   which  the  ESCO  or  the  ESCO's representative personally solicits the
3   sale, and the buyer's agreement or offer to purchase is made at a  place
4   other  than the place of business of the seller; provided that such term
5   shall  not  include any sale which is conducted and consummated entirely
6   by mail, telephone or other electronic  means,  or  during  a  scheduled
7   appointment  at  the  premises  of  a  buyer  of  nonresidential utility
8   service, or through solicitations of commercial  accounts  at  trade  or
9   business shows, conventions or expositions.
10   2.  Any  person  who sells or offers for sale any energy services to a
11   customer for or on behalf of an ESCO shall (a) properly identify himself
12   or herself and the energy services company or companies which he or  she
13   represents; (b) explain that he or she does not represent a distribution
14   utility;  (c)  explain  the  purpose  of  the solicitation; (d) provide each
15   prospective customer with a copy of the "ESCO consumers bill of  rights"
16   developed  by  the  public  service commission, in consultation with the
17   Long Island power authority, the state consumer protection board and the
18   department of law; and (e)  provide  any  written  materials,  including
19   contracts  and the "ESCO consumers bill of rights", in the same language
20   utilized to solicit the prospective customer.
21   3. No person who sells or offers for sale any energy services for,  or
22   on behalf of, an ESCO shall engage in any deceptive acts or practices in
23   the marketing of energy services.
24   4.  No  contract  for  provision  of  energy services by an ESCO shall
25   require any customer prepayment for energy services.  However, an  ESCO
26   may  offer  a  customer an option of prepayment. Any contract providing
27   for prepayment may be cancelled by the customer, without any penalty  or
28   obligation,  within  ninety  calendar days. Any  unused portion of the
29   prepayment shall be returned to the customer by the ESCO  within  thirty
30   business days following receipt of notice of cancellation.
31   5. No contract  for  provision  of energy services by an ESCO shall
32   require the customer to pay any fee for termination or  early  cancella-
33   tion  of  a contract in excess of either (a) one hundred dollars for any
34   contract with a remaining term of  less  than  twelve  months;  (b)  two
35   hundred  dollars  for any contract with a remaining term of twelve months
36   or more; or (c) twice the estimated bill for  energy  services  for  an
37   average  month.  To charge a fee based on the estimated bill for energy
38   services for an average month, an ESCO must have provided the  customer,
39   at  the time that the contract is offered, with an estimate of the aver-
40   age monthly bill that customer would be charged for energy services  and
41   the fee that would be charged based on such estimate.
42   6.  No  material  change shall be made in the terms or duration of any
43   contract for the provision of energy services by  an  ESCO  without  the
44   express  consent  of the customer. This shall not restrict an ESCO from
45   renewing a contract by clearly informing the customer  in  writing,  not
46   less  than  thirty  days  nor  more than sixty days prior to the renewal
47   date, of the renewal terms and of his or her option not  to  accept  the
48   renewal  offer;  provided,  however, that no fee pursuant to subdivision
49   five of this section shall be charged to a customer who objects to  such
50   renewal  not  later  than  three business days after receiving the first
51   billing statement from the ESCO under  the  terms  of  the  contract  as
52   renewed.   The  public  service  commission  and  the Long Island power
53   authority may adopt additional guidelines, practices, rules or  regu-
54   lations governing the renewal process.

A. 1558--C                           3

1   7. In every contract for energy services and in all marketing materi-
2   als provided to prospective purchasers of such contracts, all variable
3   charges shall be clearly and conspicuously identified.
4   8. Any contract for energy services which does not comply with the
5   applicable provisions of this section shall be void and unenforceable as
6   contrary to public policy. Any waiver by a buyer of energy services of
7   the provisions of this section shall be deemed void and unenforceable by
8   the ESCO as contrary to public policy.
9   9. The attorney general, upon his or her own motion or upon referral
10  from the public service commission, the Long Island power authority or
11  the state consumer protection board, may bring a civil action against
12  any energy services company that violates any provision of this section
13  and may recover (a) a civil penalty not to exceed one thousand dollars
14  per violation; and (b) costs and reasonable attorney's fees. In any such
15  proceeding the court may direct restitution.
16  10. In addition to the right of action granted to the attorney general
17  pursuant to this section, any person who has been injured by reason of
18  any violation of this section may bring an action in his or her own name
19  to enjoin such unlawful act or practice, an action to recover his or her
20  actual damages or five hundred dollars, whichever is greater, or both
21  such actions. The court may, in its discretion, increase the award of
22  damages to an amount not to exceed three times the actual damages up to
23  ten thousand dollars, if the court finds the defendant willfully or
24  knowingly violated this section. The court may award reasonable attor-
25  ney's fees to a prevailing plaintiff.
26  11. Nothing in this section shall be deemed to limit any authority of
27  the public service commission or the Long Island power authority, which
28  existed before the effective date of this section, to limit, suspend or
29  revoke the eligibility of an energy services company to sell or offer
30  for sale any energy services for violation of any provision of law,
31  rule, regulation or policy enforceable by such commission or authority.
32  12. Nothing in this section shall be deemed to limit any authority of
33  the public service commission or the Long Island power authority, which
34  existed before the effective date of this section, to adopt additional
35  guidelines, practices, policies, rules or regulations relating to the
36  marketing practices of energy services companies to residential and
37  commercial customers, whether in person (including door to door), or by
38  mail, telephone or other electronic means, that are not inconsistent
39  with the provisions of this section.
40  § 2. The public service commission shall amend its guidelines, prac-
41  tices, policies, rules or regulations governing energy service to resi-
42  dential customers as may be necessary to implement the provisions of
43  section one of this act.
44  § 3. The Long Island power authority shall amend its regulations
45  adopted pursuant to section 1020-f of the public authorities law and its
46  guidelines, practices and policies as may be necessary to implement the
47  provisions of section one of this act.
48  § 4. The public service commission, in consultation with the Long
49  Island power authority, the state consumer protection board and the
50  department of law, shall develop a short, plain language statement of an
51  "ESCO consumers bill of rights" which shall summarize the protections
52  afforded to consumers of energy services pursuant to section 349-d of
53  the general business law and other applicable laws.
54  § 5. If any clause, sentence, paragraph, section or part of this act
55  be adjudged by any court of competent jurisdiction to be invalid, such
56  judgment shall not affect, impair or invalidate the remainder hereof but

A. 1558--C                          4

```
 1  shall  be  applied  in its operation to the clause, sentence, paragraph,
 2  section or part hereof directly involved in  the  controversy  in  which
 3  such judgment shall have been rendered.
 4      § 6. This act shall take effect on the one hundred fiftieth day after
 5  it shall have become a law and shall apply to all energy  services  sold
 6  or  offered  for sale on or after such date; provided, however, that the
 7  public service commission and the Long Island power authority are  imme-
 8  diately  authorized  and directed to take any and all actions, including
 9  but not limited to the promulgation of any necessary  guidelines,  prac-
10  tices,  policies,  rules  and  regulations,  necessary  to implement the
11  provisions of this act on its effective date.
```

# EXHIBIT G

**DPS Staff Initial Brief filed in *In the Matter of Retail Access Business Rules*, No. 98-M-1343 (N.Y. Pub. Serv. Commn., filed Mar. 30, 2018)**

STATE OF NEW YORK
PUBLIC SERVICE COMMISSION

Case 15-M-0127  –  In the Matter of Eligibility Criteria for Energy Service
Companies.

Case 12-M-0476  –  Proceeding on Motion of the Commission to Assess Certain
Aspects of the Residential and Small Non-residential Retail
Energy Markets in New York State.

Case 98-M-1343  –  In the Matter of Retail Access Business Rules.

DEPARTMENT OF PUBLIC SERVICE
STAFF REDACTED INITIAL BRIEF

F. THOMAS DWYER
STEVEN J. KRAMER

Staff Counsel

DATED:  March 30, 2018

JOINT TABLE OF CONTENTS

Page

I. PRELIMINARY STATEMENT ................................................................................................. 1

II. BACKGROUND .................................................................................................................... 6

    A. PROCEDURAL HISTORY ............................................................................................... 6

    B. THE RETAIL MARKETS TODAY ................................................................................. 16

        1. Overview of the Retail Energy Markets Serving Mass Market Customers ............................ 16

        2. ESCO Registration and Eligibility ............................................................................... 17

        3. ESCO Business Practices ........................................................................................... 17

        4. Billing and Purchase of Receivables ............................................................................ 17

        5. Current Status of the UBP ........................................................................................... 17

        6. Monitoring and Enforcement ....................................................................................... 18

III. ANALYSIS ........................................................................................................................ 20

    A. REGULATORY REGIME ............................................................................................... 20

        1. Commission's Vision in Opening the Competitive Markets .............................................. 20

        2. Application of Public Service Law to ESCOs ................................................................. 20

            a) Scope of Commission Jurisdiction Under the PSL ...................................................... 20

            b) Should ESCOs Be Required To File Tariffs? ............................................................ 24

            c) Financial Oversight ............................................................................................. 25

        3. Enforcement Powers Over ESCOs ............................................................................... 26

            a) Commission's Enforcement Mechanisms and Efforts ................................................. 26

            b) Attorney General's Enforcement Mechanisms and Efforts ........................................... 27

        4. Other State and Federal Laws Applicable to ESCOs ....................................................... 27

    B. USEFULNESS & ACCURACY OF COMPARING ESCO AND UTILITY RATES ................ 27

        1. Utility Bill Comparison Methodologies ........................................................................ 27

        2. Utility Delivery and Supply Cost Allocations ................................................................ 40

    C. RESPONSE TO COMMISSION'S INQUIRIES ON THE FUTURE OF
       ESCOs IN THE MASS MARKET ................................................................................... 41

        1. Should Retail Choice Continue In New York? ............................................................... 41

CASE 15-M-0127, et al.

     a)  ESCOs' Role in Residential Markets ............................................................. 42

         (i)  Defining Residential ............................................................. 44

     b)  ESCOs' Role in Non-Residential Markets ............................................ 45

         (i)  Defining Small Commercial ............................................... 45

         (ii)  Whether Small Commercial should be included in Mass Market? ........................... 45

         (iii)  Whether Certain UBP Provisions Should Apply to Small Commercial? ............... 48

2.  ESCOs' Place in the Competitive Market .............................................. 49

     a)  Whether ESCOs have "Market Power" ............................................. 49

     b)  The Functionality of Competitive Markets for Retail Commodity Services .................. 54

     c)  ESCOs' Impact on Commodity Prices:  Rates in the Fully Regulated Market ................ 59

3.  Future Product Offerings ............................................................. 62

     a)  Variable-Rate, Commodity-Only Products ....................................... 63

     b)  Fixed-Price Products ............................................................. 64

     c)  Renewable Energy Products ..................................................... 67

     d)  Value-Added or Bundled Products .............................................. 71

     e)  CCA Products ................................................................... 72

     f)  Other Products ................................................................. 74

4.  ESCOs' Role in the Commission's Energy Policies, Including REV and CES ................ 75

5.  ESCO Eligibility Requirements ....................................................... 77

     a)  New Applicants ................................................................. 77

     b)  Current ESCOs ................................................................. 77

6.  ESCO Reporting and Collateral Posting Requirements ................................... 77

7.  ESCO Marketing Practices ........................................................... 79

     a)  ESCO Practices; Materials; Contracts; Scripts & Training Materials .................. 79

     b)  Door-to-Door Marketing ....................................................... 79

     c)  Telemarketing ................................................................. 79

     d)  Other ......................................................................... 79

8.  Customer Information and Cyber Security ............................................. 79

9.  Purchase of Receivables and Billing Process ........................................... 80

     a)  Purchase of Receivables ......................................................... 80

CASE 15-M-0127, et al.

b) Billing Methodologies.....................................................................................82

    (1) Utility Consolidated Billing ...............................................................82

    (2) Dual Billing .........................................................................................83

    (3) Supplier Consolidated Billing ............................................................83

10. Customer Complaints.......................................................................................83

a) Historical Complaints......................................................................................83

    (1) Prices...................................................................................................83

    (2) Sales and Marketing ............................................................................83

b) ESCO Complaint Rates v. Utility Complaint Rates.........................................83

c) Impact of Enforcement on Complaint Rates ....................................................83

d) Complaint-Rate Trends and Implications .......................................................83

11. Transparency....................................................................................................85

a) Transparency in Utility Pricing .......................................................................85

b) Transparency in ESCO Pricing & Products .....................................................85

c) Mechanisms for Creating or Improving Transparency .....................................85

12. Customer Renewal Process...............................................................................90

13. Customer Shopping Tools.................................................................................90

14. Customer Choice...............................................................................................90

a) Default Service ...............................................................................................90

b) ESCO Products ...............................................................................................90

15. Examples of Competitive Market Frameworks in Other States...........................90

16. State Agency & Consumer Advocacy Group Actions .........................................90

a) Investigations .................................................................................................90

b) Actions to Monitor the Market........................................................................90

17. Energy Brokers .................................................................................................90

a) Proposed Energy Broker Role in the Mass Market ...........................................90

b) Registration of Energy Brokers in the Mass Market .........................................90

IV. CONCLUSION......................................................................................................91

# I.    PRELIMINARY STATEMENT

The prices charged to residential and small commercial (mass market) customers by energy service companies (ESCOs) for electric and gas commodity service are substantially higher than the prices charged by the utilities.  Additionally, the large gulf between ESCO and utility charges is not justified by the offering of energy-related value-added services.  Instead, mass market ESCO customers have become the victims of a failed market structure that results in customers being fooled by advertising and marketing tricks into paying substantially more for commodity service than they had remained full utility customers, yet thinking they are getting a better deal.  Rather than fierce ESCO against ESCO price competition working to protect customers from excessive charges, ESCOs have deliberately obfuscated prices and resisted market reforms such that the Commission's decision to allow ESCOs access to the utility distribution systems to sell electric and gas commodity products to mass market customers has proven to be no longer just and reasonable.  The Commission has an obligation under the Public Service Law (PSL) to rectify this situation, which can only be done through either a full revocation of retail access for mass market customers, or a fundamental reset in the retail access rules in the manner proposed by Staff in this brief.

To satisfy its ongoing obligation to ensure that retail markets are providing their commodity offerings at just and reasonable rates, the Commission initiated this ESCO Track I proceeding by notice issued December 2, 2016.[1]  That notice directed the parties to submit testimony and exhibits addressing, to the extent relevant to their positions, 20 questions.[2]  The overarching question among those 20 is whether ESCOs should be prohibited, in whole or in part, from serving mass market customers, and how the Commission should regulate the ESCOs and their product offerings.[3]

---

[1]    Case 15-M-0127 et al., In the Matter of Eligibility Criteria for Energy Service Companies, Notice of Evidentiary and Collaborative Tracks and Deadline for Initial Testimony and Exhibits (December 2, 2016) (December 2016 Notice).

[2]    Id. at 5-8.

[3]    Id. at 5-6, questions 1-6.

CASE 15-M-0127, et al.

       In order to analyze the retail markets to determine whether they are or are not providing commodity products at just and reasonable rates, the Commission also directed that the record for Track I contain data for the years 2014 through 2016 including the number of customers served by the ESCOs, volume of sales in dollars and in kilowatt hours (kWh).[4]  This, and other data, were to be used to analyze the prices that ESCOs have charged for electric or gas commodity on an annual basis during the period 2014-2016 compared to the incumbent utilities, including whether the ESCOs were profitable or not, and whether under the current mass markets structure, ESCOs can profitably offer lower prices on an annual basis compared to the incumbent utility.[5]  Other questions sought information regarding the marketing practices of the ESCOs, whether customers were able to obtain information about the relative prices and offerings of the ESCOs and utilities and their likely ability to understand this information, including evidence regarding the transparency of the retail markets and customer complaints about ESCO service and practices.[6]

       As we explain in this initial brief, the retail energy markets for the mass market customers are not functioning as the Commission originally intended for those customers.  The Commission's intention in opening the retail markets to competition was for customers to realize the benefits of competition – lower prices for customers.  Evidence proves that, on an aggregated basis, ESCOs are charging mass market customers significantly more than those customers would have been charged if they instead remained as full service utility customers.  According to the data provided by the utilities, the approximately two million New York State residential utility customers who took commodity service from an ESCO collectively paid almost $1.2 billion more than they would have paid if they purchased commodity from their distribution utility during the 36-months ending December 31, 2016.  Additionally, small commercial customers

---

[4]  Id. at 6-7, questions 9-11.

[5]  Id. at 7, questions 12-13.

[6]  Id. at 6, 7-8, questions 7, 14-20.

CASE 15-M-0127, et al.

paid $136 million more than they would have paid if they instead simply remained with their default utilities for commodity supply for the same 36-month period. Combining the residential and small commercial customer classes, mass market customers were "overcharged" by over $1.3 billion dollars over this time period. Finally, the data also shows that low-income customers (a subset of the residential customer mentioned above) who took commodity service from an ESCO collectively paid in excess of $146 million more than they would have paid if they took commodity supply from their utility. Staff has shown that the lack of transparency in the mass markets for commodity service does not allow customers to make rational price comparisons among all competitors in the market (the ESCOs and the incumbent utility). Additionally, the evidence developed by Staff proves that the marketing and enrollment practices of many of the ESCOs are not in accord with the Commission's Uniform Business Practices (UBP) for ESCOs and that their marketing practices rely on pressure tactics and unfulfilled promises that the customer will save money on commodity. In contrast, the evidence clearly demonstrates that, overall, mass market customers paid $1.3 billion more than they would have if they simply remained with their default utility provider during the 2014-2016 period that the Commission directed be analyzed in this Track I proceeding.

Most customers are receiving no material energy-related value-added products or services to account for the excess charges. Thus, a majority of mass market customers are receiving nothing more than the same electrons or therms they would have received from the utility, but at a significantly higher price. These facts, combined with evidence in the record of ESCO marketing abuses, lack of price transparency, and high complaint rates, demonstrate that the Commission must take action to protect mass market customers and to ensure they receive commodity service at just and reasonable rates.

Further, in light of the pricing abuses ESCOs are committing against their customers, Staff recommends that the Commission direct the utilities to prohibit ESCOs from using their distribution systems to provide commodity service to mass market

CASE 15-M-0127, et al.

customers (both residential and small commercial, as defined by the Commission and discussed in sections III.C.1.a.(i) and III.C.1.b.(i) of this brief), unless Staff's eleven recommendations are implemented by the Commission (Tr. 2032, ln 18 to Tr. 2037). These 11 recommendations are discussed in detail in Section III.C.3.a, below.

   Briefly, Staff's recommendations are that ESCOs not be allowed to use the utilities' systems to distribute their commodity unless the ESCO provides a guarantee that each customer's total electric and/or gas bills are lower than, or no greater than, that charged by the utility for delivery and commodity service over the calendar year. That said, an ESCO may provide customers energy generated through 100 percent renewable resources, that are delivered to and consumed in New York and otherwise in compliance with the Commission's environmental disclosure program requirements, at a premium to utility service. We also recommend that aggregation of customers be allowed through either a Not For Profit (NFP) or municipal entity or Community Choice Aggregation (CCA) utilizing a professional energy buyer acting as a fiduciary to the CCA and independent of the ESCO.

   Commodity product and price transparency is a tremendous problem in the retail energy markets, as discussed in Section III.C.11., thus the Commission must direct that mass market ESCO customer bills disclose a relative bill comparison showing the current bill charges and what the customer would have paid had they taken delivery and commodity from their utility. Furthermore, the Commission must establish a reporting requirement to ensure that the Commission and the Department can monitor ESCOs to ensure that they are not charging customers more than what the utility would have charged over the calendar year. The protection of customer data is critical, and the Commission should direct the ESCOs to protect this confidential data with appropriate cyber security measures.

   ESCO marketing practices are frequently abusive to customers, as discussed in detail in Section III.C.10. Therefore, the Commission should prohibit ESCOs from using the utilities' systems to deliver commodity to their customers unless

CASE 15-M-0127, et al.

they agree not to use door-to-door, point of sale, telephonic sales, or similar marketing practices, since the record proves that customers are often provided incorrect or incomplete information, coupled with a lack of transparency, upon which they make their decision as to whether to sign up with the ESCO.  ESCO marketing should be limited to direct mail, electronic communications (such as e-mail), or similar forms of marketing where the customer initiates contact with the ESCO.

Finally, the UBP should be amended to conform to our recommendations, ordering clauses as contained in Exhs. 724 (SP-12) and 725 (SP-13) should be adopted, and the Commission should provide for an orderly transition to implement our recommendations, and not allow itself to be distracted from implementing our recommendations by the offering of "value-added" services by the ESCOs in conjunction with their commodity offerings.

The Commission has the jurisdiction and authority to establish and modify the conditions under which ESCOs may offer electric and gas commodity service to customers, and even whether they should be prohibited from using the distribution utilities' systems to provide commodity service.  The Commission's authority to oversee ESCO product offerings, including setting limits on the prices charges by ESCOs, has been upheld by the courts.

In light of the above, the Commission should take action to reform the retail commodity marketplace to protect New York's mass market customers.  As discussed in detail in this brief, the Commission should take action to cap ESCO commodity prices at the utility rate.  This will serve to further the Commission's primary objective in establishing the retail energy markets -- lower commodity rates for customers.

CASE 15-M-0127, et al.

## II. BACKGROUND

**A.**   **PROCEDURAL HISTORY**

    **1.**   **Creation of the Retail Markets**

        In the 1980's, utility regulators began unbundling utility service into transport and energy (commodity) components. (See Associated Gas Distribs. v Federal Energy Regulatory Commn., 824 F2d 981, 997-1001 [DC Cir. 1987] [affirming, as lawful, a decision of the Federal Energy Regulatory Commission (FERC) that "bundled" gas rates were discriminatory and anticompetitive and needed to be unbundled to yield open access to transportation in order to achieve "just and reasonable" rates]). As a result of "unbundling," the cost for the provision of natural gas was billed as two components: a charge for the transportation and distribution of the gas, and a charge for the gas itself. The gas itself (commodity) could therefore be provided or contracted for by an independent, competitive, supplier.

        In 1984, the New York Legislature amended the PSL to provide the Commission with the authority to require franchised providers of gas transportation and distribution services to open their pipelines to competitively provided gas. (PSL §66-d). The Commission later adopted a regulatory framework for non-utility gas marketers establishing policies and guidelines for the competitive gas market.[7]

        With respect to electric commodity, the Commission began unbundling electric rates into distribution and commodity components in the 1990's in order to enable competition in the electric supply markets as well. On June 7, 1995, the Commission adopted nine principles to guide the transition to competition for electric service, the primary principle being the realization of savings and other benefits.[8]

---

[7]   Case 93-G-0932, Proceeding on Motion of the Commission to Address Issues Associated with the restructuring of the Emerging Competitive Natural Gas Market, Opinion 94-26, Opinion and Order Establishing Regulatory Policies and Guidelines for Natural Gas Distributors (issued December 20, 1994) (Opinion 94-26).

[8]   Case 94-E-0952, supra, Opinion No. 95-7, Opinion and Order Adopting Principles to Guide the Transition to Competition (Issued June 7, 1995) at 5 (Opinion 95-7).

CASE 15-M-0127, et al.

      Then, in Opinion 96-12, the Commission stated that the operation of market forces could be expected over time to produce retail rates that would be lower than would otherwise be expected under a regulated environment.[9]  The Commission's expectation was that retail competition and increased consumer choice would result in lower customer bills and the introduction of innovative products and services, and that there would be market based solutions to public policy issues, including aggressive pursuit of energy efficiency measures.[10]  The Commission subsequently adopted a set of rules and guidelines to govern interactions between the utilities, customers, and ESCOs known as the UBP.[11]

      Also in 1996, the Albany County Supreme Court held that the Commission could effectuate competitive access to utility systems by unbundling utility rates into monopoly (transmission and distribution) and competitive (energy commodity) portions. (Matter of Energy Assn. of New York State v Pub. Serv. Commn. of State of New York, 169 Misc 2d 924, 932-37 [Sup Ct Albany County 1996], affd on other grounds, 273 AD2d 708 [3d Dept 2000]).

      The Supreme Court further rejected utility claims "that the PSC may not allow market pressures to set rates for the generation component of electric service." (Energy Assn., 169 Misc.2d at 936).  In doing so, the court relied on Federal case law holding that "FERC's approval of market-based pricing was 'just and reasonable'" because, in part, FERC had emphasized that it would exercise its oversight powers to assure that a market rate remained 'just and reasonable.' (Id. at 936). The utilities did not

---

[9]    Case 94-E-0952, Competitive Opportunities Regarding Electric Service, Opinion No. 96-12, Opinion and Order Regarding Competitive Opportunities for Electric Service (Issued May 20, 1996) at 30-32 (Opinion 96-12).

[10]   Id. at 30-32.

[11]   Case 98-M-1343, In the Matter of Retail Access Business Rules, Order Adopting Uniform Business Practices and Requiring Tariff Amendments (issued January 22, 1999).

CASE 15-M-0127, et al.

appeal Albany County's decision; a PULP appeal was dismissed on standing grounds. (Energy Assn., 273 AD2d 708, 710-11).

Then, in 2002 the Legislature amended PSL §53; as a result, the Commission's regulations at 16 NYCRR Part 11 (the Home Energy Fair Practices Act or HEFPA) were also amended so that HEFPA protections extended to residential customers taking service from an ESCO. (L. 2002, c. 686). Moreover, the Commission developed several policies to promote the development of competitive retail energy markets[12] including: providing utilities with significant financial incentives to migrate blocks of customers to ESCOs;[13] using utility customer service call centers to facilitate the transfer of customers to ESCOs;[14] the purchase of ESCO accounts receivable by utilities in combination with the continuation of utility consolidated billing;[15] the unbundling of utility bill formats;[16] and procedures for making customers' utility account numbers more readily available to ESCOs.[17] In an Order issued October 15, 2008, the Commission concluded that statewide retail access markets were mature and that

[12] Case 00-M-0504, Provider of Last Resort Responsibilities, the Role of Utilities in Competitive Energy Markets, and Fostering the Development of Retail Competitive Opportunities, Statement of Policy on Further Steps Toward Competition in Retail Energy Markets (issued August 25, 2004)(2004 Policy Statement).

[13] Case 04-E-0572, Consolidated Edison Company of New York, Inc., Order Adopting Three-Year Rate Plan (issued March 24, 2005)(Con Edison Rate Order), Joint Proposal (JP), pp. 35-36.

[14] Case 05-M-0858, State-Wide Energy Services Company Referral Programs, Order Adopting ESCO Referral Program Guidelines and Approving an ESCO Referral Program Subject to Modifications (issued December 22, 2005).

[15] See Case 05-M-0333, Niagara Mohawk Power Corporation, Order Clarifying and Adopting Joint Proposal on Competitive Opportunities (issued April 20, 2006).

[16] Case 00-M-0504, supra, Order Directing Submission of Unbundled Bill Formats (issued February 18, 2005).

[17] Case 98-M-1343, Accent Energy LLC, Order Denying Petition and Making Other Findings (issued November 7, 2006).

CASE 15-M-0127, et al.

ratepayers should, therefore, no longer incur incremental costs related to promotional programs unless a particular program directly benefits ratepayers.[18]

  **2.**  **Growing Concerns with the Retail Markets**

    Then, in 2010, in response to many high bill complaints from ESCO customers, Department Staff began to investigate and evaluate the prices that ESCOs were charging.  (Tr. 2055-2056, lns. 20-3).  Staff subsequently reported that ESCOs were typically charging significantly higher commodity rates than the utilities for the exact same commodity with minimal or no value-added products.[19]  (Id.).  Attempts to informally work with ESCOs to reform the pricing schemes were ultimately unsuccessful, prompting the Commission to institute a proceeding in October 2012 to address the Commission's growing concern with the retail markets.[20]

    The October 2012 Order directed Staff to undertake a review of the retail markets for mass market customers to determine whether the market was functioning as intended, and to identify areas that could be improved.  (Tr. 2056-2057, lns. 21-2). Among the most significant of Staff's findings was the large premiums charged for commodity services by ESCOs compared to the utilities with no readily apparent energy-related value-added attributes.  (Tr. 2058, lns. 12-17).  Following that investigation, the Commission issued its Order Taking Actions to Improve the Residential and Small Non-

---

[18] Case 07-M-0458, Policies and Practices Intended to Foster the Development of Competitive Retail Energy Markets, Order Determining Future of Retail Access Programs (issued October 27, 2008).

[19] Energy-related value-added services are products or services that can be provided by ESCOs that enhance the value of traditional utility products or services to customers. (Tr. 2063, lns. 5-8).

[20] Case 12-M-0476, et al., Proceeding on Motion of the Commission to Assess Certain Aspects of the Residential and Small Non-residential Retail Energy Markets in New York State., Order Instituting Proceeding and Seeking Comments Regarding the Operation of the Retail Energy Markets in New York State (issued October 19, 2012) (October 2012 Order).

CASE 15-M-0127, et al.

residential Retail Access Markets on February 25, 2014 (February 2014 Order).[21]  The February 2014 Order attempted to address the major flaws in the retail energy markets including, but not limited to, the lack of accurate, transparent commodity product pricing information, and predatory marketing behavior that frequently relied on customer confusion.[22]  The Commission found that:

> [A]s currently structured, the retail energy commodity market for residential and small commercial customers cannot be considered to be workably competitive.  Although there are a large number of suppliers and buyers, and suppliers can readily enter and exit the market, the general absence of information on market conditions, particularly the price charged by competitors, is an impediment to effective competition (i.e., neither buyers nor sellers have good information about prices).[23]

In addition to the higher prices charged by ESCOs compared to the utilities, the Commission also found that while there are a large number of ESCOs in the market, they lacked any competitive pressure that would cause the ESCOs to innovate and develop and provide real energy-related value-added services or products to mass market customers.[24]  The Commission took a variety of actions in the February 2014 Order directed at improving the retail markets including: (a) the creation of utility historic bill calculators; (b) the requirement that ESCOs report their historic pricing data on a quarterly basis to the Commission; (c) the expansion of the Power to Choose website, and a requirement that the ESCOs honor the prices quoted on the website; (d) the requirement that ESCOs provide low-income customers with products that guarantee savings, or provide energy-related value-added services designed to reduce the customer's overall bill; (e) the requirement that all door-to-door and telephonic sales be subject to independent third party verification; (f) the requirement that a standardized renewal

---

[21]  Case 12-M-0476 et al., supra, Order Taking Actions to Improve the Residential and Small Non-residential Retail Access Markets (issued February 25, 2014).

[22]  Id. at 4.

[23]  Id. at 10.

[24]  Id. at 11.

CASE 15-M-0127, et al.

notice be sent in an envelope clearly marked that the contract renewal offer is enclosed; (g) the creation of a streamlined process to facilitate prompt enforcement actions against ESCOs; and (h) the requirement that ESCOs file with the Department a list of entities marketing on their behalf.  (Tr. 2059-2060, lns. 21-19).

        Four parties filed petitions for rehearing, reconsideration, and clarification of the February 2014 Order and, as a result, the Commission stayed several of the actions mandated by the February 2014 Order.[25]  The Commission stated that, given the breadth and complexity of the February 2014 Order, and the desire to first address the petitions for rehearing and the comments thereto, the Commission decided to stay the requirements regarding: (1) independent third party verifications; (2) service to low-income customers; (3) implementation of PSL §32(5)(d); (4) the filing of quarterly historic pricing reports; (5) price reporting on the power-to-choose website; (6) ESCO specific purchase of receivable (POR) rates; and, (7) specific redlines to the UBP.[26]  Subsequently, the Commission issued an Order on February 6, 2015 addressing, among other things, the conditions for ESCO service to low-income customers enrolled in their default utility's low-income assistance programs, third party verification requirements, and whether UBP changes were adopted in conformation with the State Administrative Procedure Act (SAPA).[27]  Among the directives in the February 2015 Order was the requirement that when serving low-income customers, an ESCO must either: 1) guarantee that the customer will pay no more than the customer would have paid the utility; or, 2) provide energy-related value-added services that do not dilute the effectiveness of the financial assistance programs provided by the utilities and funded by ratepayers.[28]  Additionally,

---

[25]  Case 12-M-0476 et al., supra, Order Granting Requests for Rehearing and Issuing a Stay (issued April 25, 2014).

[26]  Id. at 4-6.

[27]  Case 12-M-0476 et al., supra, Order Granting and Denying Petitions for Rehearing in Part (issued February 6, 2015) (February 2015 Order).

[28]  Id. at 6.

CASE 15-M-0127, et al.

the Commission directed that a Staff-led collaborative be convened to address

implementation issues concerning the requirements for serving low-income customers.[29]

    **3.**    **Protections for Low-Income Customers**

        The collaborative met several times throughout 2015 and, ultimately, a

Collaborative Report was filed with the Commission on November 5, 2015.[30]  (Tr. 2062,

lns. 12-13; Tr. 2064, lns. 1-7).  Following the collaborative process, the Commission

issued an Order on July 15, 2016 imposing a moratorium on new enrollments and

renewals of low-income customers by ESCOs.[31]  The July 2016 Order found that, during

the collaborative, many ESCOs indicated they were unwilling or unable to beat utility

commodity prices, and that despite the efforts of the collaborative participants, no

combination of commodity service and energy-related value-added services were

developed that would provide a cost-effective benefit to low-income customers.[32]

        Three parties filed petitions seeking rehearing or clarification, and the

Commission clarified its July 2016 Order on September 19, 2016, affirming the

protections directed for low-income customers in the July 2016 Order.[33]  The September

2016 Order, among other things, re-adopted the low-income moratorium on an

emergency basis, and sought comments on whether to continue the moratorium,

terminate it, or continue it with modifications.[34]  Then, on December 16, 2016, the

---

[29]  Id. at 7-8.

[30]  Case 12-M-0476 et al., supra, Report of the Collaborative Regarding Protections for
Low-Income Customers of Energy Service Companies (November 5, 2015).

[31]  Case 12-M-0476 et al., supra, Order Regarding the Provision of Service to Low-
Income Customers by Energy Service Companies (issued July 15, 2016) (July 2016
Order).

[32]  Id. at 17.

[33]  Case 12-M-0476 et al., supra, Order on Rehearing and Providing Clarification (issued
September 19, 2016) (September 2016 Order).

[34]  Id. at 6-7.

CASE 15-M-0127, et al.

Commission issued an Order[35] stating that "[a]fter years of investigation and numerous thwarted attempts to address the persistent, unresolved problem of ESCO overcharges to residential customers in general and the specific issues arising from overcharges to [low-income customers]..."[36] it is necessary to convert the moratorium on ESCO service to low-income customers into a prohibition to protect low-income customers.  The December 2016 Order further stated that:

> In light of the persistent ESCO failure to address (or even apparently to acknowledge) the problem of overcharges to [low income] customers and the resulting diminution of financial assistance to those customers, by this Order, the moratorium on ESCO service to [low-income] customers directed in the July and September Orders is converted to a permanent prohibition on ESCO service to [low-income customers]. Further, the Department of Public Service is actively pursuing reforms to the retail market for mass-market customers (citation omitted). Through this process, the Commission will evaluate the products and services to be offered to mass-market customers, including energy related value-added products or services, as part of its broader effort to ensure just and reasonable rates for retail access customers.[37]

The ESCO trade associations, as well as individual ESCOs, challenged the Commission's authority to issue and enforce the July, September, and December 2016 low-income related Orders in New York State Supreme Court, which ultimately upheld the Commission Orders and denied and dismissed, in all respects, the petitioners' requests.  (National Energy Marketers Assn. v New York State Pub. Serv. Commn., 57 Misc. 3d 282 [Sup Ct Albany County 2017] appeal pending).  There the Court decided that the record before the Commission fully supported imposing a prohibition on ESCO service to low-income customers given "the overwhelming evidence that low-income [sic] ESCO customers are paying more than the utility would charge for energy..." and

---

[35]  Case 12-M-0476 et al., supra, Order Adopting A Prohibition On Service To Low-Income Customers By Energy Services Companies (issued December 16, 2016) (December 2016 Order).

[36]  Id. at 2.

[37]  Id. at 3.

CASE 15-M-0127, et al.

the fact that ESCOs, despite claims to the contrary, have been unable to identify a single energy-related value-added product or service that would provide price savings.  (Id. at 57 Misc. 3d 296; "In spite of ESCOs repeated insistence that the Commission recognized the price guarantee offered by the energy companies as a value-added project, this simply is not and was never the case, and instead the record establishes that the ESCOs during the Collaborative—and to this day—- were unwilling or unable to identify a value added *energy* product which would provide a price guarantee.").

    4.    **Mass Market Customers and the Current Proceeding**

        Turning to retail access issues as they relate to mass market customers in general, not just low-income customers, the Commission addressed the broader retail market concerns in its February 2016 Order which directed that, when serving a mass market customer, an ESCO must provide that customer with a product that either guarantees savings in comparison to what the customer would have paid as a full-service utility customer or provides at least 30 percent renewable electricity.[38]  In the February 2016 Order, the Commission again noted that mass market customers have not seen benefits from being ESCO customers.[39]  Staff then held a series of collaborative meetings with ESCOs, utilities, consumer advocates, and other stakeholders, between April 15, 2016 and March 19, 2017, and received comments from the parties on a number of issues related to the reshaping of the retail energy market for mass market customers.  (Tr. 2070, lns. 16-21).

        The ESCO trade associations, as well as individual ESCOs, challenged the February 2016 Order, and Albany County Supreme Court restrained the Commission

---

[38]  Case 15-M-0127 et al., supra, Order Resetting Retail Energy Markets and Establishing Further Process (issued February 23, 2016) (February 2016 Order).

[39]  Id. at 2.

CASE 15-M-0127, et al.

from enforcing Ordering Clauses 1-3 of the Order.[40]  National Energy Marketers Assn. v New York State Pub. Serv. Commn., 53 Misc. 3d 641 [Sup Ct Albany County 2016]). The Court found that the Commission violated ESCOs' procedural due process rights insofar as the SAPA notice used by the Commission mentioned revisions to the UBP, but not with regard to the imposition of pricing protections to customers other than low-income customers.  However, the Court also concluded that the claim that the Commission lacks jurisdiction to impose pricing requirements on ESCOs "surely defies logic."  (Id. at 53 Misc. 3d 649-50).  The challenging parties appealed the Supreme Court's decision that the Commission has jurisdiction over ESCO prices and, on July 27, 2017, the Appellate Division, Third Department, affirmed that decision of the Supreme Court.  (Matter of Retail Energy Supply Assn. v Public Serv. Commn. of The State of New York, 152 A.D.3d 1133 [3d Dept 2017] appeal pending).  There, the Court found that "the PSC's broad statutory jurisdiction and authority over the sale of gas and electricity authorized it to impose the limitations set forth in the Reset Order," and further noted that "it is the PSC's broad jurisdiction that enabled it to allow ESCOs access to utility systems in the first place.  The PSC essentially maintains that this same authority allows it to impose limitations on ESCO rates as a condition to continued access.  We agree."  (Id. at 152 A.D.3d 1137-38).

Continuing its efforts to address concerns with the retail markets serving mass market customers, the Commission issued the December 2016 Notice which established two tracks (Track I and Track II) in these proceedings.  In Track I, the

---

[40]  Those three ordering clauses directed ESCOs to: (1) only enroll new customer or renew existing customers on products that guarantees that the customer will pay no more than were the customer a full-service customer of the utility or provide an electricity product derived from at least 30 percent renewable sources; (2) receive affirmative consent from customers prior to renewing from a fixed rate or guaranteed savings contract into a contract that provides renewable energy but does not guarantee savings; and (3) submit a filing by the Chief Executive Officer (CEO) or equivalent corporate officer of the ESCO certifying that any enrollments will comply with the conditions of the February 2016 Order.  The remaining Ordering Clauses were not vacated by the Court and remain in effect today.

CASE 15-M-0127, et al.

Commission expects the parties to address, in a litigated proceeding, "(a) whether ESCOs should be completely prohibited from serving their current products to mass market customers; (b) whether the regulatory regime, rules and Uniform Business Practices (UBP) applicable to ESCOs need to be modified to implement such a prohibition, to provide sufficient additional guidance as to acceptable rates and practices of ESCOs, or to create enforcement mechanisms to deter customer abuses and overcharging..."[41]  Track II, using a collaborative process, would commence in the future to consider whether new ESCO rules and products can be developed that would provide sufficient real value to mass market customers at just and reasonable rates.[42]

**B.    THE RETAIL MARKETS TODAY**

**1.    Overview of the Retail Energy Markets Serving Mass Market Customers (December 2016 Notice Questions 9, 10, 11, and 12)**

The percentage of residential and small commercial customers served by ESCOs is considerable.  (Tr. 2041-2042, lns. 5-4).  The distribution utilities provide, as of December 2016, electric delivery service to approximately 5.9 million residential customers, and approximately 927,700 small commercial customers.  (Tr. 2041, lns. 8-12).  Comparatively, as of December 2016, ESCOs provided electric supply service to approximately 1.2 million, or 20 percent, of residential customers, and 160,000, or 33 percent, of the non-residential small commercial customers.  (Exh. 712 (SP-2); Tr. 2041, lns. 17-23).  With respect to gas, the utilities provide gas delivery service to approximately 4.4 million residential customers and 414,000 small commercial customers in New York State.  (Tr. 2041, lns. 13-17).  ESCOs provided gas commodity supply service to approximately 754,000, or 17 percent, of the residential and 130,000, or 31.4 percent, of the small commercial customers.  (Tr. 2041-2042, lns. 24–4; see also Exh. 712 (SP-2)).

---

[41]  Id. at 3-4.

[42]  Id.

CASE 15-M-0127, et al.

2.      **ESCO Registration and Eligibility**

        The requirements for an ESCO to obtain and maintain eligibility are defined in UBP §2.  The UBP sets forth the necessary contents of an ESCO's eligibility application, the review process undertaken by the Department of Public Service, the ongoing filings that an ESCO must make to maintain eligibility, as well as the conditions under which eligibility can be revoked.  (UBP §§2.A.-2.D.).  As of December 2016, there were approximately 155 eligible, and 140 active, electric commodity ESCOs, and 150 eligible, and 130 active, natural gas commodity ESCOs throughout the state.  (Tr. 2045, lns. 10-13).

3.      **ESCO Business Practices**

        This subsection is not addressed here, but is instead addressed throughout this brief.

4.      **Billing and Purchase of Receivables**

        See Section III.C.9. of this brief for a discussion of billing practices and purchase of receivables.

5.      **Current Status of the UBP**

        **(December 2016 Notice Question 6)**

        The Commission's UBP serves not only to define an ESCO's interactions with customers and utilities, but also imposes the standards to which an ESCO must adhere in order to remain in compliance with the Commission's performance requirements (see Exh. 723 (SP-11)).  As such, the UBP defines and codifies all interactions between an ESCO, its customers, and the distribution utility.  Since it was established by the Commission in 1999, the UBP has been modified and refined numerous times in response to changes in the retail markets and/or customer abuses discovered through the customer complaint review process.  (Exh. 715 (SP-4)).  Notably, however, the UBP does not currently address issues regarding the prices charged by ESCOs, such as rate transparency, and does not set or cap those prices in any way.  (Tr. 2109, lns. 22-24).

CASE 15-M-0127, et al.

6.     **Monitoring and Enforcement**

       **(December 2016 Notice Questions 5, 7, 14, and 15)**

       As indicated, the UBP provides the standards by which ESCO compliance with their customer facing operations, including appropriate marketing practices, are measured. (Tr. 2050, lns. 1-5). Enforcement actions against ESCOs are typically initiated after a negative trend in customer complaints is noted by the Department's Call Center Staff or by anti-competitive complaints raised by competing ESCOs or the distribution utility. (Tr. 2104, lns. 11-15). A Staff investigation begins first by gathering the facts regarding the customer complaint or inquiry regarding an ESCO. (Tr. 2104, lns. 18-21). Staff then communicates with the affected parties directly via email or telephone to determine if in fact there appear to be UBP violations. (Tr. 2104-2105, lns. 21-3). If Staff observes a trend in complaints or UBP violations related to, for example, deceptive or anti-competitive marketing practices, or customer slamming,[43] or the ESCO's fails to meet compliance reporting requirements, including ESCO price reporting, notices of Apparent Failure (NOAFs) are issued, which detail the specifics of the complaints and alleged UBP violations by the ESCO or its agents, for which the ESCO is ultimately responsible. (Tr. 2103-2104, lns. 16-7).

       Since January 2013, the Department of Public Service, Office of Consumer Services (OCS) has issued 79 NOAFs. (Tr. 2103, lns. 10-12). If the ESCO fails to adequately respond to or address the issues identified in Staff's NOAF, Staff recommends that the Commission issue an Order to Show Cause (OTSC) requiring the ESCO to explain why, in light of the allegations, it should be allowed to continue to market or otherwise not be subject to consequences or sanctions as provided for in the UBP. (Tr. 2108-2109, lns. 20-4). The Commission issued OTSCs to three ESCOs in 2013, six in 2015, six in 2016, and four were issued in 2017 as of the date testimony was filed. (Tr. 2109, lns. 7-10).

---

[43]   UBP §1 defines slamming as the enrollment of a customer by an ESCO without authorization.

CASE 15-M-0127, et al.

We caution the Commission that the relatively small number of Commission actions is no indication that the market is performing as it should or that the Commission's current enforcement powers are strong enough to correct the on-going failings of ESCOs serving the mass market. Because the UBP currently does not address commodity price transparency, nor otherwise limit in any way the prices charged by ESCOs, the Commission is unable to address the fundamental flaw of price transparency in the retail markets which allows the majority of the ESCO community to aggressively market and charge commodity prices that significantly exceed the prices charged by the utility for supply. (Tr. 2109-2110, lns. 21-5). As the Staff Panel explained in its testimony, the current enforcement mechanisms are reactive, and typically driven by customer complaints or known UBP violations, and many mass market customer complaints concern high commodity prices and lack of transparency as to what they would pay after the "teaser rate" ended after a few months, which are presently not violations of the UBP. (Tr. 2109, lns. 18-20). The data in the record proves that, in aggregate, ESCOs have charged their residential customers over $1.3 billion more than they would have paid their default utility if they had remained with their utility for commodity service for the years 2014 through 2016. (Exh. 711 (SP-1a Confidential); Exh. 720 (SP-8 Confidential)). In addition to concerns regarding the prices charged by ESCOs, the Commission has made several attempts through the years to curtail aggressive marketing. (Tr. 2110, lns. 6-9). On a daily basis Staff hears from, and works with, customers who tell us that they were subjected to high pressure sales tactics by ESCO employees and agents. (Tr. 2110, lns. 6-9). In summary, the Commission cannot correct the flaws in the mass markets solely through amendments to the UBP or modifications to its enforcement process because the UBP does not regulate the prices ESCOs charge for their products. Real change to the ESCO regulatory regime, as discussed in this brief, is required to protect residential and small commercial customers and ensure that their commodity rates are just and reasonable.

CASE 15-M-0127, et al.

# III.   ANALYSIS

## A.   REGULATORY REGIME

### 1.   The Commission's Vision in Opening the Competitive Markets

The Commission stated its expectation that retail competition and increased consumer choice should result in lower bills and the introduction of new products and services.[44]  The Commission posited that, over time, the market forces should produce lower retail commodity rates than would be expected in a fully regulated commodity environment and ESCOs would drive or at least facilitate the introduction of innovative products and services.[45]  The Commission further stated its expectation that there would be market-based solutions to public policy issues, including aggressive pursuit of energy efficiency measures and a competitive energy service market.[46]

The Supreme Court concluded that the Commission could use its ratemaking authority to effectuate competitive access to electric utility systems.  The Supreme Court further rejected utility claims "that the PSC may not allow market pressures to set rates for the generation component of electric service."  (Energy Assn. v Pub. Serv. Commn., 169 Misc 2d at 932-36 [Sup Ct Albany County, Nov 25, 1996] affd on other grounds, 273 AD2d 708 [3d Dept 2000]).

### 2.   Application of the Public Service Law to ESCOs
### (December 2016 Notice Questions 2, 3, 4, 12, and 20)

a. Scope of Commission Jurisdiction Under the PSL

The jurisdiction of the Commission to control ESCO product offerings, including setting limits on the prices charged by ESCOs, has been upheld by the courts. Most recently, the Appellate Division, Third Department, held that "the PSC's broad

---

[44]   Case 94-E-0952, Competitive Opportunities Regarding Electric Service, Opinion No. 96-12, Opinion and Order Regarding Competitive Opportunities for Electric Service at 30-32 (Issued May 20, 1996) (Opinion 96-12).

[45]   Id. at 30.

[46]   Id. at 31.

CASE 15-M-0127, et al.

statutory jurisdiction and authority over the sale of gas and electricity authorized it to impose the limitations set forth in the Reset Order." (Matter of Retail Energy Supply Assn. v Public Serv. Commn. Of The State of New York, 152 A.D.3d 1133, 1137–8 [3d Dept. 2017] appeal pending).  The Court went on to hold that "it is the PSC's broad jurisdiction that enabled it to allow ESCOs access to utility systems in the first place," and agreed with the position of the Commission that "this same authority allows it to impose limitations on ESCO rates as a condition to continued access."  (Id. at 1138).  ESCOs that want to utilize the utility distribution system to serve customers in New York are subject to the full regulation of the Commission as to whether they can use such systems.

The Commission has broad legal authority to oversee ESCOs, pursuant to its jurisdiction in Articles 1 and 2 of the PSL.[47]  ESCO eligibility requirements were originally created in Opinion 97-5,[48] and were reflected in the UBP in 2003.[49]  In both instances, the Commission's authority under PSL §66(5) was used to direct the distribution utilities to incorporate the applicable requirements in their respective tariffs.  Since the eligibility requirements were originally established, those criteria have been amended on numerous occasions.  For example, in 2003, ESCOs were required to submit

---

[47]  See PSL §5 (Commission's broad statutory grant of authority over the sale of natural gas and electricity); see also Case 98-M-1343, In the Matter of Retail Access Business Rules, Order Adopting Amendments to the Uniform Business Practices, Granting in Part Petition on Behalf of Customers and Rejecting National Fuel Gas Distribution Corporation's Tariff Filing at 10 (issued October 27, 2008) (2008 Order); PSL §53 (stating Article 2 of the PSL applies to "any entity that, in any manner, sells or facilitates the sale or furnishing of gas or electricity to residential customers").

[48]  Case 94-E-0952, In the Matter of Competitive Opportunities Regarding Electric Service, Opinion and Order Establishing Regulatory Policies for the Provision of Retail Energy Services (issued May 19, 1997) (Opinion 97-5); Opinion and Order Deciding Petitions for Clarification and Rehearing (issued November 18, 1997) (Opinion 97-17).

[49]  Case 98-M-1343, supra, Order Adopting Revised Uniform Business Practices (issued November 21, 2003).

CASE 15-M-0127, et al.

sample standard customer agreements and disclosure statements in order to be deemed eligible to provide electricity and/or natural gas commodity service in New York.[50]  In adopting ESCO eligibility requirements, the Commission stated that such requirements are necessary to ensure that ESCOs provide consumer protections, to give the public confidence in ESCOs, to ensure competency of providers, to protect system reliability, and to oversee development of the market.[51]  Eligibility requirements remain a necessary baseline tool to accomplishing the Commission's related goals and policies.

In 2002, the Legislature amended PSL Article 2 to add PSL §53 and specifically to require that ESCOs adhere to PSL Article 2, also known as the Home Energy Fair Practices Act (HEFPA), which provides numerous protections to residential utility customers.  (L. 2002, c. 686).  Following this amendment, while ESCOs were required to afford HEFPA protections to customers, HEFPA also provides certain rights to utilities and ESCOs.  For instance, ESCOs could suspend or terminate the provision of utility distribution service to compel payment of unpaid ESCO commodity bills.  If, however, upon service termination the ESCO commodity bills exceeded what the utility would have charged for commodity, then a customer need only pay the lesser utility bill to reinstate service.  (PSL §32(5)(d)).

The Commission also has broad authority over utility  tariffs, which contain the rules and regulations of the particular electric and gas distribution utility and, as such, places conditions on when the distribution utilities may allow, or are required to allow, ESCOs to use utility's electric and gas systems to distribute electricity and natural gas to ESCO customers.[52]  In fact, the creation of competitive retail markets was an exercise of Commission ratemaking authority over jurisdictional utilities whereby the unbundling of electric rates was accomplished purely through the Commission's exercise of its authority to set "just and reasonable" rates for gas and electric utilities pursuant to PSL §65(1).

---

[50]  Id.

[51]  Opinion 97-5.

[52]  PSL §66(5).

CASE 15-M-0127, et al.

(Energy Assn. v PSC, 169 Misc 2d at 932-36).  The unbundling of utility rates enabled the creation of the retail market by subsequently imposing upon utilities the obligation to deliver eligible competitors' energy.  (Id. at 932-34).  In Energy Assoc., Albany County Supreme Court observed that the decision to restructure traditional monopoly utility markets had to advance the Legislature's purpose of bringing customers just and reasonable prices for electric service.  (Id. at 936-7).

       Moreover, the Commission's obligation to ensure that the retail markets are providing just and reasonable rates is an ongoing obligation and central to the issues and concerns raised by the Commission in these proceedings (December 2016 Notice) and addressed in Staff testimony.  Restructuring of the utility monopolies was approved based on the assumption that the Commission would exercise continuing oversight to ensure that prices in the competitive energy markets would remain just and reasonable.  (Energy Assoc. v PSC, 169 Misc 2d at 936-7).  In upholding utility restructuring, the Court relied heavily on precedent stating FERC approval of market-based rates was reasonable because FERC would continue to exercise oversight power to ensure that market prices were just and reasonable.  (Energy Assoc. v PSC, 169 Misc 2d at 936, citing Elizabeth Town Gas Company v Federal Energy Regulatory Commn., 10 F3d 866, 869 [DC Cir 1993]).  Utility rates are set by the Commission and are, therefore, just and reasonable.

       In satisfying its continuing obligation to ensure that retail markets are providing just and reasonable rates, the Commission may limit or otherwise control what products ESCOs can offer – including setting limits on price - in order to retain access to utility distribution systems.  Using utility rates to cap ESCO commodity offerings is a logical and reasonable proxy in the absence of full rate regulation of ESCO pricing. Absent such imposition of pricing requirements, the retail mass markets should not continue.  Restructured energy markets that have resulted in higher prices run contrary to the fundamental legal basis for such markets.  The Commission basis for unbundling rates or maintaining rate unbundling is absent, and not just and reasonable, if the resulting retail market rates were higher than comparable bundled utility rates.  In addition, if the

CASE 15-M-0127, et al.

ESCO rates are generally, and often significantly, higher than utility rates, it is not reasonable - and certainly not in the public interest - to continue to allow ESCOs access to utility systems.  The current system cannot be reconciled with the Commission's responsibility to ensure rates are just and reasonable.

Additionally, the Commission's authority over ESCO pricing through limiting competitive access was further solidified by Chapter 416 of the Laws of 2010, adding GBL §349-d (11-12) to preserve Commission authority over ESCO eligibility and marketing practices.[53]  GBL §349-d (11-12) is not a grant but rather a reservation of the Commission's authority to suspend ESCO eligibility or control their marketing practices.  Those provisions recognize that the Commission's authority to control ESCO access to utility systems allows it to impose limits on such access.  There is, therefore, no question that the Commission has the jurisdiction and authority to establish and modify the conditions under which ESCOs may offer electric and gas commodity service to mass market customers.

    b.  Should ESCOs Be Required to File Tariffs?

ESCOs should not be required to file tariffs.  Such a requirement is unnecessary to effectuate the pricing controls on ESCOs that we recommend because, as stated above, the Commission has jurisdiction over ESCO prices through its very broad powers to regulate the rates, service classifications, and the terms and conditions under which utility service is furnished to customers.[54]  Additionally, the expense and administrative burden associated with having each ESCO file a rate case would not make sense given the available alternative mechanisms to achieve the same goal.  Therefore, to effectuate the required changes in the mass markets, the Commission can direct the

---

[53]  GBL § 349-d (11 & 12)

[54]  Matter of Campo Corp. v. Feinberg, et al., 284 AD 302, at 304-307 (3rd Dept. 1952), aff'd. 303 NY 995.  In Campo, the Appellate Division held and the Court of Appeals affirmed at the Commission could prohibit the submetering and resale of electricity through tariffed terms and conditions of service.

CASE 15-M-0127, et al.

utilities to file tariff amendments in compliance with the Track I order it issues in these proceedings.

    c.  <u>Financial Oversight</u>

        More rigorous financial oversight of ESCOs is necessary to ensure the retail markets meet the objectives identified by the Commission when it initially established the markets.  However, as discussed in Section III.A.2.a., above, the Commission need not assert jurisdiction under PSL Article 4 to exert control over the prices charged by ESCOs.  The Commission has authority to control practices of even non-jurisdictional entities such as ESCOs through the imposition of conditions on access to utility facilities.  (<u>Matter of Campo Corp. v Feinberg</u>, 279 AD 302, 306 3d Dept [1952]).  In <u>Campo Corp.</u>, non-jurisdictional "submeterers" of electricity (<u>i.e.</u>, owners of multiple-dwelling buildings that purchased electricity from the utility and resold it to their tenants) challenged a Commission decision to curtail that practice.  The Court held that although the Commission lacked authority to directly regulate submeterers, it did have authority to impose conditions upon the utility's provision of service to them.  (<u>Id</u>. at 305-06).  In this instance, the PSL precluded Commission jurisdiction over providers of submetered electricity.  (PSL §2 [10, 11, 12 and 13] [Exempting entities providing gas or electricity to their tenants]).  Subsequently, however, and identical to the application to ESCOs in the present proceedings, submeterers became subject to HEFPA under the 2002 amendments adding PSL §53.  (L. 2002, c. 686).  Thus, oversight over the products ESCOs can offer in New York, including the prices they can charge, can be effectuated through restrictions on access to the utility distribution system and the Commission's ongoing obligation to ensure that the rates arising out of the retail markets are just and reasonable.  (<u>Retail Energy Supply Assn.</u>, 152 A.D.3d at 1137–8).

CASE 15-M-0127, et al.

3.      **Enforcement Powers Over ESCOs**
        **(December 2016 Notice Questions 2 and 19)**

   a.      Commission's Enforcement Mechanisms and Efforts

         The Commission has taken steps to ensure market participants are complying with Commission rules and regulations since the creation of the retail markets. Since January 2013, OCS has issued 79 NOAFs.  (Tr. 2103, lns. 16-23).  Violations warranting the issuance of an NOAF can include deceptive marketing practices, customer slamming, or an ESCO's failure to meet compliance reporting requirements as specified in the UBP, or otherwise not in compliance with a Commission order.  (Id.).  Following the issuance of an NOAF, the ESCO implements either improved training or procedural processes to address and resolve the immediate UBP violation concerns.  If the UBP violations are not remedied, or the ESCO fails to respond to the NOAF, Staff would request that the Commission issue an Order to Show Cause, directing the ESCO to explain why, in light of the allegations, it should be allowed to continue to market to customers in New York, or otherwise not be subject to consequences as provided for in the UBP.  (Tr. 2208-2209, lns. 22-24).

         While the existing enforcement mechanisms have been effective in addressing violations of the UBP that are brought to the attention of the Commission or OCS, they are not sufficient to address the concerns identified by Staff in its testimony.  (Tr. 2209-2210, lns. 15-12).  As evident in the Commission's December 2016 Notice, there are ongoing concerns with the retail markets surrounding the prices charged by ESCOs and the lack of innovative products offered, which ultimately contributes to the lack of real value being offered to customers by the retail markets.[55]  Under the current UBP, there are no requirements or standards regarding the prices ESCOs can charge for commodity – thus there is nothing that can be enforced using the Commission's existing enforcement mechanisms.  Those mechanisms have proven insufficient to address the primary concerns identified by the Commission and at the heart of these proceedings.

───────────────

[55]   December 2016 Notice at 3-4.

CASE 15-M-0127, et al.

> b.      Attorney General's Enforcement Mechanisms and Efforts
>
>    This subsection is not addressed in this Brief.

## 4.      Other State and Federal Laws Applicable to ESCOs

>    This subsection is not addressed in this Brief.

## B.      USEFULNESS & ACCURACY OF COMPARING ESCO AND UTILITY RATES

### 1.      Utility Bill Comparison methodologies

### (December 2016 Notice Questions 12, 16, and 17)

In the February 2014 Order, the Commission addressed several major flaws in the mass markets, including the lack of accurate, transparent commodity product pricing information for customers, and predatory marketing behavior that too often relied on customer confusion.[56]  Therefore, to address the lack of commodity pricing transparency and utility-to-ESCO pricing comparisons, the Commission directed the utilities to develop historic bill calculators that would "…allow existing ESCO customers receiving a consolidated utility bill to compare the total amount charged, including utility delivery service and ESCO supply charges, with the total that the customers would have paid if purchasing commodity service from the utility for that period."[57]

In these proceedings, and to be responsive to the Commission's directives in questions 9, 10, and 11 of the December 2016 Notice, Staff performed a total utility-to-ESCO, bill-to-bill comparison.  (Tr. 2112, lns. 5-12).  The comparison of the total cost for energy, including commodity provided by an ESCO versus commodity provided by the utility, is more conservative and accurate comparison than if only comparing a customer's utility commodity service rate to an ESCO's commodity service rate.  (Id.).  In fact, such a comparison is to the ESCOs' advantage because it also reflects any tax advantages that an ESCO customer received.  (Tr. 2112, lns. 12-15).

---

[56]   February 2014 Order at 4.

[57]   Id. at 13-15.

CASE 15-M-0127, et al.

           To evaluate ESCO commodity charges relative to utility pricing, we aggregated the historical bill data provided by the utilities in response to Staff IR DPS-Utility 5 (Exh. 709). This analysis was summarized in Exh. 716, which provides an aggregated relative total bill comparison of what ESCO customers were billed for ESCO commodity and utility delivery services, compared to what they would have been billed for commodity and delivery service from the default utility. (Tr. 2113, lns. 9-16). This data indicates that customers served by ESCOs were generally charged significantly more for ESCO provided commodity service than they would have been charged if they received commodity service from their utility. (Id.). Specifically, as shown at the top of page 1 of Exh. 716, residential utility customers who took commodity service from an ESCO collectively paid almost $1.2 billion more than they would have if they purchased commodity from their distribution utility during the 36 months ending December 31, 2016. (Tr. 2113-2114, lns. 21-5). Additionally, small commercial customers paid $136 million more than they would have paid if they instead simply remained with their default utilities for commodity supply for the same 36-month period. (Tr. 2114, lns. 5-14). Combining the residential and small commercial customer classes, the mass market was charged by over $1.3 billion dollars more than had they remained on full utility service over this time period. Finally, the data also shows that low-income customers (a subset of the residential customer mentioned above) who took commodity service from an ESCO collectively paid in excess of $146 million more than they would have paid if they took commodity supply from their utility. (Tr. 2114, lns. 5-14).

CASE 15-M-0127, <u>et</u> <u>al</u>.

       The following examples use actual customer data in the record to illustrate the negative impact ESCO practices have on individual customers.[58]





CASE 15-M-0127, <u>et</u> <u>al</u>.



CASE 15-M-0127, <u>et</u> <u>al</u>.



CASE 15-M-0127, <u>et</u> <u>al</u>.



CASE 15-M-0127, <u>et</u> <u>al</u>.



CASE 15-M-0127, <u>et</u> <u>al</u>.



CASE 15-M-0127, <u>et</u> <u>al</u>.



CASE 15-M-0127, et al.

████████████████████████████████████
████████████████████████████████████
██████████████████████████████
████████████████████████████████
██████████████████████████████████
███████████████████████████████
████████

   While this total bill-to-bill comparison methodology remains the most effective, and perhaps the only accurate, way to consistently compare ESCO and utility charges, it does have its limitations.  Specifically, this comparison only reflects the amount that the ESCO tells the utility to bill the customer for ESCO service each month; the utility does not know what type of product (fixed, variable, or energy-related value-added services) the customer purchased from the ESCO; further, the utility can only report on accounts for which the utility bills using the consolidated utility billing (CUB) model.  (Tr. 2130-2131, lns. 15-21).  In other words, it does not account for, nor can Staff quantify, the amount of any overcharges that are likely to have accrued to customers who were billed directly by the ESCOs.  Furthermore, this analysis is also unable to account for any reduction in consumption that may have occurred as a result of some value-added energy efficiency products that an ESCO may have offered to its customers.  Nevertheless, for the reasons stated above, this methodology remains the most appropriate comparison methodology.

   That said, Staff attempted to parse the commodity pricing disparity to identify and quantify any portion of premiums associated with the ESCO provided value-added products or other associated product benefits such as energy consumption reductions versus the total overall mark-up associated with the bundled product by asking the ESCOs to provide this information in response to Staff IRs DPS-ESCO 1 through 4.  (Exh. 615).  In response to our requests, however, ESCO parties generally either refused to respond., or offered statements that the request to quantify the actual value of value-

CASE 15-M-0127, et al.

added products was beyond the scope of these proceedings, that the data was unavailable, or that it would be of no value and/or relevance. (Tr. 2115-2116, lns. 23-2). Moreover, individual review of those responses revealed no significant real dollar value associated with the "value-added" products claimed by the responding ESCOs. (Tr. 2116, lns. 4-7). ESCOs' substantive responses also failed to explain or describe what the value-added products were, or how the reported value was developed by the ESCO. (Tr. 2116, lns. 8-11). The limited substantive responses to the IRs (Exh. 615) that were received, however, included data that was not conducive to performing a consistent analysis. (Tr. 2116, lns. 2-4). As a result, Staff was unable to quantify or verify the actual value, if any, of the value-added benefits that ESCOs claim were provided to customers. Thus, and as explained in detail below, the ESCOs' argument that the value-added products account for the significant pricing differences between the ESCO customers' bills for commodity and delivery and the "all-in" distribution utility bills is unsupported in the record and should be rejected by the Commission as, at best, a post hoc rationalization for the $1.3 billion in overcharges collected by ESCOs from their unsuspecting customers. (Tr. 2116, lns. 11-18).

Several ESCO parties challenge any analysis comparing actual ESCO bills to what the default utility would have charged for the same billing period. These parties assert that such a comparison is improper because ESCOs incur costs that utilities do not, ESCOs allegedly offer value-added products and services such as renewable energy and fixed rate contracts, and because utilities are allowed to recover costs outside of the period those costs were incurred. (See, Tr. 253-257, lns. 15-3). With respect to the costs incurred by ESCOs, such as customer acquisition and "overhead costs," no party to these proceedings put forth any evidence of the magnitude of these costs, or even whether these costs are experienced by a majority (or even any) of the ESCOs operating in New York. (Tr. 253-254, lns. 15-11). Moreover, even taking these speculative costs into account, vague reference to "overhead costs" does not justify the significant overcharges evidenced by the record in these proceedings. Additionally, ESCO costs are not at issue

CASE 15-M-0127, et al.

in these proceedings.  What is at issue is the value ESCOs provide to customers and whether or not the prices charged by ESCOs are just and reasonable that is at issue here.

Turning to the issue of out-of-period adjustments, ESCO parties cite the fact that utilities are permitted to sometimes defer recovery of costs to soften increases in default rates or to true-up default revenues and costs and recover any under-collection in subsequent months.  (Tr. 254-255, lns. 11-7).  On its face, this argument is flawed in that it fails to recognize that such true-ups and out-of-period adjustments can be both negative and positive.  Notwithstanding the argument that out-of- period adjustments make a comparison between ESCO and utility bills improper it also fails when one considers that this analysis is done over periods of time longer than one month.  Staff acknowledges that, if one looks at such a comparison for a single month, potential out-of-period adjustments on the utility side might make the utility rate either appear more or less favorable compared to the ESCO.  However, when such a comparison is done over the course of an entire year, or as in these proceedings, over three consecutive years, the impact of any out-of-period adjustments is minimized because both the overcollection, for example, and the true-up are likely to be contained within the analysis.  It is important to remember that Staff aggregated the overpayments over a three-year period, and no out-of-period adjustments, polar vortexes, or other event could explain the over $1.3 billion in overcharges.

With respect to the argument that the analysis performed by Staff does not take into account any potential additional services offered by the ESCO, Staff acknowledged this as a potential shortcoming, but nonetheless, as discussed above, this type of comparison remains the most effective way to evaluate ESCO price performance in the retail markets.  Several ESCO parties argue that because Staff acknowledged that the bill-to-bill comparison has flaws, that the entire analysis should be disregarded.  (See, Tr. 292-294, lns. 234-280; Tr. 364-366, lns. 13-12; Tr. 695-696, no line numbers in this testimony; Tr. 812-815, lns. 5-3).  However, these parties at the same time fail to provide any reasonable alternative price comparison, and also fail to acknowledge that Staff in

CASE 15-M-0127, et al.

fact attempted to elicit the value of any alleged value-added products included on the ESCO side of the comparison, but that effort was stifled by the ESCO parties. (Tr. 2115-2116, lns. 23-2). These parties withheld this information as "not relevant to these proceedings" (Id.), and then argued that Staff's analysis is not creditable because it does not account for the very information withheld. This is a prime example of the obstructionist position taken by so many ESCO parties. Moreover, as discussed below, the substantial delta between utility and ESCO charges simply cannot be justified through the alleged offering of additional energy-related value-added services by ESCOs. Evidence in the record shows that, using renewable energy as an example, nearly every ESCO operating in New York offers a level of renewable energy that is practically identical to the level of renewable energy offered by the utility, thus refuting the claim that ESCO charges in excess of what the utility would have charged can be justified in part by the fact that ESCOs are providing a higher level of renewables to customers at a premium.

Additionally, this argument also assumes that customers in New York are actually taking products from ESCOs that include energy-related value-added services. Direct Energy witness Hanger lists products and services that ESCOs "can" offer such as (1) fixed rates, (2) renewable energy, (3) smart thermostats, (4) gift cards, (5) airline miles, (6) information regarding energy consumption, and (7) "more customer-friendly terms and conditions" (Tr. 255-256, lns. 21-13), but does not provide any hard evidence that ESCOs in New York are offering any or all of these products, nor that any New York customers actually take such products. Furthermore, there is no attempt to quantify the benefits associated with such products so as to potentially justify the over $1.3 billion in overcharges experienced by mass market customers who took ESCO service for the 36-month period ending June 2016.

Finally, several parties attempt to argue that the time period and customer class selected for this analysis is inappropriate. (See, Tr. 694-695, no line numbers in this testimony). Ignoring the fact that review of the most recent (at the time) 36-month time

CASE 15-M-0127, et al.

period was directed by the Commission itself,[60] the wealth of information and data collected for this three-year time period provides a more than sufficient data set for evaluation of relative ESCO price performance.  The claim that the data set is flawed because it does not include large commercial and industrial customers is also misguided as this proceeding is limited to addressing the recognized flaws with the retail markets serving mass market customers, not the markets serving large commercial and industrial customers.[61]  For example, NEM witness Cicchetti relies on ESCO data self-reported to U.S. Energy Department (EIA) which included both mass market as well as large commercial and industrial customers, which biases his analysis and is therefore of no use in these proceedings.  (Tr. 696-707, no line numbers in this testimony).  The use of EIA data is discussed in more detail in section III.C.2. of this brief.

The data sets and sources relied on by Staff for its analysis is the most comprehensive relative pricing comparison between New York ESCOs and utilities in the record.  (Exh. 701 (JSA-1 Confidential); Exh. 711 (SP-1a Confidential)).  This data is not just a sample, it is the entire universe of actual data for the three-year period that the parties were to analyze according to the Commission's directive in the December 2016 Notice.[62]  This is the only data set in evidence in these proceedings, and is the most reliable and accurate source of ESCO to utility price comparisons available.

**2.     Utility Delivery and Supply Cost Allocations**

Footnote 20 of the February 2014 Order explains that specific rate unbundling and cost allocation questions would be addressed and subsequently approved in individual rate cases based on detailed analyses which conform to provisions set forth

---

[60]   December 2016 Notice at 7-8.

[61]   Id. at 1-2.

[62]   December 2016 Notice at 7.

CASE 15-M-0127, et al.

by the Commission.[63]  These allocation questions are, therefore, outside the scope of these proceedings.

## C.   RESPONSE TO COMMISSION'S INQUIRIES ON THE FUTURE OF ESCOS IN THE MASS MARKET

### 1.   Should Retail Choice Continue in New York?

#### (December 2016 Notice Question 1)

The evidence in the record clearly proves that the retail access mass markets for electricity and natural gas are not working as the Commission originally envisioned when it first established the retail markets in the 1990s.  (Tr. 2038, Exh. 724 (SP-12)).  The primary problem with the retail markets for mass market customers is the overcharging of customers for commodity due to the lack of transparency to customers on ESCO prices and products (Tr. 2039, lns. 8-11); this lack of transparency allows ESCOs to charge customers practically whatever they want without customers' understanding that they are paying substantially more than if they received full utility service.  Consequently, potential commodity customers attempting to choose between the ESCO offerings and the default utility service cannot readily determine which ESCO offers the best price for comparable products or if the ESCOs' prices can possibly "beat" or even be competitive with the utility's default commodity service for the duration of the contract term.  (Tr. 2039-2040).

Thus, as the current retail access mass markets are structured, customers simply cannot make fully informed and fact-based choices on price and other factors, such as energy-related value-added products, since the terms and pricing of the ESCO product offerings are not transparent to customers.  For variable rate products this is due, in large part, to the fact that ESCOs often offer "teaser rates" to start (Tr. 2080, lns. 4-6; Tr. 2082-2083, lns. 17-3), and after expiration of the teaser rate, the rate is changed to

---

[63]  See, Case 00-M-0504, Proceeding on Motion of the Commission Regarding Provider of Last Resort Responsibilities, the Role of Utilities in Competitive Energy Markets, and Fostering the Development of Retail Competitive Opportunities.

CASE 15-M-0127, et al.

what is called a "market rate" that is not transparent to the customer, and the contract signed by the customer does not provide information on how that "market rate" is calculated (Tr. 2084, lns 2-10; Tr. 2219-2220, lns. 22-4). The transparency issues are discussed in detail below in Section C.11.

    a.    <u>ESCOs' Role in Residential Markets</u>

In light of the pricing abuses ESCOs are committing against their customers, Staff recommends that the Commission direct that the utilities prohibit ESCOs from using their distribution systems to provide commodity service to mass market customers (both residential and small commercial, as defined in sections III.C.1.a.(i) and III.C.1.b.(i) of this brief), unless our recommendations are implemented by the Commission (Tr. 2032, ln 18 to Tr. 2037).

Staff's first recommendation is that the commodity service product provided by the ESCO must either provide a guarantee that the mass market ESCO customer's overall electric or gas bill will be lower, or no greater, than that charged by the utility for delivery and commodity, or that 100 percent of the ESCO product is generated from renewable resources that are delivered to and consumed in New York and otherwise in compliance with the Commission's environmental disclosure program requirements. (Tr. 2033, lns. 1-14).

Second, the Commission should prohibit ESCOs from using the utility distribution systems to provide commodity service to aggregated mass market customers unless the customer aggregation is enabled through either a Community Choice Aggregation (CCA) model utilizing a professional energy buyer acting in a fiduciary manner that is independent of the ESCO (Tr. 2033, lns. 14-24), or the energy service provider is a not-for-profit (NFP) corporation or municipal entity (Tr. 2033-2034, lns. 24-3).

Third, in both instances, the Commission should monitor the performance of the CCA and NFP to ensure that they are providing competitive prices vis-á-vis the utility's default service (Tr. 2034, lns. 3-6).

CASE 15-M-0127, et al.

Fourth, mass market customer bills (whether individual or aggregated) must disclose a relative bill comparison in a manner acceptable to the Commission between the current bill charges and what the customer would have paid if the customer took both delivery and commodity service from the distribution utility (Tr. 2034, lns. 7-18).

Fifth, the Commission should direct that the utilities no longer provide Purchase of Receivables (POR) without recourse to ESCOs, but instead that POR only be offered to ESCOs with recourse, meaning that the ESCOs would not be made whole in the instance where funds for commodity service cannot be collected from the ESCO's customers (Tr. 2034-2035, lns. 18-2; Tr. 2155, lns. 1-3; Tr. 2157-2158, lns. 10-2; Tr. 2159, lns. 1-3)).

The sixth recommendation is that the Commission should require that ESCOs provide written reports on a calendar year basis, and that those filings contain the information necessary for the Commission to monitor the mass market and ensure that ESCOs are compliant with the Commission's new requirements (Tr. 2035, lns. 2-10), including that ESCO customers must be provided with 100 percent green energy or realize savings on their commodity compared to the default utility's offering.

Regarding ESCO marketing practices, the seventh recommendation is that the Commission should prohibit ESCOs from using door-to-door, point of sale, telephonic sales, or similar marketing practices (Tr. 2035, lns. 11-14).  Instead, the Commission should direct ESCOs to limit their marketing to direct mail, electronic communications, or similar forms of marketing where the potential ESCO customer would respond to such marketing and otherwise initiate direct contact with the ESCO (Tr. 2035, lns. 15-22).

The eighth recommendation is that the Commission should require that the ESCOs ensure the protection of customer data, confidentiality and cyber security by being in compliance with UBP Section 4 and consistent with the National Institute of Standards and Technology Cyber Security Framework (NTS&TCS) (Tr. 2035-2036, lns. 22-12; Tr. 2188, lns. 9-16) or the applicable cyber security requirements of the North

CASE 15-M-0127, et al.

American Electric Reliability Corporation (NERC) (Tr. 2698-2700, lns. 9-3), as proposed in the UBP, Section 12 (Exh. 724 (SP-11)).

The ninth recommendation is that the Commission should modify the UBP to conform to Staff's recommendations, which are shown on our redlined revisions to the UPB in Exh. 724 (SP-11).  (Tr. 2036, lns. 12-14).

The tenth recommendation is that the Commission should provide for an orderly transition to implement our recommendations, and direct interested parties to file with the Secretary proposals concerning the scope of Track II, and that the Commission issue an Order determining the scope and issues to be addressed in Track II.  (Tr. 2036, lns. 14-20).

The eleventh and final substantive recommendation is that the Commission should not delay or be distracted from implementing these recommendations by the prospect of potential value-added products that the ESCOs may offer to mass market customers until the transitional actions that we recommend have been implemented.  The potential development of appropriate energy-related value-added products should occur later in a collaborative process in Track II, after the detrimental aspects of the current ESCO markets have been eliminated and customers can then make fully informed decisions regarding whether they want ESCO products based on full transparency of pricing for commodity products available to them, untainted by misleading or inappropriate marketing (Tr. 2036-2037, lns. 20-10).[64]

(i)     Defining Residential

Presently, the Commission defines residential customers as those electric customer accounts that are not demand-metered.  (Tr. 2038-2039, lns. 21-1).[65]  The definition of a residential electric customer is clear, and we do not recommend that it be

[64]   The twelfth recommendation is that the Commission adopt findings and ordering clauses consistent with our recommendations in testimony, Exh. 724 (SP-12) and Exh. 725 (SP-13).

[65]   Case 15-M-0127, et al., supra, Order Resetting Retail Energy markets and Establishing Further Process (issued February 23, 2016), at 4, fn 2.

CASE 15-M-0127, et al.

modified.  Residential gas customers (and small commercial gas customers) are defined as those customers whose annual gas consumption is not greater than 750 dekatherms (dth), or equivalent, per year (Tr. 2039, lns. 1-3; Tr. 2043, lns. 1-6).[66]  While staff has some concerns that the 750 dth threshold for small commercial gas customers may be too low, we recommend this definition be maintained for Track I of these proceedings. Staff's concerns with regard to the definition of a gas mass market threshold are discussed below in Section III.C.1.b.(i).

      b.   ESCO's Role in Non-Residential Markets

      (i)   Defining Small Commercial

The mass market includes small commercial customers, as defined above in Section C.1.a.(i).  Therefore, Staff's recommendations in section C.1(a) apply to the mass market small commercial electric and gas customers.  While there are concerns that the threshold of 750 dth for small commercial customers may not be high enough to protect all small commercial customers who are more like residential customers as to their ability and sophistication to understanding the markets and buying gas commodity for contract terms often measured in yearlong increments, at this time we recommend that this issue be addressed in Track II, or that the Commission institute a proceeding limited to investigating the threshold of 750 dth to determine whether it should be increased.

      (ii)   Whether Small Commercial should be included in Mass Market

The Commission should not modify the definition of mass market to exclude small commercial customers.  Small commercial customers who are presently defined by the Commission as part of the mass market are in need of the same consumer protections in the UBP that are afforded to residential customers.  The customer compliant data reveals that many of the complaints received are registered by small commercial electric and gas customers that contend that they were either slammed or subject to inappropriately aggressive and/or deceptive marketing practices.

---

[66]  Id.

CASE 15-M-0127, et al.

In addition, Staff is concerned that the 750 dth and below threshold that presently defines small commercial gas customers is actually set too low, as the threshold likely results in protections not being afforded to smaller commercial customers whose lack of technical expertise places them in the same situation as those at or below the threshold. This endeavor is particularly important because, while the electric commodity market for non-demand commercial customers (small commercial customers) appears to have provided these customers with a small savings (0.1 percent or $940,000) over the 2014 to 2016 period, mass market commercial gas customers paid approximately $137.2 million, or 9.8 percent more between 2014 and 2016 than they would have if they had taken gas commodity from their utility (Tr. 2135, lns. 3-17).

BBPC, LLC d/b/a Great Eastern Energy (GEE) witness Lukas raises two issues in his testimony concerning small commercial customers. First, he proposes that instead of limiting the definition of small commercial gas customer to customers with usage of less than 750 dth, GEE claims that "some link" to the size of a residential customer is a "good proxy" for gas. (Tr. 77-79, lns. 17-12). Lukas states that he researched the issue and that, for lending purposes, banks will grant a residential mortgage on a four-family structure and a commercial loan for a larger building. (Tr. 78-79, lns. 16-3). From this "analysis," which is not presented in the record, GEE claims that its proposal of 500 dth is a reasonable level. (Tr. 79, lns. 6-12).

The Commission should reject Mr. Lukas' "analysis" because his argument is an attempt to convince the Commission to believe that the financial risk associated with small commercial gas customers has some relationship or nexus to residential customers and the sorts of mortgages they might be able to obtain from a bank. This is a red herring, as the important distinction between mass market commercial customers and the larger commercial and industrial customers is not the size of their buildings or the sort of loans a bank might provide to them, but the sophistication of these customers and their ability to navigate the nuances of obtaining gas commodity service at rates that are competitive. The Commission should be concerned with the small commercial

CASE 15-M-0127, et al.

customers' ability to negotiate with ESCOs in an equitable and transparent manner so
that they know and understand the rate that they will be paying for gas commodity after
the introductory rate term expires and whether it is likely to be competitive with the
default utility and other ESCOs.

Lukas' second argument is that small commercial customers must make
decisions on rent, fixtures and other inputs into whatever product or service they are
selling, and therefore, tend to be more sophisticated than the residential customers they
are "lumped" with.  (Tr. 98, lns. 5-9).[67]  Witness Lukas offers no evidence to support his
claims.  The Commission should reject this argument as the question is not how
sophisticated a small commercial customer is compared to a residential customer; the
question is whether the small commercial gas customer has the sophistication to make
informed decisions on commodity purchases that often cover a year or more time frame
and often vary at the whim of the ESCO (unlike rent payments).  The fact is that the
evidence adduced in these proceedings indicates that small commercial gas customers
face the same problems and challenges in the retail energy markets as residential
customers.

Witness Hanger claims that he could find no justification for inclusion of
what he calls the "small business sector"[68] in the Commission's December 2016 Notice
as he could find no justification for the Commission to conclude that the small business
market is not working effectively.  (Tr. 241, lns. 12-16).  Mr. Hanger certainly offers no
proof that the small commercial markets are operating "effectively," he merely offers the
red herring that he could find no evidence in "major orders" indicating that the market
was not working effectively, and describes the Commission's action "an egregious

---

[67]  Witness Hanger makes the very same argument in his testimony, and our criticism of
Mr. Lukas' testimony applies to his as well. (Tr. 242, lns. 3-9).

[68]  It appears that witness Hanger is referring to small commercial customers, which is
the terminology used by the Commission. Case 15-M-0127, et al., supra, Order
Resetting Retail Energy markets and Establishing Further Process (issued February
23, 2016), at 4, fn 2.

CASE 15-M-0127, et al.

example of regulatory over-reach." (Tr. 241-242, lns. 15-2). Mr. Hanger's claims are simply unsupported by the facts and the structure of the retail energy market itself and are in direct conflict with the Commission's longstanding and oft stated concerns for residential and small commercial customers participating in the retail energy markets.[69] The fact is, the December 2016 Notice properly included the small commercial markets in these proceedings as those markets are part of the mass market that the Commission directed be reviewed in these proceedings. The evidence has shown that small commercial ESCO gas customers are paying approximately ten percent more in aggregate than they would pay for their local utility, and this percentage is often significantly higher when looking at ESCO provided gas commodity. (Tr. 2136-2137, lns. 18-14). Mr. Hanger's concerns should be rejected by the Commission, particularly because, as discussed in this brief, Staff has identified that small commercial customers have also experienced many of the same problems experienced by residential customers in the markets.

The Commission should adopt our recommendation to investigate expanding the definition of small commercial gas customer beyond 750 dth of usage to ensure that it is providing appropriate protections to these customers, who are often as misinformed and vulnerable to the ESCOs' marketing practices.

     (iii)   Whether Certain UBP Provisions Should Apply to Small Commercial?

All UBP provisions currently applicable to small commercial electric and gas customers should be continued. There is no basis for limiting their applicability to only residential customers, as the evidence adduced in these proceedings shows that these customers need the protections (Tr. 2135, lns. 3-17; Tr. 2136-2137, lns. 18-20; Tr. 2138-2139, lns. 3-20), and that, in fact, the protections should possibly be expanded to commercial customers with annual gas usage above the 750 dth per year threshold. The

---

[69]  See, February 2014 Order, February 2015 Order, February 2016 Order, December 2016 Order.

CASE 15-M-0127, et al.

Commission should reject any attempt to limit the applicability of the provisions of the UBP to only residential customers.

### 2.   **ESCO's Place in the Competitive Market**
   **(December 2016 Notice Questions 1, 2, 3, 9, and 13)**

a.   Whether ESCOs have "Market Power"

Absent any market power, if an ESCO marks up its price over the prevailing competitive price, then one would expect that ESCO's market share to decline if the ESCO operates within a competitive market. (Tr. 3269, lns. 13-24). In analyzing the competitiveness of the retail commodity markets, both Staff and Direct Energy Services LLC (Direct Energy) relied upon the analytical framework (Tr. 3335, lns. 4-7) laid out in the Harvard Law Review article entitled Market Power in Antitrust Cases, by Richard A. Posner and William M. Landes. (Exh. 69 (JSA-6)). The first sentence of this seminal article defines the term "market power" as the ability of a firm or a group of firms acting jointly to raise prices above the competitive level, without losing so many sales so rapidly that the price increase is unprofitable and must be rescinded. (Id.; Tr. 3334-3335, lns. 21-3). It is as simple as that. Exhibits 701 and 704 show that a significant number of ESCO suppliers have been able to consistently charge residential customers in excess of levels charged by the utilities, and some other lower priced ESCOs, for the entire three-year period covered by the pricing data set Staff entered into the record of this proceeding. (See, Exh. 701 (JSA-1 Confidential); Exh. 704 (JSA-3 Confidential); Tr. 3262, Tr. 4170, Tr. 4177, Tr. 4180, Tr. 4188, Tr. 4194).

Direct Energy, however, attempts to focus the market power question specifically on the elasticity of demand, and notes that the merger guidelines treat low elasticity of demand as a factor that enhances market power. (Tr. 3319, lns. 9-24). Both Staff and Direct Energy agree that a low elasticity of demand would make it more likely that market power could be exercised. (Id.). However, the ESCO parties' attempts to singularly focus the analysis of market power upon the necessarily difficult estimation of price elasticity is a red herring. (Tr. 3336-3337, lns. 24-6). ██████████████

-49-

CASE 15-M-0127, et al.

████████████████████████████████████████████

██████████  ████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████

     To support this view Staff referred to the ability of an ESCO to sustain a significant, small but non-transitory, increase in prices (SSNIP) as a relevant indication of whether ESCOs' have market power.  (Tr. 3318, lns. 1-24; Tr. 3366).  This SSNIP test is outlined in the Department of Justice and Federal Trade Commission Merger Guidelines (Exh. 33).  Price elasticity plays into the ability to sustain a significant, small but non-transitory increase in prices (TR 3318, lns. 22-24).

     Exhibit 704 (JSA-3 Confidential) reveals numerous instances where ESCOs have consistently charged residential customers in excess of levels charged by the utilities and some other ESCOs for the entire three-year period covered by the data provided in response to DPS-Utility 4 (Exh. 701 (JSA-1 Confidential)), without significantly losing market share.  (Tr. 4170, lns. 3-21; Confidential Tr. 3730 lns. 20-23; Tr. 4188 lns. 7–11).  All else equal, these sustained 20 percent plus mark-ups would clearly represent an exercise of market power.  However, is all else really equal?  Could these ESCOs be providing additional value beyond what is attributable to utility default service?  There is no dispute that customers paid more than 20 percent higher prices to take commodity service from these ESCOs.  The real question is whether the customer switching data on actual purchasing decisions by customers (Tr. 4189) is reflective of a reasonable valuation of those services. (Tr. 4190).  In fact, over the three-year time period, 30 percent (226 out of 746) of the ESCOs were billing customers in excess of 20 percent more than what the utility would have billed them for commodity, yet these ESCOs were able to remain in the market all three years.  (Tr. 4177, lns. 1-7).

CASE 15-M-0127, et al.

        It is telling that parties decided to spend more time pointing out alleged anomalies in Staff's analysis of the data provided in Exh. 701 (JSA-1 Confidential), rather than using the data, which is the most comprehensive data set on pricing and purchasing decisions produced in this proceeding and in the record, in trying to prove their case.  Moreover, these parties could have potentially used this rich pricing and customer demand data set, along with their own proprietary data, to show that the charge in excess of the utility's charge is attributable to a value-added service and not rent-seeking behavior, but failed to do so.  (Confidential Tr. 3731-3732, lns. 20-6).

        Although Staff did not have ESCO supplied information on whether the value of differentiated products could reasonably warrant a sustained, 20 percent mark-up in prices, Staff did provide its views on certain added value attributes.  For example, in typical financial markets, a risk premium would range from 3.5 percent to 5.5 percent.  (Tr. 4191, lns. 13-15).  Thus, these 20 percent plus mark ups reflect more than just a hedge against price fluctuations.  In contrast, the Staff Policy panel testified that a NYSEG 100 percent green product contained a green product adder of 2.5 cents per kWh.  (Tr. 2869).  A 2.5 cent per kWh adder would represent more than a 20 percent markup on most commodity rates (e.g. Exh. 65; Exh. 1402).  However, the ESCO, utility, and spot market emission profiles are very similar (Tr. 3260), indicating that, on average, ESCOs are not providing a greener product.  Thus, the 20 percent plus mark ups provided by the conventional ESCOs included in the emissions profiles in Exh. 705 (JSA-4), on average, should not be reflective of the value of a greener product.  Also, the five "Specialty ESCOs," which Exhibit 705 (JSA-4) lists as providing noticeably different fuel shares than the Conventional ESCOS, at most would explain away the number of ESCOs that were billing customers in excess of 20 percent more than what the utility would have billed them for commodity from 226 out of 746 ESCOs to 191 of 746 (assuming that these five ESCOs were active in all six electric utility service areas).

        Direct Energy offers the possibility that consumers may simply consider ESCO services and utility services to be different value propositions.  (Tr. 255-256, lns.

CASE 15-M-0127, et al.

16-16).  In fact, Staff issued information requests to probe that possibility in more depth. (Tr. 3352, 17-25).  Unfortunately, however, Staff could not conclude, due to the lack of information provided by the ESCO parties, that the observed price differences were, or were not, based on how consumers valued those services.  (Tr. 3353-2254, lns. 15–9). The Staff Panel testified that the information they evaluated in Exhibit 704 (JSA-3 Confidential) reflected customers' actual purchasing decisions.  (Tr. 4189, lns. 17-20). The pertinent question, according to Staff, was whether that decision was based on a reasonable valuation.  (Tr. 4190, lns. 7-10).  When asked if utility default service customers are told the basis for this rate, that is, how much of it is based on the spot market, how much is a hedge, how much is included as capacity, how much is electricity, PULP witness Barbara Alexander responded, "No, they are not."  (Tr. 3657).

Staff did ask the ESCOs to provide information on the types of products they offered in the market.  (Tr. 3264, lns. 5-11).  However, there was not enough information in these responses to make a meaningful determination of either product type or the price charged for that product.  (Id.).  Moreover, where there's a significant price difference between the ESCO and the utility, the provider of a value-added service should have the burden of proof regardless of the complexities and difficulties that arise in performing studies to estimate the amounts by which consumers value products.  (Tr. 4195-4197, lns. 9–22).  Either a few individual, large ESCOs, or an association of ESCOs, would have the adequate resources to conduct a study that would identify reasonable amount of value-added by differentiated ESCO products.  (Tr. 4197, lns. 16-20).  Clearly, it was in the ESCOs' best interest not to present such a study.  Instead, witness Morris only argues, offhandedly, that revealed preference, simply by buying something, somehow proves that the price paid was commensurate with the actual value of that product.  (Tr. 555-557, lns. 7-24).  This conclusion, however, completely ignores the fact that, regardless of any "revealed preference," the Commission needs a basis to find that prices charged in the retail mass markets are just and reasonable.  The Commission should not let this deliberate obfuscation by the ESCO parties hinder it in

CASE 15-M-0127, et al.

finding that the differential between ESCO and utility service cannot be supported by the ESCOs' value-added claim; they are simply padding their retained earnings (profit).

RESA witness Makholm even acknowledged that his consulting firm, the National Economic Research Associates (NERA), has performed ordered logit studies to weigh how customers value the attributes of services in the past.  (Tr. 1020, lns. 6-8). However, witness Makholm, somewhat superciliously argues that such a study would not be useful to the record in this proceeding and would leave the ALJs and the Commission with no ability to choose among the parties warring over the arcane econometrics study that would be in front of them.  (Tr. 1019-1022, lns. 6–14).

But in fact, ordered logit analyses have been presented by NERA before the Commission in Case 90-C-0191 regarding the attributes associated with business telecom services.  (Tr. 4196, lns. 7-21).  A few single large ESCOs with adequate resources, or an association of ESCOs with adequate resources could have engaged in such a study for this proceeding.  (Tr. 4196-4197, lns. 22-22).

Direct witness Kagan argues that it is difficult to state that the utilities' default rates were developed by appropriate 'transfer pricing principles.'  (Tr. 254, lns. 6-11).  However, Direct and others who hold this view had the opportunity to cross examine the Staff Rates Panel, witnesses Twergo and Wheeler, with a combined almost 70 years of experience in the energy industry, and sought only to generally attack the methodologies used to arrive at the merchant function charge (MFC), but proposed no solution to what they saw as a glaring problem.  (Tr. 3149-3155).  RESA witness Lacey goes further, stating that utilities are exerting market power by placing all costs in delivery and thus suppressing their commodity prices.  (Tr. 1222, lns. 13-18).  Lacey neglects the fact that the unbundling case was designed to place utilities and ESCOs on an even playing field, and that any disputes as to the components of the MFC are appropriately handled in individual utility rate cases.  (Tr. 3116, lns. 5-15). Moreover, retail competition was implemented, carefully and slowly, with the intent to ensure customer protection, so that customers could realize rates lower than those

CASE 15-M-0127, et al.

currently being provided by utilities, or access to value-added products; and only if that market is effectively competitive.[70]  Witness Kagan affirmatively states that ESCO rates can generate savings (Tr. 183, lns. 5-6) over utility rates, but at no point was he able to demonstrate, using historical data from actual New York customer purchases, that ESCOs do provide value.  Given the resources at Direct's disposal, and given the critical issues raised in this proceeding, it is surprising that Direct's witnesses did not reconcile the charges as shown in Exh. 701 (JSA-1 Confidential) with the charges in Direct's proprietary data set (which was not entered into the record) to show instances where the overcharge was attributed to a value-added service.  It is readily apparent that the ESCO parties are derelict in their duty to defend the reasonableness of their high-priced sales to end-use customers by quantitatively showing that their products met either of these two conditions, nor have they made a showing regarding the Commission's requirement of an effective or workably competitive market.  They have not done so because they cannot make such a showing.

b.   The Functionality of Competitive Markets for Retail Commodity Services

Though parties in this case would like to point out aspects of the market that exhibit the markers of competition, some of which have not been contested in this proceeding (e.g., markets function best when there are a large number of buyers and sellers; Tr. 164), they fail to provide substantive evidence regarding certain issues raised by Staff which point out how certain aspects deviate from what would typically be seen in a competitive market, such as a large number of ESCOs charging well in excess of the utilities and other ESCOs over the entire 2014 to 2016 time period.  (Tr. 3264; Tr. 4195-4197).  Furthermore, the ESCOs attempt to muddy the record by making analogies to other markets without laying a foundation as to how and why these two markets are similar.  (Tr. 2722-2729).

The testimony of the Staff Economics Panel reveals that a number of market characteristics in the retail access market are counter to what would be expected

---

[70]  Opinion 96-12 at 12-15.

CASE 15-M-0127, et al.

in a workably competitive market.  (Tr. 3278, lns. 3-6).  These unfavorable characteristics include (1) the ability of many ESCOs to charge significantly in excess of competitive price levels without losing market share, (2) the lack of price transparency, (3) high market concentration indices (HHIs), (4) the limited degree of ESCOs exiting the market, and (5) the lack of differentiating products and pricing strategies beyond what is currently available under utility default supply.  (Tr. 3278, lns. 6-15).  Whether these unfavorable characteristics are present in what the Commission intended to be a reasonably competitive retail markets was the key question raised in the February 25, 2014 Order.[71] Thus, we will discuss what the record shows for each of these market characteristics.

Regarding the ability of many ESCOs to charge significantly more than competitive price levels without losing market share (Tr. 3264; Tr. 4195–4197), markets for retail commodity services are not functioning as expected, and prices for many ESCOs reflect the exercise of market power.  (Tr. 4181, lns. 4-8; Tr. 3302 – 3303, lns. 24-17).  As indicated in Exh. 704 (JSA-3 Confidential), a significant number of ESCOs have been able to consistently charge residential customers in excess of levels charged by the utilities and some other ESCOs for the entire three-year period covered by the data provided in response to DPS-Utility 4 (Exh. 701 (JSA-1 Confidential)).  Large differences in prices do not appear to be the primary factor behind ESCOs remaining in or exiting the market.  (Tr. 4176-4177, lns. 14-19).  The competitive forces in the mass markets have failed, and retail commodity markets are not price competitive.  (See, Tr. 4180-4182).

Witness Kagan suggests the retail markets are workably competitive and even contestable.[72]  (Tr. 168-169, lns. 15–5).  However, Staff proved that there are other considerations that must hold true for a market to be perfectly contestable, and that, in

---

[71]  See, February 2014 Order.

[72]  A contestable market is a market in which there are no barriers to entry or exit, and thus the threat of entry by competitors is sufficient to maintain the price discipline associated with perfect competition regardless of the number of competitors.  (Tr. 4163, lns. 18-24, citing Direct Energy witness Kagan at Tr. 168).

CASE 15-M-0127, et al.

fact, the existence of high mark-ups over the utility charge has not resulted in competitive entrants which undercut those high prices, to take over considerable market share – however, we simply see no evidence of this happening.  (Tr. 4163-4168).

   Regarding the lack of price transparency, while some parties wish to focus on the perceived lack of transparency of the utility price, they conveniently ignore that the Commission exercises regulatory oversight over utility commodity pricing.  (Tr. 3402, lns. 10-15).  One of the threshold questions the Commission seeks to answer to in Track I is whether or not ESCOs have consistently offered lower prices than the incumbent utility on an annual basis, and whether offering lower prices could be done profitably.[73]  The evidence shows that, in very few instances ESCOs have been able to maintain a lower price, on an annual basis, than the utility (JSA-3), but that Staff was unable to determine whether the ESCOs were profitable.[74]  (Tr. 2172, lns. 14-16).  In fact, witness Cook would refer that the Commission design utility rates to make ESCOs more competitive.  (Tr. 644, lns. 1-6).  Witness Cook is arguing that the regulated utility commodity rate is simply too efficient and the only innovative solution ESCOs can come up with for competing is raising the utility rate.  Utility rates are efficient, and they are set by the Commission to be collected in a manner, including out-of-period adjustments, that is best for customers.  If ESCOs are to be a valuable and viable alternative, they must provide even more value than the incumbent utility, something they have not been doing. If they cannot provide such value, it is not in the public interest to continue retail access for mass market customers.

   Regarding high market concentration indices, the February 2014 Order in these proceedings mentioned the relationship between market concentration and market competitiveness.[75]  (Tr. 3244).  Staff presented in initial testimony an analysis based on

---

[73] December 2016 Notice at 3-4.

[74] However, one can make the assumption that if the ESCO remained in business, it must have been profitable.

[75] February 2014 Order at 10.

CASE 15-M-0127, et al.

the Department of Justice/ Federal Trade Commission (DoJ/FTC) Horizontal Merger
Guidelines' Herfindahl-Hirschman Indices (HHIs) that is used by economists as a
screening tool to analyze the potential for anti-competitive behavior in a market.  (See,
Tr. 3247, Tr. 3313, Tr. 3315, Tr. 3316).  No other party calculated market HHIs in their
initial testimony, although Kagan spoke of them in general terms.  (Tr. 165).  Staff, in
contrast, presented HHIs in two ways.  The Staff Economics Panel first calculated the
HHIs including the kWh's, ccf's, or therms that each supplier and the incumbent utility
sells to retail customers, and then subsequently removed the sales from the incumbent
utility and calculated the HHIs based solely on the sales made by ESCOs.  (Tr. 3249;
Exh. 702 (JSA-2)).  Given the market share impact of the incumbent utility in the "with"
calculations, and since the change in the HHIs from the "with" to "without" calculations
reflect that the incumbent utilities have the majority share of these retail markets, Staff
concluded that the utilities retain the dominant share in these markets, and that continued
regulation in these markets is warranted.  (Tr. 3249).

Witness Kagan also notes that the Commission has stated that the large
C&I market is workably competitive[76] (HHI 2083) and, thus, a lower HHI for residential
market means it is also workably competitive.  (Tr. 184, lns. 9-15).  However, Kagan
fails to follow his own recommended methodology of consolidating ESCOs' market
shares for those ESCOs under one parent company and recalculate those HHIs.  (Tr. 220,
lns. 7-19).  If he did, this would result in increases to the HHI indices, undercutting his
flawed argument regarding competitiveness of the market.   Moreover, Kagan ignores the
fact that there is no one single measure that would point to a workably or non-workably
competitive market, and market concentration is just one factor to be considered.  In fact,
economists use the HHI as a screening tool. (Tr. 3247).  HHIs are not the be all, end all of
market power examinations. (Tr. 3253, lns. 16-17).

---

[76]  Staff has not conducted an analysis as to whether the large C&I market is actually
workably competitive.

CASE 15-M-0127, et al.

        With respect to the limited number of ESCOs exiting the market, large differences in prices do not appear to be the dominant factor behind ESCOs remaining in or exiting the market. (Tr. 4176-4177, lns. 14–19). Staff has shown that since 2010, the retail energy market migration has not significantly changed in either size or product offerings (Tr. 2157, lns. 1-3). In addition, Exhibit 703 (JSA-3) shows evidence that many ESCOs have entered the market within the period of 2014-2016, have continued to sustain prices above the utility price, and have not lost significant market share. For customers who do switch, Staff has shown evidence that customers are, in fact, switching back to the utility. (Exh. 726 (SEP-1)). In other words, competition is primarily between the utility and the ESCO, not between ESCOs, as should be expected. Customers appear to be willing to take a chance on an ESCO initially, but it is more likely that they return to utility service when they find the utility price to be better, instead of switching to another ESCO.

        Regarding the lack of differentiating products and pricing strategies beyond what is currently available under utility default supply, Staff engaged in a lengthy discovery process with the intent of developing the record on the types of products offered in the market. Unfortunately, there was not enough information in the ESCO's responses to make a meaningful determination of either product type (e.g., fixed rate product, variable rate product, green product) or the price charged for that product. (Tr. 3264, lns. 5-11). Absent responsive information from the ESCOs, Staff made its own attempt at distinguishing between fixed and variable rate products, and found that some Con Edison small commercial electric customers from 2014-2016, Central Hudson small commercial electric customers in 2014, and Orange & Rockland low-income electric customers in 2014 showed instances of savings over the utility. Almost all other ESCO customers in those three service territories showed charges above those of the utility, as an absolute value and percent difference, for both fixed and variable rate products. This suggests that in most all instances, for mass market customers, there has been no clear

CASE 15-M-0127, et al.

price benefit to either a fixed or variable ESCO rate over a default utility rate for the 2014-2016 period.  (Tr. 3264–3269, Exh. 706 (JSA-5)).

      c.      ESCOs' Impact on Commodity Prices: Rates in the Fully Regulated Market

        ESCO parties manipulate EIA data to manufacture a claim that ESCO participation in the New York energy market has, over the last decade and half, saved New Yorkers over $10 billion.  (Tr. 676–678, no line numbers in this testimony).  According to these parties, by eliminating the utilities' monopoly on energy supply, and introducing competition into the marketplace, ESCOs have lowered energy costs for all New Yorkers, and put billions of dollars back into customers' pockets.  (Id.).  However, this is not the case.  (Tr. 3895-3898).  In fact, witness Yates shows that the $10 billion Dr. Cicchetti claims has been saved by "New Yorkers" was actually the difference between the $1.5 billion of extra cost burden incurred by residential customers, offset by $11.5 billion of savings to C&I ESCO customers.  (Tr. 3895, lns. 16-18).  Therefore, taken as a whole, Dr. Cicchetti's EIA data shows that ESCO participation in the mass market, the relevant customer segment for evaluation in these proceedings, does not result in net positive value for its customers.  (Tr. 3895, lns. 19-21).

        Moreover, NEM and RESA attempt to use EIA data to argue that since 2012, ESCOs actually have been selling more MWhs than the incumbent utilities.  (Tr. 698, no line numbers in this testimony).  However, NEM relied on all customer categories reported in the EIA dataset even though the focus of this proceeding is on mass market customers.  (Tr. 4173, lns. 4-7).  In contrast, the market shares for the subset of residential mass market customers shown in Exh. 726 (SEP-1) show the opposite.  Notable is that in all instances except one (Con Edison electric), the incumbent utility's usage share of the residential market increased from 2014 to 2016.  (Tr. 4174, lns. 5-7; Exh. 726 (SEP-1)).  Additionally, in all instances, with the exception of O&R gas and electric, the incumbent utility market shares were above 70 percent for 2014 through 2016.  (Tr. 4173, lns. 10-16).

CASE 15-M-0127, et al.

These increases in utility default service market share are completely at odds with the decreases in utility markets share envisioned when residential markets were opened to retail competition.[77]  More incredulous are RESA's references to Dr. Alfred E. Kahn's advocacy of "the benefit of 'letting go' in markets where competition, even if sometimes with unpredictable results, was a better avenue to pursue than regulation." (Tr. 887).  The market share increases of the incumbent utilities occurring in the retail electricity and gas markets for residential customers over the 2014 to 2016 time period are simply not consistent with the dramatic decreases in incumbent utility market shares that were evident at the time parties were arguing for a relaxation of regulatory constraints on New York's telecommunications markets.  (Tr. 4173, lns. 17-24; Exh. 726 (SEP-1)).

The rate at which competitive forces impact pricing behaviors is important. (Tr. 4178-4179, lns. 21–12).  Even assuming that market forces alone could bring commodity rates for all customers down to competitive levels multiple years into the future, it would be problematic if the Commission were to waive its pricing oversight on rate levels in the present.  (Tr. 4179, 8-12).  Moreover, the record in this proceeding indicates that any competitive forces currently at work in the retail access market quite often take years to have a constraining impact on prices.  (Tr. 4180, lns. 6-16).  Competitive forces have had over two decades to have a constraining impact on prices; time is up.  Exhibit 704 (JSA-3 Confidential) shows that a significant number of ESCO suppliers have been able to consistently charge residential customers in excess of levels charged by the utilities, and some other lower priced ESCOs, for the entire three-year period covered by the pricing data set in the record of this proceeding.  (Tr. 4180, 10-16; Exh. 701 (JSA-1 Confidential)).

The Commission did not envision a workably competitive market as one in which a significant number of ESCOs were charging 20 percent plus markups without being forced out of the market.  Also, indicative of the competitive failure of the ESCOs

---

[77]  Opinion 96-12, at 26; Opinion 97-5, at 5.

CASE 15-M-0127, et al.

is that, overall, instead of switching away from high priced ESCO offerings to lower-priced ESCO offerings, consumers were moving away from competition in general by moving back to, and increasing the market share of, utility default service.  (Tr. 4172, lns. 19-23).

       Witness Kagan also suggests that ESCOs have beneficial impact on retail commodity markets via the role that ESCOs play in facilitating wholesale competition.  (Tr. 162, lns. 7-13).  We categorically refute this assertion.  Witness Kagan gives no quantitative support for this assertion.  In fact, Exh. 705 (JSA-4) shows that the great majority of ESCOs are not involved in long term supply agreements with generators, and no party has presented evidence to the contrary, such as redacted or confidential long-term agreements with generators.  Witness Makholm, in addition, confirms that wholesale markets drive down costs, and stated affirmatively that ESCOs do not own any generation (Tr. 764-765, lns. 15-12).  Furthermore, the Commission requires real-time pricing (mandatory hourly pricing) for large, interval metered utility customers in excess of 2MW.[78]  There, the Commission appropriately isolated these customers, as "targeting the largest customers could yield the level of demand response and load reductions advocated by the NYISO and Con Edison/O&R as being necessary to mitigate wholesale price spikes effectively."[79]

       No ESCO presented evidence that they are uniquely situated to reduce wholesale market coincident peak through their various pricing schemes, or that their energy management services are economical for mass market customers to reduce wholesale market coincident peak or affect the bids by merchant generators.  In fact, the Impacted ESCO Coalition stated affirmatively that they only have demand response

---

[78]  Case 03-E-0641, Proceeding on Motion of the Commission Regarding Expedited Implementation of Mandatory Hourly Pricing for Commodity Service, Expedited Implementation of Mandatory Hourly Pricing for Commodity Service, Order Instituting Further Proceedings and Requiring the Filing of Draft Tariffs. (issued September 23, 2005).

[79]  Id. at 14.

CASE 15-M-0127, et al.

products aimed at NYISO peak period for large C&I customers, and none for residential customers.  (Tr. 4043-4044, lns. 6–13).

Thus, the evidence in the record highlights several characteristics which indicate that the retail energy market for residential mass market customers is not workably competitive.  Namely, many ESCOs are able to charge prices in excess of the utilities, and other lower priced ESCOs, without losing significant market share.  Additionally, the high HHI indices suggest a concentrated retail market.  Moreover, the similarity of the emissions profiles indicates that, on average, the ESCOs offers few distinguishable and innovative green products from those currently offered by the utility.  Finally, the lack of price transparency in both product attributes and relative pricing likely enhanced many ESCO's ability to sustain high prices.  The evidentiary phase of these proceedings was not commenced to base conclusions about market competitiveness on what the ESCOs would have us believe -- that when customers buy a product it is unquestionably worth that amount.  The ESCOs should have the burden of proof, and should not be allowed to argue that ESCOs have no role in quantitively defending the value of their products.  Taken in sum, not as isolated market characteristics, the evidence presented by the non-ESCO parties constitutes a strong indication that the market is not workably competitive, and the Commission's continued oversight and focus on customer protections is warranted.

3.    **Future Product Offerings**

   **(December 2016 Notice Questions 1, 2, 3, 16, and 20)**

As explained in Section III.C.1., the utilities should be ordered, and tariffs should be filed, to prohibit the ESCOs' use of the utilities' systems to provide their commodity service, except where: (1) the products offer a guaranteed savings to mass market customers or, in the instance of low-income customers that take commodity service only from Commission approved ESCOs, to provide commodity service at a cost that is no greater than the default utility; (2) the ESCO provides 100 percent electricity generated from 100 percent renewable sources, as defined in and subject to the

CASE 15-M-0127, et al.

environmental attributes and delivery rules of the Commission's EDP; or, (3) the ESCO is engaged in customer aggregation using either the CCA model or the NFP model (Tr. 2033, 2092). Thus, Staff recommends that the Commission determine the following:

    a.    <u>Variable-Rate, Commodity-Only Products</u>

As previously stated, the Commission should prohibit the ESCOs from using the utilities' distribution systems to provide any sort of variable-rate commodity-only products unless the ESCO guarantees that it will charge less, or no more, than the applicable utility's default commodity service on an annual basis. (Tr. 2033, lns. 1-14).

Witness Lukas proposes that variable rates be continued in the mass markets, but that benchmarks be used to establish a reference price for commodity service as a means of preventing "potential" ESCO overcharges. (Tr. 50-51, lns. 5-6). Mr. Lukas makes a number of proposals on how to benchmark gas and electric commodity prices (Tr. 62-63, lns. 1-11); however, these complicated calculations will not provide market clarity and transparency, but could confuse consumers even further, and thus should be rejected by the Commission. The clearest way to ensure that mass market customers are not overcharged for commodity is to require that the utility price be shown in a side-by-side comparison on the customer's bill, and that the ESCOs guarantee that they will charge less, or no more, than the utility default service.

Claiming that restricting variable rate products is a draconian and harmful step, witness Hanger proposes "reform" options, including requiring ESCOs to disclose variable rate product prices at the beginning of each applicable month, establishing "guardrails" to limit how much an ESCO variable rate product can increase each month, banning the sale to low-income customers, or prohibiting their sale to residential customers. (Tr. 259, lns. 7-20). After initially stating that his preference is to not intervene in any manner in ESCO pricing, he proposes, in the alternative, guardrails for a trial period and with a starting point of 30 percent increase from month-to-month, that would limit how much a variable rate could increase in any one month. (Tr. 260, lns. 2-5).

CASE 15-M-0127, et al.

   The proposals offered by Mr. Hanger should be rejected as inferior to Staff's recommendation on limiting such pricing to less than or equal to the utility's price.  Publishing the monthly price the month before it applies does not allow the customer to shop for the best commodity price; it only provides a "heads-up" as to what the commodity price will be next month.  The guardrails proposed would allow prices to only increase by 30 percent from month-to-month, which is hardly a benefit to customers who are already paying exorbitant rates as compared to what they would have paid had they remained with the utility.  We do agree, however, and the Commission already requires, that low-income customers are guaranteed savings over the default utility service.  We also agree with Mr. Hanger that prohibiting the sale of variable rate products is a logical reform to the mass markets.  That is why the Commission should determine that ESCOs are prohibited from using the utilities' systems to sell their variable products unless they guarantee that mass market customers will not be charged more than they would have been charged for default utility service.

   Witness Lacey describes at length a number of measures that other states have implemented regarding variable rates.  (Tr. 1187-1192).  Mr. Lacey does not suggest that the Commission adopt any specific set of rules adopted in other states, but recommends that the Commission have the stakeholders address these potential solutions in a collaborative to explore these solutions.  (Tr. 1192-1193, lns. 13-7).  The time for stalling and stone walling by the ESCOs is over.  The Commission should reject this suggestion and adopt Staff's recommendation to cap variable rate products at no more than what the utility would have charged.

   b. <u>Fixed-Price Products</u>

   The Commission should prohibit the distribution utilities from providing ESCOs access to their systems to provide fixed-price commodity products to mass market customers (Tr. 2132) unless the product can be structured so that they provide a guaranteed savings when measured against the default utility on an annual basis.  (Tr. 2132, lns. 7-14).  The rationale for this recommendation is the generally significant

CASE 15-M-0127, et al.

premiums charged for fixed-price products – as evidenced by the data provided by the utilities in response to Staff IR DPS-Utility 5 – and the failure of ESCOs to quantify the "value" attributed to their fixed-price products in response to Staff IR DPS-ESCO 2. (Exh. 709 (SP-1); Exh. 710 (SP-1a); Exh. 711 (SP-1a Confidential)).  In addition, the utilities' budget billing process offers many of the same benefits as fixing the commodity price and does not impose any premium on the customer.  (Tr. 2131, lns. 15-21).  Fixed rate products stabilize only one of the four inputs to customers' bills.  (Tr. 2209, lns. 2-11).

Witness Lukas proposes that fixed-price products be continued in the mass markets, but that a "market price comparison" be used to benchmark commodity service as a means of identifying ESCOs that are "unjustifiably" taking advantage of mass market customers.  (Tr. 58, lns. 3-6).  Lukas suggests that this market price comparison would use the average of ESCO charges, as published in the Commission's Price to Compare website, for the commodity markets and set an upper bound of reasonableness above those average gas and electric commodity prices.  (Id.).  However, these complicated calculations will not provide market clarity and transparency, but could further confuse consumers, and should be rejected by the Commission.  The most clear and simple way to ensure that mass market customers are not overcharged for commodity is to require that the ESCOs guarantee that, on an annual basis, they will charge less, or no more, than the utility default service.  In the alternative, Lukas offers an "index based" benchmark similar to that discussed in his variable rate product proposal, and contained in a May 4, 2016 Staff Whitepaper (2016 Whitepaper), to monitor fixed prices.  (Tr. 59, lns. 12-17).  It should be noted that in his rebuttal testimony, Mr. Lukas criticizes Staff for not following the approach in the 2016 Whitepaper, noting the statement that fixed prices could provide value to customers.  (Tr. 90, lns. 4-8).  He claims that a fixed price offers value because the customer knows he or she will not pay more than the fixed price despite increased commodity prices.  (Tr. 90, lns. 15-16).  Staff's 2016 Whitepaper was

CASE 15-M-0127, et al.

simply a proposal for offered for comment and was never adopted, and the Commission should place no weight on the document since Track I is a litigated proceeding.

Direct Energy witnesses Kagan, Sharfman, and Cicchetti agree with Mr. Lukas, and make the statement that ESCOs offering a fixed-price product provide "clear" value for customers, allowing them to budget their energy costs. (Tr. 161, lns. 14-15; Tr. 355, lns. 11-13; Tr. 725, no line numbers in this testimony). Witness Kagan also argues that eliminating fixed prices for small business customers is a concern because he claims, without supporting evidence, that these customers rely on fixed-price offerings to manage their energy expense within their budgets. (Tr. 242, lns. 15-17). Witness Hanger also argues that fixed prices offer a benefit to customers, and that Staff's proposal would result in the termination of hundreds of thousands of current fixed-price contracts and prevent future customers from electing to take such products. (Tr. 295, lns. 294-298(sic)).

RESA witness Lacey views the "ESCO of the future" as one that provides innovative products that customers want, such as fixed-price commodity as customers often seek protection or "insurance" on their commodity prices, and that should be allowed in the markets going forward. (Tr. 1142, lns. 7-10; Tr. 1176, lns. 10-14). He believes that customers should be allowed to place the price risk on their ESCO(s). (Tr. 1256, lns. 4-5). In responding to Staff, Mr. Lacey opined that Staff's opinion of what constitutes a benefit does not matter; only the customer's opinion as to the "value" of that benefit matters. (Tr. 1275, lns. 5-6). Witness Lacey's final argument is that the budget billing offered by the utilities is not the same as a fixed-price product (Tr. 1275, lns. 13-14), noting that the ESCO fixed-price product does not use intra-period price adjustments or a true-up at the end of the year. (Tr. 1275, lns. 11-13).

The Commission should reject the arguments of the ESCO witnesses because the evidence in the record shows that the significant premium demanded by most ESCOs offering fixed-price products is a tremendous expense to the customer, and only fixes one input to the amount billed to the customer. Thus, the "insurance" price is too high, and most rational customers, presented with the facts in a transparent manner,

-66-

CASE 15-M-0127, et al.

would see this.  The mass markets, however, are not transparent and customers are not provided sufficient information by the ESCOs to determine if the product actually provides them "value."  If there is no way to analyze a fixed-price offering, then the customer cannot make a rational choice, and they are making a choice based on marketing tactics by the ESCO or, perhaps, fear.  Thus, the ESCOs' basic argument here is that customers should be left to their own decision-making process, whether or not they have any information or transparency as to the commodity markets or the premium charged by the ESCO.  It is simply a "buyer beware" mentality that the ESCOs have, and the Commission should step in and protect customers by ensuring just and reasonable rates.  The ESCOs' argument also completely ignores the fact that the Commission needs to be able to determine whether the rate is just and reasonable.  Therefore, the Commission should adopt Staff's recommendation on fixed prices to protect mass market customers.

       c.     Renewable Energy Products

       As discussed above in section III.C.3.a., the Commission should determine that the only renewable energy products ESCOs may offer to mass market customers, excluding low-income customers, is a 100 percent renewable resource energy product provided over the calendar year and generated from renewable resources.  (Tr. 2040, lns. 4-8).  This recommendation modifies the requirement the Commission intended to establish in the Reset Order,[80] that ESCOs provide to their customers "green products" that are comprised of at least 30 percent renewable energy.  (Tr. 2086).  The renewable energy may be generated by biomass, biogas, hydropower, solar, or wind as defined in

---

[80]  Case 15-M-0127, et al., supra, Order Resetting Retail Energy Markets and Establishing Further Process (issued February 23, 2016)(Reset Order) at 14-16.

CASE 15-M-0127, et al.

and subject to the Commission's environmental attributes and delivery rules contained in the EDP.[81]  (Tr. 2086-2087, lns. 14-5).[82]

A large percentage of the electric commodity that customers purchase from the utilities is generated from renewable resources.  The utility-provided renewable resources come from utility-owned and contracted facilities, from renewable energy credits (RECs) (coupled with conversion transactions) utilities purchase for their customers to comply with the old Renewable Portfolio Standard (RPS) and the new Renewable Energy Standard (RES) mandates, and additional residual renewable resources blended into the New York Spot Market purchased that utilities make.  As a result, the Environmental Disclosure Labels on the Commission's website disclose that as of 2015 the utilities were currently satisfying between 11 percent and 28 percent of their electric load with power generated from renewable resources.  Those utility-provided resources are and will ratchet upward each year through 2030 due to the RES mandates.  On the other hand, the Environmental Disclosure Labels on the Commission's website disclose that as of 2015 the ESCOs were providing very in the way of renewable resources other that what they were obtaining through the residual mix of the New York Spot Market where most ESCOs obtain virtually all of the power.  The Environmental Disclosure Labels show the fuel sources and air emissions used to generate the electricity commodity provided by each ESCO in New York on a portfolio basis.[83]  The Environmental Disclosure Label of Direct Energy is typical of the fuel source mix provided by ESCOs in New York and, in fact, only two ESCO vary significantly from

---

[81]  Under the EDP, energy labels are based on the environmental attributes of the energy purchased by the load serving entity (LSE) and are not affected by the separate purchase of Renewable Energy Certificates (RECs).

[82]  Case 15-E-0696, Environmental Disclosure Labeling Program, Notice Instituting Proceeding and Soliciting Comments on Environmental Disclosure Labeling Program (issued December 10, 2015).

[83]  Environmental Disclosure Labels for every ESCO operating in New York can be found on the Department's website at: https://nygats.ny.gov/ng/Report/getdto_view_Report_PublicEDPLabel.

CASE 15-M-0127, et al.

that mix.[84]  (Exh. 1301).  The Direct Energy label shows a virtually identical fuel mix to that of the label for the New York Spot Market.  The claim that at least a portion of the significant delta between ESCO and utility charges is explained by ESCOs offering renewable energy is disingenuous at best.  ESCOs may be charging a premium for green energy, but they are not actually providing a significant amount of added renewable energy to customers in New York.

Any market for voluntary purchases of additional renewable resources should not allow customers to pay voluntary premiums for renewable resources that ESCOs or utilities are already mandated to deliver, or for resources that an ESCO received by chance in the residual mix of the New York Spot Market.  Such purchases do not add value.  In addition, any market for voluntary purchases of additional renewable resources should not allow customers to pay voluntary premiums for renewable resources at a level that is below what the customer could have received without a premium from the utility company.  If there is to be voluntary purchases of additional renewable resources, they should provide obvious added value.  Staff recommends that the best way to do that is to require a 100% renewable resource product which will ensure that the value will be above what is already mandated through 2030.

Additionally, any argument that these labels do not reflect the actual products offered because they are reported on a total ESCO portfolio basis is misplaced.  The fuel mixes of electricity purchased on the spot market cannot be disaggregated, meaning that an ESCO cannot "divert" the renewable portion of the spot market electricity to some customers, while serving other customers with the electricity

---

[84]   See Environmental Disclosure Labels at
        https://nygats.ny.gov/ng/Report/getdto_view_Report_PublicEDPLabel.

CASE 15-M-0127, et al.

generated by non-renewable sources.[85]  An Environmental Disclosure label that nearly matches the spot market mix evidences that the ESCO is providing all its customers with the same level of renewables, without any bilateral agreements with renewable generators or conversion transactions, which would be reflected in the label.  Thus, in almost every instance, a customer who switches from the utility to an ESCO is likely to receive the same or less renewable energy than they were receiving from the utility, even if they are sold a "green" commodity product.

GEE's witness argues that meeting our recommendation regarding 100 percent renewable energy is unreasonable because, he claims, without offering any analysis, that GEE has difficulty selling renewable products at a minor premium and that GEE's "electric desk" determined that the level at which it would have to price such a product would be too high and not attractive to customers.  (Tr. 97, lns. 8-12).  Yet, Direct witness Hanger sees no such problem and states that ESCOs can provide 100 percent renewable energy to their customers.  (Tr. 256, lns. 2-3).  Messrs. Hanger, Sharfman, and Lacey state in their rebuttal that Staff's proposal is radical and draconian. (Tr. 304, lns. 4-6; Tr. 419; Tr. 1269-1270).  Witness Hanger and Sharfman also claim, without offering any analysis, that a 50 percent product "could" meet the states 50 percent renewable goal by 2030, before the 2050 deadline. (Tr. 309, lns. 94-98(sic); Tr. 419).  Witness Lacey also asks that the Commission reject the proposed requirement that 100 percent renewable energy products comply with the New York environmental disclosure label program. (Tr. 1269-1270, lns. 18-8).

---

[85]  Case 94-E-0952, In the Matter of Competitive Opportunities Regarding Electric Service, filed in C 93-M-0229, Opinion NO. 98-19, Opinion and Order Adopting Environmental Disclosure Requirements and Establishing A Tracking Mechanism, Appendix page 1 of 12 (issued December 15, 1998); "An LSE can disaggregate its generation sources into separate products with different environmental characteristics, provide disclosure by product, and sell the products to different customers. However, disaggregation of the environmental characteristics of spot market purchases, except those that are otherwise subject to conversion transactions (further described below), is not permitted."

CASE 15-M-0127, et al.

        The Commission should reject these arguments as they fail to acknowledge that the 100 percent requirement is the exception to our overarching position that ESCOs should be providing value to their customers by guaranteeing that they will save money over the year when compared to the default utility service or by providing them with 100 percent renewable energy at an uncapped cost. However, should a ESCO create a "green" product with something less than 100 percent renewable energy, but is also willing to guarantee that customers will not pay more than the default utility rate over a year, then that product could be allowed. In fact, one ESCO is currently serving customers with a 100 percent green product that also guarantees that the customer will pay no more than if the customer was a full-service utility customer.[86] Finally, the recommendation that the ESCOs comply with the New York Environmental Disclosure Label program is to ensure that New York obtains the benefits of renewable generation. When an ESCO commits to sell a customer a renewable product, the Commission should ensure that the renewable energy is actually delivered in New York, and is not just a paper transaction that cannot be verified. Thus, the Commission should determine that the only renewable energy products ESCOs may offer to mass market customers, excluding low-income customers, is a 100 percent renewable resource energy product provided over the calendar year and generated from renewable resources.

        d.    Value-Added or Bundled Products

        Regarding energy-related value-added and "bundled products," the prospect of potential "value-added" products that the ESCOs could or do offer to mass market customers should not be considered until after the recommended transition to the new retail access mass markets has been implemented by the Commission. (Tr. 2036-2037, lns. 20-2). After the detrimental aspects of the current ESCO products and marketing activities are eliminated, the potential development of value-added products should then occur in the collaborative process contemplated in Track II. (Tr. 2037, lns. 2-10). At this

---

[86]  Case 12-M-0476, et al., supra, Order Approving Waiver and Authorizing Utility Expense Reduction, LLC to Serve Low-Income Customers (issued December 14, 1027).

CASE 15-M-0127, et al.

time, the only "value-added" products that may justify a modest premium over default utility pricing are 100 percent renewable energy products (Section c., above).

The ESCOs view any commodity product they offer as value-added simply because customers "value" them.  (See, Tr. 46, lns. 3-4; Tr. 187, lns. 1-7; Tr. 291, lns. 210-213(sic); Tr. 364, lns. 2-3).  What the ESCOs mean by this is that the effort to quantify these value-added products by the Commission is misplaced, that the Commission should simply accept that customers ascribe some value to these products and leave it at that, with no analysis.  In the ESCOs' view, it does not matter whether the Commission finds the value of value-added products reasonable; it's whether the customer does.  Yet, if these value-added products were actually providing real economic benefit to customers, the ESCOs would have quantified it and touted it in their testimony.  Claiming that only the customers should decide, in a market that lacks transparency, whether they are receiving value is akin to arguing that "buyer should beware."   The Commission must ensure that customers rates for commodity service are just and reasonable.  This is precisely why the Commission should, for Track I, set aside and not consider value-added products or services at this time.  First, the Commission must address and correct the pricing, transparency, and marketing of ESCOs.  After that is done, and the mass markets have transitioned as recommended by Staff, then the Commission should consider potential energy-related value-added services and the pricing of such products.

    e.    CCA Products

At the onset, it is important to note that CCA is still in its infancy and further evaluation is needed to determine whether or not CCA programs are providing real value to customers.  However, one of the primary differences between a CCA and a traditional ESCO offering is the fact that a CCA utilizes an independent expert or aggregator that works with the municipality to arrange favorable terms in ways that

CASE 15-M-0127, et al.

individual customers have not been able to do.[87]  The evidence in these proceedings shows that the aggregation of mass market customers could provide economic benefits to such customers, and that ESCOs could address the commodity energy needs of such customers with a significantly improved pricing performance.  (Tr. 2145, lns. 18-23).  This is supported by the review of bill data from the Sustainable Westchester Community Choice Aggregation (SW CCA) provided by Con Edison and NYSEG, contained in Exh. 709 (SP-1), Exh. 711 (SP-1a Confidential), and summarized in Exh. 722 (SP-9).  (Tr. 2145-2146, lns. 18-5).  This data indicates that in the aggregate, from May 2016 (the start of the program) to the end of that calendar year, certain electric customers participating in the SW CCA in the NYSEG service area saved approximately eight percent on their total bill compared to what NYSEG would have charged for the bundled commodity and delivery service.  (Tr. 2146-2147, lns. 6-19).  In Con Edison's service territory, the SW CCA customers, who appear to have a more typical electric usage patterns and no electric heat, saved approximately 5.3 percent compared to what they would have paid for bundled service from Con Edison.  (Tr. 2147-2148, lns. 20-2).

While, of course, data for more than just the eight months from the SW CAA program would be preferable, the data suggests that aggregating enough mass market customers with a CCA administrator can save customers on their commodity service.  (Tr. 2148-2149, lns. 5-5).  Similarly, the Not For Profit (NFP) model offers some promise as our review of the NFP data indicates that mass market customers of some NFP ESCOs were able to provide commodity at a lower price than NFG over the 2016 calendar year.  (Tr. 2149-2150, lns. 9-11).

Therefore, the rules should be changed to prohibit ESCOs from providing commodity service to aggregated mass market customers directly.  Instead, the CCA must utilize a professional energy buyer independent of the ESCO and acting in a

---

[87]  Case 14-M-0224, Proceeding on Motion of the Commission to Enable Community Choice Aggregation Programs, Order Authorizing Framework for Community Choice Aggregation Opt-Out Program, at 2 (issued April 21, 2016)(CCA Framework Order).

CASE 15-M-0127, et al.

fiduciary capacity (Tr. 2033, lns. 14-24), or a NFP model where the ESCO is a bonafide not-for-profit corporation or municipal entity.  (Tr. 2033-2034, lns. 24-3).

RESA witness Lacey argues that aggregators should be free to offer whatever product is best for a particular community (Tr. 1278, lns. 17-18), nor should they be limited in any way as to the price and products they offer.  (Tr. 1278-1279, lns. 18-2).  Witness Lacey also is concerned about limiting CCA to those facilitated through a NFP, municipality, or fiduciary buyer, since he claims, without any evidence, that they might not be viable business options for some entities.  (Tr. 1279, lns. 4-7).  Mr. Lacey believes that traditional ESCOs should not be prohibited from this market as excluding them will lead to potentially stifling innovative products, and he claims that ESCOs are able to quickly provide supply options to these CCA customers.  (Tr. 1279, lns. 14-19). However, witness Lacey shows a lack of understanding of the New York market, provides no support for his assertions, and further fails to acknowledge that: (1) the framework for offering service through a CCA is not being addressed here, but instead has already been established by the Commission; (2) CCAs are still of an experimental nature; and (3) CCAs depend heavily on an expert buyer.[88]  In light of the overcharging of mass market customers by the ESCOs, the Commission should limit CCA facilitators to only NFPs or municipal entities to ensure that the Commission's and communities' CCA programs are benefiting customers by the utilization of an independent professional energy buyer acting in a fiduciary capacity.

      f.     <u>Other Products</u>

There are no "other products" that Staff has to discuss.  However, any other potential ESCO products offerings should be discussed and developed in Track II of these proceedings, notwithstanding adoption of the above recommendations in Track I.

---

[88]   <u>See</u>, CCA Framework Order.

CASE 15-M-0127, et al.

4.   **ESCO's Role in the Commission's Energy Policies, Including REV and CES**

   **(December 2016 Notice Questions 1 and 20)**

   The Commission has, in recent years, undertaken numerous energy initiatives, including the Reforming the Energy Vision (REV) initiative[89] and the Clean Energy Standard (CES) initiative.[90]  While, currently, ESCOs can offer products to New York customers that may advance one or more of the goals of these initiatives, ESCOs are not essential to either initiative and, to date, have done little to materially contribute to either initiative.

   Several ESCO Parties have asserted that ESCOs play an essential role in advancing the Commission's REV and CES initiatives, claiming that ESCOs offer energy efficiency, green products and other Distributed Energy Resource (DER) products.  (See, Tr. 268-269, lns. 12-15; Tr. 1139-1142, lns. 9-3).  However, as discussed below, the ESCO parties offer no evidence to support these claims, and instead rely on assumptions and unsupported conclusions.

   As an initial matter, while the Commission has acknowledged that ESCOs can play a role in REV and other Commission initiatives, it is expected that DER providers will be the entities that will drive innovation and penetration of DER in furtherance of these important Commission initiatives.[91]  (Tr. 2588, lns. 13-19).  DER providers, as distinguished from ESCOs, do not sell commodity, and their practices are governed by the Uniform Business Practices for Distributed Energy Resource Suppliers

---

[89]   Case 14-M-0101, Proceeding on Motion of the Commission in Regard to Reforming the Energy Vision.

[90]   Case 15-E-0302, Proceeding on Motion of the Commission to Implement a Large-Scale Renewable Program and a Clean Energy Standard.

[91]   See, Case 14-M-0101, supra, Order Adopting Regulatory Policy Framework and Implementation Plan (issued February 26, 2015).

CASE 15-M-0127, et al.

and a separate registration process.[92]  (Tr. 2588, lns. 13-19).  Thus, the DER market is a market distinct from that of the ESCOs.[93]  In fact, in the DER Oversight Order, the Commission specifically mentions the retail markets, the shortcomings of those markets, and the need to provide the appropriate level of oversight to the DER markets to avoid making the same mistakes.[94]  It is expected that DER markets will provide the innovative products and services that, to at least some extent, ESCOs active in the retail markets were expected to promote, but which never materialized.  (Tr. 2596, lns. 2-14). Therefore, while it is possible for an ESCO to provide DER services, they are not required to offer such services, and they are not expected to be the primary entity driving DER penetration in the market; and thus, ESCOs are not essential to or even needed to ensure the success of the Commission's REV and CES initiatives.

Moreover, even assuming that ESCOs are the entities primarily responsible for the introduction of DER (which they are not), evidence in the record shows that, even after approximately two decades, very few ESCOs are offering DER products and services, or any products that can remotely be considered innovative.  (Tr. 2596, lns. 2-14; Exh. 710 (SP-1a Public Redacted) and 711 (SP-1a Confidential) pages 163-1253).  In fact, there is scant evidence introduced in these proceedings that shows that ESCOs are in fact offering energy-related value-added products and services, and more importantly, that any customers in New York actually take those services from an ESCO.  Instead, the ESCO parties state on numerous occasions throughout the record that ESCOs offer such products and services to customers, but they provided little to no evidence to show that ESCOs are providing such products and services to New York State residents.  Indeed,

---

[92]  See, Case 15-M-0180, In the Matter of Regulation and Oversight of Distributed Energy Resource Providers and Products, Order Establishing Oversight Framework and Uniform Business Practices for Distributed Energy Resource Suppliers (issued October 19, 2017)(DER Oversight Order).

[93]  Id. at 1-3.

[94]  Id. at 2, and passim.

CASE 15-M-0127, et al.

the Commission should take notice of the ESCOs' failures in the mass markets and take a jaundiced view of their potential to be productive resources for DER services.

5.   **ESCO Eligibility Requirements**

**(December 2016 Notice Questions 1 and 4)**

The ESCO eligibility process is thoroughly explained in the UBP §2. Exhibit 724 (SP-11) contains, in redline, several proposed changes to UBP, specifically requiring compliance with the proposed UBP §11 as part of an ESCO's eligibility requirement.  These proposed changes include both the redlined changes that were proposed for comment in March 2016,[95] as well as several additional proposals offered as part of the Staff Panel Testimony.  The latter includes, but is not limited to, a new §11 that proposes the additional consumer protections necessary for mass market customers that are reflective of the recommendations Staff offered in the initial testimony of the Staff Panel, and that are further supported by this brief.  Additionally, depending on the Commission's determinations in Track I of these proceedings, further modifications of the UBP may be required.  Any changes to the UBP should be implemented on a prospective basis and apply to ESCOs that are currently eligible to serve in New York State, as well as ESCOs that may apply for eligibility.  In order to address the issues identified with the retail markets serving mass market customers, the Commission needs self-executing solutions that rely solely on enforcement.

6.   **ESCO Reporting and Collateral Posting Requirements**

**(December 2016 Notice Question 20)**

One of the premier challenges in conducting the investigation directed by the Commission in the December 2016 Notice has been the unwillingness of ESCOs to provide information regarding their business practices, particularly with respect to specifics of the products and services that they claim to offer in New York.  (Tr. 2115, lns. 10-24 – Tr 2116, lns. 1-4).  Despite the multiple comments on the value of the

---

[95]   Case 98-M-1343, In the Matter of Retail Access Business Rules, Notice Seeking Comments on Revisions to the Uniform Business Practices (March 8, 2016).

CASE 15-M-0127, et al.

products ESCOs are selling, including fixed rate products, the ESCOs were unwilling to quantify or provide the value of such products and services. Staff recommends additional reporting requirements that are necessary in order to effectively monitor and oversee the retail markets going forward. If the ultimate goal is to ensure that customers are receiving material value from participation in the retail markets, then accurate and transparent reporting on the products that ESCOs are offering to customers is essential. In particular, if an ESCO is charging prices for commodity in excess of the amount the utility would charge that same customer because the ESCO is offering an energy-related value-added service, then ESCOs should be required to report on the cost of the commodity, and separately state the cost of the energy-related value-added service so that the Commission, and the customer, can determine what the premium for that energy-related value-added service is, and then decide whether it is actually providing a value commensurate with the cost.

Some of the ESCOs claim that collateral posting requirements, or bonding, for ESCOs would have the same salutary effects as price controls by forcing bad actors out of the markets. (Tr. 606, lns. 11-14; Tr. 1170; Tr. 1216, lns. 12-15). Generally, the proponents of establishing bonding requirements ask that the Commission establish a collaborative process to determine specifics, such as the amount of the bond or posted collateral. (Id.). The Commission should reject the idea that bonding and collateral posting will have the same effect as ensuring that the ESCOs are charging just and reasonable rates, as it will not. Presently, the UBP place no limit on what an ESCO can charge a customer, so the Commission cannot currently seek consequences under the UBP against a bad actor charging unjust and unreasonable rates. Thus, the posting of a bond or collateral will not have the effect they claim, and the proposal should be rejected by the Commission. Additionally, this appears to be part of a hidden agenda advanced by the larger ESCOs to weed out the smaller ESCOs.

CASE 15-M-0127, et al.

7.    **ESCO Marketing practices**

       **(December 2016 Notice Questions 6 and 7)**

       a.    ESCO Practices; Materials; Contracts; Scripts & Training Materials

              The guidelines for ESCO marketing practices are explained in UBP §10.
The Commission has, on several occasions, revised and strengthened those requirements
in light of persistent abuses arising out of ESCO marketing.[96]  The Commission has taken
a number of steps to address ESCO marketing abuses and, while the number of
complaints has generally decreased, issues surrounding ESCO marketing practices
continue to persist.  (Tr. 2102-2103, lns. 6-5; Tr. 3027-3028, lns. 20-5).  Marketing
abuses, such as slamming and false representations regarding who the marketer
represents or what the proposed products will actually provide, continue to drive a
significant portion of customer complaints against ESCOs.  (Tr. 2105-2108, lns. 20-2).
Additionally, a majority of such abuses arise out of direct door-to-door and telephonic
marketing.  (Tr. 3027-3028, lns. 20-5; Tr. 3029, lns. 3-11).  ESCOs should therefore be
prohibited from utilizing direct door-to-door, point of sale, telephonic sales, or similar
marketing practices to enroll mass market customers.  Instead ESCOs' marketing
practices should be limited to direct mail, electronic enrollments, or similar marketing
channels whereby the consumer must respond and/or initiate direct contact with the
ESCO.

8.    **Customer Information and Cyber Security**

       **(December 2016 Notice Question 6)**

              As stated above, the Commission should require that the ESCOs ensure the
protection of customer data, confidentiality, and cyber security by demonstrating
compliance with UBP §4, and consistent with the National Institute of Standards and
Technology Cyber Security Framework (NTS&TCS) (Tr. 2035-2036, lns. 22-12; Tr.
2188, lns. 9-16) or the applicable cyber security requirements of the North American
Electric Reliability Corporation (NERC)(Tr. 2698-2700, lns. 9-3) as proposed in the

---

[96] See, e.g. February 2014 Order at 27-47.

CASE 15-M-0127, et al.

UBP, Section 12 (Exh. 724 (SP-11)).  The current UBP include protections against selling or otherwise improperly transferring customer information,[97] but does not address processes and procedures regarding cyber security necessary in the digital age where cyber security breaches have become more prevalent.  (Tr. 2187-2188, lns. 19-16).  No parties offered positions directly opposing the addition of cyber security requirements.

### 9. **Purchase of Receivables and Billing Process**
   **(December 2016 Notice Question 8)**

   a.   Purchase of Receivables

   In the early stages of the retail markets, the Commission authorized utilities to purchase the ESCO accounts receivable in order to reduce ESCO operating costs, ensure that customers receive the full benefits of HEFPA, minimize the switching of payment-troubled customers back to full utility service, and further promote retail access migration.[98]  (Tr. 2053, lns. 4-14).  The Commission also noted that the purchase of receivables (POR) program would only be needed on a transitional basis to help jump-start the retail energy market, stating that "in the long run, ESCOs should no longer need the support of the utilities to provide customer care services, and should ultimately provide all customer services associated with the provision of commodity."[99]

   Under the current POR construct, the utility purchases the ESCO receivables when they occur, at a discount (POR discount).  (Tr. 2053, lns. 16-18).  The discount amount varies by utility based on, among other things, the uncollectibles incurred by all of the ESCOs in that utility's service area.  (Tr. 2053, lns. 18-21).  Furthermore, the utilities purchase the ESCO receivables without recourse, which means that the utility cannot subsequently seek to collect from the ESCO any monies that it could not collect from the ESCO's customers.  (Tr. 2154-2155, lns. 17-3).  Pursuant to the rate plans of each utility, these POR discount rates are updated annually and are

---

[97]   See, UBP Section 4.

[98]   See, 2004 Policy Statement.

[99]   Id. at 16.

CASE 15-M-0127, et al.

composed of four components: (1) the uncollectibles discount rate; (2) the risk factor associated with the uncollectibles; (3) a credit and collections adder based upon forecasted POR receivables for the upcoming year; and, (4) a small administrative handling fee.  (Tr. 2155, lns. 11-19).

        Question 8 of the December 2016 Notice asked "whether the Purchase of Receivables system for mass market customers should be modified in any way, including but not limited to, imposing 'purchase with recourse' provisions or tiered discount rates so that ESCOs with abusive practices bear more financial risk from such practices?"[100] GEE offers that the existing POR model should not be changed.  (Tr. 80, lns. 1-6).  GEE argues that modifying the POR system as proposed in the Staff testimony would subject ESCOs to additional costs in the form of "credit checks on customers, incremental credit and collection costs and the inability of ESCOs to pledge receivables to guaranty payments to utilities under gas retail choice programs."  (Tr. 81, lns. 14-17).  GEE also opines that if POR were eliminated, ESCOs would need to have the ability to terminate a customer's service for non-payment, and could also have a negative impact on competition by favoring larger ESCOs.  (Tr. 82-83, lns. 3-2).  Infinite Energy recommends eliminating POR altogether, requiring ESCOs to bear the costs.  (Tr. 642, lns 15-18).  RESA proposes modifications to the POR system to address the perverse incentive to engage in "distasteful business practices."  (Tr. 1197, lns. 1-11).  One such modification, RESA continues, would be the implementation of a "claw back" whereby, if an ESCO's bad debt exceeds a certain threshold, or the ESCO charges rates above a pre-determined pricing threshold, the ESCO would be charged the difference between the ESCO's actual bad debt, and the other pre-determined threshold.  (Tr. 1197-1198, lns. 11-6).  Other parties support reforms to the POR system, but provide no specific recommendations.  (See, Tr. 278, lns. 12-16).

        The retail energy markets are now mature, albeit fundamentally flawed, steady state markets that are populated by a significant number of ESCOs that promote

---

[100]  December 2016 Notice at 6.

CASE 15-M-0127, et al.

themselves as well-established national providers of retail commodity services. (Tr. 2156-2157, lns. 17-19). Therefore, POR without recourse, using an overall ESCO uncollectible discount rate, is neither a necessary nor an appropriate mechanism to continue. Moreover, POR without recourse can have potentially unfair effects on ESCOs and their customers because ESCOs with higher prices, and likely higher uncollectibles, are shielded from higher uncollectibles, while ESCOs with potentially lower prices and uncollectibles are paying an unnecessarily high POR discount rate to account for those higher uncollectibles. (Tr. 2157-2158, lns. 19-2). Accordingly, the Commission should direct the utilities to no longer provide the ESCOs the option of purchase of receivables without recourse. Instead, the distribution utilities should be directed to provide ESCOs the option of purchase of receivables "with recourse." Staff recognizes the complexities surrounding such a change and thus implementation of this new paradigm should be addressed with the parties, particularly the utilities.

      b.    Billing Methodologies

          1.    Utility Consolidated Billing

      As explained in detail in the Staff Policy Panel testimony, the Commission also directed the utilities to provide consolidated utility billing services (CUB) as an additional enticement to encourage ESCOs to participate in the developing market. (Tr. 2051-2052, lns. 22-2). CUB, which was enabled by Commission actions directing the utilities to completely unbundle their delivery and supply operations and bifurcate bills to separately show their unbundled delivery service and commodity supply service charges, allowed ESCOs to provide the utility with the customer's commodity charges to be separately identified on the customer's bill. (Tr. 2052, lns. 2-10). This lowered ESCOs' barrier to market entry, and greatly simplified their back office operational requirements. Staff does not propose to eliminate CUB at this time, but recommends inclusion of a bill comparison on the customers' bill which will help to improve transparency for retail access customers. The Commission should require that mass market ESCO customer

CASE 15-M-0127, et al.

bills include a "side-by-side" comparison showing the current bill charges and what the customer would have paid had they taken delivery and commodity from their utility.

2.    Dual Billing & Supplier Consolidated Billing

While we have no direct recommendations regarding changes to these billing model mechanisms at this time, though we expect that adoption of several of the recommendations of Staff and the proposals of other parties in these proceedings may impact these processes, and there may be a need to review these processes in Track II of this proceeding.

10.    **Customer Complaints**

**(December 2016 Notice Questions 1 and 14)**

A customer complaint regarding ESCO or utility services can be registered with the Department's Call Center via telephone, by email, fax, through the Commission's website, or in person.  (Tr. 2098-2099, lns. 22-3).  In the initial process, known as the Quick Resolution System, or QRS, Staff reviews the details of the concern to first determine if it falls within the Commission's jurisdiction and, if it does, a case is opened, the customer will receive a six-digit case number, and the concern is forwarded to the utility or ESCO for review and response.  (Tr. 2099, lns. 4-10).  If the customer is not satisfied with the utility or ESCO's response to their QRS concern, he or she will contact the Department again and, if appropriate, the concern is escalated to a complaint under the Standard Resolution System (SRS), which is the first step in the formal complaint process.  (Tr. 2099, lns. 10-16).  An escalated complaint requires a written response from the utility or ESCO, including what resolution will be offered, if any.  (Tr. 2099, lns. 16-20).

The Department's OCS compiles consumer complaint statistics monthly and these are publicly available on the Department's website.  (Tr. 2101, lns. 4-6).  The number of complaints is used as a performance indicator by which utilities are measured, and they are also tied to financial incentives.  The substance of a customer complaint is also evaluated for trends in utility activities that may require a more focused review.

CASE 15-M-0127, et al.

While ESCOs are not subject to financial adjustments predicated on the number of complaints, Staff does similarly review, document and track trends and the basis of consumer complaints about ESCO activities. (Tr. 2101).

Regarding ESCOs specifically, the Department's year-end complaint reports indicate a significant number of customer calls alleging deceptive marketing, by or on behalf of ESCOs.  For the years 2012 through 2016, the number of ESCO related complaints were: 322, 2,001, 2,510, 2,348 and 1,375 respectively.  (Tr. 2101-2102, lns. 16-6).  Similarly, the reports indicate that the Department registered 186, 289, 936, 1,076, and 664 escalated complaints for the years 2012 through 2016, respectively, about ESCOs.  (Id.).  In total, and on an equivalent per capita basis, the level of escalated complaints received by the Department concerning ESCOs during 2014 was several times the per capita escalated complaint rates of the combined gas and electric utilities, which also provide distribution and billing services, unlike the ESCOs.  (Tr. 2102, lns. 6-14; Exh. 612; Exh. 1123).  For 2015, the ESCO complaint rate per 100,000 customers rose to 5 times the comparable rate for the combined electric and gas utilities.  (see, Exh. 612).  This comparison modestly improved to 3.8 times the combined utilities complaint rate during 2016.  (see, Exh. 1123).

In summary, Staff remains concerned that despite the efforts to oversee and monitor ESCO activities and interactions with their customers, ESCOs have been unable to achieve the level of customer satisfaction that the regulated utilities are able to achieve.

The ESCOs generally characterize customer complaints against ESCOs as insignificant when compared to all initial complaints filed with the Commission.  Witness Sharfman claims that only 0.016 percent of customers filing complaints each month were ESCO customers.  (Tr. 404, lns. 10-14).  Mr. Lacey states that for 2016, the customer complaint rate for ESCOs is identical to the rate for utilities.  (Tr. 1097, lns. 13-16).  The Direct Energy Panel claims that Direct's customers (and two unspecified competitors) "show a high degree of satisfaction with the market." (Tr. 584, lns. 10-12).  Infinite Energy's witness Cook, however, acknowledges that although utility complaints have

CASE 15-M-0127, et al.

been stable on an annual basis, ESCO complaints have "skyrocketed" from one complaint per 1,000 in 2012 to one complaint per 390 customers in 2016.  (Tr. 655, lns. 8-13).

The Commission should reject Direct's claim that its customers "show a high degree of satisfaction with the market" as satisfaction with the "market" and customer complaints about their commodity service, often due to marketing or pricing abuses, are not the same.  (Tr. 584, lns. 10-12).  The evidence shows that that for 2015, the ESCO complaint rate per 100,000 customers was five times that of the combination utilities (Exh. 612), and 3.8 times the combination utilities for 2016.  (Exh. 1123).

11. **Transparency**

**(December 2016 Notice Questions 16 and 17)**

As stated in the Staff Panel testimony, one of the primary flaws with the current retail access markets for mass market customers is that they are not price transparent to customers.  (Tr. 2039, lns. 8-13).  Price and product transparency is the ability of the customer to know all of the bid prices and ask prices and trading quantities for given goods or services (such as electric and gas commodity) at any point in time, such that they cannot be misled by marketing claims.  A market where such information is not available or incomplete, is, by definition, less efficient as true and open competition is inhibited.  The Commission should recognize that as the retail markets are currently structured, mass market customers cannot make rational and fully informed decisions between commodity service from one of a number of ESCOs operating in the service territory, or the utility's default service, because the ESCOs are unwilling to provide the necessary information required to make a rational decision (Tr. 2081, lns. 10-20).  This is evidenced by the number of customers filing complaints with the Commission wherein they state that they were unaware of the rate they would pay for commodity after the ESCO's "teaser" rate expired, or that they were subject to aggressive marketing techniques (Tr. 2081, lns. 17-24; Tr. 2084, lns. 2-10; Tr. 2106-2107, lns. 13-17).

CASE 15-M-0127, et al.

ESCOs take advantage of the mass market customers' lack of knowledge and understanding of, among other issues, the electric and gas commodity markets, commodity pricing, and contract terms (which often extend to three full pages), and in particular, the ESCOs' use of teaser rates and "market based rate" mechanisms that customers are charged after the teaser rate expires (Tr. 2106-2107, lns. 13-7 and Tr. 2107-2108, lns. 16-2).  In fact, ESCOs appear to be unwilling to provide the necessary product pricing details as to how those "market based rates" are derived to mass market customers in a manner that is transparent so as to enable an open and competitive marketplace where customers can participate fairly and with the necessary knowledge to make rational and fully informed decisions on whether it is in their best interest to take commodity service from their default utility, or from a particular ESCO among competing but equally opaque choices (Tr. 2081, lns. 11-20).  Additionally, these problems would not occur if the ESCOs could not charge in excess of the utilities.

Price and product transparency is also an issue in the retail markets in situations where ESCOs bundle their commodity service with so-called energy-related value-added products, such as LED light bulbs, furnace maintenance plans, thermostats, and other products (Tr. 2084, lns. and Tr. 2114, lns. 23-24), where the incremental costs for those additional products are not disclosed.

The available data does, however, show that there was no significant (de minimis) real incremental value, or cost to the ESCO, associated with these products (Tr. 2116, lns. 4-18).  Through information requests propounded on the few ESCO parties to these proceedings (along with subpoenas to the non-party ESCOs), Staff attempted to obtain information from the ESCOs to identify the value (that is, the cost) of the value-added products they were providing to their customers, but that the ESCOs generally failed to provide data in response to DPS-ESCO 2 and 3 (Exh. 709 (SP-1); Exh. 710 (SP-1a); Exh. 711 (SP-1a Confidential)).; Tr. 2115-2116, lns. 10-11).  Those ESCOs that did provide substantive responses to DPS-ESCO 2 and 3 (Id.) did not provide Staff with data

CASE 15-M-0127, et al.

that could be used to perform a consistent analysis of the data among the ESCOs (Tr. 2116, lns. 2-4).

Thus, the cost incurred by the ESCOs in procuring these sorts of value-added products is at best de minimis and does not explain away the significantly higher commodity costs charged by so many ESCOs.  (Tr. 2116, lns. 12-18).  The $1.3 billion in charges over what these customers would have been charged had they taken default utility service cannot be explained away as the result of the costs incurred by the ESCOs to provide their customers with light bulbs and thermostats as "energy-related value-added products" (Tr. 2214, lns. 1-5; December 2016 Notice, at 7-8).  The massive $1.3 billion in overcharges is the result of higher, and more often than not, significantly higher, commodity costs imposed by the ESCOs on unsuspecting residential and other mass market customers.  (Tr. 2116, lns. 11-18).  These Overcharges are simply due to (1) the lack of transparency and greed in the market, which prevents customers from making rational economic choices based on facts rather than the promises of the ESCO representative, and (2) obvious efforts by the ESCOs to prevent, or at least limit, the transparency of the market.  (Id.).  These obvious efforts include the lack of a definition for "market rate" in their contracts, resulting in the fattening of ESCOs' retained earnings.  (Id.).

ESCOs also contend that their fixed-price offerings are "value-added" because these products guarantee that the customer will not be subject to the potential increase in commodity costs during the term of the agreement (Tr. 2063, lns. 10-13).  Of course, these products only offer price stability in the sense that customers know the rate they will be charged for the commodity itself over a fixed term.  A fixed-rate only provides "upside" protection if the commodity rate actually does rise above the fixed rate the ESCO offers; they do not provide any protection to customers if commodity prices go down ("downside protection").  While the Staff Panel acknowledges that fixed commodity prices might provide some de minimis incremental benefit to customers seeking to "fix" their commodity charges, that benefit is grossly outweighed by the fact

CASE 15-M-0127, et al.

that there is no downside protection for customers, that customer bills are still subject to fluctuations due to changes in customer usage patterns, and that the premiums charged customers to obtain this de minimis potential value are often unreasonable, as discussed below.  Finally, customers can largely achieve the primary intent of the fixed price commodity option (levelized monthly billing) by using the budget billing that all utilities must offer to smooth and levelize the mass market customers' total commodity and delivery costs (their bills) over the year (Tr. 2084, lns. 19-24).

The value of fixed-rate products is grossly overstated by the majority of ESCOs in their marketing, and does not provide the customer material "value" as the ESCOs claim.  (Tr. 2132, lns. 1-14).  In fact, while a few ESCOs charge a modest premium for their fixed price products, in the five to six percent range, the majority of ESCOs are charging premiums of 20 to 30 percent or more.  (Id.).  Since the utilities are required to offer budget billing programs, the monthly bill stability sought by some customers can be achieved without paying a premium over their otherwise available default and ESCO commodity options (Tr. 2132, lns. 14-24) and will further enable customers to realize the financial benefit when commodity prices do drop.  Therefore, the Commission should not be distracted from implementing Staff's 12 recommendations by the prospect of potential energy-related value-added products offerings until all our recommendations have been implemented, and the ESCO mass markets have transitioned to the new paradigm we recommend (Tr. 2036-2037, lns. 20-10).

The ESCOs see the current commodity mass market as transparent, although GEE's witness Lukas states that it has always been GEE's position that variable rate products are "most prone" to overcharges as they are not transparent.  (Tr. 92, lns. 15-16).  Mr. Kagan, testifying on behalf of Direct Energy, sees it differently and claims that ESCOs play a "critical role" in providing customers direct and transparent access to wholesale markets, and that the retail markets are transparent.  (Tr. 161, lns. 15-16; Tr. 211, lns. 18-19).  Mr. Sharfman, also testifying on behalf of Direct Energy, at least offers his definition of transparency, stating that the customer must know the price per unit of

CASE 15-M-0127, et al.

the commodity he or she is buying before receiving a bill.  (Tr. 363, lns. 1-3).  Sharfman does admit, however, later in his direct testimony, that longer term ESCO variable pricing offers may only show customers the price for the first month of the term, and so are less transparent.  (Tr. 366, lns. 4-6).  Mr. Lacey's, Mr. Lukas', and Dr. Cicchetti's testimony also claim that utility default service is not fully unbundled, therefore, consumers cannot be provided transparent price signals regarding the default service, and that delivery rates are inflated.  (Tr. 1210, lns. 15-16; Tr. 1255, lns. 8-11; Tr. 71-72, lns. 12-5; Tr. 690, no line numbers in this testimony).

       The ESCOs hired witnesses did their best to dance around the fact that the retail markets are not transparent to customers, but even in their own pre-filed testimony, witnesses Lukas and Sharfman cannot ignore the reality of these markets and admit that variable priced ESCO commodity service is not transparent to customers.  Finally, the claims that the markets are not transparent because utility rates are not unbundled is simply incorrect, as explained in detail by the Staff Rates Panel.  (Tr. 3108-3120).  The ESCOs' proposals would raise delivery costs for customers, violate Commission regulations, and skew default delivery rates to make the ESCOs' rates appear to be lower. Thus, the ESCO claims that incomplete unbundling makes their commodity rates appear artificially high compared to the utility default rates is wrong and yet another effort by the ESCOs to explain away the $1.3 billion delta between their rates and the utilities' rates.

       Finally, one recommendation that will help to improve transparency in the retail markets is inclusion of a comparison on the customer's bill.  The Commission should require mass market ESCO customer bills to include a comparison showing both the current charges with the ESCO, and what the customer would have paid had they taken delivery and commodity from their utility.  Such a comparison will assist customers in assessing whether the ESCO is living up to any promises of savings, or allow the customer to determine what premium they are paying for ESCO service.  Additionally, ESCOs that offer energy-related value-added products in the future should be required to

CASE 15-M-0127, <u>et</u> <u>al</u>.

disclose the price of that additional product on the customer bill, separate and apart from the price charged for commodity service.  Both recommendations will provide mass market ESCO customers with critical information right on their bill.

**Subsections III.C.12 – III.C.17 are not addressed in this brief.**

These sections include: (1) Customer renewal process; (2) Customer shopping tools; (3) Customer choice; (4) Examples of competitive market frameworks in other states; (5) State agency & consumer advocacy group actions; and (6) Energy brokers.  Staff reserves the right to address these, and other points not addressed in this brief, in our reply brief.

CASE 15-M-0127, <u>et</u> <u>al</u>.

# IV.   CONCLUSION

The Commission should determine that the prices charged to residential and small commercial customers in the electric and gas mass markets are substantially higher than those charged by the utilities.  The ESCOs, NEMA and RESA seek to explain away this substantial difference by pointing to "value-added" services that they offer.  As Staff has proven, the tremendous difference in prices cannot be justified by light bulbs, thermostats, ridiculously high fixed-price offerings, "green" energy that is no more green than the energy provided by the utilities at a lower cost, and other "value-added" services and products.  Mass-market customers are in fact the victims of a failed market structure that has emboldened the ESCOs into taking advantage of customers trust in statements made to them by unscrupulous representatives of the ESCOs and marketing tricks, designed to obfuscate commodity prices to exact unconscionable commodity prices that are not just and reasonable.  Therefore, the Commission must take bold action to protect customers and ensure just and reasonable rates by either preventing the ESCOs' from using the utilities' systems to serve mass-market customers or fundamentally change the retail access requirements and rules in the manner proposed by Staff in this brief.

Respectfully Submitted,

F. THOMAS DWYER
STEVEN J. KRAMER

Staff Counsel

# EXHIBIT H

**Order Adopting Changes to the Retail Access Energy Market and Establishing Further Process,** *In the Matter of Retail Access Business Rules*, **No. 98-M-1343 (N.Y. Pub. Serv. Commn. Dec. 12, 2019)**

STATE OF NEW YORK
PUBLIC SERVICE COMMISSION

CASE 15-M-0127  -   In the Matter of Eligibility Criteria for
                    Energy Service Companies.

CASE 12-M-0476  -   Proceeding on Motion of the Commission to
                    Assess Certain Aspects of the Residential
                    and Small Non-residential Retail Energy
                    Markets in New York State.

CASE 98-M-1343  -   In the Matter of Retail Access Business
                    Rules.

ORDER ADOPTING CHANGES TO THE RETAIL ACCESS ENERGY MARKET AND
           ESTABLISHING FURTHER PROCESS

Issued and Effective: December 12, 2019

## **TABLE OF CONTENTS**

INTRODUCTION.................................................... 1

BACKGROUND..................................................... 2

NOTICE OF PROPOSED RULE MAKING................................. 5

PUBLIC COMMENTS................................................ 6

LEGAL AUTHORITY................................................ 6

BRIEF SUMMARY OF PARTY POSITIONS............................... 8

  Non-ESCO Parties ............................................ 8

  ESCO Parties ............................................... 9

DISCUSSION AND CONCLUSIONS.................................... 10

  Order Implementation ....................................... 14

I. Enhanced ESCO Eligibility Criteria ....................... 14

  I.A. Non-ESCO Party Positions Regarding ESCO Eligibility
  Requirements ............................................... 16

  I.B. ESCO Party Positions Regarding ESCO Eligibility
  Requirements ............................................... 18

  I.C. Conclusions Regarding ESCO Eligibility Requirements .... 22

    I.C.1. Method(s) of Marketing ............................ 23

    I.C.2. Types of Products Offered ......................... 23

    I.C.3. Complaint Data for Other States of Operation ...... 24

    I.C.4. Data Security Breaches ............................ 24

    I.C.5. Bankruptcy History ................................ 24

    I.C.6. Financial Assurances/Collateral Requirements ...... 25

    I.C.7. ESCO Officer Certification ........................ 26

    I.C.8. Additional Eligibility Review Process ............. 26

II.Access to and Transparency of Pricing Information ........ 30

  II.A. Non-ESCO Parties' Positions Regarding Access to and
  Transparency of Pricing Information ........................ 31

  II.B. ESCO Parties' Positions Regarding Access to and
  Transparency of Pricing Information ........................ 32

CASE 15-M-0127, <u>et</u> <u>al.</u>

II.C. Conclusions Regarding Access to and Transparency of
Pricing Information ........................................... 32

  II.C.1. Utility-Provided Price Comparisons ................ 33

  II.C.2 Utility-Provided Cost Itemizations ................. 36

III. Product Offerings ........................................ 37

 III.A. Variable-rate, Commodity-only Service ............... 37

  III.A.1. Non-ESCO Party Positions Regarding Variable-rate
Commodity-only Service ..................................... 38

  III.A.2. ESCO Party Positions Regarding Variable-rate
Commodity-only Service ..................................... 38

  III.A.3. Conclusions Regarding Variable-rate, Commodity-only
Service .................................................... 39

   III.A.3.a. The Merchant Function Charge .................. 42

   III.A.3.b. Out-of-Period Adjustments .................... 43

 III.B. Non-Energy-Related Value-Added Products and Services . 43

 III.C. Energy-Related, Value-Added Products and Services .... 44

  III.C.1 Non-ESCO Party Positions Regarding Energy-Related,
Value-Added Products and Services ......................... 45

  III.C.2. ESCO Party Positions Regarding Energy-Related,
Value-Added Products and Services ......................... 47

  III.C.3. Conclusions Regarding Energy-Related, Value-Added
Products and Services ..................................... 50

 III.D. Fixed-Rate Products ................................. 56

  III.D.1. Non-ESCO Party Positions Regarding Fixed-Rate
Products ................................................... 57

  III.D.2. ESCO Party Positions Regarding Fixed-Rate Products 59

  III.D.3. Conclusions Regarding Fixed-Rate Products ........ 64

 III.E. Renewably Sourced Commodity ......................... 70

  III.E.1. Non-ESCO Party Positions Regarding Renewably Sourced
Commodity .................................................. 72

  III.E.2. ESCO Party Positions Regarding Renewably Sourced
Commodity .................................................. 74

  III.E.3. Conclusions Regarding Renewably Sourced Commodity  75

CASE 15-M-0127, <u>et</u> <u>al.</u>

III.E.3.a. Minimum Renewable Percentage ................... 77

III.E.3.b. Eligible Electricity .......................... 78

III.E.3.c. Transparency of Information and Disclosures ... 80

III.E.4. Pricing of Renewably Sourced Commodity .......... 81

III.E.5. Low-Income Customers ............................ 82

IV.  ESCO Marketing Practices ............................... 83

IV.A. Non-ESCO Party Positions Regarding Additional
Restrictions on ESCO Marketing Practices .................... 84

IV.B. ESCO Party Positions Regarding Proposed Restrictions on
ESCO Marketing Practices .................................... 87

IV.C. Conclusions Regarding Proposed Restrictions on ESCO
Marketing Practices ......................................... 88

V.   ESCO Billing Methodologies .............................. 92

V.A. Non-ESCO Party Positions Regarding Billing Methodologies 93

V.B. ESCO Party Positions Regarding Billing Methodologies ... 93

V.C. Conclusions Regarding Billing Methodologies ............ 95

VI.  Utility Purchase of ESCO Receivables .................... 96

VI.A. Non-ESCO Party Positions Regarding POR Reform ........ 98

VI.B. ESCO Party Positions Regarding POR Reform ............ 99

VI.C. Conclusions Regarding POR Reform .................... 101

VII. Considering the Definition of Small Non-Residential
Customers................................................... 102

VII.A. Non-ESCO Party Positions Regarding the Definition of
Small Non-Residential Customers ............................ 103

VII.B. ESCO Party Positions Regarding the Definition of Small
Non-Residential Customers .................................. 104

VII.C. Conclusions Regarding the Definition of Small Non-
Residential Customers ...................................... 106

VIII. Community Choice Aggregation.......................... 107

The Commission orders: ..................................... 108

STATE OF NEW YORK
PUBLIC SERVICE COMMISSION

At a session of the Public Service
Commission held in the  City of
New York on December 12, 2019

COMMISSIONERS PRESENT:

John B. Rhodes, Chair
Diane X. Burman, concurring, in part and dissenting, in part
James S. Alesi
Tracey A. Edwards
John B. Howard

CASE 15-M-0127  -   In the Matter of Eligibility Criteria for
                    Energy Service Companies.

CASE 12-M-0476  -   Proceeding on Motion of the Commission to
                    Assess Certain Aspects of the Residential
                    and Small Non-residential Retail Energy
                    Markets in New York State.

CASE 98-M-1343  -   In the Matter of Retail Access Business
                    Rules.

ORDER ADOPTING CHANGES TO THE RETAIL ACCESS ENERGY MARKET AND
ESTABLISHING FURTHER PROCESS

(Issued and Effective December 12, 2019)

BY THE COMMISSION:

INTRODUCTION

        In this Order, the Commission strengthens protections
for residential and small commercial customers (mass-market
customers) in the retail energy market.  The Commission protects
these customers by remedying unfair business practices that have
been used by various retail energy market participants and by
adopting limitations on the types of products that may be
offered to mass-market customers by energy services companies

CASE 15-M-0127, et al.

(ESCOs)[1] to ensure that those customers are receiving value from the retail energy market.  In designing and implementing these changes, the Commission relies on its extensive experience regarding the retail energy market.  The Commission is also guided by the considerable record in the instant proceedings, which parties were invited to develop for the purpose of further illuminating the current state of the Retail Energy Market.

In this Order, the Commission: (1) increases ESCO accountability by enhancing eligibility criteria and implementing other changes in the eligibility process; (2) empowers customers by improving transparency of ESCO product and pricing information, primarily through an on-bill comparison of ESCO to utility commodity prices and through required itemizing of ESCO charges; and (3) prohibits ESCO product offerings that lack energy-service-based value by adopting restrictions on the types of products and services ESCOs are allowed to offer mass-market customers, as more fully discussed below.  In some instances, as discussed below, further process is required before certain customer protections can be implemented.

BACKGROUND

This track of these proceedings was instituted in response to a Notice, issued December 2, 2016 (December Notice),[2] after lengthy investigation and repeated action by the Commission to course-correct the Retail Energy Market for electricity and natural gas.  During the last 30 years, the

---

[1]   ESCOs are entities eligible to sell electricity and/or natural gas to end-use customers using the transmission or distribution system of a utility. ESCOs also may perform other retail service functions.

[2]   See Cases 15-M-0127 et al., Notice of Evidentiary and Collaborative Tracks and Deadline for Initial Testimony and Exhibits (issued December 2, 2016) (December Notice).

-2-

CASE 15-M-0127, et al.

Commission has witnessed significant, and in some instances unexpected, changes in the Retail Energy Market.  Ultimately, the Commission reached the conclusion that this market had not evolved as originally intended and, more importantly, was not providing sufficient energy-related benefits for customers.

The December Notice stated that "the Commission has determined that the retail markets serving mass-market [residential and small commercial] customers are not providing sufficient competition or innovation to properly serve consumers."[3]  The notice informed parties that the Commission had specific concerns about reports of customer abuses in the retail access market, including "overcharging," as well as the lack of innovation with respect to energy efficiency and energy management services.  For these and other reasons, the evidentiary track of these proceedings was commenced to, among other things, consider whether: the regulatory regime applicable to ESCOs requires modification; new ESCO rules and products could be developed that would provide the desired benefits to residential and small commercial customers; or the retail access market should be closed entirely.  In furtherance of this inquiry, the parties were requested to submit testimony and exhibits with respect to certain enumerated topics, including the parties' positions with respect to the continuation of the retail access market, whether the regulatory regime can and/or should be modified and how customer abuses and overcharging could be further deterred or eliminated.

The record in these proceedings consists of initial testimony, rebuttal testimony, cross-examination testimony and exhibits, initial briefs, reply briefs, and public comments. The evidentiary hearing took place before two Administrative Law

---

[3]    December Notice, p. 3.

CASE 15-M-0127, et al.

Judges (ALJs) over ten days in Albany, beginning on Wednesday, November 29, 2017 and continuing through Tuesday, December 12, 2017.  The transcript of the hearing consists of 4,233 pages of testimony and cross-examination of 22 witnesses and panels of witnesses.

Nineteen parties were active in submitting testimony, conducting cross-examination and/or submitting briefs: AARP New York (AARP); Agway Energy Services, LLC (Agway); the Joint Utilities (Central Hudson Gas & Electric Corporation; Consolidated Edison Company of New York, Inc.; KeySpan Gas East Corp. d/b/a National Grid; National Fuel Gas Distribution Corporation; New York State Electric & Gas Corporation; Niagara Mohawk Power Corporation; Orange and Rockland Utilities, Inc.; Rochester Gas and Electric Corporation; and The Brooklyn Union Gas Company d/b/a National Grid NY); the City of New York (NYC); Constellation Energy Gas Choice, LLC (Constellation); Direct Energy Services LLC (Direct Energy); Drift Marketplace, Inc. (Drift); ENGIE Resources LLC and ENGIE Retail, LLC d/b/a Think Energy (collectively, ENGIE); Great Eastern Energy (GEE); the Impacted ESCO Coalition (IEC); Infinite Energy, Inc. d/b/a Intelligent Energy (Infinite); National Energy Marketers Association (NEMA); Staff of the New York State Department of Public Service (Staff); the Office of the New York State Attorney General and the Utility Intervention Unit, Division of Consumer Protection, of the New York State Department of State (collectively, UIU/NYAG); the Public Utility Law Project of New

-4-

CASE 15-M-0127, et al.


York, Inc. (PULP); Retail Energy Supply Association (RESA); Robison Energy, LLC (Robison); and The OE Group (OE Group).[4]

Initial briefs were filed by Agway, NYC, Constellation, Direct Energy, GEE, IEC, Infinite, NEMA, Staff, UIU/NYAG, PULP, and RESA.  Reply briefs were filed by AARP, Agway, Joint Utilities, Constellation, Direct Energy, Drift, GEE, IEC, Infinite, NEMA, Staff, UIU/NYAG, RESA, and Robison. Staff's motion to strike NEMA's late-filed reply brief was granted by the ALJs.[5]


NOTICE OF PROPOSED RULE MAKING

Pursuant to the State Administrative Procedure Act (SAPA) §202(1), a Notice of Proposed Rulemaking was published in the State Register on June 7, 2017 [SAPA No. 15-M-0127SP8].[6]  The time for submission of comments pursuant to the Notice expired on July 22, 2017.  No comments were received in response to the SAPA Notice.

---

[4]  Following the ALJs' determination that parties to the evidentiary proceeding would be subject to information requests and other discovery, approximately 30 ESCOs who were previously parties to the proceedings withdrew their party status.  See Transcript of Procedural Conference Held in Albany on January 26, 2017 (filed February 8, 2017), p. 15, ln. 16 – p. 19, ln. 17; See also Evidentiary Hearing Transcript (Tr.) 2115, ln. 10-2116, ln. 2; Tr. 2182, ln. 15-24.

[5]  Cases 15-M-0127 et al., Ruling on Staff's Motion to Strike (issued May 24, 2018).  The Commission had denied NEMA's previous motion for an extension of time to file a reply brief.  See Cases 15-M-0127 et al., Confirming Order (issued May 21, 2018).

[6]  SAPA Notice.

-5-

CASE 15-M-0127, et al.

### PUBLIC COMMENTS

Outside of the statutory notice-and-comment period, the Commission received few public comments related to this track of the proceedings.  The Queens and Bronx Chambers of Commerce opposed any changes in how ESCOs provide service to mass-market customers, out of concerns that such changes would hamper the role of ESCOs and would force small ESCOs out of the market.  The Queens Chamber of Commerce disagreed with Staff's proposal to require ESCOs to guarantee savings on commodity service and the inclusion of small commercial customers in the definition of "mass-market" customers.  It further opined that the Commission should consider fixed-rate commodity pricing as a value-added service.  A non-party ESCO stated its support for reducing the threshold definition of a gas mass-market customer from 750 to 400 or 500 dekatherms/year to increase the choices available to small businesses.  A customer commented that he was overcharged by an ESCO and opposes any attempt to keep misconduct by ESCOs confidential in these proceedings.  Another customer sought a comprehensive investigation into ESCO business practices, claiming that an ESCO employed deceptive and fraudulent business practices and overcharged him 250% more than what the utility would have charged him, without his consent.

### LEGAL AUTHORITY

The Public Service Law (PSL) expressly provides the Commission authority to limit or discontinue ESCOs' access to utility distribution systems based on whether such access is just and reasonable in all respects.  PSL § 5(1)(b) grants the Commission authority over, among other things, both the sale and the distribution of natural gas and electricity.  In addition, PSL §§ 65 and 66 provide the Commission specific authority over utilities and their distribution services.  As is relevant here,

CASE 15-M-0127, et al.

and pursuant to PSL § 65(1), a utility's distribution services must be, "in all respects[,] just and reasonable."

        This state's highest court has recognized that these and other PSL provisions empower the Commission to regulate ESCO access to utility systems.  The Court of Appeals held that "the legislature has delegated to the [Commission] the authority to condition ESCOs' eligibility to access utility [distribution systems] on such terms and conditions that the [Commission] determines to be just and reasonable."[7]  This broad authority encompasses, among other things, the power to "prohibit utilities from distributing overpriced [ESCO] products."[8]  As a corollary power, the Commission is authorized to require that ESCOs prove, as a condition of accessing utility systems, that their products do not harm customers.[9]

        PSL § 66 provides additional authority relevant to ESCO sales.  Most notably, PSL § 66(12-a) provides the Commission authority to require that utility bills, which often include charges for applicable ESCO service, be simple and clear.  Accordingly, the Commission has express authority to require that utility billing reflect ESCO charges in a transparent manner that best facilitates customer understanding of the cost of ESCO service.

        Given the Commission's broad power to determine what is required for ESCO access to utility systems to ensure the provision of just and reasonable energy service to customers, as well as the Commission's express authority to regulate utility

---

[7]   Matter of National Energy Marketers Assn. v. New York State Pub. Serv. Commn., 33 N.Y.3d 336, 351 (2019), reargument denied, 33 N.Y.3d 1130 (2019) (NEMA v. PSC); see also PSL §66-d(2).

[8]   NEMA v. PSC, 33 N.Y.3d at 351.

[9]   Matter of National Energy Marketers Assn. v. New York State Pub. Serv. Commn., 167 A.D.3d 88, 93, 95 (3d. Dept. 2018).

CASE 15-M-0127, et al.


billing to encourage transparency, the Commission has ample
authority to implement each of the following recommendations.


BRIEF SUMMARY OF PARTY POSITIONS

Non-ESCO Parties

The non-ESCO parties (Staff, UIU/NYAG, PULP, AARP,
NYC) all agree that the current retail access market does not
benefit customers.  Some argue the Commission should shut down
the market entirely while others argue that the Commission
should implement systematic and substantial reforms to limit
ESCO products and/or ESCO prices.

Staff provided data that it obtained from the
utilities demonstrating that, on average, ESCO customers paid
$1.2 billion more than utility customers would have paid for
commodity service during the 36-month period ending December 31,
2016.[10]  Staff, UIU/NYAG, PULP, and AARP generally believe that
ESCO prices are unreasonable and that ESCO products lack actual
benefits for the customers, even when alleged value-added
products or services are bundled with commodity.  Due to the
evidence of ESCO "overcharges," the lack of demonstrated
financial value in ESCO offerings, and in light of the history
of customer complaints against ESCOs, Staff, UIU/NYAG, and PULP
advocate that the Commission should prohibit ESCOs from serving
mass-market customers or, if the Commission allows the market to
continue, restrict product offerings, pricing, and marketing.
For its part, NYC believes that ESCOs could provide "real and
measurable value" to customers if they were to provide
guaranteed savings plans, services and products to help reduce

---

[10]  Tr. 2113-2114; Hearing Exhibit 716; see also Hearing Exhibit
703; Tr. 3254-3256.

CASE 15-M-0127, et al.

or manage customers' electric bill, energy efficiency services,
or other innovative products or services.[11]

ESCO Parties

        In general, the ESCO parties (NEMA, RESA, Direct
Energy, Agway, Constellation, GEE, IEC, Infinite) believe that
little or nothing is wrong with the retail access market and
argue that Commission interference with ESCOs' current access to
customers is unwarranted.  Those ESCOs that acknowledge room for
market improvement offer suggestions that range from mild to
moderate reforms.  Some of those reforms suggested by the ESCOs
require shifting certain responsibilities from utilities to
ESCOs, thereby granting ESCOs more power and more immediate
access to customers.  As examples, some ESCOs suggest the
Commission adopt more rigorous eligibility criteria, while
others suggest that the Commission shift responsibility for
certain business operations, such as billing and collecting,
from utilities to ESCOs.

        In general, the ESCO parties argue that Staff's price
comparison between utilities and ESCOs is flawed.[12]  The ESCOs
also generally contend that the retail access market is
functioning well.  While most of the ESCOs acknowledge that
there are some "bad actors" in the market that are taking
advantage of customers, those same ESCOs argue that the
Commission should use existing regulations to penalize bad-
acting ESCOs.  The ESCOs also generally believe that any market
failures can and should be remedied through regulatory fine-
tuning, such as: increasing eligibility requirements for ESCOs,
including requiring a bond or other security instrument;

---

[11]   NYC Initial Brief, p. 13-14.

[12]   See Tr. 358-363, 365-369; Hearing Exhibit 8.

CASE 15-M-0127, et al.

increasing the Commission's use of Orders to Show Cause to
address bad-acting ESCOs; and eliminating utility purchases of
ESCO receivables without recourse.

<u>DISCUSSION AND CONCLUSIONS</u>

The record compiled in these proceedings suggests
that, despite the Commission's previous efforts, little has
changed in New York's retail access market since 2014,[13] when the
Commission observed that complaint rates for the retail access
market were high, prices for customers in the retail access
market are higher than the utility commodity prices, and the
retail access market has failed to produce meaningful energy-
related innovation over its decades of existence.[14]  Indeed,
according to the data and analysis offered by the ESCO Direct
Energy, mass-market ESCO customers generally paid significantly
more for both gas and electric commodities than utility
customers did, excepting for a very short period early in 2014
(<u>i.e.</u> the so-called "Polar Vortex").[15]  While some mass-market
ESCO customers saved money during the time period analyzed

---

[13]  However, as to a specific subset of that market, low-income
customers, the Commission has implemented new strong customer
protection reforms to protect low-income customers from bad-
acting ESCOs.  Those reforms have been upheld in New York
State Courts.  <u>See generally</u>, <u>Matter of National Energy
Marketers Assn. v. New York State Pub. Serv. Commn.</u>, 167
A.D.3d 88 (3d Dept. 2018).

[14]  Cases 12-M-0476, <u>et al</u>., <u>Proceeding on Motion of the
Commission to Assess Certain Aspects of the Residential and
Small Non-residential Retail Energy Markets in New York
State</u>, Order Taking Actions to Improve Residential and Small
Nonresidential Retail Access Markets (issued February 25,
2014), p. 10 (February 2014 Order).

[15]  Hearing Exhibit 9.

-10-

CASE 15-M-0127, et al.

(2014-2016), PULP estimated the number of customers who realized a savings to be less than 25% of all ESCO customers.[16]

The most commonly offered ESCO product continues to be a commodity-only, variable-rate product, that frequently is provided at a higher price than charged by the utilities.  While some ESCOs provide fixed-rate products, ESCO customers who receive such service - an estimated 20% of all ESCO customers[17] - pay a significant premium for that service.  Finally, to the extent that any value-added products and services are available to New York customers, those products and services are, by and large, not energy related.  Rather, they are typically products that are more accurately described as marketing devices or one-time offers intended to induce customers to enroll with the ESCO.  The items - such as frequent flyer miles, gift cards, sports tickets, LED light bulbs, and "smart" thermostats - frequently have a market value that is much lower than the amount customers ultimately pay to the ESCO over the course of the contract in excess of what they would have paid to the utilities.  Moreover, many of the aforementioned items have nothing to do with providing energy services and therefore serve none of the goals of the energy retail market.  As to the items that have a tangential relationship to energy services - lightbulbs, thermostats, etc. - these items offer little or no value for the purposes of the energy retail market given that customers can easily purchase these items outside of that market; we find no convincing proof that customers receive any

---

[16]   Tr. 3827-3830.  Direct Energy alleges in rebuttal that a small majority of ESCO small commercial customers – 52% - saved money during the relevant period.  Tr. 402-403.  See also Tr. 2135.

[17]   Tr. 2118.

CASE 15-M-0127, et al.

meaningful value when these easily accessible retail items are tethered to the receipt of commodity energy.

Finally, the record establishes that the complaint rate for ESCOs remains unacceptably high. Between 2014 and 2016, the Department's Office of Consumer Services (OCS) received more than 11,000 initial complaints about ESCOs.[18] About half of these initial complaints alleged deceptive ESCO marketing practices, and there is a positive correlation between the level of extra cost associated with ESCO service and the overall number of initial complaints made to OCS.[19]

The record establishes that many of the concerns raised by the non-ESCO parties about the current operation of the retail access market are warranted. The Commission shares those concerns, particularly regarding the lack of easily accessible and comprehensible product and pricing information and, the number of complaints alleging that bad-acting ESCOs were misleading and exploiting customers. Thus, we conclude that significant changes to provisions governing retail access are needed to provide adequate protections for New York customers. If market participants are unwilling, or unable, to provide material benefits to customers beyond those provided by utilities in exchange for a regulated, just and reasonable rate, the market serves no proper purpose and should be ended.

Nonetheless, the Commission recognizes that some ESCOs appear to offer customers product and service choices that are not available from the utilities. Some of these types of product offerings may have the potential to advance policy goals of the State, including the development of renewable energy and promotion of energy-related products and services that help

---

[18]   Tr. 2101-2102.

[19]   Tr. 3866; Hearing Exhibits 957, 998.

CASE 15-M-0127, et al.

customers lower their energy consumption and/or save on their energy bills. Moreover, fixed-rate commodity products, which utilities are not permitted to offer, might, in certain limited instances, provide some small marginal value due to the predictability of commodity unit costs for financial planning purposes – although fixed rates do not prevent fluctuation in monthly bills due to variations in energy use over time and seasonal weather changes.

Because certain ESCO products and services have the potential to provide some benefits to customers and help the State advance its clean energy goals, the Commission determines that, at this time, the regulated retail energy market will continue. However, the continuation of the markets is contingent on the participants' unconditional commitment to, and strict compliance with, the reforms adopted herein, which are intended to enhance transparency for customers, provide greater customer protection from bad-acting ESCOs, and ensure that only the products and services that truly benefit the customers and the State will be offered, at just and reasonable rates. While many of the reforms adopted herein are interrelated to some extent, the Commission finds that each new customer protection requirement is independently justified. Moreover, while we take decisive steps here to better protect customers, we anticipate that a successful retail access market will likely require further analysis and action from the Commission as the market responds to the instant reforms and as, more generally, energy markets change over time. We further anticipate that such issues, as they arise, will likely be best addressed in rulemaking proceedings that are more focused on particular aspects of the market than the instant evidentiary-proceeding track.

CASE 15-M-0127, et al.

Order Implementation

          Unless otherwise set forth herein, requirements
adopted in this Order governing ESCO terms of service are
implemented as of the effective date of the amended Uniform
Business Practices (UBP), 60 days from the effective date of
this Order.


          I.   ENHANCED ESCO ELIGIBILITY CRITERIA

          Approximately 200 ESCOs are deemed eligible in New
York to provide electricity and natural gas.  The record
establishes that the majority of ESCOs in New York continue to
offer solely commodity resale to mass-market customers.  Given
the high number of complaints received by the Department
concerning ESCOs, the Commission strengthens the criteria by
which ESCOs obtain, and then continue to exercise, the privilege
of access to utility systems and continue to participate in the
retail energy market.

          In 1999, the Commission established criteria that
ESCOs must satisfy to become eligible to sell electricity or
natural gas in New York State, and to maintain eligibility, as
detailed in the UBP § 2.[20]  Through the use of the plain-language
term "eligibility," the Commission made clear that it does not
grant ESCOs licenses.  This is because, among other reasons, it
would be improper for ESCOs to obtain a property interest in
utility systems that are "clothed with a public interest", given

_____

[20]  See Case 98-M-1343, Matter of Retail Access Business Rules,
      Order Adopting Revised Uniform Business Practices (issued
      January 19, 2018), Appendix A.  The UBP are incorporated into
      each utility's tariff.  See also Case 98-M-1343, Order on
      Rehearing and Providing Clarification (issued September 23,
      2019).

CASE 15-M-0127, et al.

that ESCOs do not share utilities' public-interest obligations.[21] The Commission's eligibility regime properly reflects the fact that access to utility systems is a privilege over which the Commission retains significant discretion,[22] a point which is repeatedly emphasized via the UBP's numerous provisions regarding ESCOs' obligation for maintaining eligibility.  An ESCO's failure to adhere to the Commission's eligibility criteria subject it to consequences, including suspension or revocation of its eligibility to operate in New York.

 Applicants for ESCO eligibility are required to submit, among other things: a Retail Access Eligibility Form; a variety of sample forms, including sales agreements; sample promotional materials; internal procedures to prevent unauthorized and illegal conversion of accounts – practices known as "slamming"; the name and contact information for the applicant's main office; the name and contact information for any entity holding an ownership interest of 10% or more; and an explanation of any regulatory or criminal sanctions imposed during the last 36 months against any senior officers or entity holding a 10% or more ownership interest.  The ESCO is required to file annually a statement that the filed application information remains accurate or provide a description of any revisions to the application information.  Every three years, the ESCO is required to update all the information in the application.

 The Commission adopted these criteria to ensure that ESCOs participating in New York's retail energy market satisfy

---

[21]  Rochester Gas & Elec. Corp. v. Pub. Serv. Comm'n of State of N.Y., 71 N.Y.2d 313, 322 (1988); see also Matter of Retail Energy Supply Assn. v Public Serv. Commn. of The State of New York, 152 A.D.3d 1133, 1139 [2017], affd sub nom NEMA v. PSC, 33 N.Y.3d 336.

[22]  NEMA v. PSC, 33 N.Y.3d at 350.

CASE 15-M-0127, et al.

minimum eligibility conditions and facilitate development of
competitive retail energy markets, including the development of
innovative energy-related services or products that may be
offered.  While Department staff currently review the contents
of the applications for completeness and compliance with the UBP
requirements, there is no process by which Department staff can
review and make a determination as to an applicant's overall
fitness or qualifications to operate as an ESCO in a manner that
is beneficial to consumers.[23]

        To maintain eligibility, at least once every 30 days
an ESCO must post on the Department's "Power to Choose" website
a price for each commodity-only product offered to residential
customers.[24]  The ESCO is not permitted to charge newly enrolled
customers more than the prices posted for that specific product
at the time of the enrollment.


I.A. Non-ESCO Party Positions Regarding ESCO Eligibility
     Requirements

        Staff does not make any recommendation for substantive
amendments to the UBPs that regulate ESCO eligibility.  Rather,
Staff recommends that the Commission amend UBP § 2(D), which
requires ESCOs to perform certain tasks in order to maintain
eligibility, to impose new reporting requirements set forth in a
proposed UBP section, section 11.[25]  The proposed UBP Section 11
would require ESCOs to, among other things, file an annual
report containing: basic financial statements, in accordance

---

[23]  The UBP do contain a separate provision for creditworthiness
      standards that, if not met, could subject the ESCO to a
      demand by the distribution utility to post and maintain
      financial assurances, such as a bond or a deposit, or some
      other means of establishing creditworthiness.  See UBP § 3.

[24]  UBP § 2(D)(4).

[25]  Hearing Exhibit 723.

                            -16-

CASE 15-M-0127, et al.

with the Uniform System of Accounts for gas and electric utilities; information specific to the ESCO's New York operations regarding the number of mass-market customers served, the ESCO's revenues, with commodity unbundled from any value-added service, the "cost of goods sold", the cost of value-added services provided in New York, the units of sales by kWh or therm, and the amount of capital deployed in the State.[26]

Notably, Staff did not join the ESCOs' call for bonding or collateral requirements.  According to Staff, bonding and collateral requirements would not have the same effect as ensuring that ESCOs are charging just and reasonable rates. Staff also expresses concern that the call for such financial surety by some larger ESCOs is an attempt by those ESCOs to "weed out" smaller ESCOs.[27]

For its part, NYC opines that a more rigorous application process, like a licensing structure, could improve customer protections without adversely affecting the retail access market.[28]  NYC believes that the Commission should actively review an ESCO's fitness to serve customers before the ESCO is permitted to operate in the state.  NYC suggests that an "officer certification" requirement, pursuant to which an ESCO corporate officer would affirm that he or she understands that the ESCO must comply with all relevant laws and regulations, could be an effective tool when prosecuting bad-acting ESCOs.[29]

Finally, NYC supports a requirement that ESCOs post some form of collateral or other financial assurances.  NYC

---

[26]   Hearing Exhibit 723 (UBP proposed §11(F)).

[27]   Staff Initial Brief, p. 78.

[28]   NYC Initial Brief, p. 23.

[29]   NYC Initial Brief, p. 23; Tr. 1460.  Direct Energy also supported an officer or management affirmation.  See Tr. 179.

-17-

CASE 15-M-0127, et al.

opines that this collateral would be available to make customers whole if the ESCO engages in misconduct and/or to deter misconduct in the first place.[30]

UIU/NYAG recommends that the UBPs be modified to enhance eligibility criteria by requiring the disclosure of investigations and complaints in other states that were made against the ESCO and its marketing agents.  UIU/NYAG believe that eligibility should be denied to any ESCO with a history of "poor performance."[31]  In addition, they recommend that ESCOs be required to post a performance bond, similar to the security requirements established by the utilities and the New York Independent System Operator (NYISO).[32]  UIU/NYAG propose that the amount of the security required should be determined based upon the number of customers served by the ESCO and the amount the ESCO historically has charged customers above the utility price. If the ESCO has not charged more than the utility, then the amount should be a pro-rated share of the average overcharge of all ESCOs.  According to UIU/NYAG, this financial security requirement would ensure that ESCOs operating in New York have the resources to make customers whole if there is a violation of the contract or any applicable law or regulation.


I.B.  ESCO Party Positions Regarding ESCO Eligibility
      Requirements

Constellation urges the Commission to look to the eligibility standards in other states as a guidepost for potential changes to the rules and process in New York for ESCO

---

[30]  NYC Initial Brief, p. 24.  Direct Energy and RESA support a collateral or other financial assurance requirement.

[31]  Tr. 1542-1543. (UIU/NYAG does not define "poor performance").

[32]  Tr. 1544.

CASE 15-M-0127, et al.

eligibility.[33]  Constellation offers Delaware, Connecticut,
Illinois, Ohio, Pennsylvania, Virginia, and the District of
Columbia as examples of jurisdictions that require an ESCO to
demonstrate that it has the technical, managerial, operational
and financial capability to adequately provide the public with
gas and/or electricity service.  Similarly, Constellation points
out, New Jersey requires an ESCO to demonstrate its "financial
integrity" by submitting, among other things, financial
statements and other information to demonstrate that the
applicant can satisfy its financial requirements.  Constellation
explains that some states, like Connecticut, New Hampshire,
California, and Delaware, require an applicant to post some type
of financial assurance, such as a surety bond or a letter of
credit.[34]

         Drift, GEE, and Direct Energy similarly support a more
rigorous application process for ESCOs, with heightened
eligibility requirements.[35]  Drift is concerned that, without
more barriers to entry in place, "fly by night" companies will
continue to infiltrate the market, rapidly enroll customers on
unfavorable contract terms, and then sell the customers to other
ESCOs.  These parties believe that strengthening the eligibility
requirements is a way to expand customer protection without
endangering legitimate ESCO operations.

         Drift, GEE, and Direct Energy also recommend that the
Commission establish a financial assurance requirement.  For its
part, Direct Energy believes that each ESCO should be required
to post a financial surety in an amount between $1 million and

---

[33]  Constellation Initial Brief, pp. 20-24.

[34]  Id., p. 26.

[35]  Drift Initial Brief, pp. 17-18; Tr. 83-84, 247-248.

CASE 15-M-0127, et al.

$5 million, depending on the number of meters the ESCO serves.[36]
Direct Energy, much like most ESCOs that support financial
assurances, suggests that such requirement would provide a means
for customer refunds and deter bad-acting companies or companies
with suspect financial abilities from entering the marketplace.

The IEC similarly urges the Commission to adopt a
formal licensing process that has "comprehensive eligibility
requirements", including a demonstration of financial fitness,
and an opportunity for Department staff to make a substantive
determination of eligibility.[37]  Financial fitness could be
established, according to the IEC, through the submission of
documentation, such as audited financial statements, banking
records, or credit reports.  The IEC notes that ESCOs currently
are required to satisfy financial assurances with both the NYISO
and local utilities and, thus, requiring multiple additional
assurances are prejudicial to smaller, less liquid ESCOs.[38]
Thus, the IEC recommends that the Commission require ESCOs to
post financial assurance that is relative to the risk the ESCOs'
products pose to customers.[39]

RESA points out that there is wide support among the
parties - ESCOs and non-ESCOs alike - for Commission action to
strengthen the eligibility requirements.  RESA believes that
stronger requirements would send a signal to customers and other
market participants that all active ESCOs in the market have the
skills and financial capability to operate responsibly in a

---

[36]   Tr. 248.

[37]   IEC Initial Brief, pp. 37-39; IEC Reply Brief, p. 17.
       Robison supports the positions offered on this issue by the
       IEC. Robison Reply Brief, p. 10.

[38]   IEC Reply Brief, p. 21.

[39]   IEC Initial Brief, pp. 38-40.

CASE 15-M-0127, et al.

complex market.[40]  Specifically, RESA suggests that the
Commission should require all new applicants to "demonstrate
experience with wholesale energy procurement, energy risk
management and hedging."[41]  In addition, RESA believes that new
applicants should be required to demonstrate that they have
experience developing and offering energy-related products and
services.[42]  RESA believes that any ESCO that does not have
experience in these areas should be required to present a plan
to develop these capabilities before it is authorized to operate
in New York.

As for existing ESCOs, RESA believes that the
Commission should establish a bonding requirement that is
reasonably tied to the amount of risk to which the customers are
subjected.  RESA disagrees with the suggestion by UIU/NYAG that
the bonding requirement be tied to any alleged "overcharge"
because such recommendation would be difficult to implement,
given that prices fluctuate from year to year, and, more
importantly, "it is a false premise" to label any difference
between an ESCO and a utility price as an "overcharge".[43]

Finally, RESA believes that New York's retail access
market requires "greater assurance that each ESCO has the
financial wherewithal to honor existing contracts" and to comply
with the UBP.[44]  According to RESA, the lack of any bonding or

---

[40]  RESA Initial Brief, pp. 38-39.  Infinite Energy supports the
      positions set forth by RESA regarding ESCO eligibility.
      Infinite Energy Initial Brief, p. 19.

[41]  RESA Initial Brief, p. 39; Tr. 1171-1172.

[42]  Direct Energy similarly suggested that ESCO applicants be
      required to demonstrate relevant industry expertise.  See Tr.
      249.

[43]  RESA Initial Brief, p. 40.

[44]  RESA Initial Brief, p. 41.

CASE 15-M-0127, et al.

other collateral requirement in New York is in stark contrast to other states with competitive electricity and gas markets.  RESA believes that any collateral requirements adopted by the Commission should take into consideration factors such as: the type of marketing the ESCO uses; the number of customers served; and the ESCO's UBP compliance history.[45]


I.C. Conclusions Regarding ESCO Eligibility Requirements

      The Commission adopts enhanced eligibility requirements as discussed below.  These stricter eligibility requirements will ensure that only the ESCOs that are prepared to comply with rules and regulations and uphold policy goals and expectations are participating in the retail access market. Enhancing the quality and trustworthiness of market participants should, in turn, reduce the exposure to risk for customers and improve confidence in the marketplace.

      Currently, the UBP requires ESCOs to complete an application including information such as company name and contact information, a list of products and services to be offered, and sample sales agreements of products and services to be offered.  The collection of additional information from all ESCOs, as discussed herein, will assist Department staff in its review of applications and assist staff in determining which applicants are likely to comply with eligibility and operations requirements.  Consequently, the UBP is amended to impose additional application requirements, as follows.  Those modifications are reflected in the red-lined text of the amended UBP, attached hereto as APPENDIX A, and shall become effective 60 calendar days after issuance of this Order.

---

[45]   RESA Initial Brief, p. 42; Tr. 1169-1171.

CASE 15-M-0127, et al.

### I.C.1. Method(s) of Marketing

Department staff are better able to monitor the retail market when staff knows each ESCO's method(s) of marketing. Therefore, staff shall modify the ESCO eligibility application to include a checklist for the applicant to identify method(s) by which the ESCO intends to market to customers. This checklist shall include, at a minimum, the following methods: door-to-door; other in-person, including events; telemarketing; direct mail; through partners (with attached list of partners); and online advertisements. Staff may add additional methods, in the initial filing or as part of future updates, as needed.

### I.C.2. Types of Products Offered

Pursuant to the following sections of this Order, any product marketed by an ESCO after the effective date of the modified UBP adopted in this Order must meet at least one of three criteria, with one exception noted below: (a) it must include guaranteed savings; (b) it must be a fixed-rate product compliant with a price limit; or, (c) it must be a renewably sourced product compliant with rules regarding content, sourcing, and transparency, discussed below in the Products Offering section. As part of its application for eligibility, an ESCO must identify in which of these categories it intends to offer products.

The Commission provides one exception to these three criteria and allows Agway a limited opportunity to continue to offer its EnergyGuard service, due to the specific, credible evidence Agway submitted regarding the energy-related value of this product. As discussed below, the Commission permits a limited opportunity for other ESCOs to apply for the opportunity to sell a product/service similar to EnergyGuard.

-23-

CASE 15-M-0127, et al.

### I.C.3. Complaint Data for Other States of Operation

ESCOs will be required to disclose each state in which they operate or have operated within the 24 months prior to the date of the application and provide any data in their possession regarding complaint history in those states.  If the ESCO operates under multiple trade names, it must identify each name used and the state(s) in which each name is used.  This information will be used by Department staff, in its discretion, to contact the regulatory agencies in those states to obtain information regarding the ESCO's complaint history.  The Commission will retain discretion to consider complaint history in other states as a basis for denying or withdrawing ESCO eligibility.

### I.C.4. Data Security Breaches

As a general matter, ESCOs must make all reasonable efforts to prevent and discover security breaches associated with customer proprietary information.  ESCOs that apply to operate in New York will be required to list and describe any security breaches associated with customer proprietary information that occurred in any jurisdiction in which it operates, under any trade name, within the 24 months prior to the application, and actions taken by the applicant in response to the incident.  ESCOs also shall provide specific policies and procedures addressing how they intend to secure customer data.  The Commission retains discretion to consider in its eligibility determinations ESCOs' security vulnerabilities as a basis for denying or withdrawing ESCO eligibility.

### I.C.5. Bankruptcy History

ESCO applicants will be required to disclose any history of bankruptcy, dissolution, merger, or acquisition activities during the 24 months prior to the application.  This data will provide Department staff with access to information

-24-

CASE 15-M-0127, et al.

about the ESCO's recent financial history, without seeking historical data that is stale or unduly burdensome to compile. This information also must be provided for each trade name used as well as for affiliates of the ESCO, including upstream owners and subsidiaries. The Commission will consider this information, in its discretion, in determining ESCO eligibility.

> I.C.6. <u>Financial Assurances/Collateral Requirements</u>

ESCO applicants will be required to provide proof of financial assurance. This may take the form of bonding, collateral, a letter of credit or the like, or may take the form of a meaningful demonstration that the ESCO is sufficiently capitalized for the amount and type of business the ESCO is conducting in New York. A demonstration of financial health will ensure that ESCOs that guarantee pricing, such as through savings guarantee or fixed-rate contract, are able to fulfill that guarantee. Such requirement will both deter bad-acting ESCOs from entering the market and ensure that ESCOs do not take on responsibilities they may not be able to fulfill. Likewise, it will help deter ESCOs from attempting to strategically exit the market in a manner that allows them to capture the value of their energy services contracts while evading their obligations to customers.

A financial assurance requirement would provide a means to ensure that customers who were wronged by an ESCO by overcharging or other financial injury can be made whole. Moreover, this requirement will help ensure that only ESCOs that are ready, willing, and able to compete in the retail access market in full compliance with the UBP will populate the market.

In order to properly protect customers while simultaneously encouraging market participation from smaller ESCOs, a sufficient financial assurance must have a relationship to the amount of business a particular ESCO does in the state.

-25-

CASE 15-M-0127, et al.

To develop a proper methodology for assessing entry level and
ongoing financial assurance requirements, Staff is directed to
consult with interested stakeholders and propose both an
appropriate form of financial assurance and a reasonable
methodology for calculating the required amount.  A report of
Staff's recommendations will be due within 120 calendar days of
the date of this Order.

     I.C.7. ESCO Officer Certification

        ESCOs will be required to provide as part of the
application an "officer certification", as was recommended by
NYC.  Such certification must be a document sworn to by a high-
level officer of the ESCO, such as the president or chief
operating officer or equivalent, in which the officer affirms
that the ESCO is willing and able to comply with all applicable
laws and regulations.  Annually thereafter, each ESCO must file
this officer certification to affirm that the ESCO is following
all applicable laws and regulations.

     I.C.8. Additional Eligibility Review Process

        Under the current UBP, an applicant that submits the
required information is automatically deemed eligible to operate
as an ESCO in New York.  The fact that this process relies on an
assumption of good faith participation in the market has likely
contributed to bad-acting ESCOs' ability to participate in the
market.  To remedy the unintended effects of this presumption, a
more thorough review process is necessary.  The amended process
will allow Department staff to recommend to the Commission that
the Commission deny an entity's application to operate as an
ESCO in New York, for good cause shown.  In any instance that
Department staff recommends denial of an application, the
applicant shall be afforded an opportunity to provide
information in support of its application to the Commission

-26-

CASE 15-M-0127, et al.

before a final determination is made.[46]  Furthermore, an ESCO
will not be eligible to operate in New York State until its
application has been approved by staff or the Commission.

       Department staff's application review process
generally will be guided by the eligibility requirements
identified in the UBP and any relevant Commission order.[47]  Those
requirements create various mechanisms by which the Department
and the Commission may acquire materials that directly bear on
the applicant's ability and willingness to provide electric
and/or gas service while complying with relevant consumer
protection provisions.  Historically, applicants' eligibility
largely has been evaluated based upon whether they submitted the
necessary documents and/or information.  Going forward, staff
will continue to assess whether applicants have submitted the
required documents and information and will assess what those
documents and information reveal about the applicant's
likelihood of compliance with the UBP if the ESCO were deemed
eligible to operation in New York.

       To provide a few illustrative examples of factors to
be considered during this eligibility review process, staff will
assess not only whether an applicant has submitted the required
marketing materials and sales agreements, it also will assess
whether those marketing materials contain any obviously false or
misleading information, including claims about the applicant's

---

[46]  This opportunity is intended to permit response and/or
rebuttal to any arguments raised by staff and is not intended
to permit supplementation of a deficient application.  The
Commission retains the right to consider, in its eligibility
determination, the significance of any applicant's failure to
make a prima facie case for eligibility in its initial
application.

[47]  See generally UBP § 2.

–27–

CASE 15-M-0127, et al.

service that are inconsistent with laws, rules, or regulations.[48]
Staff also receives considerable information regarding an
applicant's managerial staff, contractors, and subcontractors,
as well as information regarding whether any senior management
has been engaged in, or has worked for ESCOs that have engaged
in, violations of law, regulations or rules.[49]   Department staff
now will be empowered to recommend to the Commission that an
applicant's eligibility be denied in any situation in which an
applicant employs senior management, or hires
contractors/subcontractors, that have a history of legal
noncompliance and/or disregard for relevant customer
protections.

     These examples are not exhaustive.  They are intended
to illustrate that staff should evaluate applications in
relationship to the clear substantive concerns that underpin the
requirements for various submissions in the application process.
We reiterate that staff's discretion is significantly
constrained in this exercise, inasmuch as it is not authorized
deny an applicant eligibility.  Rather, in appropriate
circumstances, staff shall provide a recommendation to the
Commission when it believes an applicant is unqualified for
eligibility.  The Commission then will perform a de novo review
of the application.

     Existing ESCOs that currently are validly operating in
New York will continue to be eligible to operate pending the
effective date of the modified UBP adopted in this Order.
However, all currently operating ESCOs that wish to continue
operations by enrolling new customers or renewing contracts with
existing customers following the effective date of the modified

---

[48]   See UBP §§ 2.B.1.b., 2.B.1.l.

[49]   See UBP § 2.B.1.K.

CASE 15-M-0127, et al.

UBP (i.e., 60 calendar days following the date of this Order) must file an application in accordance with the modified UBP no later than 30 calendar days after the effective date of the UBP (i.e., an application must be filed within 90 calendar days of the effective date of this Order).  To the extent that the information submitted in such application, or other information available to Department staff, suggests that an ESCO's eligibility to operate should be revoked, staff shall make such recommendation to the Commission, and consideration of that ESCO's eligibility shall follow the process for denial of an application discussed above.[50]

The eligibility of any currently operating ESCO to enroll new customers or renew contracts with existing customers shall be immediately and automatically suspended if the ESCO fails to submit a new application within 30 calendar days of the effective date of the UBP as modified in this Order.  While such suspension will bar the ESCO from entering any new agreements with customers, it will not relieve the ESCO of its outstanding legal obligations under existing contracts.  The ESCO's eligibility will be restored only after it has filed a new application and Department staff or the Commission has approved that application.

In addition, Department staff periodically will review the eligibility of each ESCO operating in New York and make a recommendation to the Commission if it finds that the ESCO should not be permitted to continue its New York operations.  Thus, ESCOs must be prepared to provide Department staff with any and all information that is necessary to establish eligibility.  An eligibility review process that includes both

---

[50]   We note that, to any extent that they conflict, this specific eligibility-determination process supersedes the more generic process described in UBP §§ 2.D.5 and 2.D.6.

CASE 15-M-0127, et al.

an initial and periodic assessment of the fitness of an ESCO
will enhance the customer protections already in place and
ensure that only the most qualified ESCOs provide service to New
York customers.

At a minimum, the process should include regular
updates from the ESCOs, including prompt filings for any major
changes and annual filing of all updates, combined with a formal
reassessment every several years, or more frequently as needed.
Staff is directed to file a review process guidance document
within 60 days of the issuance of this Order.

## II.   ACCESS TO AND TRANSPARENCY OF PRICING INFORMATION

The evidence in the record demonstrates that, on
average, mass-market ESCO customers pay more for their electric
and/or gas service than utility customers pay.  While certain
ESCO products may justifiably cost the customer more, it is
troubling that, after the extensive process associated with this
track, neither ESCOs nor any other party have shown, to any
meaningful degree of certainty, that ESCO charges above utility
rates were generally – or in any specific instances – justified.
The reasons for the pricing discrepancies between ESCOs and
utilities are unclear due, in part, to the fact that the State's
utilities, which deliver the commodity sold by ESCOs to the ESCO
customers and frequently perform all of the ESCOs' billing
functions, are not privy to data regarding what type of products
or additional services the ESCO customers have contracted to
obtain from the ESCOs.  Further, commodity costs for ESCO
customers are not unbundled and identified separately from any
value-added product or service purportedly supplied by the ESCO,
either in the ESCOs' communication to the utilities or on the
customers' bills.  ESCOs' collective failure to use the instant
track to establish, to any reasonable degree of certainty, that

CASE 15-M-0127, et al.

customers receive valuable energy-related services that justify
the specific premiums they pay for ESCO service underscores and
supports the Commission's long-held concern that many customers
may only be taking ESCO service due to their misunderstanding of
the products and/or prices that they are purchasing from the
ESCO.

   The lack of specific data and information about the
types of products ESCO customers are receiving is problematic
for several reasons.  Most importantly, though, without
transparent or unbundled pricing data, neither the Commission
nor ESCO customers can evaluate whether the prices being charged
by ESCOs are just and reasonable.  In addition, the lack of
easily accessible data about the various types of products
offered by the ESCOs, including the pricing, makes it difficult
for customers to make fair comparisons among the ESCO offerings
to decide which ESCO product might be beneficial for them.

   The retail market cannot function properly if it
leaves the Commission -- or customers -- unable to easily assess
the value of permissible ESCO products.  Itemized, transparent
pricing data matched with clearly described ESCO products will
better allow customers to compare ESCOs' products against one
another and against the value of utility commodity service.

II.A. Non-ESCO Parties' Positions Regarding Access to and
   Transparency of Pricing Information

   Staff and PULP believe that the utilities, where
Consolidated Utility Billing (CUB) is used, and ESCOs, where
Consolidated ESCO Billing (CEB) or dual-billing is used, should
be required to produce an on-bill comparison for all ESCO
customers.  They suggest that the comparison show what the ESCO
customer is being billed for commodity and delivery service
during the identified period and provide the customer with the

-31-

CASE 15-M-0127, et al.

amount he or she would have paid had the customer remained with the default utility.[51]

The Joint Utilities do not oppose Staff's recommendation, but caution that the development and implementation of an on-bill comparison will have significant cost and other resource requirements. They request that the implementation time-frame and estimated resource requirements be investigated prior to adoption of this recommendation.[52]

II.B.   ESCO Parties' Positions Regarding Access to and Transparency of Pricing Information

Most ESCO parties do not directly address or oppose an on-bill comparison but, rather, focus on the validity of comparing monthly ESCO charges to the charges of the default utility. These parties argue that any comparison is inherently flawed, given, among other reasons, that ESCOs incur costs that utilities do not, ESCOs provide value-added products and services not offered by utilities, and utilities can recover costs outside the periods in which the costs are incurred.[53]

II.C.   Conclusions Regarding Access to and Transparency of Pricing Information

One of the purposes of allowing ESCOs to participate in the retail energy market was to offer customers the option to choose among energy providers, with the understanding that

---

[51] Tr. 3460-3461.  This is like the practice adopted in Connecticut.  Staff Initial Brief, pp. 82-83, 89.

[52] Joint Utilities Reply Brief, pp. 4-5.

[53] See, e.g., tr. 253-257, 292-294, 364-366, 695-696, 812-815. Agway Initial Brief, pp. 1-2; Constellation Initial Brief, pp. 18-20; Direct Energy Brief, pp. 12-13, 15-16, 44; Direct Energy Reply Brief, p. 23; Infinite Energy Reply Brief, pp. 14-15; NEMA Initial Brief, pp. 56-57.  See also RESA Initial Brief, §III.C.3; GEE Initial Brief, pp. 10-11; GEE Reply Brief, pp. 19-20, 23-24.

CASE 15-M-0127, et al.

"[c]ustomers acting in their own self-interest, when presented
with a variety of market choices, will arrange their consumption
to maximize their welfare and save costs."[54]  Thus, in theory,
the ESCO business model is "dependent on creating value for the
end customer"[55] and the expectation that, when an ESCO customer
does not perceive value, he or she simply will change ESCOs or
return to utility service.

        However, for ESCO customers to perceive the existence
or lack of value, the customers must have easy access to
sufficient, clearly conveyed pricing information.  Customers
with such access can easily educate themselves, and an educated
customer base will, in turn, increase competitive pressure on
ESCOs to the benefit of customers through a more competitive and
efficient market.[56]  Simply put, price transparency clearly
furthers the purposes of the retail energy market, and we reject
all arguments that customers will be better off in a retail
market that permits opaque and confusing ESCO pricing/billing to
continue.

    II.C.1.   Utility-Provided Price Comparisons

        Customers' ability to easily make accurate price
comparisons is a critical component of achieving the goals
articulated by the Commission when it established competitive
markets.  The on-bill comparison suggested by Staff and PULP is
a promising method for empowering customers to make informed
choices, and therefore the Commission supports the comparison as
a requirement placed on utilities that bill on behalf of ESCOs.

---

[54]  Cases 94-E-0952 et al., Matter of Competitive Opportunities
     Regarding Electric Service, Opinion 96-12, p. 40.

[55]  RESA Initial Brief, p. 80.

[56]  Case 12-M-0476, supra, Order Instituting Proceeding and
     Seeking Comments Regarding Operation of Retail Energy Markets
     (issued October 19, 2012), p. 5.

CASE 15-M-0127, et al.

Ideally, the first page of each utility bill sent to a customer
would contain a conspicuous price comparison that shows the ESCO
name and charge for the prior billing period and what that
charge would have been for the same period had the customer
received commodity from the utility.   A clear price comparison
would also identify the difference between those two amounts in
a manner that unambiguously conveys whether the customer is
saving money or paying a premium for the ESCO service.   The
Commission also finds that customers could benefit from a bill
that contains a chart showing the preceding 12-month period and
a comparison of the ESCO price paid by the customer and the
price the utility would have charged over that term.   An ideal
price comparison also would identify the difference between
those two 12-month amounts in a manner that unambiguously
conveys whether the customer is saving money or paying a premium
for the ESCO service over that term.

     The Commission is cognizant of the fact that the
aforementioned on-bill price comparison is merely one mechanism
for achieving the desired result of making accurate,
comprehensible pricing information readily available to
customers.   While an on-bill comparison is expected to be a
necessary element for achieving this goal, the Commission
recognizes that it may not be, in and of itself, sufficient.

     The utilities already use a variety of methods, in
addition to the traditional utility bill, to convey service
information to customers and those various methods can also
serve as potential opportunities for educating and empowering
customers.   The Commission anticipates that utilities likely
will need to use more than one existing method, and perhaps
adopt new methods, to effectively convey price comparison
information to customers.   The methods for conveying price
comparison information could include, but are not limited to,

CASE 15-M-0127, et al.

websites, regular mail, email, customer service representative interactions, and interactive voice recording system interactions.

We recognize that achieving these goals requires a tailored approach given that each utility may face unique hurdles to ubiquitously conveying price-comparison information. As one obvious example, differences in the utilities' information technology systems could alter the costs, or reasonable implementation timelines, between the utilities if we were to direct utilities to provide identical information in an identical manner on a unified timeline. Mindful of the need to consider individual characteristics of utilities' billing systems, the Commission directs Staff to collaborate with the utilities and develop individualized plans that set forth, for each utility, a timely and cost-effective pathway toward maximizing the dissemination of useful price-comparison information to customers.

The Commission generally finds that an inflexible timeline placed upon plan filings or implementation dates would be imprudent at this juncture. Nonetheless, we stress that empowering customers in this manner is of the utmost importance to retail energy market reform. Further, the price transparency goals articulated herein clearly implicate the utilities' legal obligations to convey price information simply and clearly regarding energy services and, more generally, to do business in a manner consistent with the public interest. Therefore, we direct the utilities and Staff to act in a prompt and diligent manner for the purpose of creating a Joint Billing Plan for each utility that meets the foregoing parameters and is supported by both Staff and the respective utility. To the extent that Staff and any utility are unable to reach a mutually agreed upon, binding Joint Billing Plan within a reasonable time, Staff shall

CASE 15-M-0127, et al.

file a proposed Billing Plan for Commission review and
consideration.  The utility will then have an opportunity to
make a filing identifying and explaining the areas of the
Billing Plan to which they object and offering alternative
proposals.  The underscore our expectation and – our direction –
that the utilities will act in a prompt manner to expand the
opportunities for meaningful price comparison and transparency.

     II.C.2 <u>Utility-Provided Cost Itemizations</u>

     Our conclusions on itemized billing are consistent
with our findings in the previous section (II.C.1.) regarding
utility-provided price comparison information.  The Commission
finds that ESCO customers could meaningfully compare services
and products among the various energy retailers if they received
itemized ESCO pricing data.  Customers would benefit from a bill
that clearly differentiated charges for commodity from charges
for non-commodity products and services they receive from the
ESCO.  With itemized pricing information, customers would be
able to precisely determine the cost associated with the ESCO
commodity supply, as well as the additional cost associated with
value-added products and services.

     The Joint Billing Plan directed above shall also
address the implementation of itemized billing by each utility.
The Joint Billing Plan may also address viable alternative or
additional methods – other than traditional utility bills – for
providing customers with information that itemizes the costs
associated with ESCO services.  The timelines for this
implementation may follow or differ from the timelines regarding
the provision of price comparison information, depending on
relevant circumstances.

-36-

CASE 15-M-0127, et al.

### III. PRODUCT OFFERINGS

ESCOs represent a competitive alternative to traditionally regulated utilities and, ideally, their market participation would spur innovation and provide the types of products and services envisioned in the Reforming the Energy Vision (REV) proceeding,[57] such as energy efficiency management, integration of renewable resources and increased customer engagement. Thus, to the extent that ESCOs can or do operate as something more than mere generic commodity providers, they have potential to provide valuable products and services to mass-market customers.

The Commission recognizes that, based upon actual costs, certain ESCO products will be more expensive than default utility service. However, because energy services are essential to customers' health and wellbeing, the additional cost to customers must not outweigh the purported benefits to them. Consequently, we adopt the following reforms regarding the range of permissible ESCO product offerings.

### III.A. Variable-rate, Commodity-only Service

Based on the record before it, the Commission cannot accurately identify the specific number of mass-market ESCO customers who receive commodity-only, variable-rate service. However, variable-rate, commodity-only service is obtainable from the utility, most often at a lower price than from an ESCO and without any termination fee. We find that there is no demonstrated customer benefit to allowing ESCOs to offer this service to mass-market customers.

---

[57] See Case 14-M-0101, Reforming the Energy Vision – Policy, Order Adopting Regulatory Policy Framework and Implementation Plan (issued February 26, 2015).

CASE 15-M-0127, et al.

### III.A.1.  Non-ESCO Party Positions Regarding Variable-rate Commodity-only Service

Staff compared the 2014-2015 emissions profiles for various utilities and ESCOs selling electricity, which were derived from environmental disclosure labels, with the emission profile of the New York State spot market and found that the conventional ESCOs and Mid-Hudson Large Utilities had similar emissions profiles.  Staff suggests that similar emissions profiles indicates that the ESCOs likely had few bilateral contracts or physical hedges and, instead, purchased a large amount of energy off the spot market.[58]  According to Staff, other utilities, specialty ESCOs and not-for-profit entities apparently enter into more bilateral contracts and physical hedges.  Thus, Staff does not believe that the disparity in variable-rate electric commodity offered by ESCOs and the utilities can be fully explained by any alleged commodity procurement costs.  According to Staff and others, there is no need for the ESCOs to provide variable-rate service to customers at a premium to the default utility commodity cost because that service is readily available from the utilities at a just and reasonable rate.

### III.A.2.  ESCO Party Positions Regarding Variable-rate Commodity-only Service

While some ESCOs argue that they provide their customers, including those that take variable-rate commodity, with a better customer service experience, which purportedly justifies a higher cost, they provided no proof at the evidentiary hearing to substantiate this claim.  Nor did any ESCO attempt to justify or explain how the significantly higher

---

[58]  Tr. 3259-3262.  According to Staff, most, if not all, load serving entities (LSEs) in New York, including ESCOs, also use financial hedges and such transactions would not be reflected in emissions profile data.

CASE 15-M-0127, et al.

costs associated with ESCO service for variable-rate electric
commodity was in reasonable proportion to any claimed customer
service benefit to customers.

RESA suggested that simply being an ESCO customer
provides a customer with benefits not offered by the utilities
because ESCOs buy electricity on the wholesale market to
optimize prices, while the utility simply passes through the
commodity costs.[59]  In making this claim, RESA appears to suggest
that variable-rate, commodity-only ESCO customers save money.
However, RESA has not made any evidentiary showing to support
that proposition.  Furthermore, the utilities also purchase most
or all of the electricity they supply from the wholesale market
and RESA has not demonstrated that utility purchasing practices
fail to optimize prices.  Moreover, the credible pricing data in
the record leads us to conclude that mass-market ESCO customers,
on average, spend significantly more money than utility
customers.

III.A.3.  Conclusions Regarding Variable-rate, Commodity-
only Service

Because customers receive no value when they pay a
premium for variable-rate commodity-only service from ESCOs,
ESCOs will be prohibited from offering variable-rate, commodity-
only service except where the offering includes guaranteed
savings.[60]

As has been demonstrated in these proceedings in the
context of low-income customer protection,[61] it is possible for

---

[59]  Tr. 809, 814, 911, 974-977.

[60]  This is a point supported by NYC.  See NYC Initial Brief, p.
14.

[61]  See 12-M-0476 et al., Order Adopting a Prohibition on Service
to Low-Income Customers by Energy Service Companies (issued
December 16, 2016).

-39-

CASE 15-M-0127, et al.

some ESCOs to serve customers at a guaranteed savings.  Saving
customers money was a crucial policy goal articulated by the
Commission when the retail access market was initially opened.
Thus, rather than prohibit variable-rate, commodity-only
offerings, such offerings will be permitted only if the ESCO
guarantees to serve the customer at a price below the price
charged by the utility on an annually reconciled basis.

        The Commission successfully implemented a guaranteed
savings requirement in the Low-Income Proceeding.  In the Low-
Income Proceeding, ESCOs have been required to petition the
Commission for permission to provide a guaranteed savings
offering to low-income customers.  While an ESCO that wants to
provide service to customers who do not qualify as low-income
will not be required to petition the Commission for permission
to offer a guaranteed savings product to those customers, the
ESCO will be required to submit information on the product to
Department staff and to make annual reports to Department staff
on the product.  Consistent with the requirements in the Low-
Income Proceeding, the initial submission to staff must include,
at a minimum, the following: (a) an ability to calculate what
the customer would have paid to the utility; (b) a willingness
and ability to ensure that the customer will be paying no more
than what they would have been paid to the utility; and (c)
appropriate reporting and ability to verify compliance with
these assurances.  If staff believes that a submission is
insufficient to demonstrate the ESCO's intention and/or ability
to provide a guaranteed savings product, staff shall attempt to
resolve this issue with the ESCO or recommend that the
Commission bar the ESCO from offering a guaranteed savings
product, as staff deems appropriate.  In the case of a
recommendation to the Commission, the ESCO will have the

-40-

CASE 15-M-0127, et al.

opportunity to respond before the Commission renders its
decision.

The product must guarantee savings on an annual basis,
or with greater frequency; to achieve this, the ESCO must
perform a reconciliation on an annual basis, or with greater
frequency, and provide a credit or refund[62] to any customers who
were billed more over the relevant period than they would have
been billed had they remained on the utility default supply
rate. ESCOs providing a guaranteed savings product must also
perform such a reconciliation when customers taking such
products cancel their ESCO service and must provide a credit or
refund to any customers who were billed more over the relevant
period, either since the end of the previous reconciliation
period or since the customer was enrolled if no reconciliation
period had yet ended, than they would have been billed had they
remained on the utility default supply rate.

In either case, the credit or refund must be at least
as large as the difference between what the customer was billed
during the relevant period and what the customer would have been
billed had the customer remained on the utility default supply
rate. Department staff will monitor this process through
reporting from ESCOs and utilities; if staff concludes that any
ESCO has failed to provide a required credit or refund, staff
may instruct the utilities to temporarily withhold a portion of
the payments that would be remitted to that ESCO under the
purchase of receivables. The utility shall withhold the portion
as instructed by staff until instructed otherwise by staff or
the Commission. Department staff shall work with the ESCO to
ensure that an appropriate credit or refund is made and then

---

[62] ESCOs are required to provide refunds if no ongoing
relationship with a customer allows for a credit against
outstanding charges for ESCO service.

CASE 15-M-0127, et al.

instruct the utilities to release the funds; if staff and the
ESCO are unable to come to an agreement on the appropriate
credit or refund, staff shall make a filing with the Commission
requesting the Commission make a finding on the appropriate
credit and refund.  The ESCO will have an opportunity to respond
to this filing, and it may make any arguments regarding
justifications for its actions and/or rights to receipt of the
withheld funds at that time.  The Commission then may find that
no additional credit or refund was required, and the funds held
by the utility should be released, may find that an additional
credit or refund is required and direct that credit or refund be
made using the funds held by the utility, or may make other
appropriate findings and determinations.

III.A.3.a.  The Merchant Function Charge

        In discussing variable-rate commodity service, some
ESCOs advocate for an updated methodology to calculate each
utility's Merchant Function Charge (MFC).[63]  The MFC, and the
policies underlying such, were adopted by the Commission in
2004.[64]  Inasmuch as the MFC is litigated and adjusted as part of
each utility's individual rate case, this proceeding is not an
appropriate forum in which to make any changes to the MFC.  To
the extent any ESCO takes issue with cost allocation and rate

---

[63]  GEE Initial Brief, pp. 27-32; Agway Reply Brief, p. 3; NEMA
      Initial Brief, pp. 57-58.

[64]  Case 00-M-0504, Proceeding on Motion of the Commission
      Regarding Provider of Last Resort Responsibilities, the Role
      of Utilities in Competitive Energy Markets, and Fostering the
      Development of Retail Competitive Opportunities, Statement on
      Unbundling and Order Directing Tariff Filings (issued August
      25, 2004) (Unbundling Order).

CASE 15-M-0127, et al.

design issues, they can participate in the utilities' rate cases.[65]

### III.A.3.b. Out-of-Period Adjustments

Similarly, some ESCOs complain that out-of-period adjustments made by utilities, with the Commission's approval, make it impossible for ESCOs to be competitive with the utilities, particularly in the context of variable-rate gas commodity service.[66] These ESCOs do not acknowledge, however, that out-of-period adjustments by the utilities ultimately are a zero-sum game: for any downward adjustment made to a customer's bill, a corresponding out-of-period increase must be made. This process moderates fluctuations in customer bills that otherwise would result from market activity.[67] Thus, out-of-period adjustments do not unfairly provide the utilities a pricing advantage when a price comparison is made on an annual basis.

### III.B. Non-Energy-Related Value-Added Products and Services

Value-added products and services that have no energy-related benefit and/or that are offered as a one-time promotion do not further the energy policy goals of the State and, therefore, provide no value in the context of the retail energy market. These promotional items, such as gift cards or other "swag," are frequently offered as promotions to induce customers to sign a contract with the ESCO. However, the market value of these items often is significantly less than the price the customer ultimately pays for the item or service over the term of the contract. Accordingly, because these promotional items

---

[65]   UIU/NYAG Initial Brief, pp. 26-27.

[66]   See, e.g., GEE Initial Brief, pp. 12, 16, 20; Agway Reply Brief, p. 3.

[67]   See, e.g., Joint Utilities Reply Brief, pp. 5-6.

CASE 15-M-0127, et al.

typically do not provide any energy-related benefit to customers, ESCOs are prohibited from offering them to prospective customers as inducements to sign a contract.

III.C.  Energy-Related, Value-Added Products and Services

          The Commission expected that allowing ESCOs to market commodity to customers would lead to productive innovation.  It anticipated that ESCOs would offer products and services to customers that utilities could not offer.  That expectation has been only partially fulfilled.  Today, in addition to variable-rate, commodity-only service, which is obtainable from the utilities, ESCOs in New York offer products and services that are not obtainable from the utilities, including: commodity plus some additional product and/or service; fixed-rate commodity products; and renewably-sourced commodity products.  Fixed-rate commodity and renewably-sourced commodity are each discussed separately below; other than those products, ESCOs have offered little or no evidence that they offer innovative or novel energy-related products and services.  In other words, there is little to no credible evidence on this record that the so-called "value-added" product and services offered by ESCOs are, in fact, providing a valuable benefit to customers.

          The parties hold widely disparate viewpoints on whether ESCOs should be authorized to continue marketing "value-added" products and services to mass-market customers.  The parties generally agree that there is potential for value-added products or services to provide measurable value to New York customers, but the parties fiercely dispute issues such as whether such products and services are already being offered in New York, and to what extent; who should determine the value of such products; how value should be defined; and what product offerings should be considered to be value-added.

CASE 15-M-0127, et al.

### III.C.1   Non-ESCO Party Positions Regarding Energy-Related, Value-Added Products and Services

Staff, UIU/NYAG and NYC argue that the record on what value-added products and services are offered by ESCOs in New York is meager and that any products bundled with commodity should provide real and measurable value to customers at just and reasonable rates.  Staff recommends that the permissible ESCO products and services should be limited, asserting, among other reasons, that ESCOs have been "overcharging" customers for these products.[68]  While Staff acknowledges that its utility-to-ESCO price-comparison analysis was incomplete to the extent that it could not ascertain which, if any, ESCO charges included additional products or services, Staff asserts that "there is scant evidence introduced in these proceedings that shows that ESCOs are in fact offering energy-related value-added products and services, and more importantly, that any customers in New York actually take those services from an ESCO."  Staff's general concern is that ESCO customers have not received sufficient value to justify the price those customers paid, which is on average more than the price charged by the utility for commodity service.

Staff argues that, while ESCOs provided witness testimony about what value-added products and services are generally offered, or could be offered, in New York, by and large no ESCO provided actual data showing: which value-added products it in fact offers in New York; how many customers have in fact contracted for such services; the cost to ESCOs of providing such services to customers; or what, if any, benefit customers received from selecting the value-added product or service.  Staff explains that it attempted to collect such

---

[68]   Staff Initial Brief, pp. 71-72.

Case 6:19-cv-06907-FPG-MWP   Document 52-2   Filed 06/20/22   Page 326 of 457
CASE 15-M-0127, et al.

information from the ESCOs during the discovery phase of these
proceedings, but that the ESCOs largely failed to respond to its
inquiries.[69]  Having received insufficient data in response to
its inquiries, Staff posits that the costs incurred by ESCOs to
procure and offer value-added products must be de minimis and,
therefore, likely cannot explain the significantly higher prices
charged by many ESCOs.

        Staff maintains that ESCOs have the burden of proof to
show that the value-added products they offer provide
commensurate value to customers to justify the cost.  Staff
believes that the ESCOs' failure to advance any data regarding
the costs of value-added products and services suggests that
such data, if it had been revealed, would not support the ESCOs'
position.  Staff avers that the Commission has an obligation to
ensure that service is just and reasonable and cannot simply
leave the reasonableness of the commodity price, where it
includes a value-added product or service, to be assessed by
customers.  To do so, it asserts, would be a breach of the
Commission's statutory duty.  Accordingly, Staff recommends that
the potential development of appropriate energy-related, value-
added products be reviewed in a collaborative process in Track
II, only after more immediate measures to protect mass-market
customers are implemented.[70]

        While NYC acknowledges that ESCOs have the potential
to help the State and municipalities achieve clean energy goals,
NYC, along with UIU/NYAG, asserts that innovation by ESCOs is
lacking.  These parties contend that, while the ESCOs filled the

---

[69]  Also, in the lead up to the evidentiary hearing, various
      ESCOs withdrew from the proceeding and, consequently, did not
      exercise the opportunity to present evidence on this and
      other points.  See n. 4, above.

[70]  Staff Initial Brief, p. 44.

CASE 15-M-0127, et al.

record with testimony about innovative products and services offered by ESCOs in other jurisdictions and with testimony about products and services that, in theory, could be offered in New York, the record has little evidence of products that are offered in New York.

UIU/NYAG, and to a certain extent PULP,[71] take the position that ESCOs have not proven either that they offer innovative products to customers or that the prices they charge for such products are justified compared to the price of default utility service. UIU/NYAG stresses the importance of quantifying the value of bundled services because, if a customer's energy bill is unpaid, the customers may have their service disconnected. Consequently, UIU/NYAG contends that ESCOs should be prohibited from selling any allegedly value-added products to mass-market customers until they objectively demonstrate that the value-added product or service provides quantifiable value to customers.

### III.C.2. ESCO Party Positions Regarding Energy-Related, Value-Added Products and Services

ESCOs generally argue that a broad view of what constitutes "value-added" should be taken and customer choice should not be restricted in any way. For instance, NEMA claims that "ESCOs provide value-added services such as fixed-rate products, green products, product bundling, brand loyalty programs, and customer service conveniences that traditional

---

[71]   Tr. 3883-3884.

CASE 15-M-0127, et al.

default service do not, and cannot, offer customers."[72]  Other
ESCOs described products and services that they provide
customers, including: improved customer service experiences;
"smart" thermostats; heating system maintenance service; rebate
and incentive programs; community support and affinity groups;
and products that allow customers to better manage their usage
through energy efficiency upgrades or smart devices.[73]  They also
described products that are offered by ESCOs in other
jurisdictions, such as free nights and weekends, discounted LED
light bulbs and online energy management tools.  According to
the ESCOs, these products distinguish their service from default
commodity service provided by the utilities and, therefore,
there should be no price restrictions on these products and
services.

        ESCOs claim that, in the retail market, the customers
should be in the position of determining what product attributes
appeal to them and will seek out products that meet their needs
and values.  They contend that in selecting an ESCO product, a
customer may value enhanced customer service, loyalty programs
and energy efficiency tools.  All these attributes, the ESCOs
maintain, have a cost to offer, and they take issue with Staff's
position that such cost is de minimis and claim that, depending

---

[72]  NEMA Initial Brief, p. 26; see also Tr. 1114, Table FL-1.
      NEMA further opines that "[e]nergy management tools bundled
      with commodity provide significant value in reducing
      consumers' bottom line expenses and consumption" and asserts
      that such products are essential to New York's energy future.
      NEMA Initial Brief, p. 66.  However, NEMA does not claim that
      any of its member ESCOs provide energy-management tools in
      New York and, to the extent that NEMA is referring to what
      ESCOs may be doing in other jurisdictions, we find that
      information to be irrelevant to our inquiry in this case.

[73]  See. e.g., IEC Initial Brief, pp. 26-27; Tr. 4022-4023; GEE
      Initial Brief, p. 27.

-48-

CASE 15-M-0127, et al.

on the product or service offered, the cost in fact may be significant.

ESCOs emphasize, however, that the cost incurred by the ESCOs in providing value-added products or services is not an appropriate measure of value from the customer's perspective. Direct Energy categorizes any attempt by the Commission to establish a cost-based premium for value-added products or services as a fundamental misunderstanding of "the proper operation of competitive markets."[74]  Most ESCOs opine that the appropriate method of valuing the product is assessing whether the customer that received the product or service was satisfied with that product or service at the price that he or she paid. In this regard, Direct Energy, NEMA and RESA point out that Staff did not attempt to assess either whether customers received the products and services for which they bargained or whether those customers were satisfied with their ESCO-provided product or service.[75]  Direct Energy contends both that the customer satisfaction data it provided shows that its customers are satisfied with the products and services Direct Energy provides and that Staff ignored that data.

However, not all ESCOs share the belief that the New York market provides customers innovative value-added products and services.  These ESCOs typically blame the lack of innovation on several phenomena in the New York energy market that they contend inhibit innovation.  For instance, ENGIE asserts that the market does not allow for customer-specific load data and price signals.  It suggests that the Commission should consider "lifting barriers to innovation such as provision of accurate and timely consumer historical usage

---

[74]  Direct Energy Initial Brief, p. 15.

[75]  RESA Initial Brief, p. 10; NEMA Initial Brief, p. 65; Tr. 1264-1265.

CASE 15-M-0127, et al.

information in a standardized format and establishing price
signals to positively affect consumer behavior." ENGIE also
believes that customers should own their energy data and have
control over who can access and connect to their energy
information, more like commercial and industrial customers.[76]
ENGIE additionally asserts that utility default service rates,
ESCO pricing and NYISO settlements should be based on actual,
rather than deemed, consumption profiles so that proper pricing
signals could inform customer behavior.[77] Essentially, ENGIE
urges a "consumer-focused" path and a shift in focus from the
commodity price to the total cost and, ultimately, value.[78]

   III.C.3.  Conclusions Regarding Energy-Related, Value-Added
             Products and Services

        As an initial point, throughout these proceedings the
parties often have used differing or competing definitions of
"value" and "value-added." When Staff raised the issue of
"value," it tended to refer to an objectively quantifiable
monetary value. When ESCO parties used the term, they tended to
refer to an inherent, theoretical, or subjective value that,
they argue, is not easily quantifiable monetarily. From the
ESCOs' perspective, a product or service necessarily has value
if customers choose to purchase it.

        In establishing how the Commission traditionally has
used the terms "value" and "value-added," the Commission's Order
Taking Actions to Improve the Residential and Small Non-
Residential Retail Access Markets, issued February 25, 2014 in
Cases 12-M-0476 et al. (Retail Access Order) is instructive.
There, the Commission specifically declined to adopt definitions

_____

[76]   Tr. 23-24.

[77]   Tr. 23.

[78]   Tr. 21.

-50-

CASE 15-M-0127, et al.

of "value" and "value-added" that were different from the common understanding and usage.  The Commission stated that "value" and "value-added" mean "something more than the standard; something that exceeds the expectations associated with provision of what is otherwise an undifferentiated commodity."[79]  Further, "whether a particular offering falls within the definition of 'value-added' may depend on a case-by-case qualitative assessment."[80]

In discussing the products and services offered by ESCOs in the retail access market, the definition of "value" and "value-added" articulated in the Retail Access Order remains operative.  In the retail energy supply context, a value-added product or service is an enhancement to the commodity supply. Thus, when a product or service is described in this order as "value-added," that term should be understood as referring to bundled services - commodity service plus some additional product(s) or service(s).

It is both notable and troubling that no ESCO party could or would produce objective evidence regarding: the specific value-added products or services that are currently offered in New York; how many ESCO customers elect to receive those products and services; the level of premium ESCO customers are charged for the value-added product or service; and what type and level of benefit is obtained by customers who receive the products or services offered.  We recognize that the ESCO parties could have produced highly detailed information about their actual products and services, but, instead, they generally chose to present information around purported products and services that ESCOs might offer or that they do offer in unspecified numbers or circumstances.  Thus, we must consider

---

[79]   Cases 12-M-0476 et al., Retail Access Order, p. 2, n. 3.

[80]   Id.

-51-

CASE 15-M-0127, <u>et</u> <u>al.</u>

whether ESCOs should be permitted to offer value-added products and services in the future based on a record in which ESCOs appeared to believe that it was in their best interest not to better inform the Commission on the actual state of the retail market.

Nonetheless, we recognize that, whether, or to what extent, such products are currently offered, <u>appropriate</u> value-added products and services have the potential to provide benefits to customers. We reiterate, however, that, consistent with the purposes of the retail energy market, only energy-related products and services will satisfy the Commission's definition of value-added products or services. As a notable example of a service that meets this definition, Agway offers "EnergyGuard" as a service bundled with both natural gas and electricity supply. Agway claims that this service, which it describes as "[s]imilar to a pre-paid maintenance contract," provides its customers with "valuable and essential peace of mind." Agway asserts that the value of the EnergyGuard service is quantifiable, in that the service covers the cost of most parts and repairs to the residential customer's air conditioning unit, up to $1,000 annually, as well as the additional cost for electrical wiring repairs, up to $1,000 annually.

Among the energy-related value-added products or services that ESCOs could develop are demand-management programs or tools, voluntary dynamic pricing programs or tools, and energy-efficiency measures. These offerings would both further the State's energy policy goals and provide meaningful value to the customer. Other examples of desirable energy-related, value-added products and services include: sophisticated energy-management services and smart-grid technologies; energy storage products; and electric vehicle-related services. However, most or all of these products can be, and currently are, provided by

-52-

CASE 15-M-0127, et al.

other companies separately from energy supply service.
Considering whether ESCO products that include such services are
beneficial to customers would require both consideration of
whether and how ESCOs could and would be willing to provide
those services and of whether the tethering of those services
with energy supply by ESCOs would create benefits.  Any company,
ESCO or not, may currently provide such services separately from
energy supply service so long as they comply with established
rules for those service, including the Uniform Business
Practices for Distributed Energy Resources where applicable.

        Because certain of these products and services overlap
with the REV and/or DER proceedings,[81] Staff and other interested
stakeholders are directed to explore in Track II of these
proceedings which, if any, energy-related products and services
are most likely to benefit customers and advance the State's
energy policy goals, which products and services can or should
be offered by ESCOs and which are more appropriately offered by
DER providers, and what rules, including pricing and disclosure
requirements, should be applied to ESCO products including such
energy-related products and services.

        Because, with the exception of Agway's EnergyGuard
product, no meaningful evidence was provided to demonstrate that
any energy-related value-added product or service currently
offered provides benefits to customers comparable to its costs,
the provision of such a product or service is not sufficient at
this time to demonstrate that an ESCO offering benefits
customers and should be permitted.  Therefore, during the
pendency of Track II of these proceedings and with the exception

---

[81]   See Case 15-M-0180, In the Matter of Regulation and Oversight
       of Distributed Energy Resource Providers and Products, Order
       Establishing Oversight Framework and Uniform Business
       Practices for Distributed Energy Resource Suppliers (issued
       October 19, 2017) (DER Proceeding).

CASE 15-M-0127, et al.

of Agway's EnergyGuard product, all ESCO products offered
following the effective date of the revised UBP must, as
discussed elsewhere in this order, qualify as permitted products
under the rules for guaranteed savings products, fixed-rate
products, or renewably-sourced products; no product that is
noncompliant with these rules may be offered on the basis that
it includes an energy-related value-added product or service or
may charge higher prices than permitted under those rules on the
basis that those prices are for the energy-related value-added
product or service.  ESCOs may offer energy-related value-added
products or services as part of an offering that also complies
with those rules and meets the price requirements under those
rules.

        To be clear, Track II of these proceedings may result
in rules that permit certain energy-related value-added products
and services to be offered as an additional cost to or without
the requirement of being paired with a compliant guaranteed
savings, fixed-rate, or renewably sourced product.  Because
Agway provided detailed evidence demonstrating that EnergyGuard
provides a unique benefit that may be reasonably comparable to
its costs, Agway may continue to offer EnergyGuard during this
interim period.  If new requirements for such products result
from Track II, Agway must comply with those requirements.  If
any other ESCO wishes to offer a product like EnergyGuard during
the pendency of Track II, it may submit a petition for waiver to
the Commission explaining the benefits its product provides and
how they will reasonably relate to its cost.

        Finally, some parties argue that the Commission should
not be an arbiter of the rates ESCOs charge for value-added
products and services and that the ESCOs negotiate rates with
customers without any Commission interference.  The Commission
rejects this contention.  This position ignores the statutory

-54-

CASE 15-M-0127, et al.

mandate of the Commission to ensure that all New Yorkers are receiving safe and reliable electric and gas service at just and reasonable rates.  Some ESCOs claim that requiring them to meet or beat the default utility price would be unfair, and likely impossible, given they are offering additional products and/or services that are not included in the default utility's rates. The Commission recognizes that reasonable rates do not necessarily require an ESCO to meet or beat the utility price when providing bona fide energy-related, value-added products and services to its customers.

The Track II process should address this issue by focusing on, first, determining how to identify actual energy-related value-added products and services that may be provided by an ESCO along with energy supply service and, second, ensuring that pricing for such products is transparent.  The Track II process should then address whether ESCOs have shown a sufficient willingness and ability to provide such value-added products such that the Commission should consider expanding the category of permissible value-added products or services.

In the instance of EnergyGuard and in any other instance in which the Commission concludes that ESCOs meet this threshold criteria and therefore are permitted to charge prices higher than the utility default supply rate for energy-related, value-added products and services, pricing transparency will ensure that the customer and the Commission can identify the portion of the total ESCO bill that is attributable to commodity and the portion that is attributable to the energy-related, value-added product or service.  Price and product transparency will empower customers to be better able to evaluate whether ESCOs are providing them with value, or whether they believe that a better value could be obtained from default utility service or another ESCO.  The Commission will ensure this level

-55-

CASE 15-M-0127, et al.

of transparency via the on-bill price comparison and unbundled bill structure that will be required.[82]

III.D.  Fixed-Rate Products

There is limited data in the record from which an accurate estimation can be made as to how many mass-market customers opt for a fixed-rate product.  This is because, as Staff explained, the raw customer data maintained by the utilities does not distinguish among the various ESCO products.[83] Nevertheless, Staff attempted to discern how many mass-market customers were on a fixed-rate plan by analyzing bill fluctuations in the customer data it received from the utilities.  By Staff's estimation, between 13% and 30% of mass-market ESCO customers in New York currently are served on a fixed-rate plan.[84]  Most ESCOs again chose to forego the opportunity to better inform the Commission as to the realities of their businesses, as they did not identify how many of their customers take a fixed-rate product, produce their own estimate, or challenge Staff's estimate.[85]  The notable exceptions are GEE, which reports that 90% of its mass-market customers take fixed-rate service, and Direct Energy, which report that it serves 36% of its mass-market customers on a fixed-rate plan.[86]

Some parties generally agree that there are some mass-market customers who might perceive value in fixed-rate products

---

[82]  Supra, Section II, Access To and Transparency of Pricing Information.

[83]  Staff Initial Brief, pp. 36, 58, 65-66.

[84]  Tr. 2958; 3258.

[85]  An exception, Constellation criticized Staff's estimation of the percentage of ESCO customers who receive a fixed-rate product and claims that the estimates are inaccurate (See Constellation Reply Brief, pp. 8-9).

[86]  Tr. 46, 409; Hearing Exhibit 47 [Confidential version].

CASE 15-M-0127, et al.

and that ESCO-offered fixed-rate products, in some form, should continue to be permitted by the Commission.[87]  However, the parties hotly dispute whether and how the Commission should regulate the terms and conditions under which ESCOs are permitted to offer fixed-rate products.

    III.D.1.  <u>Non-ESCO Party Positions Regarding Fixed-Rate Products</u>

        Staff acknowledges that some customers may choose fixed-rate products because the customer believes that fixed rates can help them avoid unit cost volatility in the commodity markets and/or help them budget their energy costs on a monthly basis.[88]  Staff posits, however, that the majority of ESCOs have been charging "significant premiums", in the range of "20 to 30 percent or more", for fixed-rate products.[89]  In Staff's view, if a customer is paying more to an ESCO on a monthly basis for a fixed-rate product than he or she would have paid to the utility for a variable-rate product, then the customer has been overcharged.

        It is Staff's position that ESCOs should be allowed to offer fixed-rate products only if the ESCO also provides a monthly price guarantee as compared to what the customer's bill with its utility would have been.[90]  According to Staff, any potential value associated with fixed-rate products is in decline, given that the "risk of significant commodity rate swings has been greatly reduced" due to the utilities' "more-surgically target[ed] hedging at peak prices and local price

---

[87]   See <u>e.g.</u>, NYC's Initial Brief, pp. 11, 15; UIU/NYAG Initial Brief, p. 36; Staff Initial Brief, p. 32.

[88]   Staff Initial Brief, p. 32.; Tr. 2063, 2364, 2549, 2684-2685.

[89]   <u>Ibid</u>., pp. 66, 88.

[90]   Staff Initial Brief, p. 64.

CASE 15-M-0127, et al.

conditions." [91]  Staff also believes that the advancement of new
technologies, such as battery storage, likely will cause that
risk to continue to decline.  Due to this declining risk of
commodity price swings, Staff states, it makes little sense to
allow fixed-rate products to be offered unless the ESCO can
provide additional benefits to the customer, such as a price
guarantee.

Staff also asserts that the value of fixed-rate
products is undercut by the availability of budget billing from
the utilities.[92]  According to Staff, budget billing provides
customers with the desired price stability without the price
premium associated with fixed-rate products.

According to UIU/NYAG, ESCOs have not demonstrated
that the fixed-rate products offer mass-market customers
anything of additional value, but nevertheless charge a
significant premium.[93]  UIU/NYAG also asserts that, due to the
lack of transparent, historical pricing data available to the
public, it is impossible for a mass-market customer to discern
the amount of the premium associated with a fixed-rate product.
UIU/NYAG therefore agree with Staff that ESCOs should be
required to offer a price guarantee if the Commission permits
them to continue offering fixed-rate products.

UIU/NYAG further opine that fixed-rate products, as
currently offered, do not provide customers with price certainty
because the amount of the customers' bills changes monthly based
upon customer's commodity usage.[94]  In addition, UIU/NYAG assert,
even when a customer saves money with a fixed-rate product in a

---

[91]   Ibid., pp. 35-36.

[92]   Ibid., p. 88.

[93]   UIU/NYAG Initial Brief, pp. 33-37.

[94]   Ibid., pp. 35-36.

CASE 15-M-0127, et al.

given month, that savings is often negated by the significant
premium charged in the other months of the contract.  For these
reasons, it is UIU/NYAG's opinion that customers who desire
price certainty from month to month would be best served by
enrolling with the utility-offered budget billing program.

NYC supports the continuation of fixed-rate product
offerings, inasmuch as they "hav[e] potential to provide value
to customers" who prefer to know what the electricity or gas
price will be every month.[95]  However, NYC believes that the
premium charged for a fixed-rate product should be reasonable,
and that "a fixed-price product that is four or five times above
the spot market price does not provide value, and negates the
perceived benefit that was gained from a fixed supply cost."[96]

III.D.2. ESCO Party Positions Regarding Fixed-Rate Products

Constellation, NEMA, and RESA believe that fixed-rate
products provide value to customers in the form of price
stability and cost certainty.[97]  RESA opines that the true value
of fixed-rate products cannot be evaluated without consideration
of innovative energy efficiency technologies.[98]  According to
RESA, when fixed-rate products are used in conjunction with
energy management tools the value to customers is high.
Constellation and RESA disagree with Staff's position that the
price for fixed-rate products should be capped and assert that
the best way to determine whether the premium charged for the
product is excessive is to look to customer purchasing

---

[95]   NYC Initial Brief, p. 15.

[96]   Id.

[97]   Constellation Reply Brief, pp. 5-6; NEMA Initial Brief, p.
       60; RESA Initial Brief, p. 30.

[98]   RESA Initial Brief, p. 31.

CASE 15-M-0127, et al.

decisions.[99]   RESA states that Staff's opinion as to whether
fixed-rate products offer value to customers is irrelevant and
that is it up to the individual customers to determine whether
value exists in any given product.[100]

Constellation also takes issue with Staff's position
that the risk of commodity price swings has been reduced in
recent years.  According to Constellation, there were
significant commodity price swings as recently as early 2018,
and it is impossible for anyone to predict the future price of
energy commodities.[101]  Constellation states that it is not
appropriate to judge the value associated with a fixed-rate
product in hindsight.

Constellation, Direct Energy and RESA do not believe
that budget billing is an equivalent alternative to fixed-rate
products.[102]  Constellation states that budget billing does not
provide customers with any certainty with respect to their
monthly energy bill because, although the customers' monthly
bills are levelized, the price per kilowatt-hour is still
subject to significant market price volatility and the customer
is subject to a reconciliation charge at the end of the budget
period.  In contrast, Constellation explains, customers on a
fixed-rate plan know with certainty the unit price of commodity
every month.  Thus, Constellation believes, customers on a
budget-billing plan are not insulated against price fluctuation
in the same way that customers on a fixed-rate plan would be.

---

[99]  See Tr. 410; RESA Initial Brief, p. 32.

[100] RESA Initial Brief, p. 32.

[101] Constellation Reply Brief, pp. 9-10.

[102] Constellation Reply Brief, pp. 12-13; Direct Energy Initial
      Brief, pp. 17-18; RESA Initial Brief, p. 33.

CASE 15-M-0127, et al.

       Constellation and RESA point out that, in any event, ESCO customers retain the option to be on a budget-billing plan. According to these parties, the customers with the most insulation against price fluctuation are those who opt for a fixed-rate contract with an ESCO and enroll in a budget-billing plan with the utility.[103]  They explain that this is because the utility calculates the customer's monthly budget bill amount by multiplying an estimated monthly usage, which is based upon the customer's most recent 12-month historical data, by the actual commodity costs in each month.  The customer's bill is then subject to a reconciliation at the end of the year if the usage estimate was not accurate.  Therefore, RESA points out, with budget billing the utility customer ultimately always pays a price associated with commodity market volatility.[104]  In comparison, with a monthly fixed rate and a budget bill, RESA suggests that the ESCO customer is not exposed to monthly commodity cost fluctuations and benefits from a stable monthly usage estimate.

       Direct Energy adds that the Commission previously has dismissed arguments that budget billing is just as effective as utility hedging activities in eliminating bill fluctuations.[105] Direct Energy believes that a fixed-rate product should be viewed as a form of "price insurance" or hedging, even if the

---

[103]  Constellation Reply Brief, p. 15; RESA Initial Brief, p. 33.

[104]  RESA Initial Brief, pp. 34-35.

[105]  Direct Energy Initial Brief, pp. 18-19, quoting Case 06-M-1017, Proceeding on Motion of the Commission as to the Policies, Practices and Procedures for Utility Commodity Supply Service to Residential and Small Commercial and Industrial Customers, Order Requiring Development of Utility-Specific Guidelines for Electric Commodity Supply Portfolios and Instituting a Phase II to Address Longer-Term Issues (issued April 19, 2007) (Supply Portfolio Order).

CASE 15-M-0127, et al.

price ultimately ends up being substantially higher than what the customer would have paid as a utility customer.[106]  According to Direct Energy, while a fixed-rate customer may pay more than the default utility price during periods of stable or declining commodity costs, that same customer "will be pleased by his or her purchase" if the commodity costs increase.[107]

NEMA generally contends, without providing any specifics, that disallowing fixed-rate products would "impair[] the functionality of the state's retail energy markets."[108]  NEMA claims that more than 1.6 million customers in New York chose to enroll with an ESCO and asserts that those customers' choices should not have to be justified to the government.[109]

NEMA does not believe that it is possible or necessary to establish a reference price for fixed-rate products.  NEMA believes that the premium associated with fixed-rate products is transparent to customers when ESCOs fully disclose the contract term and per-kWh or per-therm rate for fixed-rate products.[110]  According to NEMA, the decision to purchase a fixed-rate product should be left to the customer.

RESA asserts that customers already have access to many tools to understand the pricing associated with their energy supply, including the Power to Choose website, individual ESCO websites, and Commission-mandated, standardized contract disclosures.  According to RESA, some customer confusion will remain regardless of the amount of information available to

---

[106]   Tr. 193.

[107]   Direct Energy Brief, p. 22, quoting Tr. 306.

[108]   NEMA Initial Brief, p. 62.

[109]   See NEMA Reply Brief, p. 3.

[110]   NEMA Initial Brief, p. 71

CASE 15-M-0127, et al.

customers, since some customers will always be confused or have trouble understanding energy contracts.[111]

      For its part, GEE agrees with Staff that remedial measures should be taken to further protect mass-market customers and, to that end, generally supports "some form of price cap" for fixed-rate products.[112]  However, GEE takes issue with Staff's recommendation to cap the price for fixed-rate products at the utility price.[113]  GEE explains that comparing fixed-rate prices to the utility rates is inappropriate because the utilities provide only variable-rate service and, therefore, are not subject to the risks and costs associated with fixed-rate products.[114]  According to GEE, because the fixed-rate products offered by an ESCO are reflective of the market conditions at the time the contract with the customer is made and future commodity prices are highly variable, the only appropriate way to evaluate the reasonableness of a fixed-rate product is to establish a forward-looking benchmark price.[115] GEE believes that a "Market Price Comparison" benchmark, whereby the average ESCO price for a fixed-rate product should be

---

[111]  RESA Initial Brief, pp. 63-64.

[112]  GEE Reply Brief, p. 1.

[113]  GEE Initial Brief, pp. 20-23.

[114]  GEE Initial Brief, p. 21.  GEE identifies the risks as including being over- or under-hedged, an under-collection of fixed costs, utility cash-outs and NYSIO reconciliations.

[115]  GEE Initial Brief, p. 23.

CASE 15-M-0127, et al.

determined and then a "zone of reasonableness" above that average price would be determined.[116]

### III.D.3. Conclusions Regarding Fixed-Rate Products

As some ESCOs have noted, the Commission previously acknowledged that fixed-rate product offerings could have the potential to provide value to customers.[117]  However, the record in this case establishes that customers who choose fixed-rate ESCO products frequently pay a significant premium for the product.  Fixed-rate products cannot provide meaningful benefits to customers unless they are reasonably priced.

There is evidence in this record demonstrating that, even with the utilities' hedging activities, utility customers' bills for commodity can vary during the year.[118]  Fixed-rate contracts have the potential to provide customers who may be particularly risk-averse with some protection against unit cost fluctuations that they may experience with the variable-rate product offered by utilities.[119]  Fixed-rate products also allow customers to know the unit price of commodity prior to usage. By knowing the unit price prior to usage, these customers may be

---

[116] GEE Initial Brief, p. 23.  GEE offers a zone of reasonableness of up to 20% above average as an example. Alternatively, GEE supports the approach outlined in a Staff Whitepaper on Benchmark Reference Prices.  In that whitepaper, Staff proposed a "just and reasonable" reference price for a 12-month fixed-rate product be established each month for each utility operating in the State.  Cases 15-M-0127 et al., supra, Staff Whitepaper on Reference Price Benchmarks (Filed May 4, 2016).

[117] Case 12-M-0476, supra, Order Instituting Proceeding, pp. 4-5. (issued Oct. 19, 2012).

[118] Hearing Exhibit 11 (Direct Energy's Exhibit – Utility Weighed Average Bill Price Comparison); Tr. 384-389.

[119] Tr. 383.

CASE 15-M-0127, et al.

able to budget their finances by adjusting their commodity use during the year.[120]

The Commission acknowledges that utility budget-billing is not the same as a fixed-rate ESCO product. As several ESCOs point out, while budget billing levelizes a customer's bill for a period of time, the bill amount is based upon forecasts of usage and estimated delivery and commodity rates and any additional amount owed by the customer due to the actual rates and usage are recouped from the customer at the end of the budget-billing period.[121] Whereas, with fixed-rate products, the customer knows the exact unit price for the commodity prior to the usage period and, ideally would adjust his or her usage to control the amount of the monthly bill. If the ESCO misjudges the actual cost to procure commodity, the ESCO may not recoup any additional payment from the fixed-rate customers.

ESCOs may face additional risks and incur additional costs when offering a fixed-rate product. Some of the risks identified by GEE include being over- or under-hedged, under-collecting fixed costs and risks associated with utility cash-outs and/or NYISO reconciliations.[122] In addition, as GEE explains, ESCOs may enter into derivatives agreements with a creditworthy organization to obtain the financial collateral needed to hedge commodity supply, or enter into transactions directly on commodity exchanges and agreeing to adhere to exchange-mandated margin requirements.[123] These activities,

---

[120] See, e.g., NYC's Initial Brief, p. 15.

[121] Hearing Exhibit 1125; tr. 2359-2360, 3265. Conversely, a customer could receive a credit if his or her usage was less than forecasted.

[122] Tr. 48-49.

[123] Tr. 47-48.

CASE 15-M-0127, et al.

among others, result in the ESCO incurring expenses, which must be reflected and recovered in the charges to customers.

It is worth noting that fixed-rate products may provide certain benefits to the supplying ESCO, which is able to make its own purchasing and hedging decisions.  Contracts for fixed-rate products are generally for a term of at least one year and often include a cancellation fee, thereby providing the ESCO with revenue certainty.

Considering the Commission's statutory mandate to ensure that all customers receive safe and reliable gas and electric service at just and reasonable rates, there must be an evaluation of the costs versus the benefits of fixed-rate products offered by ESCOs.  For example, when it evaluated whether to encourage supply hedging by utilities, the Commission stated: "That hedging practices may over time cost somewhat more than the average of wholesale spot market prices is not a reason to forgo hedging, so long as the price incurred in obtaining the hedge is not more costly than the benefit of the volatility reductions that are achieved."[124]  The same must be said of ESCO-offered fixed-rate contracts: if the cost incurred is significantly more than the value of the benefit achieved, then the Commission cannot permit ESCOs to offer such products.

Staff's opinion is that the cost to customers significantly exceeds any benefit gained and, thus, fixed-rate products as currently offered should be discontinued.  Staff claims that "the majority" of ESCOs operating in New York charge a premium of "20 to 30 percent or more" than the utility price, a price that already includes the cost of hedging.  However, there is insufficient evidence in the record compiled in these proceedings to justify this claim.  Rather, the record evidence

---

[124]  Supply Portfolio Order, p. 10.

CASE 15-M-0127, et al.

demonstrates that, while some ESCOs charge a premium in that
range, others charge a smaller average premium.

While Staff's quantitative position that "the
majority" of ESCOs charge a premium of more than 20% is
overstated based upon record evidence, we share Staff's ultimate
concern: any premium charged for a fixed-rate product must be
just and reasonable.  The information in the record suggests
that most ESCOs could continue to offer fixed-rate products if a
reasonable price cap were adopted.

A trailing 12-month average utility supply rate offers
a meaningful baseline against which to judge the reasonableness
of the price of ESCO fixed-rate products, as it is a reasonable
proxy in the absence of more detailed forecast data.  Further,
because a typical risk premium in financial markets ranges
between 3.5% to 5.5%,[125] we believe that a reasonable price
premium associated with fixed-rate ESCO products would be 5%.
Thus, as an interim measure, fixed-rate products will be limited
to a price no greater than the trailing 12-month average utility
supply rate plus a premium of no more than 5%.  The utilities
shall ensure that this data is provided on their websites for
each mass-market service class and for each mass-market customer
grouping that receives different supply rates based on the
applicable tariff.[126]  The utilities also shall establish a
standard quarterly schedule for updating this data.
Specifically, utilities shall publish on their websites 12-month
average utility supply rates within 15 days of March 31, June
30, September 30, and December 31.  Following the effective date
of the modified UBP as established in this order, ESCOs fixed-

---

[125] See, e.g., tr. 4191.

[126] For example, National Grid groups customers by load zone and
charges each customer based on supply costs in that
customer's load zone, while Con Edison groups customers into
two regions.

-67-

CASE 15-M-0127, et al.

rate products must be offered for a price no more than 5%
greater than the trailing 12-month average utility supply rate.
ESCOs are required to implement any necessary modifications to
any new fixed-rate contracts based on a change in the referenced
average within five days of the deadline for utility publication
(April 20, July 20, October 20, and January 20).

        While the Commission is allowing fixed-rate products
to continue so long as the ESCOs comply with the pricing
requirements, we leave open the possibility that, upon future
consideration, fixed-rate products sold at prices higher than
utility rates will be disallowed entirely.  Staff should monitor
the initial results of the instant reform - imposing a premium
cap - and then evaluate the need for future additional customer-
protection proposals regarding fixed-rate products, including
prohibition of the product, in light of customers' rights to
reasonably and transparently priced energy services.

        Finally, concerns raised by certain parties regarding
the renewal of fixed-rate contracts must be addressed.  Some
parties complain that customers who initially sign a fixed-rate
contract with an ESCO ultimately end up, often unwittingly, on a
variable-rate contract once the term of the initial contract
expires.[127]  Currently, the UBP requires ESCOs to obtain
affirmative consent from a customer before making any material
change to the customer's contract.[128]  NYC and UIU/NYAG believe
that the UBP should be amended to specify that a "material
change" would include any change to the rate or the product when
a contract is renewed.[129]  This amendment would require the ESCO
to obtain affirmative consent from a customer who originally

---

[127]  See, e.g., UIU/NYAG Initial Brief, pp. 45-46; NYC Initial
       Brief, p. 25.  See also, PULP Brief, p. 19.

[128]  UBP § 5 (B)(5)(d).

[129]  NYC Initial Brief, p. 25; UIU/NYAG Initial Brief, p. 46.

CASE 15-M-0127, et al.

enrolled with a fixed-rate contract before re-enrolling, or renewing, that customer on a variable-rate contract.

For its part, PULP argues that "negative option" renewal contracts that move fixed-rate customers to variable-rate contracts of unlimited duration at the end of the fixed-rate contract term should be prohibited.

In contrast, RESA maintains that the existing rule requiring affirmative consent for any material change is sufficient to protect customers. RESA argues that any change to the affirmative consent requirement would add costs to ESCOs and unnecessarily burden customers. Instead of affirmative consent, RESA proposes that the UBP be amended to ensure that customers are provided with 30 days' notice at the time of a contract renewal when the renewal entails a significant rate change or product conversion.[130] Considering that all future variable-price commodity-only ESCO contracts will be required to be offered at a guaranteed savings, a fixed-rate ESCO customer that is rolled over to a variable-price commodity-only contract will be protected from unreasonably high prices and/or rate shock associated with the change in contract terms. Thus, any ESCO that automatically renews a fixed-price customer shall be required to place that customer on a variable-price commodity-only contract, unless the ESCO obtains affirmative customer consent to continue with a fixed-rate plan, even if the contract otherwise provides for the renewal of the existing fixed-rate plan.[131]

---

[130]  RESA Initial Brief, p. 7071; Tr. 1183-1184

[131]  See generally Matter of National Energy Marketers Assn. v. New York State Pub. Serv. Commn., 167 A.D.3d 88, 98 [3d Dept. 2018] ("No ESCO ha[s] a contractual right to renewal of any particular contract once it expire[s]").

CASE 15-M-0127, et al.

        Further, as proposed by NYC and UIU/NYAG, any change
to a customer's rate or product or service type, whether during
the contract or at the time of renewal, will be considered a
material change that triggers the requirement of affirmative
consent.  The UBPs have been amended to reflect these new
requirements.


III.E.  Renewably Sourced Commodity

        New York's State Energy Plan is a comprehensive and
ambitious clean energy policy designed to combat climate change
and modernize the State's electric system to improve system
reliability, efficiency and sustainability.  As part of this
plan, the Commission adopted the Clean Energy Standard (CES),
which, among other things, sets a goal of having 50% of the
State's electricity be generated from renewable resources by
2030.[132]  This requirement has been enhanced by the enactment of
the Climate Leadership and Community Protection Act, which
requires, inter alia, that that 70% or more of electricity
consumed in New York come from renewable energy systems in 2030
and 100% of electricity consumed in New York is zero emissions
by 2040.  To encourage development of the generation resources
that will be necessary to achieve this goal, the Commission
adopted a Renewable Energy Standard (RES) as part of the CES.
The RES imposes upon all load-serving entities (LSEs), including
ESCOs, an obligation to serve their customers by procuring
renewable energy in proportion to the total load served by the

---

[132]  See Cases 15-E-0302 et al., Proceeding on Motion of the
Commission to Implement a Large-Scale Renewable Program and a
Clean Energy Standard, Order Adopting a Clean Energy Standard
(issued August 1, 2016) (CES Order), p. 2, 22, 154. See also
Executive Order No. 24 (2009) [9 N.Y.C.R.R. 7.24]; continued,
Executive Order No. 2 (2011) [9 N.Y.C.R.R. 8.2].

CASE 15-M-0127, et al.

LSE.[133]  The current RES annual LSE obligation for 2019 is 0.78%
of each LSE's total load served.  To satisfy this obligation,
the LSEs may: purchase Renewable Energy Credits (RECs) from the
New York State Energy Research and Development Authority
(NYSERDA); purchase qualified RECs from renewable resources that
came into operation after January 1, 2015 and meet certain
eligibility criteria (Tier 1 Resources);[134] or make Alternative
Compliance Payments (ACP) to NYSERDA.  Importantly, only
electricity that is deliverable into New York qualifies as RES-
eligible electricity.[135]

        The record established that few, if any, utilities
voluntarily purchase more renewably sourced electricity than
they are required to procure under the RES.  As such, most mass-
market customers are not provided an opportunity by their
default utility to purchase a higher percentage of renewable
electricity.[136]  The retail access market can provide such
opportunities to mass-market customers.  The record establishes
that, as of December 2016, 54 ESCOs offered some form of a
"green" or renewable product.  Those ESCOs provided

---

[133] CES Order, p. 13-14. See also Case 15-E-0302, supra, Clean
Energy Standard Phase 3 Implementation Plan Proposal (filed
July 27, 2018), p. 4 (current Annual LSE Obligations for
years 2018-2021) and Order Approving Phase 3 Implementation
Plan (December 14, 2018) (Phase 3 Order), p. 13.

[134] CES Order, Appendix A.  RES eligible generation sources are:
Biogas, such as from anaerobic digestion; Biomass, such as
commercially harvested wood or agricultural residue; Liquid
Biofuel; Fuel Cells; Hydroelectric; Solar (Photovoltaics);
Tidal/Ocean; and Wind.

[135] CES Order, Appendix A, p. 7 of 8.

[136] A notable exception is NYSEG, which offers its customers the
option to purchase a 100% renewable product for a premium of
2.5 cents per kWh. Tr. 2869.

CASE 15-M-0127, et al.

approximately 328,000 MWhs of renewably sourced electricity in 2015.[137]

　　　　While all the parties agree that, if the retail access market continues, ESCOs should be permitted to offer renewably sourced electricity to mass-market customers, there is no consensus among the parties as to what the terms and conditions of that service should be.  Most notably, the parties have disparate positions on issues surrounding the level of renewable mix that should be required and the value of allowing ESCOs to purchase nationally-sourced RECs.

　　　III.E.1.  <u>Non-ESCO Party Positions Regarding Renewably Sourced Commodity</u>

　　　　Staff posits that the "best" way to permit customers to voluntarily purchase additional renewably resourced commodity, while ensuring that customers receive "obvious value" for such premiums, is to limit ESCO offerings to "a value-added electric commodity product where 100% of the electricity provided each calendar year was generated from renewable resources."[138]  Staff suggests that acceptable renewable generation sources be biomass, biogas, hydropower, solar energy and wind energy, as defined in and subject to the environmental attributes and delivery rules of the Commission's Environmental Disclosure Program (EDP).[139]  Staff explained that the utilities' generation mix in certain territories currently approaches 30%

---

[137]  Tr. 2090-2091.  This data is the most recent data available. Staff's position is that there is no reason to believe these figures have significantly changed in the last few years.

[138]  Tr. 2033. Staff Initial Brief, pp. 67-68.

[139]  Tr. 2092.

CASE 15-M-0127, et al.

renewable and it argues that "the bar for ESCO products should be set higher."[140]

NYC does not advocate for a specific percentage mix, but it generally supports a framework in which ESCOs purchase New York-based RECs through the New York Generation Attribution Tracking System (NYGATS) for their products to qualify as "green" energy products.[141]  NYC admits, however, that Staff's proposal of 100% renewable might not be possible "in today's [market] construct" and reserved judgment as to what percentage mix it might consider acceptable.[142]

PULP supports renewable product offerings but believes that ESCOs should be required to provide a percentage mix of renewables that exceeds what is currently available in the NYISO market.  It also believes that, to the extent that ESCOs purchase RECs, they must purchase RECs for which the "attributes are purchased so that the incremental renewable energy resource actually flows into the ISO-New York wholesale market."[143]  PULP does not support ESCOs purchasing nationally-sourced RECs because, in its opinion, those RECs do not provide any direct benefits to New York customers.[144]

---

[140]  Tr. 2090.

[141]  NYC Initial Brief, pp. 16-17.

[142]  Tr. 1503.

[143]  Tr. 3461.

[144]  Tr. 3461-3462.  In the alternative, PULP opines that any ESCO that uses nationally sourced RECs, rather than NY-sourced RECs, be required to conspicuously disclose to customers that their purchase of the ESCO's renewable product does not result in any additional renewable resources in the New York wholesale market.

-73-

CASE 15-M-0127, et al.

III.E.2.  ESCO Party Positions Regarding Renewably Sourced
          Commodity

          Direct Energy criticizes Staff's recommendation that
ESCOs be required to provide a 100% renewable product.[145]  Direct
Energy posits that any amount of renewable product sold that
exceeds the current NYISO average mix of 30% "could help reduce
carbon pollution that drives climate change."[146]  Other ESCOs are
similarly critical of the proposed 100% requirement, arguing
that such a high percentage necessarily would make such a
product offering too expensive to successfully market to mass-
market customers.[147]  ESCOs further argue that Staff's proposed
100% requirement overlooks customers who may be willing to
voluntarily purchase a green product but either cannot afford or
do not want to pay for a 100% renewably sourced product.[148]  Some
ESCOs argue that, if the Commission were to adopt Staff's
proposal, fewer customers would voluntarily purchase renewable
products than they do now due to the excessive cost.[149]

          Some ESCOs posit that, regardless of the pricing
concerns, it is not currently possible for ESCOs to offer
renewably sourced commodity in a mix greater than that offered
by the utilities.  NEMA claims that, "at this phase of the
market" in New York, ESCOs purchase renewable energy from the
same NYISO pool as the utilities and, practically speaking, do

---

[145]  Direct Energy Brief, p. 20.

[146]  Tr. 310.

[147]  See, e.g., tr. 97, 132-133 (GEE claims that it already
       experiences trouble selling its "Green-e" renewable product
       at "a minor premium."). See also tr. 310 (Direct Energy) and
       tr. 4018 (The IEC says 100% renewable is not cost effective
       for customers).

[148]  See, e.g., tr. 1269-1270.

[149]  See, e.g., tr. 420, 1270.

CASE 15-M-0127, et al.

not have the ability to enter into bilateral contracts with
renewable generators.[150]  The IEC similarly asserts that there
are not enough RECs in New York's market to sustain a
requirement that all ESCOs offer a 100% renewable product that
is EDP-compliant.[151]

As for any locational or delivery requirement, Direct
Energy and RESA disagree with any proposal that limits the
purchase of RECs to those traded in the NYGATS.[152]  According to
Direct Energy, carbon emissions do not respect artificially
created boundaries and create problems on a global scale and,
therefore, any renewable energy products that reduce carbon
emissions, no matter where situated, should be encouraged.[153]
Direct Energy generally opines that a requirement that ESCOs
trade in NY-specific RECs ultimately would harm global efforts
to combat climate change.  RESA similarly argues that any
renewably sourced product, even those generated out of state,
provide value to New York customers.[154]

III.E.3.  Conclusions Regarding Renewably Sourced Commodity

As discussed more fully below, ESCOs will be permitted
to offer a renewable product that is less than 100% renewable,
so long as: (1) the renewable percentage mix is at least 50%
greater than is required by the RES LSE obligation for the year;
(2) the ESCO complies with the RES locational and delivery
requirements when procuring RECs or entering into bilateral
contracts; and (3) there is transparency of information and

---

[150]  Tr. 757, 769-770.

[151]  Tr. 4018, 4098-4099.  See also IEC Initial Brief, pp. 32-33;
       IEC Reply Brief, p. 13.

[152]  See also IEC Initial Brief, pp. 32-33.

[153]  Tr. 311-312.

[154]  See tr. 1298-1299.  See also tr. 4019 (the IEC panel
       advocates use of nationally sourced RECs).

CASE 15-M-0127, et al.

disclosures provided to the customers.  To address concerns regarding the current availability of renewably sourced electricity and RECs, ESCOs will not be limited to procuring electricity or RECs from RES Tier 1 eligible generation facilities, however.  Rather, any generation facility satisfying the Climate Leadership and Community Protection Act (CLCPA) definition of "renewable" - and whose electrical output satisfies the locational and delivery requirements - will be eligible, regardless of the facility's vintage.[155]  Finally, ESCOs will be required to make certain disclosures to customers and to Department staff in such a way that claims of the renewable content of the advertised product can be easily tracked and verified.

Customers who voluntarily buy clean energy "are New York's most valuable asset towards achieving the [CES] goals"[156] and "successful stimulation of customer-initiated choices will have a necessary impact on the trajectory of the required acquisitions to achieve the [targeted goals]."[157]  While the record does not establish that ESCOs have provided significant contributions to the State's progress toward achieving its 2016 clean energy goal of 50% renewables by 2030,[158] it is

---

[155]  The CLCPA defines renewable resources as "systems that generate electricity or thermal energy through use of the following technologies: solar thermal, photovoltaics, on land and offshore wind, hydroelectric, geothermal electric, geothermal ground source heat, tidal energy, wave energy, ocean thermal, and fuel cells which do not utilize a fossil fuel resource in the process of generating electricity." This definition is similar, but not identical, to the RES eligibility requirements established in the CES Order.

[156]  CES Order, p. 9.

[157]  CES Order, p. 88.

[158]  CES Order, pp. 22, 154 (referencing the goal of 50% renewables by 2030).

CASE 15-M-0127, et al.

nevertheless possible that mass-market customers' voluntary renewable purchases in the future will make material contributions toward achieving the Clean Energy goals. Consequently, ESCOs will be permitted to offer renewably sourced products under the following terms and conditions.

III.E.3.a. <u>Minimum Renewable Percentage</u>

The minimum percentage of renewably sourced energy offered by ESCOs in any given year must be the existing annual Tier 1 LSE obligation as established by the CES Order plus 50%, but in no case greater than 100%.[159]  For example, the Tier 1 LSE obligation for 2019 is 0.78%.  Therefore, any ESCO offering a renewable product in 2019 would be required to market only renewable products that are at least 50.78% renewable.  Once the Tier 1 LSE obligation reaches 50%, the products will be required to be 100% renewable, and that requirement will remain fixed as the Tier 1 LSE obligation increases above that level.  As discussed below, the ESCOs must also abide by the locational and delivery requirements established in the CES Order.

While this requirement is less stringent than the one for which Staff advocated, this requirement nevertheless ensures that ESCOs are providing meaningfully more renewable energy than is currently offered and advances the State's clean energy policies.  As one Staff witness eventually conceded, even if ESCOs were not required to provide 100% renewable products, if more customers purchased renewable ESCO products that contain incrementally more renewably sourced commodity than is offered by the utilities, the State's goal of 50% renewable energy by 2030 could be obtained more easily.[160]

---

[159]  CES Order; Implementation Plan, Table 1.

[160]  Tr. 2315-2316.

CASE 15-M-0127, et al.

In setting this requirement, the reasonable observations regarding the current level of available RECs in the NYGATS and the perceived costs associated with procuring a 100% renewable product have been considered.  Moreover, we disagree with Staff that the average mass-market customer would not find value in electricity that is only partially "green." On the other hand, as PULP, Staff and others argued, it makes little sense to permit ESCOs to offer renewably sourced commodity if the percentage of renewable energy is equal to or less than what is obtainable from the NYISO spot market or what is offered currently by the utilities.  This requirement strikes the proper balance between the recognized value of incremental additions of renewably sourced energy against the need for a floor that protects customers against misleading claims regarding "green" ESCO products.

III.E.3.b. Eligible Electricity

ESCOs will be required to satisfy their minimum renewable requirement in the same ways they satisfy their annual CES requirements and by entering into purchase agreements with any generator of any vintage that satisfies the CLCPA definition of "renewable."  In other words, ESCOs will be permitted to satisfy their minimum renewable requirement by: (1) by purchasing RECs from eligible renewable generators through NYGATS; (2) by purchasing Tier 1 RECs from NYSERDA; (3) by procuring RECs from eligible renewable generators through bilateral contracts; (4) by making Alternative Compliance Payments (ACP) to NYSERDA; or (5) by entering into bundled energy and REC purchase agreements with eligible renewable generators.

Based on the information in the record, the majority of the ESCOs in New York that offer renewable products appear to have been obtaining RECs from other states or markets, primarily

CASE 15-M-0127, et al.

Texas.  Staff, PULP and others make valid points in stating that
it is important that the electricity associated with ESCO-
offered renewable products be delivered and consumed within New
York State.[161]  Furthermore, it is difficult or impossible for
New York regulators and customers to evaluate whether, and to
what extent, the purchase of RECs from Texas and other states
actually results in increased generation of renewable energy.
Therefore, all voluntary renewable electricity purchases made by
ESCOs will be subject to the same locational and delivery
requirements as Tier-1-eligible REC purchases.[162]  While it may
be true that the production and use of renewable energy, no
matter where the generation of such is situated, is beneficial
to countering climate change on a global scale, the Commission
is committed to ensuring that customers in New York pay a
premium only for renewable energy that has a direct benefit in
this State and that represents an incremental increase in the
amount of renewable energy generated.  The ESCOs' concerns that,
at this time, it may be more economical or logistically easier
to purchase RECs from other markets have been considered.
However, simply put, ESCO purchases of RECs from outside the
NYISO market will not advance the clean energy goals adopted by
this State and, therefore, will not be permitted to continue.
The perceived difficulties or cost increases ESCOs may encounter
in the short-term will benefit the market in the long-term by
increasing the demand for renewable generation in the State.
This increased demand is expected to encourage renewable energy
developers to increase investments in the State, which will in

---

[161]  Under the RES, out-of-state intermittent renewable generators
are permitted to participate in the Tier 1 solicitations
under certain circumstances.  See CES Order, Appendix A, p.
7.  We see no reason to deviate from this practice.

[162]  CES Order, Appendix A.

CASE 15-M-0127, et al.

turn provide various benefits to New York ratepayers that
otherwise would not exist.[163]

### III.E.3.c.  Transparency of Information and Disclosures

Concerns regarding the opacity of ESCO-offered
renewable energy products are valid.  Without access to clear,
easily accessible information, including price information,
customers cannot make rational purchasing decisions.  Thus, the
Commission adopts CEGC's suggestion that ESCOs be required to
disclose the type of renewable energy content of each product
the ESCO offers.[164]  PULP's recommendation that an ESCO be
required to disclose the percentage of renewable energy in each
product, as well as the amount by which the ESCO product
percentage exceeds the mix existing in the NYISO also is
reasonable.[165]  Accordingly, the Commission requires each ESCO
post this information on its website, in all marketing
materials, and in individual customer contracts.[166]

NYGATS can meet most or all of the reporting and
compliance needs identified by Staff.  As part of its
application and subsequent updates, an ESCO offering a renewably
sourced product or products must identify the percentage of
renewable electricity that will be advertised for that product.
ESCOs should then ensure that all transactions are recorded in
NYGATS and properly associated with their account.  Department
Staff should verify compliance through review of these NYGATS

---

[163]  Some ESCO witnesses on the IEC Panel, who initially expressed
concerns about the availability of in-state RECs, eventually
conceded the logic of this theory.  See tr. 4100-4101.

[164]  CEGC Initial Brief, p. 35.

[165]  Tr. 3543.

[166]  See generally CEGC Initial Brief, p 28; Conn. Gen. Stat. §
16-24o(h)(6).

CASE 15-M-0127, et al.

accounts.  Consistent with the RES requirements, ESCOs have
until the close of the NYGATS reporting period for a calendar
year, which occurs during the second quarter of the following
calendar year, to ensure that they have sufficient RECs in their
NYGATS accounts.

III.E.4. Pricing of Renewably Sourced Commodity

          We recognize that ESCOs likely cannot provide
renewable energy in a percentage greater than the utility at a
price that is equal to or less than the utility.  Nonetheless,
the premium charged by the ESCO for a renewable product must be
commensurate with the incremental costs it incurs to provide the
product.

          All parties acknowledge that there is an added cost
associated with the provision of renewable energy in an amount
greater than is required by the CES Order.  Yet, little evidence
was presented regarding how much more expensive it is or would
be for ESCOs to provide a renewable product.  One ESCO witness
estimated that customers may be willing to pay a price
differential for a "green" ESCO product of 2 cents per kWh.[167]
Other testimony suggested that the potential premium associated
with a 100% renewable product could range from half of one cent
to 2.5 cents per kWh.  One ESCO that currently offers a 100%
renewable, EDP-compliant product provided evidence that it
charges its customers about 10% to 15% more than traditional
utility service for the renewable product.[168]  However, when
questioned directly, several ESCO witnesses could not state what
the percentage of renewable mix was for their products, much

_____

[167]  Tr. 715-716.

[168]  Tr. 4052.  Other IEC Panel members could not testify as to
how much more their green product cost over utility prices.
Tr. 4052-4054.

CASE 15-M-0127, et al.

less how much more expensive their renewable product was
compared to the utility.[169]  Thus, on this record, it is
difficult to identify with any certainty a reasonable premium
for the renewable product.

However, with an on-bill price comparison, as was
directed in Section II, supra, the premium associated with the
renewable product compared to the utility product will be
readily apparent to a customer.  This will enable customers to
ascertain whether they believe they are receiving a fair value
for the price that the ESCO charges for that product.  If the
customer at any time decides that they are unwilling or unable
to bear the cost of the renewable product, then they will be
free to switch to another ESCO or return to the utility.  ESCOs
that offer renewably-source products compliant with the
requirements of the above sections are not required to disclose
any additional information to customers before the on-bill price
comparison is implemented.

III.E.5.  Low-Income Customers

Finally, Staff argues that ESCOs should be prohibited
from offering renewable electric commodity products to low-
income, mass-market customers, unless the ESCO is willing to
provide the 100% renewable commodity to such customers at a
guaranteed savings.[170]  Staff explains that it takes this
position due to the fact that low-income customers' rates are
subsidized by other ratepayers and such subsidy should be fully
utilized to assist low-income customers meet their basic needs

---

[169]  See UIU/NYAG Initial Brief, pp. 38-39 (summarizing pertinent
parts of the transcript).

[170]  Tr. 2092.

-82-

CASE 15-M-0127, et al.

rather than diverted to what essentially would be a subsidy for the development of renewable resources.[171]

The Appellate Division, Third Department, recently upheld the Commission's prohibition on ESCOs serving low-income assistance program participants unless an ESCO can guarantee that the customer will pay no more than he or she would have paid to the utility.[172]  We find that this requirement remains appropriate, and we note that ESCOs can always provide renewable commodity products to those low-income customers if the product meets the aforementioned price-guarantee requirements.

### IV.  ESCO MARKETING PRACTICES

Section 10 of the UBP governs ESCO marketing standards.  The standards apply to ESCOs and their representatives when marketing to customers in New York.  The current standards are the result of a gradual iterative process of increasing the specificity and restrictiveness of the applicable standards to ESCO marketing practices resulting from persistent, unacceptably high numbers of customer complaints alleging ESCO deceptive marketing.  The current standards include training requirements to ensure marketing representatives are knowledgeable about ESCO products, including applicable termination fees; customer rights, including provisions of the Home Energy Fair Practices Act; and the ESCOs' mechanisms for handling questions, disputes and complaints.  The standards provide specific requirements for contact with customers depending on whether the customer is contacted in person, via telephone or by electronic means.  The standards

---

[171]  Tr. 2096, 2701.

[172]  Matter of National Energy Marketers Assn. v. New York Pub. Serv. Commn., 167 A.D.3d. 88 (November 1, 2018).

CASE 15-M-0127, <u>et</u> <u>al.</u>

also specify, among other things, marketer identification requirements and a requirement to provide customers with a copy of the ESCO Bill of Rights.

The UBP specifically prohibits ESCOs from engaging in misleading and deceptive conduct and requires ESCOs to provide customers with written documentation to support product offerings or with a relevant web address if requested.  The marketing standards also require that ESCOs provide written information in plain language designed to be easily understood by customers, including in languages other than English when appropriate.  The UBP also requires third-party verification for all sales consummated through door-to-door and telemarketing activities.

IV.A.   <u>Non-ESCO Party Positions Regarding Additional</u>
<u>Restrictions on ESCO Marketing Practices</u>

Staff acknowledges that the Commission has acted previously to reign in ESCO marketing abuses.  However, Staff points out that marketing abuses, including enrollment of a customer by an ESCO without the customer's authorization (slamming) and misrepresentation of both products and the marketers themselves, continue to result in a significant percentage of customer complaints related to ESCOs.  Considering that complaints of alleged ESCO improprieties continue at significantly higher rates than the number of complaints received by the utilities on a per-100,000 customers served basis, Staff recommends that ESCOs be prohibited from engaging in door-to-door, point-of-sale, telemarketing or similar marketing practices to enroll customers.  Staff further recommends that ESCO marketing practices should be limited to direct mail, electronic enrollments, or similar activities

-84-

CASE 15-M-0127, et al.

whereby the customer must affirmatively respond to or initiate direct contact with the ESCO.

UIU/NYAG support prohibiting door-to-door and telemarketing sales.  They also recommend other improvements aimed at better protecting customers.  Specifically, UIU/NYAG recommends the Commission require ESCOs to: (1) disclose to Department staff and the Commission all investigations and complaints against them and their agents in New York and other jurisdictions; (2) post performance bonds before being deemed eligible to participate in the New York retail energy market; (3) use standardized contracts for energy commodity service to mass-market customers so customers can easily compare contractual terms and product offerings; (4) substantiate any claims ESCOs make regarding how customers can save money on their utility bills by switching from default utility service to an ESCO; and (5) pay monetary penalties imposed by the Commission for any instances of violating the UBP.

NYC argues that transparency regarding pricing and products and marketing practices need to be improved.  NYC attests to the continuing problem of predatory sales tactics based on its experience with the significant number of customer complaints lodged with its Department of Consumer Affairs.  It recommends improving marketing practices by providing customers greater protections from aggressive sales tactics and from marketers who misrepresent themselves as working for the incumbent utility.  Similarly, NYC supports increased oversight and additional measures to eliminate telemarketing abuse.

PULP's primary position is that ESCOs provide no discernable benefit to residential customers and, therefore, should not be allowed to market to mass-market customers at all. PULP argues that ESCOs regularly misrepresent the beneficial attributes of the products they offer as compared to default

CASE 15-M-0127, et al.

utility service.  PULP rejects any argument that the solution to
marketing problems is enhanced enforcement.  It states that
enhanced enforcement efforts would only result in an undue cost
burden on the public and a strain on already limited government
resources.

PULP further argues that it is important to evaluate
third-party sales contractors to ensure compliance with existing
UBP requirements because, according to PULP, many of these
contractors are compensated by the ESCOs based on successful
enrollment of customers.  PULP further argues that ESCOs are not
properly overseeing their contractors/agents, based on the
ESCOs' failure to provide it with documentation of such
oversight in response to PULP's discovery requests.  It also
believes that ESCOs do not properly train their sales agents, do
not audit or investigate sales agents, and do not properly
document investigatory or enforcement programs.  According to
PULP, the ESCOs' failure to maintain internal oversight ignores
customers' complaints about rates, prices, marketing and sales
practices.

Although PULP's primary position is to exclude ESCOs
from the mass-market, it also offers specific improvements in
the alternative.  PULP recommends that ESCOs be prohibited from
enrolling known low-income customers.  To improve price
transparency for customers, PULP recommends the Commission
require ESCOs to provide notices to customers that show the
price per kWh to which the customer will be or is subject and
how that price compares with the applicable default utility
service price.

AARP agrees with PULP that ESCOs should not be allowed
to serve mass-market customers.  In the alternative, AARP agrees
with Staff's recommendations to limit marketing activities to

-86-

CASE 15-M-0127, et al.


direct mail, electronic communications or other activities
requiring the customer to initiate contact with the ESCO.


IV.B.  ESCO Party Positions Regarding Proposed Restrictions on
       ESCO Marketing Practices

        RESA contends that arguments in favor of additional
restrictions of marketing activities fail to address the fact
that the marketing abuses that do occur are in violation of the
existing rules that, RESA argues, must be better enforced.

        Responding to calls to end door-to-door marketing,
RESA points out that the prevalence of door-to-door sales among
ESCOs is because the Commission requires ESCOs to obtain a
customer's account number at enrollment.  According to RESA,
eliminating the account number requirement would allow for
alternative marketing approaches, including mall kiosk and
storefront sales.  RESA additionally claims that door-to-door
marketing provides ESCOs an opportunity to educate customers
about their supply options and that banning in-person marketing
would negatively impact ESCOs' ability to promote energy
efficiency and energy management.

        Agway, NEMA, Constellation, and the IEC all oppose
Staff's recommendation to ban certain types of marketing and
argue that existing rules and regulations related to marketing
are adequate but must be more rigorously enforced.  Agway and
IEC acknowledge marketing abuses but maintain that banning
certain marketing practices will not protect residential and
small commercial customers more than better enforcement of
existing rules.  In seeking to shift the responsibility for such
abuses and also preserve marketing flexibility, both parties
suggest that lax enforcement of rules has contributed to the
prevalence of marketing abuses.  According to Agway, if the

CASE 15-M-0127, et al.

Commission "ruthlessly weed[s] out bad actors, innovative and responsive companies will succeed."[173]

Infinite Energy argues that prohibiting ESCOs from directly marketing to potential customers contradicts state law because, although GBL Section 349-d reiterates the Commission's authority to regulate ESCOs, the statute does not specifically permit the Commission to prohibit certain forms of marketing. Infinite Energy also argues that the Commission has enough regulatory power to protect customers without having to prohibit door-to-door sales, including third-party verification, identification requirements, and reminding customers to sign-up for do-not-call-lists and to post "No Solicitation" signs. Infinite also suggests that ESCOs that repeatedly commit fraud or otherwise violate the UBP be penalized or banned from the market.

Constellation disputes any claim that predatory marketing and deceptive business practices are significant issues in the ESCO market.  NEMA supports the idea of increased transparency but joins Constellation in the belief that that ESCO marketing practices are not fooling customers into paying substantially more for commodity service.  NEMA reiterates its claim that Staff did not perform any independent analysis or other research into what motivates customers to pay for ESCO products or what value customers ascribe to such products.

IV.C.  Conclusions Regarding Proposed Restrictions on ESCO
       Marketing Practices

Based upon the number of customer complaints that continue to be made against ESCOs, and the likely need for increased enforcement activities, the large number of ESCO

---

[173] Agway Initial Brief, p. 15.

CASE 15-M-0127, et al.

customers that pay significant premiums for products with little
or no apparent added benefit, and the market's dearth of
innovation and value-added services, it appears that a material
level of misleading marketing practices continues to plague the
retail access market.  Whether or not ESCOs are purposefully
deceiving or preying on unsuspecting customers, many ESCO
marketing practices nevertheless could be perceived by mass-
market customers as misleading.  Moreover, these problems
persist despite the Commission's actions over the years to
improve the function of the market, through efforts aimed at
both limiting undesirable behavior of ESCOs and their
representatives and by eliminating barriers and otherwise
supporting ESCOs' business activities.

        Based on the history of increasing marketing
regulation and ongoing marketing problems, PULP's suggestion,
which is supported by AARP, to prohibit ESCOs from engaging in
any marketing activities with residential and small commercial
customers is an attractive proposition.  It is evident that
Staff, other State Agencies, as well as a multitude of parties
and other interested participants, including some ESCOs, have
devoted substantial efforts and resources over the years to
develop a competitive market for mass-market customers.  But the
record in these proceedings reveals that these efforts have not
succeeded in eliminating customer abuse and instilling a
commitment to compliance on the part of the ESCOs.  Thus, it is
tempting to simply prohibit the ESCOs from marketing to mass-
market customers.  Ultimately, however, less drastic actions can
and will be taken to further reform and fine-tune the market so
that ESCOs can continue to work toward fulfilling the promises
they have made in these proceedings to provide customers with
real benefits and introduce innovation into the marketplace.

CASE 15-M-0127, <u>et</u> <u>al.</u>

          Similarly, Staff's proposal, supported by UIU/NYAG, to
prohibit door-to-door, point-of-sale, telemarketing or similar
practices to enroll customers, is attractive.  It narrowly and
directly addresses that aspect of the retail markets that is
generating most of the complaints, without extending beyond the
desire to reduce complaints related to ESCO marketing abuses.
It also leaves open multiple formats for ESCOs to communicate
with potential customers to not unduly stifle their message.

          The fact that problems related to ESCO marketing
practices have persisted, despite the Commission's continued
efforts to improve and strengthen applicable regulations and
standards, argues against the adoption of any of the additional,
incremental measures that are supported by many of the ESCO
parties.  With each strengthening of marketing and verification
rules, significant compliance issues continued.  In fact, ESCO-
related complaint rates steadily increased through 2015, only
showing some improvement in 2016.  The persistence of complaints
related to ESCO marketing practices is indicative of some ESCOs
continuing to skirt rules and attempting to avoid accountability
as part of their business model.  As RESA points out, an
approach involving further restrictions and/or compliance
hurdles related to marketing activity would again fail to
address the fact that marketing abuses that do occur are in
violation of the existing rules.

          It is recognized that many parties in this case
believe that incremental regulations and oversight have the
potential to deliver commensurate incremental improvements in
customer complaint rates and price transparency and
competitiveness.  Based on the information in this record,
however, the incremental approach has not effectively advanced
the Commission's vision of: effective competition; reduced
prices; increased choice of supply and services; ample and

CASE 15-M-0127, et al.

accurate information for customers to make informed decisions;
and enough information to permit adequate oversight of the
market.  Accordingly, additional incremental marketing measures
are unlikely to significantly shift the trajectory of the
residential and small commercial ESCO markets.

        The approach espoused by several parties to more
aggressively pursue wrongdoers is ostensibly attractive but
complicated by practical and administrative limitations and
costs.  It also improperly shifts the focus away from the party
responsible for the customer abuses.  To be sure, the Commission
has over the years aggressively sought improvements to the
market, by implementing restrictions, increasing oversight, and
pursuing enforcement actions.  Enforcement also has been pursued
by the NYAG.  Despite these efforts, which should have served as
a warning and a deterrent to other bad-actors that misconduct
would not be tolerated, marketing and related complaints
persist.  Finally, as PULP explains, increased enforcement is
expensive and resource-intensive and the benefits from such an
endeavor are likely to be negligible.  Thus, the increased costs
associated with more enforcement activity would outweigh the
likely benefit that may be obtained.  We recognize that these
regulatory methods are particularly expensive for ratepayers, as
they often depend on individual determinations.  Indeed, certain
ESCOs may promote these marketing reforms because they may
believe such reforms are relatively ineffective compared to what
would be more efficient regulations that they hope to avoid.
While this is not to say that the Department and the NYAG should
retreat from the current level of enforcement activities, the
Commission recognizes that customers receive the most benefit
from efficient and cost-effective market reforms.  As to current
regulations and law, the Department and NYAG should continue to

CASE 15-M-0127, et al.

monitor the ESCOs and ensure that bad-actors face appropriate consequences.

　　　　In this order, numerous reforms have been adopted that are expected to provide enhanced customer protections from bad-acting ESCOs, including reforms to: strengthen ESCO eligibility requirements to ensure that only responsible ESCOs occupy the marketplace; prohibit or limit various ESCO products and services; and improve customers' access to more transparent information, including pricing information, about the ESCO products and services they receive.  These reforms render the need for more incremental marketing restrictions unnecessary at this time.

## V.   ESCO BILLING METHODOLOGIES

　　　　Currently in New York, ESCO customers are billed in one of three ways.  ESCO customers may receive: (1) one bill from the utility that contains both the utility's delivery charge and the ESCO's commodity charge (consolidated utility billing or CUB); (2) one bill from the ESCO that contains both the ESCO's commodity charge and the utility's delivery charge (consolidated ESCO billing or CEB); or (3) two bills – one from the ESCO for commodity and one from the utility for delivery (dual billing).  While dual billing is common for commercial and industrial customers, most parties agree that residential customers typically prefer to receive one bill.  The vast majority of residential ESCO customers, other than gas ESCO

CASE 15-M-0127, et al.

customers in the National Fuel Gas Corporation (NFG) service territory, are billed through consolidated utility billing.[174]

V.A.  Non-ESCO Party Positions Regarding Billing Methodologies

      NYC and UIU/NYAG take no position on CUB, CEB, or dual billing.  Staff similarly takes no position on any of the various billing methodologies but says that there may be a need to reevaluate billing methods in a future track of these proceedings.  The Joint Utilities urge the Commission to recognize that "significant complexity and cost" would be associated with a decision to make CEB mandatory.

V.B.  ESCO Party Positions Regarding Billing Methodologies

      RESA and many ESCOS believe that "customer billing is the most direct and sustained interaction that energy suppliers have with their customers" and that "invoicing carries tremendous influence and opportunity to advance the State's initiatives to modernize the energy marketplace."  Many ESCO parties opine that the CUB model presents a barrier to effective communication with ESCO customers.  RESA believes that the CUB's lack of space for ESCOs to have "detailed line items" causes customer confusion and essentially causes the commodity cost to be hidden from customers.  Infinite Energy and NEMA echo RESA's concerns.  Infinite Energy adds that CUB causes some customers

---

[174] In the NFG service territory, approximately 23 ESCOs use CEB. Those ESCOs operate under a single retailer model, wherein the ESCOs purchase delivery service from NFG and then resell the delivery service to their customers along with commodity. No ESCO outside the NFG territory provides CEB, purportedly due to certain operational, system, and legal complexities involved in providing CEB when the ESCO does not or is not able to purchase delivery service from the utility.

CASE 15-M-0127, <u>et</u> <u>al.</u>

to mistakenly believe that the utility is the sole company
serving them.

        NEMA and Drift opine that CEB is a more desirable
billing system, because ESCOs that use that method can offer
more information to the customer about additional products and
services.  Drift states that a CEB also provides the ESCOs an
opportunity to develop more robust customer relationships by
delivering information on the bill.  RESA and Infinite Energy go
so far as to recommend that the Commission require all ESCOs to
use CEB so that the full array of value-added products and
services can be explained to customers.  According to RESA, this
reform would place downward pressure on ESCO pricing, address
concerns raised by Staff about price transparency, and address
other parties' concerns about the appropriateness of tasking
utilities with incorporating ESCOs' value-added products and
services into their billing systems.  Infinite Energy adds that
certain customer abuses would not be as prevalent if ESCOs were
required to be responsible for their own billing.  PULP supports
CEB to the extent that it would require ESCOs to be responsible
for the billing and collections associated with their products.

        GEE believes that, when CEB is permissible but not
required, as it is now, an ESCO that opts to use the CEB system
would create "diseconomies of scale" by duplicating many of the
merchant functions already in place at the utilities, including
credit checks on customers, incremental credit and collection
costs and the purchase of a billing system.  GEE explains that
those ESCOs then must pass on the additional costs to customers,
thereby rendering it difficult for them to remain competitive
with the ESCOs that avoid those costs by using CUB.

        Robison does not oppose mandatory CEB but notes that
it would implicate other rights and responsibilities, including
the power to terminate customers' service.  The IEC and Agway

-94-

CASE 15-M-0127, <u>et</u> <u>al.</u>

support CUB as a billing method.  The IEC believes that CUB is a
useful tool for smaller ESCOs because it allows them to
outsource the costs associated with billing without those costs
being passed on to ESCO customers.  Agway believes that CUB is
an efficient system for customers to receive one bill.
According to Agway, CUB also permits ESCOs to properly size
their billing and collection systems, avoids duplicate billing
systems, and limits ESCOs' exposure to uncollectable accounts.
Agway also states, however, that it would not be opposed if CEB
were mandatory.


V.C.  <u>Conclusions Regarding Billing Methodologies</u>

        While various ESCO parties may be frustrated by
perceived limitations in the CUB model with respect to customer
communication, ESCOs are not currently required to use the CUB
method.  Rather, ESCOs that believe that the CUB method
restricts their ability to effectively market value-added
products and services, or otherwise interact with customers, can
separately bill customers under the dual billing method.

        The suggestion of various parties that the CEB system
should be the only permissible billing system is rejected.  To
be sure, CEB would require ESCOs to take more responsibility for
costs associated with their business operations, such as
developing and maintaining a billing system and, possibly,
purchasing utility receivables.  However, there are two
troubling consequences associated with mandating CEB to the
exclusion of the CUB and dual-billing models and those
consequences have not been adequately explored in this phase of
these proceedings.

        First, as some ESCOs point out, mandating CEB would
give ESCOs more influence over termination of service to
customers.  For example, if ESCOs were required to purchase

CASE 15-M-0127, et al.

utility accounts receivable, ESCOs may have the exclusive
authority to direct service termination.  Given that
historically this market has been rife with both alleged and
proven instances of customer abuse, not all ESCOs can be
entrusted with this authority.  Further process would need to be
established to fully ascertain the extent to which ESCOs would
or should have the power to disconnect service.

   Second, to effectuate CUB, ESCOs must transmit
valuable data about customer usage and pricing to utilities.  In
turn, this data is accessible to the Commission and Department
staff and is one important means by which the Commission
exercises oversight over the marketplace.  If CEB were required
throughout all utility territories, this information will not be
readily accessible to the Department without imposing customer
usage and pricing data sharing obligations on the ESCOs and
significantly undermining customer protections.

   For now, all existing billing methodologies available
to ESCOs will be permitted.  ESCOs that continue to use CUB may
reach out directly to customers with any marketing materials
and/or other messages regarding their products and services.

## VI. UTILITY PURCHASE OF ESCO RECEIVABLES

   Under the existing paradigm, distribution utilities
provide billing and collection service for the majority of ESCOs
serving residential customers through CUB.  The utilities are
authorized to purchase accounts receivable from the ESCOs
operating in their respective service territories.  Utilities
purchase receivables due to ESCOs at a Commission-approved
discount rate and without recourse, meaning that the utility may
not pursue a collection action against the ESCO if the utility
ultimately is unable to collect from the ESCO customer.  The
purchase of receivables (POR) discount is applied pursuant to a

-96-

CASE 15-M-0127, et al.

formula, usually described in the utility's tariff, that takes
into consideration, among other factors, the collective level of
uncollectible accounts associated with the ESCOs in that
utility's territory.

Many parties, both ESCO and non-ESCO alike, criticize
the CUB model's use of a POR without recourse system.  They
opine that guaranteed compensation by utilities for POR may
provide refuge for bad-acting ESCOs.  They assert that, using
this system, an ESCO acting in bad faith could enter into a
contract with a customer at an exorbitant rate without the
financial and business risk of collecting from the customer.
According to Infinite Energy, CUB and the POR without recourse
system "give ESCOs little incentive to charge competitive
prices."  Infinite Energy describes POR without recourse as
providing a platform for abuse that "simply could not have
happened to this degree had ESCOs been responsible for issuing
and collecting their own bills."  Staff opines that the POR
without recourse system also disadvantages ESCOs offering
competitive prices because the discount is based on the overall
level of collectibles for that utility's territory.

Generally, the parties fall into two different
categories: those that agree that the POR system requires
modification and those that believe the POR system should remain
unchanged.  The parties that believe that the POR system
requires modification differ in how the program should be
altered, but they generally agree that the system may provide a
platform for some ESCOs to take advantage of a guaranteed
payment by the distribution utility and assert the program lacks
transparency.

There are generally three different proposals to
modify the existing CUB POR without recourse system: (1) convert
the POR system to one with recourse; (2) develop a POR system

CASE 15-M-0127, et al.

with a claw-back mechanism that the utilities could use to collect from ESCOs only in specific circumstances; and (3) adopt an ESCO-specific or tiered discount rate.  Some ESCOs suggest that CUB should be eliminated and all ESCOs required to take over billing and collection responsibilities and issue a CEB, thus eliminating the POR issue.

VI.A.  <u>Non-ESCO Party Positions Regarding POR Reform</u>

Staff supports a system of POR with recourse.  In support of its position, Staff provides historical context concerning this issue.  Staff states that the Commission allowed utilities to purchase the ESCO accounts receivable without recourse in the infancy of the retail market "to reduce ESCO operating costs, ensure that customers receive the full benefits of HEFPA, minimize the switching of payment-troubled customers back to full utility service, and further promote retail access migration."  Staff argues that the Commission intended the utilities' operational support of the ESCOs to be temporary, with the goal that ESCOs would take over all aspects of customer-care services when the market matured.  Staff asserts that the retail market is now mature and comprised of many ESCOs, some that hold themselves out as established national providers.  Staff opines that since the market is mature, POR without recourse should no longer continue.  It asserts that both customers and ESCOs alike would benefit by the discontinuance of POR without recourse: customers may see lower ESCO prices because, without the utilities' guaranteed purchase of receivables, an ESCO may establish lower prices to limit exposure to bad debt; ESCOs that generally charge lower prices than their competitors would benefit from paying a lower POR discount rate.  Staff recognizes, and other parties agree, that

CASE 15-M-0127, et al.

further discussion and development of Staff's proposal would be necessary before it could be implemented.

PULP supports the elimination of POR and requiring ESCOs to bill and collect for their products and services to eliminate the opportunity for ESCOs to charge high prices while receiving the benefit of utility billing and collections. Alternatively, as another means of protecting customers, PULP suggests that the Commission adopt reforms it adopted in 2014 that prohibited utilities from terminating or threatening to terminate service for any ESCO charges that exceed what the utility would have charged for default service.

The Joint Utilities share other parties' concerns that Staff's proposed POR with recourse system has cost and policy implications that must be further evaluated.  The Joint Utilities encourage an evaluation of the cost of moving to a "with recourse" system before making any determination.  The Joint Utilities caution that switching to a "with recourse" POR system, will give ESCOs more authority for disconnecting customers for non-payment.[175]  They opine that additional costs will be borne by utilities and ESCOs to monitor HEFPA compliance in terminating service.


VI.B.  ESCO Party Positions Regarding POR Reform

Many parties generally take issue with Staff's proposal because they support a different option or they prefer the existing POR system.  Other bases for opposition include the allegation that Staff has failed to substantiate claims of abuse stemming from the existing POR system, that the proposed system is out of touch with competitive utility retail markets that use

---

[175]  GEE agrees with most of the arguments made by the Joint Utilities regarding this issue.

CASE 15-M-0127, et al.

non-recourse POR programs, and that the proposal fails to
address a long-term strategy for ESCO billing.

　　　　For its part, Infinite Energy is suspect of the Joint
Utilities' arguments against moving to a POR with recourse
system.  It says that the utilities benefit from the existing
system because the utilities are guaranteed to always collect
the bad debt arising from ESCO POR because it is "redistributed
among their paying customers when the Commission sets their
rates."  It alleges that utilities derive benefits from the
ESCOs' customers "without having to take on any short-term risk
of serving them."  Infinite Energy states that Staff's proposal
is "the most reasonable and would be a partial improvement,"
although it recommends the Commission take another approach,
described below.

　　　　RESA believes that the POR system should be reformed
to disincentivize ESCOs that engage in undisciplined pricing
behavior, but claims the best solution is for the Commission to
establish POR controls.  RESA contends that a POR claw-back
provision, like that implemented by FirstEnergy in Pennsylvania,
should be adopted.  Under that arrangement, a penalty is imposed
on an ESCO if its annual bad debt rate exceeds 150% of the
residential class average of bad debt and the ESCO charges rates
above a pre-determined threshold.  RESA opines that adopting the
exact system would be appropriate only if New York moved to a
new default service model.  However, it suggests a similar claw-
back mechanism be implemented with the goal of penalizing those
ESCOs with an unusually high level of bad debt and excessive or
abnormally high commodity rates, while at the same time
producing a lower POR discount rate for other ESCOs.

　　　　For its part, GEE gives qualified support to the
implementation of ESCO-specific or tiered discount rates to curb
abusive ESCO practices, noting that the Commission previously

CASE 15-M-0127, <u>et</u> <u>al.</u>

supported such an approach, although it was never implemented. However, GEE also believes that modifying the purchase of receivables construct would not be in the interest of customers because both the utilities and ESCOs would be performing redundant functions and the costs associated with those functions would be borne by both utility and ESCO entities, increasing costs to all customers.  It argues that there is no evidence of abuse of the POR system and that ending the "without recourse" system will limit competition by favoring large national ESCOs.

Finally, certain ESCO parties advocate for eliminating CUB altogether and requiring ESCOs to obtain their own billing systems and engage in CEB.  RESA explains that reform of the POR program should be considered only a short-term solution and instead changes to the billing system would improve transparency and allow ESCOs to directly engage customers.  RESA, Infinite Energy and others suggest that the best way to provide transparency, patch weaknesses in the system and transition into the retail market originally envisioned by the Commission is by moving to a system where the ESCO is responsible for billing and collections.

VI.C.  <u>Conclusions Regarding POR Reform</u>

It appears that one of the most significant drivers behind arguments favoring modification of the POR system is to eliminate the opportunity for unsavory ESCOs to charge mass-market customers excessive rates for service without absorbing concomitant risk.  Yet, throughout this order, reforms to the retail access market have been adopted that will enhance customer protections and ensure that ESCO products are delivered at reasonable rates.  Consequently, there will be much less opportunity for bad-acting ESCOs to operate in the marketplace

CASE 15-M-0127, et al.

and charge excessive rates for the products and services they offer.  Thus, as stated by the Joint Utilities and GEE, as a practical matter, overhauling the POR system may not be worth its cost if the underlying concern is largely mitigated via other reforms.

However, the utilities will be required to track and maintain, by individual ESCO, additional data regarding uncollectible accounts.  At present, the utilities do not track ESCO-specific uncollectible accounts or calculate uncollectible factors for each ESCO.  Should there be a need to modify the POR system in the future, such data would provide a basis for establishing either an ESCO-specific POR discount rate or a tiered ESCO POR discount rate.

VII.  CONSIDERING THE DEFINITION OF SMALL NON-RESIDENTIAL
                    CUSTOMERS

Despite the fact that the Commission did not notice that it was considering altering the definitional boundaries of the retail-energy mass market in the instant proceeding, certain parties raised and/or disputed two unnoticed issues: (1) whether small non-residential customers should continue to be treated similarly to residential customers and (2) how small non-residential gas customers should be identified.  The Commission addresses these issues only due to the fact that no Commission action is needed: already-existing definitions remain appropriate.

Since 2012, the Commission has been evaluating the residential and small non-residential retail market and whether the structure of that market is supporting public policy goals. Residential and small non-residential customers have been grouped together as "mass-market" customers; these two groups are, numerically, the largest groups of customers in the State, though the significant usage of many large customers means that

-102-

CASE 15-M-0127, et al.

large customers make up a significant portion of the electric
and gas usage in the State.  Small non-residential electric
customers are defined as non-demand metered customers and small
non-residential gas customers are defined as those using less
than or equal to 750 dekatherms (dth) per year, which had been
GEE's suggestion.


VII.A.  Non-ESCO Party Positions Regarding the Definition of
         Small Non-Residential Customers

        In advancing its positions in these proceedings, Staff
applies the currently accepted definition of the mass market.
Staff maintains that small non-residential customers "are more
like residential customers as to their ability and
sophistication to understanding the markets and buying gas
commodity for contract terms often measured in yearlong
increments" and, therefore, should continue to be included in
the definition of the mass market and afforded the additional
protections that label provides.  Staff also asserts that the
definition of small non-residential customers should be
maintained in these proceedings and, in fact, cautions that the
threshold of 750 dth/year may be too low.  In so doing, it
explains that, while small commercial electric retail customers
experienced some savings between 2014 and 2016, small commercial
gas retail customers paid approximately $137.2 million, or 9.8%,
more than they would have during the same time if they had taken
gas commodity from their utility.  Staff suggests that a
proceeding limited to investigating the threshold level
associated with small non-residential gas customers could be
instituted to determine whether the threshold should be
modified.

CASE 15-M-0127, <u>et</u> <u>al.</u>

VII.B.   <u>ESCO Party Positions Regarding the Definition of Small</u>
         <u>Non-Residential Customers</u>

          Most ESCO parties urge that small non-residential
customers should be excluded from the mass-market label and
treat all commercial customers the same.  They assert that small
commercial customers should be excluded from the mass market
because they are necessarily more sophisticated than residential
customers and, therefore, do not require the same level of
regulatory oversight and protections.  According to the ESCOs,
identifying small non-residential customers as mass-market
customers limits small business owners' options with regards to
retail energy services.  The ESCOs further assert that small
commercial customers' business acumen and expectations in
selecting an energy service provider make them more akin to
large commercial and industrial customers than residential
customers.  The ESCOs contend that Staff agrees that small
commercial customers represent a separate market segment and, as
business owners, must engage in transactions involving
significant amounts of money and contract terms.

          Some ESCO parties claim that there never has been a
showing that small businesses require special protection or that
small businesses have experienced pricing or marketing abuses on
par with those alleged for residential ESCO customers.  ESCO
parties maintain that small business customers have benefitted
by receiving retail service, with over half of small non-
residential customers saving money between 2014 and 2016.  They
cite data provided by Staff that shows small non-residential
electric customers collectively benefitted between 2014 and 2016
with a total savings of $940,000, paying 0.1% less than if they
had purchased electric commodity from the utilities.  While on
the gas side small business customers did not save overall, the
ESCO parties opine that the modest 9.8% cost of service over the
utility price, approximately $137.2 million, is most likely due

CASE 15-M-0127, et al.

to the prevalence of fixed-rate contracts, a conscious decision by business owners to limit their exposure to commodity market volatility.

Some ESCO parties contend that the definition of small non-residential gas customers should be re-examined, and the threshold lowered, thereby excluding some of those customers from the mass market. Many ESCO parties suggest that the 750 dth/year threshold is arbitrary, and some claim a different or lower threshold should be adopted. GEE, who originally proposed the 750 dth/year threshold, states that, while the proposal was based on five times the average residential customer's usage, it had erroneously assumed the average usage level was 150 dth/year. It now asserts that the average residential usage level is much closer to 100 dth/year and recommends a threshold level of 500 dth/year. The IEC also advocates for a 500 dth/year threshold, claiming that this standard would align New York with other states such as Illinois, Kentucky, New Jersey and Ohio.

GEE also recommends a modification to the definition of small non-residential customer so that if a customer is disqualified as a small non-residential customer by either having a demand meter on the electric side or exceeding the applicable threshold dth/year on the gas side, the customer would be treated in the same manner for both commodities and not be classified as a mass-market customer. GEE alleges that treating the same customer as sufficiently sophisticated for one commodity but not the other is illogical.

RESA believes that any evaluation of a given customer's need for customer protections based solely on the volume of energy that customer used is irrational. For its part, Direct Energy argues that, to the extent the Commission believes any subset of non-residential customers require special

-105-

CASE 15-M-0127, et al.

protections, it should conduct further proceedings to identify which types of customers require those protections.  It further claims that small non-residential customers should be allowed an efficient process to opt out of protections if they wish.


VII.C.  Conclusions Regarding the Definition of Small Non-
        Residential Customers

        Small non-residential customers will not be excluded from the definition of the mass market at this time.  Small non-residential customers may have more sophistication in entering contractual arrangements than most residential customers, but the parties have offered no compelling reason to strip small non-residential customers of the protections they currently have.  While ESCOs have presented an argument that inclusion in the mass market would limit small non-residential customer choice, they have not explained how small non-residential customer choice is limited.  In fact, as the ESCOs acknowledge, small non-residential customers continue to contract with ESCOs for commodity service under the existing paradigm and none of these customers have come forward to say that their choices are restricted.  There is no compelling reason to depart from the current definition of small non-residential gas customers. While RESA complains that any volumetric threshold standard is irrational because it fails to consider the customer's level of sophistication, we disagree.  It is entirely reasonable to correlate the amount of a commodity used by a business to the level of attention a business owner likely dedicates to investigating ways to reduce his or her costs associated with that commodity.  Of course, there always will be exceptions: some smaller customers will be quite savvy business owners and some larger customers will be less capable in that regard. Nevertheless, a volumetric standard remains a rational and

CASE 15-M-0127, et al.

administratively efficient means of estimating a customer's level of sophistication.

The threshold level of 750 dth/year for gas customers will not be modified at this time.  While ESCOs believe the threshold level is too high and Staff opines that it may be too low, no persuasive arguments have been presented by the parties for either lowering or raising the threshold level.

## VIII.  COMMUNITY CHOICE AGGREGATION

Most parties did not opine in much detail on the future of Community Choice Aggregation (CCA) in the context of these proceedings.  However, NYC indicated support for "a framework for ESCO regulation that is flexible enough to accommodate opting for CCA, or similar arrangement."[176]  Staff recommends that all aggregation be "enabled through either a Community Choice Aggregation (CCA) model utilizing a professional energy buyer acting in a fiduciary manner that is independent of the ESCO or the energy service provider is a not-for-profit (NFP) corporation or municipal entity."[177]

RESA recommends that communities be "afforded flexibility to select the business partners and vendors who can best assist the community in meeting its energy procurement and policy objectives" while following public contracting rules. The IEC raised a concern with the fairness of the current CCA playing field, wherein smaller ESCOs competitively bid against larger ESCOs to be retail providers.

The currently authorized CCA projects will continue to be monitored and all future CCA projects will be individually evaluated as they are proposed.  It would imprudent and

---

[176]  NYC Initial Brief, p. 19.
[177]  Tr. 2033-2034.

CASE 15-M-0127, et al.

inappropriate to adopt any broad changes to the CCA processes in these proceedings.  Any proposed modification to the CCA process should be raised in the context of the CCA oversight case (Case 14-M-0224).


The Commission orders:

     1.  Consistent with the body of this Order (Section III) and subject to any exceptions identified therein, effective 60 calendar days from the date of this Order, energy service companies (ESCOs) shall enroll new residential or small non-residential customers (mass-market customers) or renew existing mass-market customer contracts for gas and/or electric service only if at least one of the following conditions is met: (1) enrollment includes a guaranteed savings over the utility price, as reconciled on an annual basis; (2) enrollment is for a fixed-rate commodity product that is priced at no more than 5% greater than the trailing 12-month average utility supply rate; (3) enrollment is for a renewably sourced electric commodity product that (a) has a renewable mix that is at least 50% greater than the ESCO's current Renewable Energy Standard (RES) obligation, (b) the ESCO complies with the RES locational and delivery requirements when procuring Renewable Energy Credits (RECs) or entering into bilateral contracts for renewable commodity supply, and (3) there is transparency of information and disclosures provided to the customer with respect to pricing and commodity sourcing.

     2.  Consistent with the body of this Order (Section III.D.3), effective 60 calendar days from the date of this Order, any mass-market customer contract for a fixed-rate commodity service that is subject to automatic renewal shall be renewed by the ESCO only as a contract for variable-rate, commodity-only service that includes a guaranteed savings over

CASE 15-M-0127, et al.

the utility price, unless the ESCO obtains affirmative customer consent to renew the contract as a fixed-rate contract that is priced at no more than 5% greater than the trailing 12-month average utility supply rate.

       3.  Consistent with the body of this Order (Section III.C.3), Department of Public Service Staff (staff) is directed to convene a collaborative in Track II of these proceedings to explore: (1) which, if any, ESCO-offered energy-related products and services are most likely to benefit customers and advance the State's energy policy goals, which products and services can or should be offered by ESCOs bundled with commodity, and which are more appropriately offered separately from commodity; and (2) what rules, including pricing and disclosure requirements, should be applied to ESCO-offered energy-related products and services.

       4.  Consistent with the body of this Order (Section II.C), staff is directed to collaborate with each utility and develop individualized plans that set forth, for each utility, a timely and cost-effective pathway toward maximizing the dissemination of useful price-comparison information to customers, including but not limited to on-bill price comparisons of utility and ESCO price information and itemized billing.

       5.  Revisions to Section 2 and Section 5 of the Uniform Business Practices are adopted in accordance with the discussion of the body of the Order.  The revisions shall be effective 60 days following the date this Order is issued.

       6.  ESCOs currently operating in New York that intend to continue to renew contracts with customers in New York and/or enroll new customers in New York following the effective date of Ordering Clause No. 1 (i.e., 60 calendar days following the date of this Order) are directed to file an application in accordance

CASE 15-M-0127, et al.

with the body of this Order no later than 30 calendar days
following the date the revisions to the Uniform Business
Practices become effective (i.e., no later than 90 calendar days
following the date of this Order).

7.   Electric and gas distribution utilities that have
tariffed provisions providing for retail access shall publish on
their websites 12-month trailing average utility supply rates
within 15 days of March 31, June 30, September 30, and December
31 each year, starting with a filing within 15 days of December
31, 2019, for each mass-market service class and for each mass-
market customer grouping that receives different supply rates
based on the applicable tariff.  The published averages shall
include all charges and credits that apply to full-service
customer bills but would not apply to ESCO customer bills for
the applicable service class and customer grouping.  Each
utility shall file a letter in Cases 15-M-0127, 12-M-0476, 98-M-
1343 at the time it posts the data for the 12-month trailing
average ending December 31, 2019.

8.   Electric and gas distribution utilities that have
tariffed provisions providing for retail access are directed to
file tariff amendments or addenda to incorporate or reflect in
their tariffs the Uniform Business Practices revisions approved
in Ordering Clause No. 5.  The tariff revisions shall be filed,
on not less than one day's notice, to become effective on or
before February 10, 2020.

9.   The requirements of Public Service Law Section
66(12)(b) as to newspaper publication of the tariff revisions
filed in accordance with Ordering Clause No. 7 are waived
because the process in this proceeding and this Order give
adequate notice of the changes.

10. Department of Public Service staff is directed to
file a report of financial surety recommendations for ESCO

CASE 15-M-0127, et al.

eligibility, in accordance with the body of this Order (Section I.C), within 120 days of the date this Order is issued.

   11. Department of Public Service staff is directed to file a guidance document for the periodic review of ESCO eligibility, in accordance with the body of this Order (Section I.C), within 60 days of the issuance of this Order.

   12. Central Hudson Gas & Electric Corporation; Consolidated Edison Company of New York, Inc.; KeySpan Gas East Corp. d/b/a National Grid; National Fuel Gas Distribution Corporation; New York State Electric & Gas Corporation; Niagara Mohawk Power Corporation; Orange and Rockland Utilities, Inc.; Rochester Gas and Electric Corporation; and, The Brooklyn Union Gas Company d/b/a National Grid NY are directed to commence tracking and maintaining data regarding uncollectible accounts, by individual ESCO.

   13. In the Secretary's sole discretion, the deadlines set forth in this order may be extended.  Any request for an extension must be in writing, must include a justification for the extension and must be filed at least one day prior to the affected deadline.

   14. These proceedings are continued.

            By the Commission,


 (SIGNED)        MICHELLE L. PHILLIPS
             Secretary

# STATE OF NEW YORK
# PUBLIC SERVICE COMMISSION

# UNIFORM BUSINESS PRACTICES
# CASE 98-M-1343

December 2019

TABLE OF CONTENTS

SECTION 1:  DEFINITIONS ................................................................................ 1

SECTION 2:  ELIGIBILITY REQUIREMENTS ................................................. 6

SECTION 3:  CREDITWORTHINESS ............................................................... 16

SECTION 4:  CUSTOMER INFORMATION .................................................... 21

SECTION 5:  CHANGES IN SERVICE PROVIDERS ...................................... 25

SECTION 6:  CUSTOMER INQUIRIES ........................................................... 41

SECTION 7:  DISTRIBUTION UTILITY INVOICES ....................................... 43

SECTION 8:  DISPUTES INVOLVING DISTRIBUTION UTILITIES, ESCOs OR
            DIRECT CUSTOMERS ................................................................. 45

SECTION 9:  BILLING AND PAYMENT PROCESSING ................................. 47

SECTION 10:  MARKETING STANDARDS ..................................................... 61

# SECTION 1:  DEFINITIONS

As used in the Uniform Business Practices (UBP), the following terms shall have the following meanings:

Assignment – Transfer by one ESCO to another ESCO of its rights and responsibilities relating to provision of electric and/or gas supply under a sales agreement.

Bill ready – A consolidated billing practice that requires each non-billing party, after receiving customers' usage data, to calculate its charges and send via EDI charges, billing information, and bill messages to the billing party in a form that allows the transfer of the information to the bill in a format the billing party selects.

Billing cycle – The period for which a customer is billed for usage of electricity or natural gas.

Billing services agreement (BSA) – An agreement between the distribution utility and the ESCO stating the billing practices and procedures and the rights and responsibilities of billing and non-billing parties relating to issuance of consolidated bills to customers.

Budget billing – A billing plan that provides for level or uniform amounts due each billing period over a set number of periods, typically 12 months, and determined by dividing projected annual charges by the number of periods.  Installment amounts may be adjusted during the period and may include reconciliations at the end of the budget period to account for differences between actual charges and installment amounts.

Business day – Monday through Friday, except for public holidays.

Consolidated billing – A billing option that provides customers with a single bill combining charges from more than one service  provider and issued by a distribution utility providing delivery service (utility consolidated bill) or by a commodity supplier (ESCO consolidated bill).

Customer inquiry – A question or request for information from a customer relating to a rate, term, or condition of service provided by an ESCO, distribution utility or other service provider.

Cramming – The addition of unauthorized charges to a customer's bill.

Deferred payment agreement (DPA) – A fair and equitable payment plan agreed upon by a customer and utility and/or a customer and an ESCO that allows a customer to pay an overdue amount in installments.  A DPA is based upon the customer's financial circumstances and ability to pay the overdue amount while making payment on current charges.

Demand – The amount of electricity or natural gas that is or could be immediately needed by a customer at any given point in time referred to as customer load.  For consolidated billing, the term is used in the context of "billing period demand" for customer bills.

>   Electric – The amount of electricity, measured in kilowatts (kW), that a customer uses at a point in time, the customer's usage averaged over a period, or capacity of facilities reserved for the customer for stand-by or other service.

>   Natural Gas – The amount of gas measured in cubic feet or therms that a customer uses or may use over a period, or capacity of facilities reserved for the customer for stand-by or other service.

Direct customer – An entity that purchases and schedules delivery of electricity or natural gas for its own consumption and not for resale.  A customer with an aggregated minimum peak connected load of 1 MW to a designated zonal service point qualifies for direct purchase and scheduling of electricity provided the customer complies with NYISO requirements.  A customer with annual usage of a minimum of 3,500 dekatherms of natural gas at a single service point qualifies for direct purchase and scheduling of natural gas.

Distribution utility – A gas or electric corporation owning, operating, or managing electric or gas facilities for the purpose of distributing gas or electricity to end users.

Distribution utility customer account number – A number used by a distribution utility to identify the account of a utility customer.

Distribution utility tariff – A schedule of rates, terms and conditions of services provided by a distribution utility.

Door-to-door sales – The sale of energy services in which the ESCO or the ESCO's representative personally solicits the sale, and the buyer's agreement or offer to purchase is made at a place other than the places of business of the seller; provided that "door-to-door sales" shall not include any sale which is conducted and consummated entirely by mail, telephone or other electronic means, or during a scheduled appointment at the premises of a buyer of nonresidential utility service, or through solicitations of commercial accounts at trade or business shows, conventions or expositions.

Drop – A transaction that closes a customer's account with a provider.  This term is used when:  (1) a customer's enrollment is pending and the customer rescinds the enrollment; (2) a customer enrolled with an ESCO returns to distribution utility service or enrolls with another ESCO; or (3) the ESCO discontinues service to a customer.

Dual billing – A billing option that provides for separate calculation of charges and presentation of bills to the customer by the distribution utility and ESCO.

Electronic data interchange (EDI) – The computer-to-computer exchange of routine information in a standard format using established data processing protocols.  EDI transactions are used in retail access programs to switch customers from one supplier to another or to exchange customers' history, usage, or billing data between a distribution utility or MDSP and an ESCO.  Transaction set standards, processing protocols and test plans are authorized in orders issued by the Public Service Commission in Case 98-M-0667, In the Matter of Electronic Data Interchange and available on the Department of Public Service website at:  www.dps.ny.gov/98m0667.htm.

Energy broker – A non-utility entity that performs energy management or procurement functions on behalf of customers or ESCOs but does not make retail energy sales to customers.

Energy services company (ESCO) – An entity eligible to sell electricity and/or natural gas to end-use customers using the transmission or distribution system of a utility.  ESCOs may perform other retail service functions.

ESCO marketing representative – An entity that is either the ESCO or a contractor/vendor conducting, on behalf of the ESCO, any marketing activity that is designed to enroll customers with the ESCO.

Enroll/Enrollment – The process used to switch a customer from a distribution utility to an ESCO or from one ESCO to another.

<u>Enrollment date –</u> The effective date for commencement of electric or natural gas service from an ESCO or distribution utility.

<u>Guarantor</u> – An entity that agrees to pay another's debt or perform another's duty, liability, or obligation.

<u>Independent Third-Party Verification</u> – the confirmation of a customer's agreement to take service from an ESCO or authorization for the ESCO to request information by a Verification Agent.

<u>Interval data</u> – Actual energy usage for a specific time interval for a specific period recorded by a meter or other measurement device.

<u>Load profile</u> – Actual or estimated customer energy usage by interval over a period representing usage for a customer or average usage for a customer class.

<u>Lockbox</u> – A billing payment receipt method agreed upon by a distribution utility and an ESCO, involving use of a third-party financial institution to receive and disburse customer payments.

<u>Marketing</u> - The publication, dissemination, or distribution of informational and advertising materials regarding the ESCO's services and products to the public by print, broadcast, electronic media, direct mail, or by telecommunication.

<u>Meter</u> – A device for determination of the units of electric or natural gas service supplied to consumers.

<u>Meter Data Service Provider (MDSP)</u> – An entity that provides meter data services, consisting of meter readings, meter data translations, and customer association, validation, editing and estimation.

<u>Meter Service Provider (MSP)</u> – An entity that installs, maintains, tests and removes meters, or other measurement devices and related equipment.

<u>Multi-retailer model</u> – A model for retail access that involves provision of electric or natural gas supply and of delivery service, provided separately to end use customers by two or more entities.

<u>New York State Independent System Operator (NYISO)</u> - An independent management organization, authorized by the Federal Energy Regulatory Commission, operating the bulk electric transmission system.

<u>New delivery customer</u> – A customer initiating delivery service by a distribution utility.

<u>Nomination</u> – A request for delivery of a physical quantity of natural gas or for its delivery at a specific point under a purchase, sale, or transportation agreement.

<u>Office of Consumer Services</u> – Office, within the Department of Public Service, which receives and makes determinations concerning customer complaints.  Office of Consumer Services (OCS) identifies the exiting Office or its successor in the event the Office name is changed.

Pay-as-you-get-paid method – A payment processing method offered by a billing party presenting consolidated bills, whereby the billing party forwards payment to the non-billing party after receiving payment from the customer.

Pending enrollment – A stage in processing an enrollment that commences with validation of an enrollment transaction request and ends on the enrollment date that the new supplier is expected to deliver energy.

Pending ESCO –  An ESCO is a pending ESCO from the date of receipt of an EDI notice containing the effective date for a customer's enrollment until the ESCO commences commodity service for that customer.

Plain Language – Written in clear and coherent manner using words with common and everyday meaning and avoiding legal or energy industry terms, acronyms, and abbreviations that a person of ordinary intelligence would not be expected to understand. If use of a technical term is necessary, the term is clearly defined in the portion of the text where it is used.

Purchased accounts receivable – A debt owed to an ESCO by a customer for receipt of supplies of gas or electricity and transferred to a distribution utility in exchange for consideration.

> With recourse – Purchase of accounts receivable with recourse by a distribution utility means that the ESCO remains liable if its customers fail to make payments. A distribution utility that purchases accounts receivable with recourse sends payments to an ESCO at predetermined intervals for amounts billed that are not in dispute and may offset subsequent purchase payments against or obtain reimbursement from an ESCO of any unpaid amounts.

> Without recourse – Purchase of accounts receivable without recourse by a distribution utility means that the ESCO is not liable if its customers fail to make payments.  A distribution utility that purchases accounts receivable without recourse sends payments to an ESCO at predetermined intervals for amounts billed that are not in dispute and has no right to seek reimbursement from an ESCO of any unpaid amounts.

Rate ready – A consolidated billing practice that requires each non-billing party to furnish in advance of the billing cycle, rates, rate codes or prices (fixed and/or variable), tax rates, billing information, and bill messages to the billing party.  The billing party, after receipt of usage data from the MDSP, uses the information on record to calculate the non-billing party's charges.

Residential customer – An individual or occupant of a residential premise as defined in 16 NYCRR Part 11.2(a)(2).

Sales agreement – An agreement between a customer and an ESCO that contains the terms and conditions governing the supply of electricity and/or natural gas provided by an ESCO.  The agreement may be a written contract signed by the customer or a statement supporting a customer's verifiable verbal or electronic authorization to enter into an agreement with the ESCO for the services specified.

Single retailer model – A model for retail access that involves provision of electric and/or natural gas service to end users by an ESCO that purchases delivery service from the distribution utility and resells it along with electricity and/or natural gas to end users.

Slamming – Enrollment of a customer by an ESCO without authorization.

<u>Special meter reading</u> – An actual meter reading performed, upon request, on a date that is different than the regularly scheduled meter reading date.

<u>Special needs customer</u> – A customer who has a certified medical emergency condition, who is elderly, blind or physically challenged, or who may suffer serious impairment to health or safety as a result of service termination during cold weather periods and, thus, is eligible for special procedures before termination of service under the Home Energy Fair Practices Act (HEFPA) (Public Service Law §32(3)).

<u>Switch</u> – Transfer of a customer from one ESCO to another, from a distribution utility to an ESCO, or from an ESCO to a distribution utility.

<u>Switching cycle</u> – For electric service, the period between the date of the last meter read and the next regularly scheduled meter read. For gas customers, the period between the date of the last meter read and the next regularly scheduled meter read or the first day of the month and the first day of the following month.

<u>Termination Fee</u> – An amount specified in an ESCO sales agreement where such agreement permits the ESCO to assess and collect a charge in such amount to a customer who terminates the agreement before the end of a term described in that agreement, regardless of whether the assessed amount is identified as a fee, a charge, liquidated damages or a methodology for the calculation of damages, and regardless of whether it is fixed, scaled or subject to calculation based on market factors.  In the event the customer is deceased before the end of such contract term, no fee for termination or early cancellation shall be assessed.

<u>Verification Agent</u> - An entity that is an independent vendor/contractor conducting, on behalf of the ESCO, verification of an agreement, resulting from telephonic or door-to-door marketing with a customer to initiate service and begin enrollment or to obtain customer authorization for release of information, as required by Section 5, Attachment 1 of the UBP.  In the limited circumstance where the verification is only of customer authorization for release of information, the entity does not need to be independent of the ESCO.

# SECTION 2:  ELIGIBILITY REQUIREMENTS

A. Applicability

This Section sets forth the process that an applicant is required to follow for a Department of Public Service (the Department) finding of eligibility to sell natural gas or electricity as an ESCO, that an ESCO is required to follow to maintain eligibility, and that a distribution utility is required to follow for discontinuance of an ESCO's or Direct Customer's participation in a distribution utility's retail access program.

B. Application Requirements

1. Applicants seeking eligibility to sell natural gas and/or electricity as ESCOs are required to submit to the Department an application package containing the following information and attachments:

   a. A completed Retail Access Eligibility Application Form (Application), available on the Department website ( www.dps.ny.gov). The Application shall require the applicant to:

      i.   identify the methods by which it intends to market its products and services to customers;

      ii.  identify the category/categories of commodity products it intends to provide to customers (e.g. variable-rate, fixed-rate, or renewably sourced commodity);

      iii. disclose each state in which the applicant operates as an ESCO or has operated within the 24 months preceding the date of application and provide any data in its possession regarding complaint history;

      iv.  disclose any other trade names used by the applicant and the state in which the trade name was/is used;

      v.   disclose and describe any data breaches associated with customer proprietary information that occurred in any jurisdiction within the 24 months preceding the date of application, as well as any actions taken by the applicant in response to the incident(s);

      vi.  disclose and describe specific policies and procedures established by the applicant to secure customer data; and

      vii. disclose any history of bankruptcy, dissolution, merger, or acquisition activities in the 24 months preceding the date of application, including data for affiliates of the ESCO applicant and upstream owners and subsidiaries.

   b. A sample standard Sales Agreement for each customer class that meets the requirements set forth in Section 5.B.3, infra.

   c. Sample forms of the notices sent upon assignment of sales agreements, discontinuance of service, or transfer of customers to other providers.

   d. A sample ESCO bill used when dual billing is in effect and, if applicable, a sample ESCO consolidated bill, with terms stated in clear, plain language;

   e. Procedures used to obtain customer authorization for ESCO access to a

customers' historic usage or credit information;

   f.  Sample copies of informational and promotional materials that the ESCO uses for mass marketing purposes;

   g.  Proof of registration with the New York State Department of State;

   h.  Internal procedures for prevention of slamming and cramming;

   i.  Name, postal and e-mail addresses, and telephone and fax numbers for the applicant's main office;

   j.  Names and addresses of any entities that hold ownership interests of 10% or more in the ESCO, including a contact name for corporate entities and partnerships;

   k.  Detailed explanation of any criminal or regulatory sanctions imposed during the previous 36 months against any senior officers of the ESCO or any entities holding ownership interests of 10% or more in the ESCO;

   l.  An Officer Certification document sworn to by a high-level officer of the ESCO applicant, such as the Chief Executive Officer, President or the equivalent, in which the officer affirms that the ESCO is willing and able to comply with all applicable laws and regulations;

   m. A copy of the ESCO's quality assurance program, which is designed to monitor (a) compliance with Section 10 of the UBP and (b) accuracy of the ESCO marketing materials provided to prospective customers;

   n.  A completed Service Provider Contact Form, which can be found on the Department's website http://www.dps.ny.gov/ocs.html, identifying the ESCO's employee(s) responsible for resolving consumer complaints received by the Department and referred to the ESCO; and

   o.  A list of the entities, including contractors and sub-contractors, that will market to customers on behalf of the ESCO.  The list must include the entities' names, addresses, phone numbers and owners, managers, and/or principals. This list must be updated regularly as entities are added or removed.

2.  Applicants shall submit to the Department the name of the utility that will test designated EDI transactions required for syntactical verification in the Phase I testing program.  The Department shall maintain a list of ESCOs that successfully complete Phase I  test requirements by transaction type.

3.  An ESCO that knowingly makes false statements in its application package is subject to denial or revocation of eligibility.

4.  If the application package contains information that is a trade secret or sensitive for security reasons, the applicant may request that the Department withhold disclosure of the information, pursuant to the Freedom of Information Law (Public Officers Law Article 6) and Public Service Commission regulations (16 NYCRR §6-1.3).

C.  Department Review Process

1.  The Department shall review the Application information and documentation submitted by  each applicant and make an initial determination as to the applicant's likelihood of compliance with the Uniform Business Practices if the ESCO were deemed eligible to operate in the State.  To enable the Department to make a thorough and assessment of an application, an ESCO shall notify the Department of any major  changes in the information submitted in the Retail Access Eligibility

Application Form and/or application package that occurs during the Department review process.

2. Following its review of the Application information and documentation, the Department shall advise the applicant, in writing, if the Application is approved and the applicant is eligible to operate in the State and if satisfaction of Phase I EDI testing requirement has been verified by the utility designated by the applicant.

3. ESCOs deemed eligible to provide commodity service by the Department must begin serving customers within two-years from the date of the letter notifying the ESCO of their eligibility status (eligibility letter).  The ESCO that does not begin serving customers within such two-year period may be required to conduct additional EDI testing before enrollments will be processed.

4. If following its review of the Application information and documentation the Department determines that the applicant is not likely to comply with the UBP if the ESCO were deemed eligible, the Department may recommend to the Commission that, for good cause shown, the Commission deny the ESCO's Application.

5. In any instance that the Department recommends to the Commission that an ESCO applicant be denied eligibility, the applicant shall be afforded an opportunity to provide to the Commission with a response in rebuttal to the Department's recommendation and in support of its application before the Commission renders a final eligibility determination.

6. The Department shall periodically review the eligibility of each ESCO operating in New York and make a recommendation to the Commission if the Department finds that the ESCO should not be permitted to continue operating in New York.

D.  Maintaining ESCO Eligibility Status

1. An ESCO shall submit by January 31 each year (January 31 Statement):

   a. a statement that the information and attachments in its Retail Access Eligibility Form and application package are current; or

   b. a description of revisions to the Retail Access Eligibility Form and application package and a copy of the revised portions or, at the ESCO's option, a copy of the revised portions identifying the revisions by highlighting or other means; and

   c. An Officer Certification document, as required by Section 2.B.l.

2. An ESCO shall update all the information it submitted in its original application package to the Department every three years, starting from the date of its eligibility letter, consistent with the requirements of UBP Section 2.B.  An ESCO's status as an eligible supplier is continuous from the date of the Department eligibility letter, unless revoked or otherwise limited in accordance with UBP Section 2.D.5.  If the three-year anniversary date falls within one month of January 31, the ESCO shall resubmit its application package in lieu of the January 31 statement.

3. An ESCO shall file with the Secretary, a separate average unit price for products with no energy-related value-added services for each of two groups of customers and by load zone: i) residential price fixed for a minimum 12-month period; ii) residential variable price.  The averages should be weighted by the amount of commodity sold at each price within each customer category.  ESCOs shall also file the number of customers purchasing products in those categories.  ESCOs shall file the required information quarterly, reflecting data over that period,

Case 98-M-1343                                                    SECTION 2

within 30 days of the end of each calendar quarter (i.e., data must be provided no later than April 30th, July 30th, October 30th and January 30th of each year).[1]

4. An ESCO shall submit at other times during the year:

   a. A description of any major change in the Retail Access Eligibility Application Form  and/or application package and a copy of the revised portions or, at the  ESCO's option, a copy of the revised portions identifying the revisions by  highlighting or other means.  For purposes of Subdivision D of this Section,  the term, "major change," means a revision in the terms and conditions  applicable to the business relationship between the ESCO and its customers,  including provisions governing the process for termination of sales  agreements.

   b. Changes in marketing plans, including changes to the list required in sub-section B.1.n of this Section of the UBP.

   c. Changes in the ESCO's business and customer service information displayed on the Department's Website.

   d. At least once every thirty days, each ESCO serving residential customers must post a price for each product it offers to those customer classes (e.g., fixed-price, variable-price, renewable energy, with each type of value-added service, etc.) on the Power to Choose website.  Each ESCO must guarantee to charge new customers no more than the price of the ESCOs posted offers at the time of the customer's agreement for each product.

   e. Changes in personnel responsible for resolving consumer complaints received by the Department and referred to the ESCO.

5. An ESCO may be subject to the consequences listed in UBP Section 2.D.6.b for reasons, including, but not limited to:

   a. false or misleading information in the application package;

   b. failure to adhere to the policies and procedures described in its Sales Agreement;

   c. failure to comply with required customer protections;

   d. failure to comply with applicable NYISO requirements, reporting requirements, or Department oversight requirements;

   e. failure to provide notice to the Department of any material changes in the information contained in the Retail Access Eligibility Form or application package;

---

[1]   If the Power-to-Choose website is modified to allow ESCOs to file this information there, the Department may notify ESCOs that compliance with this provision may be accomplished in that manner.

f. failure to comply with the UBP terms and conditions, including discontinuance requirements;

g. failure to comply with EDI transaction set standards and processing protocols and/or use properly functioning EDI systems;

h. repeated failures to comply with price reporting requirements, reporting misleading price information, or continuing to fail to comply with price reporting requirements after withdrawal of eligibility to enroll new customers;

i. failure to comply with the Commission's Environmental Disclosure Requirements or failure to comply with other Commission Orders, Rules or Regulations;

j. failure to reply to a complaint filed with the Department and referred to the ESCO within the timeframe established by the Department' Office of Consumer Services which is not less than five days;

k. any of the reasons stated in Subdivision F of this Section; or

l. a material pattern of consumer complaints on matters within the ESCO's control;

m. failure to comply with any federal, state, or local laws, rules, or regulations related to sales or marketing; or 'No Solicitation' signage on the premises; or

n. failure to comply with any of the Marketing Standards set forth in Section 10 of the UBP.

6. In determining the appropriate consequence for a failure or non-compliance in one or more of the categories set forth in UBP Section 2.D.5, the Commission or Department may take into account the nature, the circumstances, including the scope of harm to individual customers, and the gravity of the failure or non-compliance, as well as the ESCO's history of previous violations.

a. The Commission or Department shall:

1. Either (a) notify the ESCO in writing of its failure to comply and request that the ESCO take appropriate corrective action or provide remedies within the directed cure period, which will be based on a reasonable amount of time given the nature of the issue to be cured; or (b) order that the ESCO show cause why a consequence should not be imposed.

2. The Commission may impose the consequences listed in subparagraph b of this paragraph if (a) ESCO fails to take corrective actions or provide remedies within the cure period; or (b) the Commission determines that the incident or incidents of non-compliance are substantiated and the consequence is appropriate.

3. Consequences shall not be imposed until after the ESCO is provided notice and an opportunity to respond.

4. The notice of consequences imposed by the Commission will be published on the Department's website.

b. Consequences for non-compliance in one or more of the categories set forth in UBP Section 2.D.5 may include one or more of the following restrictions on an ESCO's opportunity to sell electricity and/or natural gas to retail customers:

    1. Suspension from a specific Commission approved retail program in either a specific service territory or all territories in New York;

    2. Suspension of the ability to enroll new customers in either a specific service territory or all service territories in New York;

    3. Imposition of a requirement to record all telephonic marketing presentations, which shall be made available to the Department for review;

    4. Reimbursements to customers who did not receive savings promised in the ESCO's sales agreement/Customer Disclosure Statement or substantially demonstrated to have been included in the ESCO's marketing presentation or to customers who incurred costs as a result of the ESCO's failure to comply with the marketing standards set forth in Section 10 of the UBP;

    5. Release of customers from sales agreements without imposition of early termination fees;

    6. Revocation of an ESCO's eligibility to operate in New York; and,

    7. Any other measures that the Commission may deem appropriate.

c. Consequences imposed pursuant to this paragraph shall continue to apply until the ESCO's failure to comply with the UBP has been cured or the Commission or Department has determined that no further cure is necessary.

7. An ESCO's eligibility to serve customers is valid unless: the ESCO abandons its eligibility status; or such status is revoked by the Commission through a final order pursuant to UBP Section 2.D.6.

8. The Department shall notify distribution utilities upon notice to the ESCO, and the NYISO if applicable, of any determination to revoke an ESCO's eligibility to sell natural gas and/or electricity. The distribution utility shall notify the ESCO's customers, in accordance with paragraph 3 of Subdivision F of this Section, of any Department revocation of an ESCO's eligibility.

E. Distribution Utility Requirements

1. After receipt of the Department's compliance letter, the ESCO shall notify the distribution utility, and NYISO if applicable, of its eligibility status and intent to complete the process to commence operation in the distribution utility's service area, including execution of any operating agreement that is required.

2. Upon satisfaction of the distribution utility's and, if applicable the NYISO's requirements, and successful completion of EDI testing conducted by the distribution utility, the ESCO may enter into an operating agreement, if any is required, with the distribution utility to commence operations in its service territory.

F.  Discontinuance of an ESCO's and Direct Customer's Participation in a Retail Access Program

    1.  In accordance with the procedures established in this Subdivision, a distribution utility may discontinue an ESCO's or Direct Customer's participation in its retail access program for the following reasons:

        a.  Failure to act that is likely to cause, or has caused, a significant risk or condition that compromises the safety, system security, or operational reliability of the distribution utility 's system, and the ESCO or Direct Customer failed to eliminate immediately the risk or condition upon verified receipt of a non-EDI notice;

        b.  Failure to provide natural gas (provided zero quantity) to the distribution utility's city gate;

        c.  Failure to pay an invoice upon the due date;

        d.  Failure to provide for delivery of at least 95% of the amount of natural gas directed by a distribution utility for delivery or at least 80% of the daily metered usage of the ESCO's customers or a Direct Customer's specified load or lower percentages included in a balancing program established in a distribution utility's tariff and/or any operating agreement;

        e.  Failure to maintain a creditworthiness standard or provide required security;

        f.  Failure to comply with the terms and conditions of a distribution utility's tariff, operating agreement, or Gas Transportation Operating Procedures (GTOP) Manual to the extent that said documents are consistent with the provisions of the UBP;

        g.  Discontinuance of an ESCO's or Direct Customer's participation in a distribution utility's retail access program by the NYISO; or,

        h.  Commission determination that an ESCO is not eligible to sell natural gas or electricity to retail customers.

    2.  To initiate the discontinuance process, a distribution utility shall send a non-EDI discontinuance notice by overnight mail and verified receipt, to the ESCO or Direct Customer and the Department.  The notice shall contain the following information:

        a.  The reason, cure period, if any, and effective date for the discontinuance;

        b.  A statement that the distribution utility shall notify the ESCO's customers of the discontinuance if the ESCO fails to correct the deficiency described in the notice within the cure period, unless the Department directs the distribution utility to stop the discontinuance process;

        c.  The distribution utility may suspend the ESCO's right to enroll customers until correction of the deficiency; and

        d.  Correction of the deficiency within the cure period, or a Department directive, will end the discontinuance process.

    3.  The distribution utility shall send notices to the ESCO's customers informing them of the discontinuance and providing the following information:

    a. The discontinuance shall or did occur on one of the following dates selected by the distribution utility:  the scheduled meter read date, the first day of the month, or another date, if readings are estimated, or on the date of a special meter read;

    b. Customers have the option to select another ESCO or return to full utility service or, if a program authorizing random assignment is in effect, to enroll with a designated ESCO through that program;

    c. Names and telephone numbers of ESCOs offering service to retail customers in the distribution utility's service territory;

    d. Any ESCO selected by a customer may file an enrollment request on the customer's behalf with the distribution utility, and the distribution utility shall charge no fee for changing the customer's provider to the new ESCO; and,

    e. During any interim between discontinuance of a customer's current ESCO and enrollment with a new ESCO, the distribution utility shall provide service under its applicable tariff, unless the distribution utility notified the customer that it is terminating its delivery services to the customer on or before the discontinuance date.

4. The distribution utility shall submit a sample copy of its discontinuance notice to the Department for review and approval prior to distribution to customers.

5. The distribution utility may request permission from the Department to expedite the discontinuance process, upon a showing that it is necessary for safe and adequate service or in the public interest.  Any expeditious discontinuance process shall include the ESCO or Direct Customer, and the distribution utility.

6. Upon any discontinuance, an ESCO or Direct Customer shall remain responsible for payment or reimbursement of any and all sums owed under the distribution utility tariffs, any tariffs on file with the FERC and service agreements relating thereto, or any agreements between the ESCO and the distribution utility.

7. The notice requirements and time limits for a distribution utility to discontinue an ESCO's or Direct Customer's participation in a distribution utility's retail access program (discontinue participation) are:

    a. Upon a distribution utility determination that an ESCO's or Direct Customer's action, or failure to act, is likely to cause, or has caused, a significant risk or condition that compromises the safety, system security, or operational reliability of the distribution utility's system and that the ESCO or Direct Customer failed to eliminate immediately the risk or condition upon verified receipt of a non-EDI notice, the distribution utility may discontinue participation as soon as practicable.

    b. Upon a distribution utility determination that an ESCO or Direct Customer responsible for the delivery of natural gas failed, except under force majeure conditions, to deliver natural gas (provided zero quantity) to the distribution utility's service territory for its load, the distribution utility may discontinue participation no sooner than two business days after receipt by the ESCO or Direct Customer of a discontinuance notice.

    c. Upon a distribution utility determination that an ESCO or Direct Customer failed to pay an invoice on the due date, as specified in the distribution

utility's tariff, and the ESCO's or Direct Customer's required security or
credit limit is insufficient to cover the unpaid amount, with interest, the
distribution utility may discontinue participation no sooner than ten business
days (cure period) after receipt by the ESCO or Direct Customer of a
discontinuance notice.  If the ESCO or Direct Customer pays the amount due

d. on or before the expiration of the cure period, the distribution utility shall stop
the process to discontinue participation.

e. Upon a distribution utility determination that an ESCO or Direct Customer
responsible for the nomination and delivery of natural gas failed, except in
force majeure conditions, to nominate and/or deliver sufficient natural gas to
the distribution utility's service territory to satisfy at least 95% of the amount
of natural gas directed by a distribution utility for delivery or at least 80% of
the daily metered usage of the ESCO's customers or the Direct Customer's
specified load or lower percentages included in a balancing program
established in a distribution utility's tariffs and/or any operating agreement on
any three days during any month,  the distribution utility may initiate a
discontinuance process no sooner than five business days (cure period) after
receipt by the ESCO or Direct Customer of a discontinuance notice.  If the
ESCO or Direct Customer provides adequate assurances and a description of
any necessary process changes that ensure adequate nominations and
deliveries on or before the expiration of the cure period, the distribution utility
shall stop the discontinuance process.  Upon a determination to continue the
discontinuance process because the assurances and proposed process changes
are inadequate, the distribution utility shall notify the ESCO or Direct
Customer that it will discontinue participation no later than 15 business days
from the expiration of the cure period.  The distribution utility shall notify the
ESCO's customers that the distribution utility will discontinue participation
on or before the expiration of 15 business days from the end of the cure
period.  If a failure to provide sufficient natural gas for any 3 days during a
calendar month occurred during the past 12 months and the distribution utility
sent a related discontinuance notice for each occurrence, it may discontinue
participation no sooner than two business days after receipt by an ESCO or
Direct Customer of a discontinuance notice.

f. Upon a distribution utility determination that an ESCO or Direct Customer
failed to provide or maintain a creditworthiness standard or required security,
the distribution utility may initiate a discontinuance process no sooner than
five business days (cure period) after receipt by the ESCO or Direct Customer
of a discontinuance notice.  If the ESCO or Direct Customer satisfies the
creditworthiness standard or provides the required security on or before the
expiration of the cure period, the distribution utility shall stop the
discontinuance process.  Upon a determination to continue with the
discontinuance process because the ESCO or Direct Customer failed to
comply with the creditworthiness standard or provide adequate security, the
distribution utility shall notify the ESCO or Direct Customer that it will
discontinue participation no later than 15 business days from the expiration of
the cure period.  The distribution utility shall notify the ESCO's customers that
it will discontinue participation on or before 15 days from the expiration

of the cure period.  If a failure to comply with the creditworthiness standard or provide adequate security occurred twice during the past 12 months and the distribution utility sent a related discontinuance notice for each failure, it may discontinue participation no sooner than two business days after receipt by an ESCO or Direct Customer of a discontinuance notice.

g. Upon a distribution utility determination that an ESCO or Direct Customer failed, except in force majeure conditions, to comply with any other applicable provision of the distribution utility's tariff, operating agreement, or GTOP manual, the distribution utility may initiate a discontinuance process no sooner than ten business days (cure period) after receipt by the ESCO or Direct Customer of a discontinuance notice.  If the ESCO or Direct Customer provides adequate assurances and a description of any necessary process changes that ensure compliance on or before the expiration of the cure period, the distribution utility shall stop the discontinuance process.  Upon a determination to continue the discontinuance process because the assurances and proposed process changes are inadequate, the distribution utility shall notify the ESCO or Direct Customer that it will discontinue participation no later than 15 business days from the expiration of the cure period.  The distribution utility shall notify the ESCO's customers that it will discontinue participation on or before the expiration of 15 business days after the end of the cure period.

# SECTION 3:  CREDITWORTHINESS

A.  Applicability

   This Section establishes creditworthiness standards that apply to ESCOs and Direct
   Customers.  An ESCO's and Direct Customer's participation in a distribution utility's
   retail access program is contingent upon satisfaction of creditworthiness requirements
   and provision of any security.

B.  ESCOs

   1.  An ESCO shall satisfy a distribution utility's creditworthiness requirements if:

      a.  The ESCO, or a guarantor, maintains a minimum rating from one of the rating
          agencies and no rating below the minimum from one of the other two rating
          agencies.  For the purposes of this Section, minimum rating shall mean
          "BBB" from Standard & Poor's, "Baa2" from Moody's Investor Service, or
          "BBB" from Fitch Ratings (minimum rating);  or,

      b.  The ESCO enters into a billing arrangement with the distribution utility,
          whereby the distribution utility bills customers on behalf of the ESCO and
          retains the funds it collects to offset any balancing and billing service charges
          provided that the distribution utility has a priority security interest with a first
          right of access to the funds.  The ESCO shall submit an affidavit from a senior
          officer attesting to such utility interest and right. Except that an ESCO serving
          customers outside of such billing arrangement, must satisfy the security
          requirements of UBP Section 3.D with respect to those customers.

   2.  If an ESCO, or a guarantor, is not rated by Standard & Poor's, Moody's Investor
       Service or Fitch Ratings, it shall satisfy a distribution utility's creditworthiness
       requirements if the ESCO, or a guarantor:

      a.  Maintains a minimum "1A2" rating from Dun & Bradstreet (Dun and
          Bradstreet minimum rating) and the ESCO maintains 24 months good
          payment history with the distribution utility; and,

      b.  Provides any security required by the distribution utility, calculated in
          accordance with Subdivision D, after deduction of the following unsecured
          credit allowances:

| Rating | Unsecured Credit Allowance |
|--------|----------------------------|
| 5A1 or 5A2 | 30% of an ESCO's tangible net worth, up to 5% of the distribution utility's average monthly revenues for the applicable service |
| 4A1 or 4A2 | 30% of an ESCO's tangible net worth, up to 5% of the distribution utility's average monthly revenues for the applicable service |
| 3A1 or 3A2 | 30% of an ESCO's tangible net worth, up to 5% of the distribution utility's average monthly revenues for the applicable service |
| 2A1 or 2A2 | 50% of an ESCO's tangible net worth, up to $500,000 |
| 1A1 or 1A2 | 50% of an ESCO's tangible net worth, up to $375,000 |

An ESCO shall provide information, upon request of the distribution utility, to enable the distribution utility to verify the ESCO's equity. The distribution utility may request reasonable information to obtain the verification and shall safeguard it as confidential information and protect it from public disclosure. The distribution utility may deny the unsecured credit allowance to any ESCO that fails to provide the requested information.

3. A distribution utility may require an ESCO to provide and maintain security in the full amount of the distribution utility's credit risk, calculated in accordance with Subdivision D, if:

   a. The ESCO, or a guarantor, is not rated;

   b. The ESCO, or a guarantor, with a minimum rating is placed on credit watch with negative implications or is rated below the minimum rating;

   c. The ESCO, or a guarantor, is rated below the Dun & Bradstreet minimum rating or the ESCO fails to maintain 24 months good payment history with the distribution utility; or,

   d. An ESCO issuing consolidated bills fails to render timely bills to customers or to make timely payments to the distribution utility.

4. If a distribution utility's credit risk, associated with an ESCO's participation in its retail access program, exceeds 5% of the distribution utility's average monthly revenues for the applicable service, the distribution utility may require the ESCO, in addition to maintaining a minimum rating, to provide and maintain security in the amount of such excess credit risk.

C. Direct Customers

A Direct Customer shall satisfy a distribution utility's creditworthiness requirements if:

1. Its account is current and remained current for the past 12 months; and,

2. If its debt is rated, it maintains a minimum rating of its long-term unsecured debt securities from one of the rating agencies and no rating below the minimum rating from one of the other two rating agencies.

D.  Calculation of Credit Risk and Security

The distribution utility shall calculate its credit risk and establish its security requirements as follows:

1.  Delivery Service Risk

   a.  For an ESCO that issues a consolidated bill under a multi-retailer model, a distribution utility may require security in an amount no greater than 45 days of peak usage of the ESCO's customers' projected energy requirements during the next 12 months, priced at the distribution utility's applicable delivery service rate and including relevant customer charges.

   b.  For an ESCO that bills customers for delivery and commodity services under a single retailer model, a distribution utility may require security in an amount no greater than 60 days of peak usage of the ESCO's customers' projected energy requirements during the next 12 months, priced at the distribution utility's applicable delivery service rate and including relevant customer charges.

   c.  Upon an ESCO request, the distribution utility shall establish separate security requirements for summer (April 1 - October 31) and winter (November 1 - March 31) and may retain winter security until the end of two months (April and May) after the end of the winter period.

2.  Natural Gas Imbalance Risk

   a.  The distribution utility may require an ESCO or Direct Customer to provide security in an amount no greater than the ESCO's customers' or a Direct Customer's projected maximum daily quantity times peak forecasted NYMEX price for the next 12 months and for upstream capacity to the city gate times 10 days.

   b.  Upon the request of an ESCO or Direct Customer, the distribution utility shall establish separate security requirements for summer (April 1 - October 31) and winter (November 1 - March 31) and may retain winter security until the end of two months (April and May) after the end of the winter period.

3.  Major Change in Risk

   a.  A major change shall mean a change in credit risk of more than the greater of 10% or $200,000.

   b.  The ESCO or Direct Customer shall promptly notify the distribution utility and the Department of any major change in credit and or rating risk.

   c.  The distribution utility may require an ESCO or a Direct Customer, within five days, to provide additional amounts of security if a major change occurs to increase its credit risk, as follows:

      1.  If Standard & Poors, Moody's Investor Service, or Fitch Ratings downgrades an ESCO's, or its guarantor's, rating or a Direct Customer's

            debt below the minimum rating or Dun & Bradstreet downgrades an
            ESCO's, or its guarantor's, rating or a Direct Customer's debt; or,

      2.  An increase occurs in customer usage or in energy prices and such
          increase is sustained for at least 30 days.

  d.  In the event that a major change occurs to decrease a distribution utility's
     credit and/or rating risk, results in compliance by an ESCO or Direct
     Customer with creditworthiness requirements, and elimination of the basis for
     holding some or all of the security, the distribution utility shall return or
     release the excess amount of the ESCO's or Direct Customer's security with
     accumulated interest, if applicable.  The distribution utility shall return such
     amount within five business days after receipt of an ESCO or Direct Customer
     notice informing the distribution utility of the occurrence of such major
     change.

E.  Security Instruments

  1.  The following financial arrangements are acceptable methods of providing
     security:

    a.  Deposit or prepayment, which shall accumulate interest at the applicable rate
       per annum approved by the Public Service Commission for "Other Customer
       Capital";

    b.  Standby irrevocable letter of credit or surety bond issued by a bank, insurance
       company or other financial institution with at least an "A" bond rating;

    c.  Security interest in collateral; or,

    d.  Guarantee by another party or entity with a credit rating of at least "BBB" by
       S&P, "Baa2" by Moody's, or "BBB" by Fitch; or

    e.  Other means of providing or establishing adequate security.

  2.  A distribution utility may refuse to accept any of these methods for just cause
     provided that its policy is applied in a nondiscriminatory manner to any ESCO.

  3.  If the credit rating of a bank, insurance company, or other financial institution that
     issues a letter of credit or surety bond to an ESCO or Direct Customer falls below
     an "A" rating, the distribution utility shall allow a minimum of five business days
     for an ESCO or Direct Customer to obtain a substitute letter of credit or surety
     bond from an "A" rated bank, insurance company, or other financial institution.

F.  Lockbox

If the distribution utility and ESCO arrange for a lockbox, security requirements are
reduced by 50% provided that the arrangement includes the following:

  1.  Agreement on allocation of funds and the first right of the distribution utility, in
     the event of an ESCO's financial difficulty, to obtain funds in the lockbox
     deposited to the credit of the ESCO;

  2.  Establishment of rules for managing the lockbox;

  3.  Agreement on conditions for terminating the lockbox for non-compliance with the
     rules or for failure to receive customer payments on a timely basis; and,

4. Responsibility of an ESCO for any costs associated with implementing and administering the lockbox.

G. Calling on Security

1. If an ESCO or Direct Customer fails to pay the distribution utility, in accordance with UPB Section 7, Invoices, the distribution utility may draw from security provided that the distribution utility notifies the ESCO or Direct Customer five business days' in advance of the withdrawal and the ESCO or Direct Customer fails to make full payment before the expiration of the five business days.

2. If an ESCO receives a discontinuance notice or elects to discontinue service to customers and owes amounts to the distribution utility, the distribution utility may draw from the security provided by the ESCO without prior notice.

3. If an ESCO files a petition or an involuntary petition is filed against an ESCO under the laws pertaining to bankruptcy, the distribution utility may draw from security, to the extent permitted by applicable law.

H. Application by Distribution Utilities

1. Within ten business days after receipt of a complete ESCO application, a distribution utility shall complete its evaluation of initial creditworthiness, state the rationale for its determination, and provide the calculation supporting the credit limit and any resulting security requirement.

2. A distribution utility shall perform, at least annually, an evaluation, at no charge, of an ESCO's satisfaction of creditworthiness standards and security requirements.

3. A distribution utility shall perform evaluations of creditworthiness, security requirements, and security calculations in a non-discriminatory and reasonable manner.

4. Pending resolution of any dispute, the ESCO or Direct Customer shall provide requested security within the time required in this Section.

5. A distribution utility may reduce or eliminate any security requirement provided that it reduces or eliminates the requirement in a nondiscriminatory manner for any ESCO or Direct Customer. The distribution utility may request reasonable information to evaluate credit risk. If an ESCO or Direct Customer fails to provide the requested information, a distribution utility may deny the ESCO or Direct Customer an opportunity to provide lower or no security.

# SECTION 4:  CUSTOMER INFORMATION

A.  Applicability

This Section establishes practices for release of customer information by distribution utilities or MDSPs to ESCOs and Direct Customers and identifies the content of information sets.  The distribution utility or MDSP and an ESCO shall use EDI standards, to the extent developed, for transmittal of customer information and may transmit data, in addition to the minimum information required, via EDI or by means of an alternative system.

B.  Customer Authorization Process

The distribution utility or MDSP shall provide information about a specific customer requested by an ESCO authorized by the customer to receive the information.

1.  An ESCO shall obtain customer authorization to request information, in accordance with the procedures in UBP Section 5, Changes in Service Providers, Attachments 1, 2, and 3.  An ESCO shall inform its customers of the types of information to be obtained, to whom it will be given, how it will be used, and how long the authorizations will be valid.  The authorization is valid for no longer than six months unless the sales agreement provides for a longer time.

2.  A distribution utility and a MDSP shall assume that an ESCO obtained proper customer authorization if the ESCO is eligible to provide service and submits a valid information request.

3.  An ESCO shall retain, for a minimum of two years or for the length of the sales agreement whichever is longer, verifiable proof of authorization for each customer.  Verification records shall be provided by an ESCO, upon request of the Department, within five calendar days after a request is made.  Locations for storage of the records shall be at the discretion of the ESCOs.

4.  Upon request of a customer, a distribution utility and/or MDSP shall block access by ESCOs to information about the customer.

5.  An ESCO and its agent shall comply with statutory and regulatory requirements pertaining to applicable state and federal do-not-call registries.

C.  Customer Information Provided to ESCOs[1]

1.  Release of Information.  A distribution utility and a MDSP shall use the following practices for transferring customer information to an ESCO:

a.  A distribution utility shall provide the information in the Billing Determinant Information Set upon acceptance of an ESCO's enrollment request and the information in the Customer Contact Information Set and the Credit Information Set, upon ESCO request.

---

[1]  Upon enrollment of a customer, an ESCO shall receive usage data and any subsequent changes, corrections and adjustments to previously supplied data or estimated consumption for a period, at the same time that the distribution utility validates them for use.  An ESCO issuing consolidated bills is entitled to receive billing information, in accordance with UBP Section 9, Billing and Payment Processing.

    b.  The distribution utility or MDSP shall respond within two business days to valid requests for information as established in EDI transaction standards and within five business days to requests for data and information for which an EDI transaction standard is not available.  The distribution utility or MDSP shall provide the reason for rejection of any valid information request.

2.  Customer Contact Information Set. The distribution utility or MDSP, to the extent it possesses the information, shall provide, upon an ESCO request, consumption history for an electric account and consumption history and/or[1] a gas profile for a gas account.

    a.  Consumption history[2] for an electric or gas account shall include:

      1.  Customer's service address;

      2.  Electric or gas account indicator;

      3.  Sales tax district used by the distribution utility and whether the utility identifies the customer as tax exempt;

      4.  Rate service class and subclass or rider by account and by meter, where applicable;

      5.  Electric load profile reference category or code, if not based on service class, whether the customer's account is settled with the ISO utilizing an actual 'hourly' or a 'class shape' methodology, or Installed Capacity (ICAP) tag, which indicates the customer's peak electricity demand;

      6.  Customer's number of meters and meter numbers;

      7.  Whether the customer receives any special delivery or commodity "first through the meter" incentives, or incentives from the New York Power Authority;

      8.  The customer's Standard Industrial Classification (SIC) code;

      9.  Usage type (e.g., kWh or therm), reporting period, and type of consumption (actual, estimated, or billed);

     10.  Whether the customer's commodity service is currently provided by the utility;

     11.  12 months, or the life of the account, whichever is less, of customer data via EDI and, upon separate request, an additional 12 months, or the life of the account, whichever is less, of customer data via EDI or an alternative system at the discretion of the distribution utility or MDSP, and, where applicable, demand information;[3] if the customer has more than one meter associated with an account, the distribution utility or MDSP shall provide the applicable information, if available, for each meter; and

---

[1]  If a distribution utility or MDSP offer a gas profile and consumption history, an ESCO may choose either option.  A distribution utility or MDSP shall make available, upon request, class average load profiles for electric customers.

[2]  A distribution utility or MDSP, in addition to EDI transmittal, may provide Web based access to customer history information.

[3]  A distribution utility may provide data for a standard 24 months or life of the account, whichever is less, as part of its Customer Contract Information Set.

           12. Electronic interval data in summary form (billing determinants aggregated in the rating periods under a distribution utility's tariffs) via EDI, and if requested in detail, via an acceptable alternative electronic format.

    b.  A gas profile for a gas account shall include:

       1.  Customer's service address;

       2.  Gas account indicator;

       3.  Customer's number of meters and meter numbers;

       4.  Sales tax district used by the distribution utility for billing and whether the utility identifies the customer as tax exempt;;

       5.  The customer's Standard Industrial Classification (SIC) code;

       6.  Whether the customer's commodity service is currently provided by the utility;

       7.  Rate service class and subclass or rider, by account and by meter, where applicable;

       8.  Date of gas profile; and,

       9.  Weather normalization forecast of the customer's gas consumption for the most recent 12 months or life of the account, whichever is less, and the factors used to develop the forecast.

3.  Billing Determinant Information Set. Upon acceptance of an ESCO enrollment request, a distribution utility shall provide the following billing information for an electric or gas account, as applicable[1]:

    a.  Customer's service address, and billing address, if different;

    b.  Electric and/or gas account indicator;

    c.  Meter reading date or cycle and reporting period;

    d.  Billing date or cycle and billing period;

    e.  Meter number, if available;

    f.  Distribution utility rate class and subclass, by meter;

    g.  Description of usage measurement type and reporting period;

    h.  Customer's load profile group, for electric accounts only;

    i.  Life support equipment indicator;

    j.  Gas pool indicator, for gas accounts only;

    k.  Gas capacity/assignment obligation code;

    l.  Customer's location based marginal pricing zone, for electric accounts only; and,

    m.  Budget billing indicator.[2]

---

[1]  As specified in the EDI standard for an enrollment request and response, the distribution utility may transmit additional data elements, based upon the request, the responding distribution utility, and the commodity type.

[2]  This indicator is limited to 12 month levelized payment plans and does not include other payment plans.

4.   Credit Information Set.  The distribution utility or MDSP shall provide credit information for the most recent 24 months or life of the account, whichever is less, upon receipt of an ESCO's electronic or written affirmation that the customer provided authorization for release of the information to the ESCO.   Credit information shall include number of times a late payment charge was assessed and incidents of service disconnection.

D.   Direct Customer Information

A Direct Customer shall receive usage data and any subsequent changes, corrections and adjustments to previously supplied data, and estimated consumption for a period, at the same time that the distribution utility validates them for use.  The distribution utility or MDSP shall make available, upon request, to an electric Direct Customer, a class load profile for its service class.

E.   Charges for Customer Information

No distribution utility or MDSP shall impose charges upon ESCOs or Direct Customers for provision of the information described in this Section.  The distribution utility may impose an incremental cost-based fee, authorized in tariffs for an ESCO's request for customer data for a period in excess of 24 months or for detailed interval data per account for any length of time.

F.   Unauthorized Information Release

An ESCO, its employees, agents, and designees, are prohibited from selling, disclosing or providing any customer information obtained from a distribution utility or MDSP, in accordance with this Section, to others, including their affiliates, unless such sale, disclosure or provision is required to facilitate or maintain service to the customer or is specifically authorized by the customer or required by legal authority. If such authorization is requested from the customer, the ESCO shall, prior to authorization, describe to the customer the information it intends to release and the recipient of the information.

# SECTION 5:  CHANGES IN SERVICE PROVIDERS

A.  Applicability

This Section establishes practices for receiving, processing, and fulfilling requests for changing a customer's electricity or natural gas provider and for obtaining a customer's authorization for the change.  A change in a provider includes transfer from: (1) one ESCO to another; (2) an ESCO to a distribution utility; and (3) a distribution utility to an ESCO.  This Section also establishes practices for:  an ESCO's drop of a customer or a customer's drop of an ESCO, retention of an ESCO after a customer's relocation within a distribution utility's service area, assignment of a customer, and initiation or discontinuance of procurement of electricity or natural gas supplies by a Direct Customer.  This Section does not establish practices for obtaining other energy-related services or changing billing options.

The process of changing a service provider is comprised of two steps.  For enrollment with an ESCO, the first step is obtaining customer agreement, and any required third-party verification, to accept electric and/or natural gas service according to the terms and conditions of an offer.  A sales agreement establishes the terms and conditions of the customer's business arrangement with the ESCO.  The second step is enrollment and the distribution utility's modification of its records to list the customer's transfer to a provider on a specific date.  The second step is primarily between the ESCO and the distribution utility.

B.  Customer Agreement

An ESCO, or its agent, may solicit and enter into a sales agreement with a customer subject to the following requirements.

1.  The ESCO shall obtain a customer agreement to initiate service and enroll a customer and customer authorization to release information to the ESCO by means of one of the following methods.

   a.  Telephone agreement and authorization, preceded, or followed within three business days, by provision of a sales agreement, in accordance with requirements in Attachment 1 – Telephonic Agreement and Authorization/Third Party Verification Requirements;

   b.  Electronic agreement and authorization, attached to an electronic version of the sales agreement, in accordance with requirements in Attachment 2 – Electronic Agreement and Authorization Requirements; or

   c.  Written agreement bearing a customer's signature on a sales agreement (original or fax copy of a signed document), in accordance with requirements in Attachment 3 – Written Agreement and Authorization Requirements.

2. For any sale resulting from either door-to-door or telephonic marketing, each enrollment is only valid with an independent third-party verification.

3. The ESCO shall provide residential customers the right to cancel a sales agreement within three business days after its receipt (cancellation period).

4. The standard Sales Agreements for each customer class shall include the following information written in plain language:

    a. Terms and conditions applicable to the business relationship between the ESCO and the customer which includes:

        1. provisions governing the process for rescinding or terminating an agreement by the ESCO or the customer including provisions stating that a residential customer may rescind the agreement within three business days after its receipt;

        2. the placeholder for the price or how the price is determined, the terms and conditions of the agreement, including the term and end date, if any, of the agreement, the amount of the termination fee and the method of calculating the termination fee, if any, the amount of late payment fees, if applicable, and the provisions, if any, for the renewal of the agreement; and,

        3. a clear description of the conditions, if any, that must be present in order for savings to be provided to the customer, if savings are guaranteed.

    b. Such contract shall also include on the first page thereof a Customer Disclosure Statement (the Statement). The text within this Statement shall state in plain language the terms and conditions described above and set forth in Attachment 4 – Sample Customer Disclosure Statement. When the form contract is used by the ESCO as its agreement with the customer, the Customer Disclosure Statement shall also contain the price term of the agreement. In the event that the text in the Statement differs from or is in conflict with a term stated elsewhere in the agreement, the term described by the text in the Statement shall constitute the agreement with the customer notwithstanding a conflicting term expressed elsewhere in the agreement.

    c. Procedures for resolving disputes between the ESCO and a customer;

    d. Consumer protections provided by the ESCO to the customer;

    e. Method for applying payments and consequences of non-payment;

    f. Any charges and fees, services, options or products offered by the ESCO;

    g. Department contact information, including the Department ESCO hotline at 1-888-697-7728;

    h. ESCO contact information, including a local or toll-free number from the customer's service location, and procedures used for after-hours contacts and emergency contacts, including transfer of emergency calls directly to a distribution utility and/or an answering machine message that includes an emergency number for direct contact with the distribution utility.

    i. A statement that the ESCO shall provide at least 15 calendar days' notice prior to any cancellation of service to a customer; and

j.  If a condition of service, a statement that the ESCO reserves the right to assign the contract to another ESCO.

5.  Additional terms and conditions applicable to residential customers and customers solicited via door-to-door sales include:

a.  Prepayments – no agreement for the provision of energy by an ESCO shall require a prepayment.  Where an ESCO is the billing party, it may offer a customer an option of prepayment.  Any agreement providing for prepayment  may be cancelled by the customer, without penalty within 90 calendar days  from the date of such agreement.  Any unused portion of the prepayment shall  be returned to the customer within 30 business days following cancellation of  the agreement.

b.  Termination fees – no agreement for the provision of energy by an ESCO shall require a termination or early cancellation fee in excess of either a) $100 for any contract with a remaining term of less than 12 months; or b) $200 for any contract with a remaining term of more than 12 months or; c) twice the estimated bill for energy services for an average month, provided that an estimate of an average monthly bill was provided to the customer when the offer was made by the ESCO along with the amount of any early termination fee.  To calculate such average monthly bill, the ESCO may use an average of the customer's actual usage for the previous twelve months or if such data is unavailable at the time the offer is made apply the usage for a typical customer in that service classification as reported by the distribution utility or the Commission, and multiply it by the ESCO's estimate of the average annual rate that will be charged under the agreement.

c.  Variable charges – all variable charges must be clearly and conspicuously identified in all contracts, sales agreements and marketing materials.

d.  Material changes and renewals – no material changes shall be made in the terms or duration of any contract for the provision of energy by an ESCO without the express consent of the customer obtained under the methods authorized in the UBP.  This shall not restrict an ESCO from renewing a contract by clearly informing the customer in writing, not less than thirty days nor more than sixty days prior to the renewal date, of the renewal terms and the customer's option to reject the renewal terms.  A customer shall not be charged a termination fee as set forth in Section 5.B.3.1.a herein, if the customer objects to such renewal within three business days of receipt of the first billing statement under the agreement as renewed.  Regarding contract renewals or an initial sales agreement  that specifies that the agreement automatically renews on a monthly, all  changes to the terms of the contract, including changes to the commodity rate, product or service type,  will be considered material and will require that the ESCO obtain the  customer's express consent for renewal.

e.  A renewal notice in the standardized format provided by the Department, must be used.

    f.   The renewal notice must be enclosed in an envelope which states in bold lettering: "IMPORTANT: YOUR [ESCO NAME] CONTRACT RENEWAL OFFER IS ENCLOSED. THIS MAY AFFECT THE PRICE YOU PAY FOR ENERGY SUPPLY."

    g.   When a fixed-rate agreement is renewed as a fixed-rate agreement, the ESCO shall provide the customer with an additional notice before the issuance of the first billing statement under the terms of the contract as renewed, but not more than 10 days prior to the date of the issuance of that bill. This notice shall inform the customer of the new rate and of his or her opportunity to object to the renewal, without the imposition of any early termination fees, within three days of receiving the first billing statement under the terms of the contract as renewed.

C.  Provision of List of ESCOs to Customers

    Distribution utilities shall offer to provide a customer who requests initiation of delivery service with an up-to-date list of ESCOs and provide the list at any time, upon request of any customer.

D.  Customer Enrollment Procedures

    1.  An ESCO shall transmit:

        a.   An electric enrollment request to a distribution utility no later than 5 business days prior to the effective date of the enrollment.

        b.   A gas enrollment request to a distribution utility no later than 10 business days prior to the effective date of the enrollment.

        c.   The enrollment request shall contain at a minimum, the information required for processing set forth in Attachment 5, Enrollment Request.

    2.  The distribution utility shall process enrollment requests in the order received.

    3.  The distribution utility shall accept only one valid enrollment request[1] for each commodity per customer during a switching cycle. If the distribution utility receives multiple enrollment requests for the same customer during a switching cycle, it shall accept the first valid enrollment request and reject subsequent requests.

    4.  An ESCO shall submit an enrollment request after it obtains customer authorization, and third-party verification where required, and it has provided the sales agreement to the customer. For telephonic enrollments, in which the ESCO sends the customer the sales agreement via US Mail, the ESCO shall provide for two business days for the customer to receive the sales agreement.

    5.  After receipt of an enrollment request, the distribution utility shall, within one business day, acknowledge its receipt, and provide a response indicating rejection and the reason, or acceptance and the effective date for the change of provider.

---

[1]   Criteria for determining the validity of an EDI transaction are described in the EDI processing protocols adopted in Case 98-M-0667, Electronic Data Interchange.

6.  Upon acceptance of an enrollment request, the distribution utility shall contemporaneously send a notice to the incumbent ESCO that the customer's service with that ESCO will be terminated on the effective date of the new enrollment.  In the event that the distribution utility receives notice from the pending ESCO, the incumbent ESCO (with specific customer authorization for each cancellation), or the customer, prior to the effective date that a pending enrollment is cancelled, the distribution utility shall transmit a request to reinstate service to the incumbent ESCO, unless the incumbent ESCO previously terminated service to the customer or the customer requests a return to full utility service.

7.  With the exception of a new installation use of an interim estimate of consumption or a special meter reading,[1] a change of providers is effective: for an electric customer, on the next regularly scheduled meter reading date; and, for a gas customer, on the next regularly scheduled meter reading date or the first day of the month, in accordance with provisions set forth in the distribution utility's tariff.[2]  The distribution utility shall set the effective date, which shall be no sooner than 5 business days after receipt of an enrollment request.  Service to new delivery customers is effective after the installation is complete and, if necessary, inspected.

8.  An off-cycle change of an electric service provider is allowed no later than 15 calendar days before the date requested for the change if a new ESCO or a customer arranges for a special meter reading or agrees to accept an interim date for estimating consumption.  The ESCO or customer is required to pay the cost for any special meter reading, in accordance with provisions set forth in the distribution utility's tariff.  A change based upon an interim estimate of consumption or a special meter reading is effective on the date of the interim estimate or special meter reading.  Off-cycle changes of gas service providers are allowed if the incumbent and new ESCO agree on an effective date no later than 15 calendar days following the request.

E.  Customer Notification

1.  The distribution utility shall send no later than one calendar day after acceptance of an enrollment request a verification letter to the customer notifying the customer of the acceptance.  The notice shall inform the customer that if the enrollment is unauthorized or the customer decides to cancel it, the customer is required immediately to so notify the distribution utility and the pending ESCO.

2 .  Upon receipt of such cancellation, the distribution utility shall cancel the pending enrollment and reinstate the customer with the incumbent ESCO, if any, or the distribution utility, provided that the distribution utility is notified prior to the planned effective date.  If the distribution utility is notified on or after the planned effective date, the change to the new provider shall occur and remain effective for

---

[1]  If meters are read bimonthly and bills are issued monthly using estimated usage, the effective date for the interim months is the date usage is estimated for billing purposes.

[2]  If meters are not read within two business days of the scheduled meter reading day, the distribution utility or MDSP shall estimate usage as of the scheduled meter reading day.  The effective date for a change of provider is that date, except where changes of natural gas suppliers are scheduled for the first of the month.

one billing cycle. The customer shall return to full utility service at the end of the next switching cycle, unless the customer is enrolled by another ESCO in accordance with this section prior to the next switching cycle.

3. If a customer notifies the pending ESCO of such cancellation, the pending ESCO shall send a customer's drop request to the distribution utility within one business day.

F.  Rejection of Enrollment Requests

The distribution utility may reject an enrollment request for any of the following reasons:

1. Inability to validate the transaction;

2. Missing or inaccurate data in the enrollment request;

3. ESCO's ineligibility to provide service in the specified territory;

4. No active or pending delivery service;

5. A pending valid prior enrollment request; or

6. The account is coded as ineligible for switching.

G.  Customer Relocations Within a Service Territory

1. A customer requesting relocation of service within a distribution utility's service territory and continuation of its ESCO service, arranges for continuation at the new location of delivery service by contacting the distribution utility and of commodity service by contacting the ESCO.[1]  Each provider contacted by the customer shall remind the customer of the need to contact the other provider to initiate the change in service or arrange for a conference call with the other provider and customer, and within two days, notify the other provider that a customer requested relocation of service.

2. The distribution utility's representative shall inform the customer, or the customer's agent, and the ESCO of the effective dates, contingent upon the customer's approval, for discontinuance of service at one location and commencement of service at the new location. The ESCO shall confirm to the distribution utility that it shall continue service to the customer at the new location.

3. In the event that the ESCO is unable or does not wish to continue service to the customer at the new location, the distribution utility shall provide full utility service to the customer.

H.  Customers Returning to Full Utility Service

1. A customer arranges for a return to full utility service by contacting either the ESCO or the distribution utility in accordance with this paragraph. An ESCO contacted by the customer shall, within one business day, process the customer's request to return to full utility service. A utility contacted by a customer shall remind the customer to contact the ESCO about the customer's returning to full

---

[1]   In the Single Retailer Model, the customer contacts only its ESCO. The ESCO notifies the distribution utility of the customer's new service location and mailing address, if applicable. Direct customers contact only the distribution utility.

utility service provided, however, that if the customer has already contacted the ESCO or wants to proceed without contacting the ESCO, the utility shall, within one business day, process the customer's request to return to full utility service. If a change to full utility service results in restrictions on the customer's right to choose another supplier or application of a rate that is different than the one applicable to other full-service customers, the distribution utility shall provide advance notice to the customer.

2. A Direct Customer that intends to change from procuring its own supplies to full utility service shall notify the distribution utility.

3. No ESCO shall transfer 5,000 or more customers during a billing cycle to full utility service, unless it provides no less than 60 calendar days' notice to the distribution utility and Department.  The transfers shall occur on the customers' regularly scheduled meter reading dates, unless the distribution utility and ESCO agree to a different schedule.

4. The following process sets forth the steps for an ESCO's return of a customer to full utility service.

   a. An ESCO may discontinue service to a customer and return the customer to full utility service provided that the ESCO notifies the customer and the distribution utility no later than 15 calendar days before the effective date of the drop.  The ESCO's right to discontinue service to any customer is subject to any limitations contained in its sales agreement.

   b. An ESCO's notice to retail customers shall provide the following information:

      1. Effective date of the discontinuance, established by the distribution utility, unless the ESCO arranged for an off-cycle date;

      2. Statement that the customer has the option to select another ESCO receive full utility service from the distribution utility, or, if available in the distribution utility's service area and the customer is eligible, accept random assignment by the distribution utility to an ESCO; and,

      3. Statement that customer shall receive full utility service until the customer selects a new ESCO and the change in providers is effective, unless the distribution utility notified the customer that it will terminate its delivery service on or before the discontinuance date.

   c. The ESCO shall provide a sample form of the notice it plans to send to its customers when it transfers 5,000 or more customers to the Department for review no later than five calendar days before mailing the notice to customers.

I. New Delivery Customers

1. A customer may initiate distribution utility delivery service and subsequently enter into a customer agreement with an ESCO for commodity supply or arrange for both services at the same time.

2. A customer may authorize an ESCO to act as the customer's agent (ESCO agent) in establishing distribution utility service. The ESCO agent shall retain, and produce upon request, documentation that the customer authorized the ESCO to act as the customer's agent.

3. An ESCO acting as a customer's agent shall establish a new delivery account on behalf of the customer and enroll the customer with the distribution utility so that

ESCO commodity service commences when distribution utility delivery service begins. The ESCO shall retain, and produce upon request, documentation that the customer authorized the ESCO to act as the customer's agent. An ESCO that is a customer's agent is authorized to submit the customer's application for new delivery service, in compliance with requirements for such applications stated in the law, rules and distribution utility tariffs. An ESCO shall provide the customer's name, service address and, if different, mailing address, telephone number, customer's requested service date for initiation of delivery service, and information about any special need customers, including any need for life support equipment. An ESCO shall refer a customer directly to a distribution utility for arrangement of distribution related matters, such as contribution-in-aid of construction and construction of facilities necessary to provide delivery service and settling of arrears and posting security.

4. Upon a customer's application for service, the distribution utility shall provide an ESCO with the effective date for initiation of delivery service and any other customer information provided to an ESCO in an acceptance of an enrollment request. The distribution utility may notify the customer of the acceptance.

J. Multiple Assignments of Sales Agreements

1. An ESCO may assign all or a portion of its sales agreements to other ESCOs provided that the assigned sales agreements clearly authorize such assignments or the ESCO provides notice to its customers prior to the assignments and an opportunity for each customer to choose another ESCO or return to full utility service. An ESCO shall provide a written notice no later than 30 calendar days prior to the assignment or transfer date to each customer and distribution utility. The notice to the distribution utility shall include a copy of the assignment document, with financial information redacted, executed by the officers of the involved ESCOs, and a copy of the notice sent to the customer, or, if a form notice, a copy of the form and a list of recipients.

2. The assignment documents shall specify the party responsible for payment or reimbursement of any and all sums owed under any distribution utility tariff or Federal Energy Regulatory Commission tariff and any service agreements relating thereto, and under any agreements between ESCOs and distribution utilities and between ESCOs and their customers.

3. An ESCO's notices to customers shall provide the following information:

   a. Effective date of the assignment;

   b. The name, mailing and e-mail addresses, and telephone number of the assigned ESCO; and,

   c. Any changes in the prices, terms and conditions of service, to the extent permitted by the sales agreement.

    4.  The ESCO shall provide sample forms and any major modifications of such notices to the Department for review no later than five calendar days before mailing them to customers.

    5.  The distribution utility shall, within two business days after receipt of an assignment request, acknowledge and initiate processing of the request and send written notice of the request to the ESCO's assigned customer.

K.  Unauthorized Customer Transfers

    1.  A change of a customer to another energy provider without the customer's authorization, commonly known as slamming, is not permitted.  The distribution utility shall report slamming allegations to the Department on at least a monthly basis.

    2.  An ESCO that engages in slamming shall refund to a customer the difference between charges imposed by the slamming ESCO that exceed the amount the customer would have paid its incumbent provider and pay any reasonable costs incurred by the distribution utility to change the customer's provider from the ESCO that engaged in slamming to another provider.

    3.  ESCOs shall retain two years or for the length of the sales agreement  whichever is longer, documentation of a customer's authorization to change  providers.  Such documentation shall comply with the requirements described in Attachments 1, 2 or 3.

L.  Lists of ESCO Customers, Budget Billing, Charges and Fees

    1.  A distribution utility, upon an ESCO's request, shall provide at no charge, once each calendar quarter, a list of the ESCO's customers at the time of the request and, monthly, the number of accounts enrolled with an ESCO and the ESCO's sales (kWh and/or dekatherms).  ESCOs may obtain such customer lists at other times for cost-based fees set forth in distribution utility tariffs.

    2.  A distribution utility shall adjust its bills rendered under a budget billing plan on the effective date for changing a provider and include the adjustments in the customer's next bill.

    3.  Upon enrollment of a distribution utility customer with an ESCO or return of an ESCO customer to full utility service, a distribution utility shall impose no restrictions on the number or frequency of changes of gas or electricity providers, except as provided in this paragraph.  The distribution utility shall accept only one valid enrollment request for each commodity per customer during a switching cycle.  If multiple requests are received for the same customer during a switching cycle, the distribution utility shall accept the first valid enrollment request and reject subsequent enrollment requests.

    4.  A distribution utility shall impose no charge for changing a customer's gas or electricity provider.

    5.  A distribution utility may establish a fee in its tariffs for a special meter reading.

**Attachment 1**

**Telephonic Agreement and Authorization/Third Party Verification Requirements**

A.  A voice-recorded verification is required to enter into a telephonic agreement or a door to door agreement, with a customer to initiate service and begin enrollment. Use of either an Independent Third Party or an Integrated Voice Response system to obtain customer authorization is required for any telephone solicitation or sales resulting from door-to-door marketing.  Verification by an Independent Third Party or an Integrated Voice Response system shall be recorded and conducted without the ESCO marketing representative's presence, either on the telephone or in person. A voice-recorded verification shall verify the following information to substantiate the customer's agreement or authorization:

1. Do you understand that this conversation is recorded and that oral acceptance of the [ESCO name]'s offer is an agreement to initiate service and begin enrollment?

2. Is it [specific date] at [specific time]?

3. Do you understand that the marketing representative represents [specific ESCO] and that [specific ESCO] is not the distribution utility?

4. If the sale was conducted through door-to-door marketing, has the marketer left the premises?

5. Are you [specify customer's name]/Please state your name (or is your company name [specify company name]/Please state your company's name)?

6. Do you live at [specific address]/Please state your address (or is your company located at [specify company address]/Please state your company's address)?

7. Is your email address [specific e-mail address] /Please provide your email address (if the customer chose to provide it)?

8. Is your distribution utility account number [specify account number]/ Please state your distribution utility account number?

9. Are you the primary account holder or do you have authority to make changes to this account?

10. If the sale was conducted through door-to-door marketing: did the ESCO marketing representative provide you with the sales agreement, his/her business card or contact information and leave a copy of the ESCO Consumer Bill of Rights?

11. If the sale was conducted through telemarketing: did the ESCO marketing representative offer to mail you a copy of the ESCO Consumer Bill of Rights or did the ESCO marketing representative tell you how to find the ESCO Consumer Bill of Rights online?

12. Did you agree to the terms of service as reviewed with you by the [ESCO name]  representative on [INSERT ENROLLMENT DATE]?

    a.  The price of____(electricity and/or natural gas) under the contract is ___for___months (years).

    b.  Or the price of____(electricity and/or natural gas) under the contract is a variable rate and will vary month-to-month.

    c.  The early termination fee (if any) is___(this may be a methodology instead of a dollar amount).

13. If savings is guaranteed (compared to the utility rate), a plain description of the type of savings and the conditions that must be present in order for the customer to be eligible for savings. If savings is not guaranteed (as compared to the utility supply service) a statement indicating such;

14. Please be advised that energy supply will be provided by the ESCO, and that energy delivery shall continue to be provided by your utility and the utility will also be available to respond to leaks or other emergencies should they occur;

15. Do you authorize the release of the following information from your distribution utility: [specify information] and do you understand that you may rescind this authorization at any time by calling [specify toll free number] or e-mailing [specify e-mail address]?

16. For residential enrollments only:  Do you understand that you may rescind the agreement within three business days after its receipt by [describe how such rescission can be accomplished] and if you do not rescind the agreement, an enforceable agreement will be created?

B.  The ESCO, or its agent, shall provide a copy of any Customer Disclosure Statement and sales agreement to the customer by mail, e-mail or fax within three business days after the telephone agreement and independent third-party verification occurs.  The sales agreement shall set forth the customer's rights and responsibilities and describe the offer in detail, including the specific prices, terms, and conditions of ESCO service.  Such agreement shall be substantially the same, in form and content, as the sample contract submitted to the Department pursuant to Section 2.B.1.b.

C.  The independent third-party verification shall be conducted in the same language used in marketing or sales materials presented to the customer and communicated clearly and in plain language.

D.  An ESCO shall retain independent third-party verification records for two years from the effective date of the agreement and/or authorization or for the length of the sales agreement whichever is longer.  In the event of any dispute involving agreement. authorization and/or the independent third-party verification, the ESCO shall make available the audio recording of the customer's agreement and/or authorization, including the

independent third-party verification within five business days after a  request from the Department.

**Attachment 2**

**Electronic Agreement and Authorization Requirements**

A.  To enter into an electronic agreement with a customer to initiate service and begin enrollment or to obtain customer authorization for release of information, an ESCO, or its agent, shall electronically record communications with the potential customer. As required in Section 5, the Electronic Agreement and authorization may also require an independent third-party verification call, which must include the information in Attachment 1.  An ESCO shall provide the following electronic information, as applicable, to substantiate the customer's agreement and/or authorization:

1.  A statement that electronic acceptance of a sales agreement is an agreement to initiate service and begin enrollment;

2.  The Customer Disclosure Statement and the sales agreement containing the prices, terms and conditions applicable to the customer, which, if printed as a physical document, would be substantially the same, in form, and content, as the sample contract submitted to the Department pursuant to Section 2.B.1.b.

3.  If savings are guaranteed, or guaranteed under only certain circumstances, the ESCO must provide a written statement which includes a plain language description of the conditions that must be present in order for the savings to be provided;

4.  An identification number and date to allow the customer to verify the specific sales agreement to which the customer assents;

5.  A statement from the ESCO that energy supply will be provided by the ESCO, and that energy delivery shall continue to be provided by the customer's utility; and that said utility will also be available to respond to leaks or other emergencies should they occur;

6.  A requirement that the customer accept or not accept the sales agreement by clicking the appropriate box, displayed as part of the terms and conditions; after the customer clicks the appropriate box to accept the sales agreement, the system shall display a conspicuous notice that the ESCO accepts the customer;

7.  Use of an electronic process that prompts a customer to print or save the sales agreement and provides an option for the customer to request a hard copy of the sales agreement; an ESCO shall send the hard copy by mail within three business days after a customer's request;

8.  A description of the types of information that the ESCO needs to obtain from a distribution utility or MDSP and the purposes of its use, a request that the customer provide authorization for release of this information, and the effective duration of the authorization;

9.  A requirement that the customer agree or not agree to provide such authorization by clicking the appropriate box, displayed as part of the terms and conditions;

10. A statement that a residential customer may rescind the agreement and authorization within three business days after electronic acceptance of the sale agreement; a statement that a customer may rescind the authorization for release of information at any time; provision of a local or toll-free telephone number, and/or an e-mail address for these purposes; upon cancellation of the agreement, the ESCO shall provide a cancellation number;

11. Verification of the date and time of the electronic agreement and authorization; and

12. Provision by the customer of the customer's name, address, distribution utility customer account number, and any additional information to verify the customer's identify.

B. The ESCO shall, within three business days of any final agreement to initiate service to a customer, send an electronic confirmation notice to the customer at the customer's e-mail address.

C. The ESCO shall use an encryption standard that ensures the privacy of electronically transferred customer information, including information relating to enrollment, renewal, re-negotiation, and cancellation.

D. Upon request of a customer, the ESCO shall make available additional copies of the sales agreement throughout its duration.  An ESCO shall provide a toll-free telephone number and e-mail address for a customer to request a copy of the sales agreement.

E. An ESCO shall retain documentation of a customer's agreement in a retrievable format for two years from the effective date of the customer's acceptance and/or authorization or for the length of the sales agreement whichever is longer.  In the event of any dispute involving an electronic agreement or authorization, the ESCO shall provide a copy of the customer's acceptance of the sales agreement and/or authorization for release of information or provide on-line access to the acceptance and/or authorization within five calendar days after a request from the Department.

Attachment 3

**Written Agreement and Authorization Requirements**

A.  An ESCO may enter into a written agreement (original or fax copy of a signed document) with a customer to initiate service and begin enrollment or to obtain customer authorization for release of information.  As required in Section 5, the Electronic Agreement and authorization may also require an independent third-party verification call, which must include the information in Attachment 1.  A sales agreement shall contain, in addition to the Customer Disclosure Statement discussed in UBP Section 2.B.1.b.2, the following information, as applicable:

1.  A statement that a signature on a sales agreement is an agreement to initiate service and begin enrollment;

2.  A description of the specific prices, terms, and conditions of ESCO service applicable to the customer, which is substantially the same, in form and content, as the sample contract submitted to the Department pursuant to Section 2.B.1.b and, if savings are guaranteed, or guaranteed under only certain circumstances, the ESCO must provide a plain language description of the conditions that must be present in order for the savings to be provided;

3.  A description of the types of information that the ESCO needs to obtain from a distribution utility or MDSP, the purposes of its use, and effective duration of the authorization;

4.  A statement that acceptance of the agreement is an authorization for release of such information;

5.  A customer signature and date; the sales agreement shall be physically separate from any check, prize or other document that confers any benefit on the customer as a result of the customer's selection of the ESCO;

6.  A statement that a residential customer may rescind the agreement within three business days after signing the sales agreement; a statement that a customer may rescind the authorization for release of information at any time; provision of a local, toll-free telephone number, and/or e-mail address for these purposes; the customer may fax a copy of a signed sales agreement to the ESCO; upon cancellation of the agreement, the ESCO shall provide a cancellation number; and

7.  The customer's name, mail and any e-mail address (if the customer chooses to provide it), distribution utility account number, and any additional information to verify the customer's identify.

8.  A statement from the ESCO that energy supply will be provided by the ESCO, and that energy delivery shall continue to be provided by the customer's utility; and that said utility will also be available to respond to leaks or other emergencies should they occur;

B.  ESCOs shall retain written agreements and/or authorizations for two years from the effective date of the agreement and/or authorization or for the length of the agreement whichever is longer.  In the event of any dispute involving a sales agreement or authorization, the ESCO shall provide a copy of the sales agreement and/or authorization within five business days after a request from the Department.

**Attachment 4**

### Sample Customer Disclosure Statement

| | |
|---|---|
| Price | |
| Fixed or Variable and, if variable, how the price is determined | |
| Length of the agreement and end date | |
| Process customer may use to rescind the agreement without penalty | |
| Amount of Early Termination Fee and method of calculation | |
| Amount of Late Payment Fee and method of calculation | |
| Provisions for renewal of the agreement | |
| Conditions under which savings to the customer are guaranteed | |

**Attachment 5**

**Enrollment and Drop Requests Information Requirements**

A.  An ESCO shall provide the following information for enrollment requests, and an ESCO or distribution utility shall provide the following information for drop requests:

1.  Utility ID (DUNS# or tax ID);

2.  ESCO ID (DUNS# or tax ID);

3.  Commodity requested (electric or gas); and,

4.  Customer's utility account number (including check digit, if applicable).

B.  The following information is required for enrollment requests:

1.  Customer's bill option;

2.  For distribution utility rate ready consolidated billing:

    a.  an ESCO's fixed charge, commodity price, sales and use tax rate or rate code;

    b.  ESCO customer account number;

    c.  budget billing status indicator; and,

    d.  tax exemption percent and portion taxed as residential.

3.  For Single Retailer Model:  special needs indicator;

4.  For gas service:  gas capacity assignment/obligation indicator, and, if applicable, gas pool ID, gas supply service options, and human needs indicator;

5.  For electric service:  indicator for a partial requirements customer, if applicable.

C.  The following information is required for drop requests:

1.  Reason for the drop;

2.  For distribution utility request, service end date;

3.  For ESCO initiated request, effective date of customer move, if applicable; and

4.  For ESCO initiated request in Single Retailer Model, customer's service and mailing address.

# SECTION 6:  CUSTOMER INQUIRIES

A.  Applicability

This Section establishes requirements for responses by an ESCO or distribution utility to retail access customer inquiries.  An ESCO or distribution utility shall respond to customer inquiries sent by means of electronic mail, telecommunication services, mail, or in meetings.  The subjects raised in inquiries may result in the filing of complaints.

B.  General

1. Distribution utilities and ESCOs shall provide consistent and fair treatment to customers.

2. Distribution utilities and ESCOs shall maintain processes and procedures to resolve customer inquiries without undue discrimination and in an efficient manner and provide an acknowledgement or response to a customer inquiry within 2 days and, if only an acknowledgement is provided, a response within 14 days.

3. Distribution utilities and ESCOs shall provide local or toll-free telephone access from the customer's service area to customer service representatives (CSRs) responsible for responding to customer inquiries and complaints.

4. CSRs shall obtain information from the customer to access and verify the account or premises information.  Once verification is made, the CSR shall determine the nature of the inquiry, and, based on this determination, decide whether the distribution utility or the ESCO is responsible for assisting the customer.

5. The CSR shall follow normal procedures for responding to inquiries.  If the inquiry is specific to another provider's service, the CSR shall take one of the following actions:

   a. Forward/transfer the inquiry to the responsible party;

   b. Direct the customer to contact the responsible party; or,

   c. Contact the responsible party to resolve the matter and provide a response to the customer.

6. Each distribution utility and ESCO shall maintain a customer service group to coordinate and communicate information regarding customer inquiries and designate a representative to provide information relating to customer inquiries to the Department.

7. ESCOs may provide a teletypewriter (TTY) system or access to TTY number, consistent with distribution utility tariffs.

C.  Specific Requests for Information

1. A distribution utility or ESCO shall respond directly to customer inquiries for any information that is related to commodity supply and/or delivery service, to the extent it has the necessary information to respond.

2. The entity responsible for the accuracy of meter readings shall respond to customer inquiries related to usage.

SECTION 6

   3.   The distribution utility and ESCO shall respond to customer inquiries about
        billing and payment processing, in accordance with UBP Section 9, Billing and
        Payment Processing.

D.  Emergency Contacts

   1.   An emergency call means any communication from a customer concerning an
        emergency situation relating to the distribution system, including, but not limited
        to, reports of gas odor, natural disaster, downed wires, electrical contact, or fire.

   2.   The ESCO CSR shall transfer emergency telephone calls directly to the
        distribution utility or provide the distribution utility's emergency number for
        direct contact to the distribution utility.  If no ESCO CSR is available, the ESCO
        shall provide for after-hours emergency contacts, including transfer of emergency
        calls directly to a distribution utility or an answering machine message that
        includes an emergency number for direct contact to the distribution utility.

   3.   Each ESCO shall provide periodic notices or bill messages to its customers
        directing them to contact the distribution utility in emergency situations and
        providing the emergency number.

# SECTION 7:  DISTRIBUTION UTILITY INVOICES

A.  Applicability

This Section establishes procedures for invoices of charges for services provided by the distribution utility directly to an ESCO or Direct Customer.  A distribution utility and ESCO or Direct Customer may agree to establish other arrangements and procedures for presentation and collection of invoices for services rendered.

B.  Invoices

1.  An ESCO or Direct Customer shall pay the full amount due, without deduction, set-off or counterclaim, within 20 calendar days after the date of electronic transmittal or postmarked date (due date).  Subsequent to the due date, charges are overdue and subject to late payment charges at the rate of 1.5% per month.  The overdue charges include the amount overdue, any other arrears, and unpaid late payment charges.  The distribution utility may provide, upon request, supporting or back-up data in electronic form, if available on its computer system.

2.  A distribution utility shall provide interest at the rate of 1.5% on an overpayment caused by the distribution utility's erroneous billing, provided that it may, without applying interest, credit all or a portion of the overpayment to the next bill issued within 30 days and/or refund all or a portion of the overpayment, upon request, within 30 days after its receipt.  The distribution utility shall refund any credit balances, upon request.

3.  An ESCO or Direct Customer shall make payments by means of an electronic funds transfer. A distribution utility shall use any partial payments first to pay any arrears and second to pay current charges.

C.  Billing Inquiries and Disputes

1.  An ESCO or Direct Customer shall make any claims relating to inaccuracies of invoices in writing no later than 90 calendar days after the date of electronic transmittal or postmarked date.  ESCOs and/or Direct Customers are responsible for payment of disputed charges during any pending dispute.

2.  A distribution utility shall designate an employee and provide a telephone number and e-mail address for receipt of inquiries from an ESCO or Direct Customer relating to invoices.  The employee shall direct an ESCO or Direct Customer that presents an inquiry or complaint to the responsible and knowledgeable person able to explain charges on an invoice.

3.  A distribution utility shall acknowledge in writing receipt of an inquiry within five calendar days after its receipt.  A distribution utility shall investigate and respond in writing to the inquiry within 20 calendar days after its receipt.

4.  A distribution utility shall refund any overpayments, including interest, within five calendar days after it makes a determination that an ESCO or Direct Customer made an overpayment.  It may provide the refund by applying a credit to any overdue amounts or making direct payment of any remainder.  The distribution utility shall provide refunds by means of an electronic funds transfer. Interest is calculated at the rate of 1.5 % per month from the date of the overpayment to the refund.

5.  No interest is required on overpayments voluntarily made by an ESCO or Direct Customer to an account, unless an overpayment is applied to security.

# SECTION 8:  DISPUTES INVOLVING DISTRIBUTION UTILITIES, ESCOs OR DIRECT CUSTOMERS

A.  Applicability

This Section describes the dispute resolution processes available at the Department to resolve disputes relating to competitive energy markets involving utilities, ESCOs and/or Direct Customers, including disputes alleging anti-competitive practices.  The processes are not available to resolve disputes between retail customers and ESCOs or distribution utilities.  They are also not applicable to matters that, in the opinion of the Department Staff, should be submitted by formal petition to the Public Service Commission for its determination or are pending before a court, state or federal agency.  The availability of the processes does not limit the rights of a distribution utility, ESCO or Direct Customer to submit any dispute to another body for resolution.

B.  Dispute Resolution Processes

The parties shall in good faith use reasonable efforts to resolve any dispute before invoking any of these processes.  Distribution utility tariffs and operating and service agreements between the parties shall identify the processes used to resolve disputes and shall refer to the dispute resolution processes described in this Section as acceptable processes to resolve disputes.

1.  Standard Process

The parties shall use a method to send documents described in this paragraph that will verify the date of receipt.

Any distribution utility, ESCO or Direct Customer may initiate a formal dispute resolution process by providing written notice to the opposing party and Department Staff.  Such notice shall include a statement that the UBP dispute resolution process is initiated, a description of the dispute, and a proposed resolution with supporting rationale.  Department Staff may participate in the process at this or any later point to facilitate the parties' discussions and to assist the parties in reaching a mutually acceptable resolution.

a.  No later than ten calendar days following receipt of the dispute description, if no mutually acceptable resolution is reached, the opposing party shall provide a written response containing an alternative proposal for resolution with supporting rationale and send a copy to Department Staff.

b.  No later than ten days after receipt of the response, if no mutually acceptable resolution is reached, any party or Department Staff may request that the parties schedule a meeting for further discussions.  The parties shall meet no later than 15 calendar days following such request, upon advance notice to Department Staff, unless the parties and Department Staff agree upon another date.  The Department may assign one or more Staff members to assist the parties in resolving the dispute.

c.  If no mutually acceptable resolution is reached within 40 calendar days after receipt of the written description of the dispute, any party may request an initial decision from the Department.  A party to the dispute may appeal the initial decision to the Public Service Commission.

    d.  If the parties reach a mutually acceptable resolution of the dispute, they shall provide to Department Staff a description of the general terms of the resolution.

2.  Expedited Process

In the event that an emergency situation arises to justify immediate resolution of a dispute, any party may file a formal dispute resolution request with the Secretary to the Public Service Commission asking for expedited resolution.  An emergency situation includes, but is not limited to, a threat to public safety or system reliability or a significant financial risk to the parties or the public.  The filing party shall provide a copy of the request to other involved parties and the Department Staff designated to receive information related to dispute resolution under this Section.  The request shall describe in detail the emergency situation requiring expedited resolution, state in detail the facts of the dispute, and, to the extent known, set forth the positions of the parties.

# SECTION 9:  BILLING AND PAYMENT PROCESSING

A.  Applicability

This Section establishes requirements[1] for billing and payment processing options offered by a distribution utility and ESCO in a multi-retailer model.  This Section does not establish requirements for billing and payment processing in the single retailer model.  A distribution utility and ESCO shall comply with the requirements established in this Section, unless they agree upon modifications or other procedures for billing and payment processing in a Billing Services Agreement.

B.  Billing and Payment Processing Options:  General Requirements

1.  A distribution utility shall offer to ESCOs without undue discrimination the billing and payment processing options available in its service territory.

2.  A customer participating in a retail access program shall select from the billing and payment processing options offered by ESCOs.

3.  A distribution utility shall allow its customers to select, through their ESCOs, one of the billing and payment options available in the distribution utility's service territory.  An ESCO may offer to its customers billing and payment processing options available in the customer's service territory and shall maintain or provide for the capability of issuing a separate bill for its services under the dual billing option.  An ESCO customer may direct the billing party to send its consolidated bills or dual bills to a third party for processing and payment.

4.  A distribution utility or ESCO may perform the responsibilities of a billing party for a customer and the other provider (non-billing party) based upon the billing and payment processing options available to the customer and the customer's choice.

5.  A distribution utility or MDSP shall make validated usage information available to the billing and non-billing parties at the time that the distribution utility or MDSP determines that the information is acceptable.[2]

6.  Information on customer usage, billing, and credit is confidential. A distribution utility or MDSP may release such information, upon a customer's authorization, in accordance with the UBP Section 5, Changes in Service Providers.

7.  A distribution utility and ESCO shall demonstrate the technical capability to exchange information electronically for their billing and payment processing options.

8.  An ESCO shall provide 60 calendar days' notice by mail, e-mail or fax to a distribution utility  of any plan to offer a billing option that is not currently offered to its customers.  The distribution utility may agree to a shorter notice period preceding initiation of the option.  The 60 calendar-day notice shall not impose any obligation on any party to proceed without a successful test of data exchange capability and the fulfillment of other obligations described in this Section.  If an ESCO later changes its system, it shall provide adequate advance notice and conduct any additional testing required.

---

[1]   The requirements are applicable when EDI is available upon issuance by the Commission of data standards applicable to a bill model and operational upon successful completion of the testing required for a bill model.

[2]   A distribution utility or MDSP shall provide electronic interval data in summary form (billing determinants aggregated in the rating periods under a distribution utility's tariffs) via EDI and, if requested, in detail via an acceptable alternative electronic format if retrieved from meters.

9.  A distribution utility and an ESCO are responsible for separately remitting their tax payments to the appropriate taxing authorities.

10. Where the ESCO is the billing party, it may offer a customer an option of prepayment. Where a distribution utility is the consolidated billing party, the distribution utility is not required to support processing of prepayments or application of customer prepayments to ESCO charges.

C.  Consolidated Billing:  General Requirements

1.  A distribution utility and ESCO shall establish in a billing services agreement (BSA) detailed expectations for their responsibilities, including consequences for any failure to carry out such responsibilities.

2.  A distribution utility may use the bill ready or rate ready method[1] for issuing consolidated bills.  An ESCO that offers consolidated billing shall use a bill ready method.

3.  A customer receiving delivery service from a distribution utility that is a combination natural gas and electric corporation (combination retail access customer) may receive a consolidated bill for both energy services if:

   a.  The distribution utility issues the consolidated bill;

   b.  One ESCO supplies the customer with both natural gas and electricity;

   c.  An ESCO supplying only one of the commodities agrees to bill for charges for the service provided by the other ESCO; or,

   d.  Separate distribution utility accounts are established for each service.

4.  A combination retail access customer may receive separate consolidated bills for each commodity or a dual bill for one commodity and a consolidated bill for the other provided that the distribution utility's system is capable of providing separate accounts for each commodity.  A distribution utility shall establish bill cycles and payment due dates.  A distribution utility may charge a fee, as set forth in its tariff, to an ESCO to establish, upon the ESCO's request, a separate account for one of the commodities the distribution utility provides.

D.  Consolidated Billing:  Functions and Responsibilities

1.  A billing party shall perform the following functions and responsibilities:

   a.  If the bill ready method is used, receive bill charges and other billing information from the non-billing party;

   b.  If the rate ready method is used, receive rates, rate codes and/or prices (fixed and/or variable) and other billing information from the non-billing party;

   c.  Receive bill messages and bill inserts from the non-billing party;

   d.  If the bill ready method is used, acknowledge receipt of the non-billing party's information and accept or reject it;

   e.  If the rate ready method is used,[1] calculate billed charges, including sales and use taxes; the non-billing party is required to provide the customer's sales and use tax rate to the billing party;

   f.  Print or make available electronically consolidated bills that state the non-billing party's charges, including taxes, arrearages, late fees, and bill messages;

---

[1]  A distribution utility electing the rate ready method for utility consolidated billing is not obligated to calculate or bill separately for other goods and services that an ESCO may provide.

  g. Insert in bill envelopes consolidated bills and inserts required by statute, regulation or Public Service Commission order;

  h. Stamp, sort and mail consolidated bills or, if authorized, transmit bills electronically;

  i. Cancel and rebill charges;

  j. Notify the non-billing party of amounts billed, by account, within two business days after rendering bills to customers;

  k. Receive and record customer payments;

  l. Allocate and transmit the non-billing party's share of receipts, by account, to the non-billing party;

  m. Respond to general inquiries and complaints about the bill and its format; refer customers to the non-billing party for inquiries and complaints related to the non-billing party's rates, charges, services, or calculations; and,

  n. Maintain records of billing information, including amounts collected, remaining and transferred, and dates.

2. If the bill ready method is used, each party shall calculate and separately state sales and use taxes applicable to its charges; if the rate ready method is used, the billing party shall calculate and separately state the state sales and use taxes applicable to its charges and the non-billing party's charges.

3. A party that requires a customer's deposit shall administer it.  If a non-billing party applies a customer deposit to an outstanding balance, it shall notify the billing party.

4. Upon receipt of payments, a non-billing party shall notify the billing party.

5. To initiate consolidated billing using the rate ready method, the non-billing party shall provide the billing party with the rates, rate codes, and/or prices (fixed and/or variable) and tax rates necessary to calculate the non-billing party's charges.  The billing party shall specify in the BSA the number of prices for each service class per commodity accepted, deadline for transmission, effective date, and acceptable frequency of changes.[2]

6. The billing party may process special handling requests from customers provided that it obtains agreement from the non-billing party for requests that affect it;

7. The billing party is not required to calculate or provide separate statements to customers regarding gross receipts taxes applicable to a non-billing party's charges.  The non-billing party may calculate and provide information on the gross receipts taxes applicable to its charges in a bill message or, if the bill ready method is used, as a line item on the bill.

8. The non-billing party may offer special billing features, such as budget billing or average payment plans.

---

[1] A distribution utility is not required to calculate or bill for ESCO services that are not directly related to the commodity it delivers.

[2] If a billing party's billing system is capable of providing the service, a billing party shall, upon request, apply a different rate, rate code, and/or price and tax rate to usage during different portions of the billing cycle to service provided after the effective date of the change.  The non-billing party shall request a change in the rate, rate code, and/or price no later than four business days prior to the effective date requested.

E.  Consolidated Billing:  Initiation, Changes or Discontinuance

1.  Initiation

a.  An ESCO that proposes to issue consolidated bills shall establish and provide to a distribution utility written procedures for billing and payment processing that ensure billing accuracy and timeliness, proper distribution of a distribution utility's bill messages and inserts, and proper allocation and transfer of distribution utility funds.

b.  No distribution utility may impose a fee on an ESCO to process its application to offer consolidated billing.

2.  Changes

A request to change a customer's billing option shall be made on or before 15 calendar days prior to the scheduled meter reading date.

3.  Suspension and Discontinuance

a.  A distribution utility may suspend or discontinue an ESCO's right to offer consolidated billing as a billing party or a non-billing party for failure to comply with a BSA. Suspension of the right to offer consolidated billing means that the ESCO is prohibited from offering consolidated billing to new customers.

b.  Upon a determination by a distribution utility to suspend or discontinue an ESCO's right to offer consolidated billing to customers, it shall provide notice on or before 15 calendar days prior to the proposed date for the suspension or discontinuance (cure period) to the ESCO and state the reason for its determination.  Upon failure of the ESCO to correct the deficiency on or before the expiration of the cure period, the distribution utility may require a change to dual billing for the ESCO's customers.

c.  Upon discontinuance of consolidated billing rights, an ESCO may reapply to the distribution utility to offer consolidated billing.  A distribution utility shall expedite consideration of such requests.  Customers may begin receiving consolidated bills again after requirements are satisfied, including submission of transaction requests to establish consolidated billing for customers.

F.  Consolidated Billing:  Customer Requests

1.  A customer may request an ESCO to change its billing option.  The ESCO shall request the bill option change on or before 15 calendar days prior to the scheduled meter reading date. An EDI change request is used to request a change in a customer's bill option.  After receipt of the change request, a distribution utility shall, within one business day, acknowledge receipt of the request and, within two days, provide a response indicating rejection and the reason or acceptance and the effective date.

2.  No distribution utility may impose a charge on a customer or an ESCO for changing a billing option.

3.  When more than one request to change a customer's billing option is transmitted for a billing cycle, a billing party shall accept the last timely request received.

4.  A distribution utility may deny a request to initiate consolidated billing or discontinue consolidated billing for a customer with an amount past due for at least 38 calendar days, unless the past due amount is subject to a DPA and the customer is fulfilling DPA obligations.

G. Consolidated Billing:  Content

1.  A billing party may decide upon the format for its consolidated bill provided that it states a summary of total charges and separately states distribution utility and ESCO charges in sufficient detail to allow a customer to judge their accuracy.  Such separate statements shall appear in clearly separated portions of the bill and identify their source, distribution utility or ESCO.  An ESCO that provides consolidated billing shall state on its consolidated bill the unadjusted distribution utility charges for delivery services provided by a distribution utility, without change.

2.  A consolidated bill shall contain the information listed in Attachment 1, General Information, preferably in a summary section.  The billing party may place the information on the bill in any order or location.

3.  A consolidated bill shall contain the information listed in Attachment 2, Distribution Utility Content, separately stated for each distribution utility.

4.  A consolidated bill shall contain the information listed in Attachment 3, ESCO Content, separately stated for each ESCO.

5.  If the rate ready method is used, the ESCO shall provide to the distribution utility information listed in Attachment 3, ESCO Section Content, to the extent necessary for the distribution utility to calculate and issue bills.  To initiate utility consolidated billing using the rate ready method, an ESCO shall provide the information to the distribution utility on or before 15 calendar days prior to the scheduled meter reading date.  An ESCO may request a price or rate change no later than four business days prior to its effective date.

6.  If a billing party and non-billing party agree to show the non-billing party's logo on the bill, the non-billing party shall provide it in an acceptable electronic format at least thirty days before its initial use.

7.  If the rate ready method is used, a non-billing party is not required to provide information after it is initially submitted, except when a change is made.

8.  When an ESCO issues a consolidated bill and the distribution utility transmits bill ready data, the distribution utility shall transmit to the ESCO at the appropriate time the applicable information listed in Attachment 2, Distribution Utility Content, items d – q, and the customer's name and service address.

9.  When an ESCO issues consolidated bills on behalf of other ESCOs and distribution utilities and the other ESCOs provide information, the non-billing ESCOs shall provide bill ready information listed in Attachment 3, ESCO Content to the billing ESCO.

10. No party shall engage in cramming.

11. A non-billing party may display its bill messages up to 480 characters in length on the bill provided that the billing party raises no reasonable objection to the message.  There is no limit in message length for the billing party.  If the bill ready method is used, the non-billing party shall transmit the text of the messages or agreed upon message codes in the same EDI transaction as the billed charges.  If the rate ready method is used, a non-billing party shall submit a common bill message on or before 15 calendar days before the date used.  Unless a final print date is provided, the billing party shall continue to print the message on bills until

the non-billing party transmits a different message or requests its discontinuance. In emergencies requiring printing of messages on bills, the billing party shall accommodate the needs of the non-billing party, if practicable.

12. The billing party shall, in a timely manner, print on bills or insert into bill envelopes information that a statute, regulation, or Public Service Commission order requires a distribution utility or ESCO to send to its customers. The billing party may not assess charges for inclusion of required inserts that do not exceed one-half ounce. A distribution utility may charge for any excess weight in accordance with its tariff. The party responsible for providing the information shall submit it to the billing party. If the information is provided in a bill insert, the responsible party shall deliver the inserts in preprinted bulk form in a proper size on or before 15 calendar days before the date requested for initiation of distribution to customers to a location designated by the billing party.

13. Due dates and other general payment terms and conditions shall be identical for distribution utility and ESCO charges, unless different terms and conditions would have no impact on them. In the event of a conflict, the distribution utility's payment terms and conditions shall govern.

H. Consolidated Billing: Bill Issuance

1. No late charge may be applied to customers' bills for distribution utility charges, if payment is received by the billing party within the grace period.

2. If the bill ready method is used, the non-billing party shall transmit its charges and other information to the billing party on or before two business days after receipt of valid usage data for a customer account. If the rate ready method is used, the non-billing party shall transmit any revisions in rate and/or price data to the billing party on or before four business days prior to the prescribed date.

3. If the bill ready method is used, a billing party that receives a non-billing party's transaction within the prescribed time and rejects the transaction for cause shall, within one business day after receipt of the transaction, send the non-billing party an EDI reject transaction and state the reason for the rejection. The non-billing party may, if time permits, submit a corrected file containing billing charges for inclusion in the current billing statement.

4. If a non-billing party's transaction is sent to the billing party outside the prescribed time frame, the billing party may reject the transaction and shall notify the non-billing party on or before two business days after its receipt that the charges were not billed. The non-billing party may resubmit its charges the following billing period in accordance with prescribed time limits and without late charges. If the bill ready method is used, the non-billing party may submit a separate bill to the customer and notify the billing party of the action. The parties may also agree that the billing party shall hold the non-billing party's charges for inclusion in the next bill.

5. If a non-billing party's transaction is accepted using the bill ready method, the billing party shall render a bill within two business days after receipt of the transaction. If a rate ready method is used, a billing party shall render a bill in accordance with the distribution utility's regular bill issuance schedule. A bill is rendered upon transfer to the custody of the U.S. Postal Service or other delivery service or, if authorized by a customer, sent electronically to a valid e-mail address or telefax number, displayed on a secure website, or presented directly to the customer or customer's representative.

6. If the billing party has not purchased a non-billing party's accounts receivable, is able to process the non-billing party's transaction, and is unable to render a bill within the prescribed time, the billing party shall notify the non-billing party immediately.  A billing party shall afford customers the same grace period to pay the bill.

7. If the rate ready method is used, the billing party shall provide to the non-billing party within two business days after bill issuance, a statement of the accounts billed, date of issuance and amount of the non-billing party's charges shown on the bill (past due, current, and late payment charges and taxes).

I.  Consolidated Billing:  Cancellations and Rebills

1. If non-billing party errors occur and are not corrected before the bill is issued, a billing party is not required to cancel bills or issue new bills.  The non-billing party shall provide any necessary explanations to the customer and billing party and make any necessary adjustments on the next bill.

2. If billing party errors cause the non-billing party charges to miss the billing window, the billing party shall cancel and reissue the bills within two business days after notification, unless the billing party and non-billing party arrange an alternative bill correction process.[1] A billing party shall afford customers the same grace period to pay bills.

3. If no party errs, the parties may agree to cancel and rebill.

4. To cancel a bill, a billing party shall:

    a.  Cancel usage by billing period;

    b.  Send consumption in the cancel transaction that matches consumption sent in the original transaction;

    c.  Send cancelled usage at the same level of detail as the original usage;

    d.  Using the rate ready method, if a bill is to be cancelled and reissued, recalculate charges and issue revised bills to customers within two business days after receipt of the revised usage data;

    e.  Using the bill ready method, if a bill is to be cancelled and reissued, issue the revised bill to customers within two business days after receipt of the revised usage data.

5. To restate usage for a period, the distribution utility or MDSP shall first cancel usage for that period and then send the full set of restatement transactions.

J.  Consolidated Billing:  Payment Processing and Remittance

1. The parties shall set forth their responsibilities, performance parameters, financial arrangements and other details associated with payment processing and remittance in a BSA, subject to the requirements in this Section.

    a.  In the Pay-as-You-Get-Paid Method, the billing party sends payments to the non-billing party, within two business days of receipt and posting of the funds and processes the payments in accordance with the required priority for application of payments established in this Section.

    b.  A BSA shall establish procedures for processing payments made on any purchased accounts receivable.

---

[1]  Such errors do not include usage-related adjustments necessary when an actual meter reading becomes available to replace an estimated reading required, for example, because a customer denies access to a meter.

2. Payment Processing

   a. The billing party shall notify the non-billing party that payment is received and send payments to the non-billing party, within two business days after receipt and posting, by use of Electronic Funds Transfer (EFT), Automated Clearing House (ACH), or similar means to banks or other entities as agreed upon by the parties.  The notice shall include, in account detail, the payments received from customers, the date payments are posted, the date payments are transferred, and the amounts allocated to the non-billing party's charges.

   b. The billing party may impose late payment charges on unpaid amounts not in dispute for the non-billing party provided the terms of the late payment charges are stated in a tariff or a sales agreement and previously disclosed to the customers.  If the bill ready method is used, each party shall calculate its late payment charges.  If the rate ready method is used, the billing party shall calculate the non-billing party's late payment charges under terms agreed upon by the parties.  If a customer's check is returned for any reason, the billing party may charge the customer's account for the return fee and any reasonable administrative fee.

   c. Upon failure of the billing party to pay the non-billing party its proper share of customer payments within two business days after their receipt and posting or at the time agreed upon when accounts receivable are purchased, the billing party shall pay interest on the unremitted amount.  The billing party shall calculate the interest at the rate of 1.5 percent per month from the date the payment was due to be received by the non-billing party or its bank.[1]  The payment of interest is in addition to, and not in lieu of, the rights and remedies otherwise available to the parties.

3. Collections

The billing party is not responsible for collection of non-billing party funds, unless agreed to in a BSA.

4. Application of payments

   a. The billing party[2] shall allocate customer payments to the following categories of charges on the bill or contained in a notice that are not in dispute in this order of priority of payment: (1) amounts owed to avoid termination, suspension or disconnection of commodity or delivery service; (2) amounts owed under a DPA, including installment payments and current charges; (3) arrears; and (4) current charges not associated with a DPA. The billing party shall pro-rate payments to the charges within each category in proportion to each party's charges in that category. After satisfaction of the charges in a category, assuming available funds, the remainder of the payment shall apply to the next highest category according to the priority of payments and in the same manner as described above until the payment is exhausted.

---

[1] Upon request, the billing party shall provide the non-billing party with a verified copy of the posting log of payments received and transferred to the non-billing party during any calendar month specified by the non-billing party.

[2] Distribution utilities supplying delivery service for both natural gas and electricity to customers receiving consolidated bills shall apply the receipts to the separate services in accordance with their regular procedures.  Where a consolidated bill displays delivery charges for separate gas and electric distribution utilities, the customer's payments shall be first prorated between the utility accounts in accordance with the amount each is due compared with the total amount due both distribution utilities.

b.  The billing party may retain any payment amounts in excess of the amounts due as prepayments for future charges or return the excess amounts to customers.  The billing party shall, in a timely manner, combine any excess payment amounts with the customer's payment on the next bill, and allocate and pro-rate the sum as set forth in Section 9.J.4.a.[1]

c.  When the billing or non-billing party enters into a multi-month payment agreement with a customer or waives any charges, that party shall notify the other party of such action.

d.  The billing party shall hold payments received without account numbers or enough information for the billing party to identify the accounts and attempt to obtain information to identify the payer.  If sufficient information is not obtained to identify the account information prior to the next bill, the billing party shall present the unpaid amount and late charge, if applicable, on the bill.  If the customer contacts the billing party to inquire about the late charge and the lack of payment credit, the billing party shall resolve the matter and reverse the late charges.  The billing party shall notify the non-billing party of the matter and its resolution and then allocate payments as necessary to balance the account.

5.  Multiple Account Payment Processing

Processing of a single customer payment for multiple accounts requires proactive action on the part of the billing party and the non-billing party to apply payments correctly.  The parties shall set forth arrangements for multiple account payment processing in a BSA.

6.  Non-billing Party's Balance

a.  Except as provided in Section 9.J.6 d., when a final bill is issued, the billing party shall maintain a current and past due balance for each account of the non-billing party until payment of the last bill issued for service provided by the non-billing party or 23 days after issuance of such bill, whichever is sooner.  After such time, the account shall be considered "inactive."

b.  Except as provided in Section 9.J.6 d., when a customer changes to a new ESCO, the billing party shall continue to receive and apply a customer's payments for the active account of the prior ESCO.  If the customer does not pay the outstanding balance owed to the prior ESCO on or before 23 days after the final bill containing the prior ESCO's charges is issued, the billing party shall notify the ESCO and report the balance due.

c.  With regard to a new distribution utility/ESCO relationship following a change of ESCOs or a change in a distribution utility, the new billing party shall, upon request of the new non-billing party, bill for the balances that may exist at the time of the change.  The new billing party may include the arrears on current bills or in a separate bill if its billing system is not capable of accepting prior charges.  If a change of providers occurs, a distribution utility is not required to post any arrears of the prior ESCO on consolidated bills issued after the final billing of its charges, unless the arrears become the property of the new ESCO, and it provides documentation of its property right to the distribution utility.

---

[1]  Where the customer elects to make a charitable donation, such as funding a low-income program, satisfaction of the donation shall be made prior to allocation and pro-ration of the customer's excess payment.

    d. Upon ESCO termination of the commodity supply of a residential customer due to failure to pay charges, the billing party shall maintain a current and past due balance for the account of the terminating ESCO for one year from the date of termination by the ESCO. In the event that the terminating ESCO seeks suspension of delivery service within one year of the termination, or the residential customer has a DPA, the billing party shall maintain a current and past due balance for each account of the terminating ESCO until the arrears are paid in full.

7. Customer Disputes: Initiating a Bill Complaint

    a. A customer or authorized representative may initiate a customer complaint regarding some or all of the charges on the customer's bill at any time.

    b. When a complaint relates to the entire bill, to only the billing party's charges or services, or, using the rate ready method, to calculation of the billing or non-billing party's charges, the customer should contact the billing party. The billing party shall resolve the complaint and, if appropriate, place the customer's account in dispute. In the event the inquiry concerns only a non-billing party's bill, charges, services, or calculations, the billing party shall refer the customer to the non-billing party.

8. Customer Complaints: Notification

    a. Upon a determination that a complaint affects the entire bill, the billing party shall notify the non-billing party of the subject and amount in dispute, if known.

    b. The non-billing party shall inform the billing party of disputes related to non-billing party charges that would affect the billing process.

    c. Once such complaints are resolved and the billed amounts are no longer in dispute, the other party shall be notified.

K. Consolidated Billing: Call Centers

A billing party shall provide call centers with toll-free or local telephone access available 24 hours a day and an answering machine or voice mail service during the hours when call center staff is not available. A billing party shall maintain adequate staff to respond to customers' inquiries or refer inquiries to the non-billing party, where appropriate, within two business days.

L. Dual Billing

1. The distribution utility and ESCO, acting as separate billing parties, shall render separate bills directly to the customer or the customer's representative. The customer or its representative shall pay the distribution utility and the ESCO separately.

2. The distribution utility's bill shall conform to the standards set by the Public Service Commission.

3. The distribution utility or MDSP shall transmit usage data to the ESCO at the time the information is available for rendering bills to customers, which may or may not coincide with meter reading cycle dates.

4. The ESCO may decide upon its bill format provided that it states its charges in sufficient detail to allow customers to judge the accuracy of their bills. At a minimum, an ESCO shall provide the following information:

    a. Customer's name and billing address and, if different, service address;

    b. Customer's account number or ID;

    c.   Period or date associated with each product or service billed;

    d.   Name of the entity rendering the bill;

    e.   Address to which payments should be sent or the location where payments may be made;

    f.   Local or toll-free number for billing inquiries; if an ESCO enrolls and communicates with customers electronically, an e-mail address and telephone number with area code;

    g.   Due date for payment and a statement that late payment charges shall apply to payments received after the due date; and

    h.   Amount and date of payments received since the last bill.

5.   Whenever a distribution utility or MDSP cancels consumption for an account, it shall provide a notice of cancellation and restated billing parameters for the  account to an ESCO and a distribution utility, if applicable, and shall:

    a.   Cancel usage by billing period;

    b.   Send consumption in the cancel transaction that matches consumption sent in the original transaction;

    c.   Send cancelled usage at the same level of detail as the original usage; and,

    d.   To restate usage for a period, cancel usage for that period and send the full set of billing parameter restatements.

**Attachment 1**

## General Information

A. Customer name

B. Service address

C. Billing address, if different than service address

D. Billing party account number, if any

E. Start of billing cycle period (prior meter reading date for metered customers)

F. Starting period meter reading (for metered customers)

G. End of billing cycle period (current meter reading date for metered customers)

H. Ending period meter reading (for metered customers)

I. Billing period metered usage, any multiplier necessary to convert usage to billing units and resulting billing units (for metered customers)

J. Billing period demand, if applicable

K. Indicators, if usage is estimated, actual or customer provided

L. Total current charges (total of billing and non-billing party charges, including late charges and taxes)

M. Total prior billed charges (total of billing and non-billing party prior bill charges, including prior late charges and taxes)

N. Total credits since last bill (total of billing and non-billing party credits);

O. Date through which the credits are applied

P. Total current bill (total of billing and non-billing party charges plus prior bill charges less credits)

Q. Billing party name (and billing party logo, if billing party wishes it shown)

R. Billing party address

S. Billing party toll-free or local telephone number, and for a billing party that enrolls and communicates electronically with customers, an e-mail address and telephone number with area code, in lieu of a toll-free or local telephone number

T. Distribution utility toll free-or local telephone number and emergency telephone number

U. Method and location for payments

V. Date of bill

W. Payment due date

X. Billing party messages of any length that apply in general to the bill and services provided by billing and non-billing parties, that are not reasonably objectionable to the parties

CASE 98-M-1343                                                      SECTION 9

**Attachment 2**

**Distribution Utility Content**

A. Distribution utility name, and logo, if the parties agree

B. Distribution utility address, if the distribution utility is not the billing party

C. Distribution utility toll-free or local telephone number for inquiries about the distribution utility portion of the bill, if the distribution utility is not the billing party, and distribution utility emergency number

D. Distribution utility customer account number, if the distribution utility is not the billing party

E. Distribution utility rate classification identifier

F. Distribution utility rates per billing unit, if applicable

G. Distribution utility rates not based on billing units, if applicable, and unbundled, if applicable

H. Distribution utility charge adjustments and adders, separately stated

I. Taxes on distribution utility charges, if separately stated

J. Billing period total distribution utility charges

K. Prior billing period total distribution utility charges, including any prior late charges

L. Credits on prior distribution utility charges

M. Net prior distribution utility balance remaining, unless included in total prior billed charges stated in the General Information Section

N. Late charge for unpaid prior distribution utility balance, unless included in total prior billed charges stated in the General Information Section

O. Total amount due for distribution utility services

P. If a budget bill, applicable billing information and resulting budget bill amount due for distribution utility services

Q. The distribution utility's bill message, if any, up to 480 characters, if the distribution utility is not the billing party

**Attachment 3**

### ESCO Content

A.  ESCO name and logo, if parties agree

B.  ESCO address, if the ESCO is not the billing party

C.  ESCO toll-free or local telephone number for billing inquiries if the ESCO is not the billing party; ESCOs that enroll and communicate electronically with customer may provide an e-mail address and telephone number with area code in lieu of a toll-free or local telephone number; if a rate ready method is used, the billing party shall include a notice directing ESCO customers to call the billing party first to clarify bill calculations

D.  ESCO account number, if the ESCO is not the billing party and has a unique account number

E.  ESCO rate classification, if applicable

F.  ESCO rate per billing unit, if applicable

G.  ESCO rate not based on distribution utility unit, if applicable

H.  ESCO charge adjustments and adders, if any, separately stated

I.  Taxes on ESCO charges, if required to be separately stated

J.  Billing period total ESCO charges

K.  Prior billing period total ESCO charges, including any prior late charges, unless included in total prior billed charges stated in the General Information Section

L.  Credits on prior ESCO charges

M.  Net prior ESCO balance remaining

N.  Total amount due for ESCO services

O.  If a budget bill, applicable billing information and resulting budget bill amount due

P.  The ESCO's bill message, if any, up to 480 characters, if the ESCO is the non-billing party.

## SECTION 10:  MARKETING STANDARDS

A. Applicability

This Section describes the standards that ESCOs and ESCO marketing representatives must follow when marketing to customers in New York.

B. Training of Marketing Representatives

1. ESCOs shall ensure that the training of their marketing representatives includes:

   a. Knowledge of this Section and awareness of the other Sections of the New York Uniform Business Practices;

   b. Knowledge of the ESCO's products and services;

   c. Knowledge of ESCO rates, payment options and the customers' right to cancel, including the applicability of an early termination fee;

   d. Knowledge of the applicable provisions of the Home Energy Fair Practices Act that pertains to residential customers; and,

   e. The ability to provide the customer with a toll-free number from which the customer may obtain information about the ESCO's mechanisms for handling billing questions, disputes, and complaints.

C. Contact with Customers

1. In-Person Contact with Customers[1]

   ESCO marketing representatives who contact customers in person at a location other than the ESCO's place of business for the purpose of selling any product or service offered by the ESCO shall, before making any other statements or representations to the customer:

   a. Introduce him or herself with an opening statement that identifies the ESCO which he or she represents as an Energy Services Company, identifies him or herself as a representative of that specific ESCO; explains that he or she does not represent the distribution utility; and, explains the purpose of the solicitation.

   b. Produce identification, to be visible at all times thereafter, which:

      1. Prominently displays in reasonable size type face the first name and employee identification number of the marketing  representative;

      2. Displays a photograph of the marketing representative and depicts the legitimate trade name and logo of the ESCO they are representing;

      3. Provides the ESCO telephone number for inquires, verification and complaints.

   c. During the sales presentation, the marketing representative must also state that if customer purchases natural gas and/or electricity from the ESCO, that the customer's utility will continue to deliver their energy and will respond to any leaks or emergencies. This requirement may be fulfilled either (a) by an oral statement by the ESCO marketing representative, or (b) written material left by the ESCO marketing representative. Further, ESCOs that are affiliates of distribution utilities should not describe or disclose their relationship to the distribution utility unless such information is specifically requested by the customer.

---

[1]   Including but not limited to marketing encompassed in the definition of door to door sales.

    d.   An ESCO marketing representative must provide each prospective residential customer a business card or similar tangible object with the ESCO marketing representative's first name and employee identification number; ESCO's name, address, and phone number; date and time of visit and website information for inquires, verification and complaints.

    e.   An ESCO marketing representative must provide each prospective residential customer or customer that is marketed to via door to door marketing, with a copy of the ESCO Consumers Bill of Rights, before the ESCO marketing representative makes his or her sales presentation.

    f.   An ESCO marketing representative must provide the customer with written information regarding ESCO products and services immediately upon request which must include the ESCOs name and telephone number for inquires, verification and complaints. Any written materials, including contracts, sales agreements, marketing materials and the ESCO Consumers Bill of Rights, must be provided to the customer in the same language utilized to solicit the customer.

    g.   Where it is apparent that the customer's English language skills are insufficient to allow the customer to understand and respond to the information conveyed by the ESCO marketing representative or where the customer or another third party informs the ESCO marketing representative of this circumstance, the ESCO marketing representative shall either find a representative in the area who is fluent in the customer's language to continue the marketing activity in his/her stead or terminate the in-person contact with the customer. The use of translation services and language identification cards is permitted.

    h.   An ESCO marketing representative must leave the premises of a customer when requested to do so by the customer or the owner/occupant of the premises.

    i.   As stated in Section 5.B.2, for any sale resulting from door-to-door marketing, each enrollment is only valid with an independent third-party verification in conformance with Section 5, Attachment 1. The verification must occur after the marketing agent has left the customer's premises and must be completed before the ESCO may enroll a customer.

    j.   All ESCOs who have ESCO marketing representatives conducting door-to-door marketing must maintain a daily record, by zip code, of the territories in which the ESCO's marketing representatives have conducted door-to-door marketing. The information should be in a form that can be reported to Staff upon request and should be retained by the ESCO for a minimum of six months.

2.   Telephone Contact with Customers

   ESCO marketing representatives who contact customers by telephone for the purpose of selling any product or service offered by the ESCO shall:

    a.   Provide the ESCO marketing representative's first name and, on request, the identification number;

    b.   State the name of the ESCO on whose behalf the call is being made;

    c.   Never represent that the ESCO marketing representative is an employee or representative or acting on behalf of a distribution utility. In addition, the ESCO marketing representative must clearly indicate that taking service from an ESCO will not affect the customer's distribution service and such service will continue to be provided by the customer's distribution utility;

d.  State the purpose of the telephone call;

e.  Where it is apparent that the customer's English language skills are insufficient to allow the customer to understand and respond to the information conveyed by the ESCO representative or where the customer or another third party informs the ESCO marketing representative of this circumstance, the ESCO marketing representative will immediately transfer the customer to a representative who speaks the customer's language, if such a representative is available, or terminate the call; and,

f.  Remove Customers' names from the marketing database upon Customers' request.

g.  When marketing to residential customers the ESCO marketing representative must also:

   1.  Explain that he or she does not represent the distribution utility;

   2.  Explain the purpose of the solicitation;

   3.  Notify each prospective customer of the ESCO Consumer Bill of Rights, where they can find it, and also provide a copy of the ESCO Consumer Bill of Rights with any written material sent to the customer including the sales agreement; and,

   4.  Provide any written materials, including contracts, sales agreements, marketing materials and the ESCO Consumers Bill of Rights, must be provided to the customer in the same language utilized to solicit the customer.

h.  As stated in Section 5.B.2, for any sale resulting from telephonic marketing, each enrollment is only valid with an independent third-party verification in conformance with Section 5, Attachment 1.  The verification must be completed before the ESCO may enroll a customer.

3.  Electronic Enrollments

   a.  When marketing to residential customers the ESCO Consumer Bill of Rights should be provided to prospective customers as a non-avoidable screen, which a customer must affirmatively acknowledge to verify they have seen the document, prior to effecting an enrollment.

4.  Conduct

   ESCOs shall:

   a.  Not engage in misleading or deceptive conduct as defined by State or federal law, or by Commission rule, regulation, or Order;

   b.  Not make false or misleading representations including misrepresenting rates or savings offered by the ESCO;

   c.  Provide the customer with written information, upon request, or with a website address at which information can be obtained, if the customer requests such information via the internet;

   d.  Use reasonable efforts to provide accurate and timely information about services and products.  Such information will include information about rates, contract terms, early termination fees and right of cancellation consistent with Section 2 of the UBP and any other relevant Section;

   e.  Ensure that any product or service offerings that are made by an ESCO contain information written in plain language that is designed to be understood by the customer. This shall include providing any written information to the customer in a language in which the ESCO representative has substantive discussions with the customer or in which a contract is negotiated;

    f.   Investigate customer inquiries and complaints concerning marketing practices within five days of receipt of the complaint; and,

    g.   Cooperate with the Department and PSC regarding marketing practices proscribed by the UBP and with local law enforcement in investigations concerning deceptive marketing practices.

5.  Dispute Resolution

ESCOs will maintain an internal process for handling customer complaints and resolving disputes arising from marketing activities and shall respond promptly to complaints forwarded by the Department.